UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ALISA WALTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 3:25-cv-00535-S |
| | ) | |
| LEE ZELDIN, | ) | |
| Administrator, U.S. Environmental | ) | |
| Protection Agency, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS

Robert C. Seldon, Esq.
D.C. Bar No. 245100
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
Phone: (202) 393-8200
Fax: (202) 318-2287

Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Fax: (972) 777-6951
Email: don.uloth@uloth.pro

**Attorneys for Plaintiff**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT................................................................................ 1

ADMINISTRATIVE PROCESSING OF WALTON'S EEO COMPLAINT............................ 4

INVESTIGATION OF WALTON'S EEO COMPLAINT AS AMENDED............................. 5

PROCEEDINGS TO DATE................................................................................. 7

ARGUMENT................................................................................................. 8

    I.    Walton has not alleged retaliation regarding her FY2021 performance evaluation... 9

    II.    Walton has adequately pleaded that her FY 2021 performance evaluation was 9
    discriminatory because she has pleaded harm in that she was denied a performance
    award as a result of the performance evaluation....................................................

    III.    Walton has adequately pleaded that she suffered an adverse action from her 2021 14
    PIP........................................................................................................

        A.  Walton has adequately pleaded discrimination for the 2021 PIP............................. 14

        B.  Walton has adequately pleaded discrimination for the 2021 PIP............................. 18

CONCLUSION............................................................................................... 18

## TABLE OF AUTHORITIES

Arnold v. United Airlines, Inc., 142 F.4th 460 (7th Cir. 2025)............................................ 16

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)............................................................ 8

Bell Atlantic Corp. v. Twombly, 550 U.S. 554 (2007)................................................ 8

Bravo v. Kendall, No. 5:22-CV-1186-JKP, 2025 WL 965927 (W.D. Tex. Mar. 31, 2025).................................................... 12

Stewart v. Miss. Transp. Comm'n, 586 F.3d 321 (5th Cir. 2009)........................................ 14

Davenport v. Edward D. Jones & Co., 891 F.3d 162 (5th Cir. 2018)........................................ 11

Dixon v. Garland, No. 4:23-cv-00019, 2024 WL 150509 (N.D. Tex. Jan. 12, 2024)............... 13

Gaudette v. Angel Heart Hospice, L.L.C., 2025 WL 1419720 (5th Cir. May 16, 2025)........... 8

Giglio v. United States, 405 U.S. 150 (1972)............................................................ 2

Green v. Kijakazi, No. 21-3938, 2024 WL 969703 (W.D. La. March 6, 2024) ...................... 11

Hamilton v. Dallas Cnty., 79 F.4th 494 (5th Cir. 2023) ............................................. *passim*

Harrison v. Brookhaven Sch. Dist., 82 F.4th 427 (5th Cir. 2023) ............................................. *passim*

James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371 (4th Cir. 2004) .................................... 10-11

Land v. Dollar, 330 U.S. 731 (1947) ........................................................................ 8

Lang v. Ill. Dep't of Child & Fam. Servs., 361 F.3d 416 (7th Cir. 2004)................................ 16

Lemonia v. Westlake Mgmt. Servs., No. 22-30630, 2023 WL 6878915 (5th Cir. Oct. 18, 2023)................................................................................................... 14

Muldrow v. City of St. Louis, 601 U.S. 346 (2024)................................................... *passim*

Narayanan v. Midwestern State Univ., 2023 WL 6621676 (5th Cir. Oct. 11, 2023)................ 9

Russell v. Principi, 257 F.3d 815 (D.C. Cir. 2001)..................................................... 10

Stewart v. Miss. Transp. Comm'n, 586 F.3d 321 (5th Cir. 2009)............................................. 14, 15

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)...................................................................... 8

Threat v. City of Cleveland, 6 F.4th 672 (6th Cir. 2021)................................................................ 13

Wright v. Union Pacific R.R. Co., 990 F.3d 428 (5th Cir. 2021)................................................... 8

Yates v. Spring Indep. Sch. Dist., 115 F.4th 414 (5th Cir. 2024)................................................. 15

**STATUTES**

5 U.S.C. § 7512............................................................................................................................ 2

42 U.S.C. § 2000e-2..................................................................................................................... 7

42 U.S.C. § 2000e-3..................................................................................................................... 8

42 U.S.C. § 2000e-16................................................................................................................... 7

42 U.S.C. § 20003-3..................................................................................................................... 7

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ALISA WALTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 3:25-cv-00535-S** |
| | ) | |
| **LEE ZELDIN,** | ) | |
| **Administrator, U.S. Environmental** | ) | |
| **Protection Agency,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS

The Renewed Motion to Dismiss ("Motion"), which the Environmental Protection Agency ("Defendant") filed on July 16, 2025, should be denied. Defendant cannot show that Alisa Walton ("Plaintiff" or "Walton") failed to state a claim.

## PRELIMINARY STATEMENT

Alisa Walton (African American female, prior EEO activity) is a highly regarded Special Agent/Criminal Investigator with the Office of the Inspector General ("OIG"), Office of Investigations ("OI"), of the Environmental Protection Agency ("EPA" or "defendant"). ECF #20:1 ¶¶ 1, 4, 14-25. EPA OIG is headquartered in Washington, D.C., and headed by defendant's Inspector General ("IG"). Id. ¶ 4. Sean Earle (Native American male) is the Deputy Assistant IG of the Office of Investigations ("DAIGI") and oversees all of OI activities including Field activities and Special Agents and their supervisors from his permanent duty station in Washington, D.C. Id. ¶¶ 6, 13. Earle frequently uses OIG investigations against African American Special Agents including Walton, and pressured and used Walton's former supervisors in an effort to fire her. Id.

1

¶¶ 13, 17-19, 40.  Earle learned that Walton named him when she commenced the administrative EEO process in November of 2021, no more than a month after she filed it.  Id. ¶ 87.

Mark Perez (Hispanic male), OIG's Acting Assistant IG for Investigations in the spring of 2022, followed Earle's advice and recommendation and placed Walton under investigation, not long after learning that Walton had filed an EEO complaint against Earle.  ECF #20:1 ¶ 84.  Perez initiated the investigation of Walton within two weeks of learning that Thomas Roelke, Deputy Assistant IG of OIG, dismissed a notice proposing Walton's termination that had removed Walton's important investigative responsibilities, but refused Walton's request for a reassignment. Roelke kept those reasons secret until required to reveal them as part of the investigation of Walton's EEO complaint.  ECF #20:1 ¶¶ 65-84. Roelke found Westfall impermissibly evaluated Walton at a "higher grade than" her current Special Agent GS-13 grade; set unrealistic deadlines for Walton; concluded that Walton was not provided the environment to perform successfully; unacceptably created unclear expectations; and disagreed with the evaluation of Walton's work product because it was overly critical. App at 92-93, 97-98.

Earle is the official in OIG who has been and is keeping the investigation of Walton open since Perez initiated it over a year and half ago.  ECF #20:1 ¶ 86.  Keeping Walton under investigation has profound consequences for her, and are actionable because of those significant consequences. For one, as Perez has stated under oath, it is exposing Walton to criminal prosecution.  Id. ¶ 90.  For another, it is threatening to make Walton useless as a witness in an OIG prosecution because calling her at trial would require disclosing that she is the subject of an OIG investigation under Giglio v. United States, 405 U.S. 150, 152-54 (1972), a matter that is not appealable to the Merit Systems Protection Board regardless of its merits.  ECF #20:1 ¶¶ 88-89; 5 U.S.C. § 7512.

As a result of these actions, Walton never received a FY 2022 performance evaluation, which in combination with the pretextual FY 2021 performance award left her ineligible to be considered  for a transfer elsewhere in OIG for two years; is being excluded from receiving a performance bonus that her supervisor should have given her as he does with Caucasian Special Agents under his supervision; and has been denied a transfer to remove herself from her supervisor's discrimination and retaliation.  ECF #20:1 ¶¶ 64, 74, 83, 90-91, 103.

Walton was also placed on a Performance Improvement Plan ("PIP") as the first step to set up grounds for a proposed for termination.  It was Garret Westfall, her then and current second-line supervisor, who issued the fatally flawed, unrealistic, and disadvantageous proposal to terminate Walton that Roelke dismissed two weeks after she initiated the administrative EEO process in which Walton named Westfall among other officials.  ECF #20:1 ¶¶ 64, 90. Contemporaneously with proposing her removal, Westfall removed Walton as lead Special Agent from a highly significant OIG Investigation without grounds, even though she was performing at Exceeds Successfully level, and despite that her performance was equal to or exceeded the performance of other Special Agents in EPA OIG OI who are male and/or not African American. Id. ¶ 106.  Conducting highly significant investigations is exceptionally important for a Special Agent because of their importance to EPA and the close attention they receive from the IG and AIGI.  Id.  Being lead Special Agent in this type of OIG investigation is a significant factor in job satisfaction and progression of a Special Agent's career.  Id.  Since Walton was removed from this investigation, defendant has failed to assign her to any other highly significant OIG investigation of this kind, or any other type of assignment for her to accomplish of this same stature; failed to assign her to any other position; and failed to provide her a full-year appraisal.  Id. ¶¶ 64, 83, 90,

91, 108. These actions have caused significant damage to Walton's reputation within EPA, including with coworkers and ongoing tensions within her supervisory line. E.g., App. at 20, 126.

**ADMINISTRATIVE PROCESSING OF WALTON'S EEO COMPLAINT**

On November 10, 2021, Walton initiated the informal administrative EEO process by requesting EEO counseling after Westfall issued her an Unacceptable rating of 1.66 out of 5.0 that then provided the basis for Westfall placing a Performance Improvement Plan ("PIP"), the first step that can result in the termination of a career federal employee on performance-based grounds. ECF #20:1 ¶¶ 41-61, 92; App at 5-6.[1] The EEO counselor noted that during counseling, on November 10, 2021, Walton identified both actions as discriminatory. App at 4. On February 15, 2022, because OIG would not engage in mediation, Walton filed her original formal EEO complaint of discrimination, including claims about the PIP and her FY 2021 rating as discriminatory, based on her race and sex, and as retaliatory. ECF #20:1 ¶¶ 61, 63; App. at 17. By way of relief, Walton sought having her FY 2021 rating raised to "Exceeds Fully Successful," receiving the "monetary bonus, time off award, step increase, and any other benefit" she had been denied as a result of that rating; reassignment to a work environment that was not hostile, and an award of compensatory damages and attorneys' fees. App. at 19.

Two weeks after Walton filed her original formal EEO complaint, on March 1, 2022, Westfall issued a Notice proposing to terminate Walton's employment allegedly because she failed the PIP; and as part of the removal process, contemporaneously removed her from a highly

---

[1] As defendant recognizes, documents attached to or incorporated into the Amended Complaint by reference were included in a Report of Investigation during the administrative process, incorporated into the Amended Complaint and/or and are judicially noticeable. As defendant recognizes, they are admissible in connection with defendant's Motion. ECF #21 at 10 n.1.

significant OIG investigation without grounds.  ECF #20:1 ¶ 64; App. at 23, 27-28.  On May 9 and May 10, 2022, Walton requested that her original complaint be amended; identifying both actions as discriminatory and retaliatory and comprising parts of a hostile work environment.  ECF #20:1 ¶ 93; App. at 29, 30.  In Plaintiff's original EEO complaint and in the amendment to her original claims and requests for relief, defendant's failure to close out the investigation and to reassign her are identified in Walton's Amended Complaint as discriminating against Walton on the basis of race, sex, and race plus sex, and as retaliating against her.  ECF #20:1 ¶¶ 97-123; App. at 19, 30.  The Amended Complaint also identifies defendant's failure to close the investigation of Walton, "although it has been completed or easily could have been completed since Perez authorized it to go forward in early May of 2022," and its concomitant failure to issue Walton a current Full Year performance appraisal.  ECF #20:1 ¶¶ 86, 91, 111.[2]

## INVESTIGATION OF WALTON'S EEO COMPLAINT AS AMENDED

The EEO investigation began after EPA rejected Walton's request for mediation.  ECF #20:1 ¶84-87.  The EEO investigator took multiple Affidavits from Earle, Perez, Roelke, and Westfall and specifically identified placing Walton under investigation as among the six issues being investigated as employment-based actions that "subjected" Walton to "discrimination and a hostile work environment" and "retaliation."  App. at 37-39, 49-50, 68.  The investigator took Affidavits from Perez, who admitted initiating the investigation which the Complaint alleges that he did on Earle's advice and recommendation, App. at 34; ECF #20:1 ¶ 84; and Earle, who falsely claimed to have "no knowledge of the facts of the internal investigation," App. at 48-49, despite Memoranda from Westfall incorporated in his Affidavit showing that he did, App. at 70, 72-88.

---

[2]    Defendant failed to dispute that that the failure of the EPA to close out the investigation against Plaintiff is actionable.  ECF #21.

The investigator also took Westfall's Affidavit, in which Westfall stated that Perez initiated the investigation of Walton; that he was "excluded" from the investigation; and that his only involvement was bringing "two matters" to the attention of Perez and Earle. App. at 38, 40-41.

The Affidavits of Earle, Perez, and Westfall contained responses to the separate questions whether "Complainant's **race** [was] a factor when the "internal investigation was initiated; whether "Complaint's **sex** was a factor," whether "Complainant's **prior EEO activity** was a factor," and whether being placed under investigation was "harassment" or, in Westfall's case, **HARASSMENT/HOSTILE WORK ENVIRONMENT**. App. at 37-39, 49-50, 68 (emphasis in originals). Framing the claims alternately was only natural, since Walton's EEO counselor, the Director of defendant's EEO office, and the EEO investigator framed them that way. *E.g.*, App. at 4, 37-39, 48-49, 68, 103.[3]

The EEO investigator also took an Affidavit from Roelke, the official in Washington, D.C., who dismissed the proposal to terminate Walton but did not reassign her. App. at 89-98. In his Affidavit, Roelke explained why he did not sustain the Notice of Proposed Removal, as he found it was unsupported, made up with unrealistic tasks and deadlines, and created a disadvantageous environment where Walton was held to a higher standard than allowed. Id. at 3-6; ECF #20:1 ¶¶ 71-83. For the first time, Roelke disclosed that he did not reassign Walton out from under Westfall's supervision on the false ground that he was unaware Walton was claiming that working under Westfall for several years was subjecting her to a hostile work environment. App. at 91-92, 95; ECF #20:1 ¶¶ 71, 80-83. Walton had no knowledge that Roelke considered and denied her request for reassignment or any reason to know of it, which was the subject of Walton's original

---

[3]    Bold and capital letters appear in originals.

complaint and raised again in her written and oral replies to the Notice proposing her termination. ECF #20:1 ¶¶ 81, 108.

## **PROCEEDINGS TO DATE**

Plaintiff initiated this action on July 31, 2023. ECF #1. Plaintiff's motion for leave to amend was not opposed and the Court granted leave to amend on February 26, 2024. ECF #20; Minute Order of February 26, 2024. The Amended Complaint contains two Counts. Count I identifies eight employment actions that are highly related and alleges that defendant discriminated against plaintiff because of her race, sex, and race plus sex. ECF #20:1 ¶¶ 97-113. Count II alleges that the six of those employment actions that occurred after Walton filed her EEO complaint as retaliatory. ECF #20:1 ¶¶114-123. A number of plaintiff's claims became actionable under Title VII, 42 U.S.C. §§ 2000e-2, 20003-3, only after Muldrow.

These actions and others alleged in Walton's Amended Complaint are all actionable because they subjected her to discrimination because she is African American and an African American female, and to retaliation for engaging in protected EEO activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. ECF #20:1 ¶¶ 92-123. Among other consequences, Walton has been exposed to criminal prosecution.

On March 26, 2024, EPA moved to dismiss the Amended Complaint or, in the alternative, transfer to the Northern District of Texas, ECF #21, which Walton timely opposed, ECF #23. On February 18, 2025, the District Court for the District of Columbia granted EPA's motion in part, dismissing as unexhausted certain of Walton's discrete act discrimination and retaliation claims and, without ruling on the motion to dismiss regarding the other claims, transferring the case to the Northern District of Texas. ECF #27.

## ARGUMENT

The Amended Complaint far surpasses the pleading standards of an employment case. <u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 511 (2002). Its allegations and inferences to be drawn from those allegations, as well as documents that are treated as incorporated by reference, must be taken as true because they are highly detailed and set forth multiple plausible claims of discrimination and retaliation. <u>See, e.g.</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 554, 570 (2007); <u>Land v. Dollar</u>, 330 U.S. 731, 735 n.4 (1947). Walton's claims of discrimination are actionable so long as she plausibly can show that she is African American and/or female, and that because of one of those protected characteristics, she was "discriminate[d] against" in any of the "terms, conditions, or privileges of employment." <u>See, e.g.</u>, <u>Hamilton v. Dallas Cnty.</u>, 79 F.4th 494, 497 (5th Cir. 2023). Walton's claims of retaliation are also actionable because Walton participated in the administrative EEO process, 42 U.S.C. § 2000e-3(a); defendant took one or more actions that are cognizable as retaliatory; and a "causal link exists between the protected activity and the adverse employment action." <u>See, e.g.</u>, <u>Wright v. Union Pacific R.R. Co.</u>, 990 F.3d 428, 433 (5th Cir. 2021).

A Title VII claim is justiciable so long as plaintiff suffered "some harm respecting an identifiable term or condition of employment" as a result of the discriminatory conduct. <u>See, e.g.</u>, <u>Muldrow v. City of St. Louis</u>, 601 U.S. 346, 354-55 (2024). Prior to <u>Muldrow</u>, the Fifth Circuit interpreted term, condition, or privilege of employment to encompass just "ultimate employment decision[s]." <u>Hamilton</u>, 79 F.4th at 500-01. After, it includes any harm that rises to more than a "*de minimis*" amount. <u>Harrison v. Brookhaven Sch. Dist.</u>, 82 F.4th 427, 431 (5th Cir. 2023). The Fifth Circuit has found this to include, among other things, when or how much an employee works, <u>see Hamilton</u>, 79 F.4th at 502, whether the employee receives certain benefits, <u>see Harrison</u>, 82

8

F.4th at 431, and lost income, see, e.g., Narayanan v. Midwestern State Univ., 2023 WL 6621676, at *4 (5th Cir. Oct. 11, 2023). This *de minimis* standard is intended to exclude conduct that amounts to a civility code for the workplace. See, e.g., Harrison, 82 F.4th at 431; see also Gaudette v. Angel Heart Hospice, L.L.C., 2025 WL 1419720, at *4 (5th Cir. May 16, 2025) (failure to protect employee from a demeaning joke not actionable).

EPA misconstrues Walton's Amended Complaint to gravely mischaracterize both of her remaining claims. EPA then misapplies outdated caselaw to wind back time to before Hamilton and Harrison, let alone Muldrow. The court should keep the clock set to 2025 and deny EPA's motion.

### I.      Walton has not alleged retaliation regarding her FY2021 performance evaluation.

EPA moves collectively to dismiss the retaliation claims regarding Walton's FY2021 performance evaluation and her 2021 PIP because both predate her EEO activity. However, EPA misconstrues Walton's complaint. Walton has not alleged that her FY2021 performance evaluation was retaliatory for precisely that reason. See ECF #20-1 ¶¶ 115-123. Therefore, as there is no such claim to dismiss, the court need not rule on this. Walton will address EPA's argument regarding the 2021 PIP below in Section III.B.

### II.     Walton has adequately pleaded that her FY 2021 performance evaluation was discriminatory because she has pleaded harm in that she was denied a performance award as a result of the performance evaluation.

Because she has pleaded "some harm" from her Unacceptable FY 2021 performance evaluation, Walton unquestionably has adequately pleaded a cause of action. As a preliminary manner—and contrary to EPA's framing in its Motion—Walton's claim is not merely that her FY 2021 performance evaluation was discriminatory. Rather, since filing her formal complaint of discrimination with the Agency through to now, Walton has continuously framed this claim as an

unacceptable performance appraisal that resulted in her being "not eligible to receive a bonus or consideration for promotion" as well as rendering her ineligible to apply for other positions. <u>See, e.g.</u>, App. at 21. Walton reiterated this in her Amended Complaint, alleging that

> Walton's pretextually low rating by Westfall for FY 2021 made Walton ineligible to receive a performance bonus for FY 2021 that her supervisor or supervisors would have automatically signed off on if Walton was appraised at the correct level, Exceeds Fully Successful, and was not African American and/or female.

ECF #20:1 ¶ 53. While the evaluation itself may have always been the headline of the claim, the adverse effects of being denied a performance award has always been part of her claim.[4] EPA ignores this, as well as <u>Muldrow</u>, to argue that Walton seeks redress solely for a poor performance evaluation.

Post-<u>Muldrow</u>, there simply is no way that a performance evaluation that led to the denial of bonus and rendered Walton ineligible for a raise or to apply for other jobs would not constitute actionable conduct. Although the Fifth Circuit has not addressed the issue since clarifying the law in <u>Hamilton</u>, most other circuit to have addressed the issue even before <u>Muldrow</u> have held that a poor performance evaluation that directly affected salary or other benefits is actionable under Title VII. <u>See, e.g.</u>, <u>Russell v. Principi</u>, 257 F.3d 815, 819 (D.C. Cir. 2001); <u>James v. Booz-Allen &</u>

---

[4] While the pre-transfer court dismissed the denial of a FY 2021 performance award as a discrete act for failure to exhaust, it did not address whether the FY 2021 performance award could be part of another claim. As noted throughout this section, Walton unquestionably alleged the denial of her FY 2021 performance award within the context of the FY 2021 performance evaluation claim as a direct effect of the evaluation.

This is not merely a semantic difference. As a discrete act, Walton would have needed to prove that she was denied a performance award for discriminatory or retaliatory reasons, which EPA could have argued was done by operation of agency policy based on her performance evaluation. However, as part of the claim regarding the FY 2021 performance evaluation, Walton would need to prove that the evaluation itself was discriminatory, and that as a result of the discrimination *in that evaluation* she was denied a performance award. Walton could therefore succeed on this claim even if EPA could establish that the denial of the performance award itself was not independently discriminatory. Put simply, as raised in the exhausted claim, the award is merely the "some harm" Walton suffered, not an independent claim.

Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004), abrogated on other grounds by Muldrow v. City of St. Louis, 601 U.S. 346 (2024).  Furthermore, the Fifth Circuit held under its older precedents that denial of a bonus would be a "tangible employment action," at least where it was significant. Davenport v. Edward D. Jones & Co., 891 F.3d 162, 170 (5th Cir. 2018) (adopting the reasoning of a case in the District of Columbia Circuit in the context of a performance award worth $800). Taken together, it would be indisputable that under Muldrow, the Fifth Circuit would hold that a poor performance review that directly led to denial of a performance award would be actionable.

But even if Walton assumes that Muldrow does not change anything, even under Hamilton and Harrison she has pleaded more than a *de minimis* amount of harm.  EPA's analysis ignores that harm entirely.  EPA's argument rests on three cases it has found since Hamilton and Harrison—the only three cases citing Hamilton that in any way address the materiality of performance evaluations—that it alleges found that "a performance evaluation does not meet the materiality requirement."  ECF #47 at 11.  However, at most, only one case actually stands for the proposition EPA purports it stands for, and the Fifth Circuit refused to endorse that holding when it reviewed the case on appeal.

For starters, one of EPA's three cases did not hold nearly as broadly as EPA states.  Rather, in Green v. Kijakazi, the court found that under the facts of the case *at summary judgment*, the plaintiff was unable to show materiality.  No. 21-3938, 2024 WL 969703, at *8 (W.D. La. March 6, 2024).  The court read plaintiff's claim as based not so much the grade he received but rather "the commentary" his supervisor placed in each element.  Although the court did not explicitly explain why it thought this to be the basis of his claim, it did note that the allegedly discriminatory evaluation was at the exact same level as the previous year's evaluation, which plaintiff did not challenge.  See id. ("The record reflects that in both his 2019 and 2020 PACS appraisals, Green

11

received a 'Successful Contribution' appraisal, with identical scores in the 'Ratings in Individual Elements' section."). The court refused plaintiff's invitation to "scrutinize the specifics of standard performance reviews," *i.e.*, the allegedly discriminatory comments, and therefore held that they constituted insufficient evidence in that case for plaintiff to succeed. Id. The court made no more broad ruling on the plausibility of a claim based, for example, on a substantially decreased score that denied plaintiff any performance award. And by noting that the scores were unchanged from the previous year, it may even have implied the contrary.

Likewise, another of EPA's cases seemed to feel bound by pre-Hamilton Fifth Circuit caselaw in reaching its decision, but it too does not stand for the point that EPA claims it does. In Bravo v. Kendall, the court acknowledged that it "must be appropriately wary of applying caselaw predating Hamilton that addresses adverse employment actions," but then proceeded to feel bound by older caselaw regardless without explaining why it was still good law. No. 5:22-CV-1186-JKP, 2025 WL 965927, at *31-32. However, this performance review was merely an interim, 90-day "initial feedback" review that was "equivalent to the civil service mid-term performance review" that is not included in plaintiff's official personnel record. Id. at *9. As a result, the court reasonably concluded that "Plaintiff has not shown that her performance review brought about any disadvantageous change to any employment term or condition," and therefore was unable to state a claim in this case. Id. at *32. The case cannot speak to whether a poor end-of-year performance evaluation that has other effects, such as denial of a performance bonus and rendering her ineligible for promotions or to apply for other positions, would state a claim post-Hamilton.

That leaves EPA with one case to support its contention that "courts" continue to categorically hold that poor performance evaluations cannot form the basis an adverse employment action claim. First, that case too is not entirely on point, as it involved an allegation that an

12

"excellent" performance review, as opposed to prior "outstanding" ones, which seemed to be the implication of the court calling it a "uniquely absurd" allegation to claim that such a good performance evaluation could be discriminatory.  See Dixon v. Garland, No. 4:23-cv-00019, 2024 WL 150509 at *5 (N.D. Tex. Jan. 12, 2024).  Yet to the extent that the court could be read as broadly as EPA claims—which Walton respectfully asserts would render that court erroneous under both Muldrow and Hamilton—on appeal, the Fifth Circuit explicitly refused to endorse that holding, instead skipping over the materiality prong of a Title VII claim entirely to address the final prong, whether appellant was treated less favorably than other similarly situated employees outside her protected class.  Dixon v. Garland, No. 24-10215, 2024 WL 4948843, at *2 (5th Cir. Dec. 3, 2024).  The court affirmed based on the fact that because her supposed comparators fell into the same protected category at her, she had no evidence to support that she was treated differently.  Id.  It therefore left unaddressed and unendorsed the lower court's materiality analysis. See id.  There is, in short, no reason or authority to support EPA's contention that the pre-Hamilton categorical bar is still standing.

Rather, Walton has adequately pleaded materiality under the applicable standard.  The *de minimis* standard the Fifth Circuit adopted in Harrison "ensures that any claim under Title VII involved an Article III injury," by-and-large equating it with a threshold standing analysis. Harrison, 82 F.4th at 431 (quoting Threat v. City of Cleveland, 6 F.4th 672, 678 (6th Cir. 2021)). Financial injuries undeniably meet this standard.  See id.  Unlike the plaintiff in Bravo, Walton has pleaded that her year-end performance evaluation had such effects.  In her Amended Complaint, Walton alleged that her Unacceptable performance rating directly resulted in her being "denied a performance bonus for FY 2021," a bonus that her supervisors would have "signed off on if Walton was appraised at the correct level."  ECF #20-1 ¶ 103.  Walton further alleged that this performance

evaluation of 1.66 left her "ineligible to apply for other 1811 [law enforcement] positions with the EPA or within the federal government," as those jobs required higher performance evaluations, as well as ineligible for "promotions, special assignments, details" or even telework.  App. at 117.  In short, the performance evaluation directly affected what job Walton did, where and when she could perform that job, how much money she received for doing her job, and the grade of the job.  <u>Cf.</u> <u>Stewart v. Miss. Transp. Comm'n</u>, 586 F.3d 321, 332 (5th Cir. 2009).  Such harms have always been actionable.

There is nothing "speculative" here, <u>see</u> ECF #47 at 19, no conditional language; rather, Walton plainly pleaded facts that, if true (and which must be assumed as true at this stage), facially meets the post-<u>Hamilton</u> standard.  Accordingly, Defendant's Renewed Motion to Dismiss this claim should be denied.

### III.    Walton has adequately pleaded that she suffered an adverse action from her 2021 PIP.

Walton sufficiently alleged both discrimination and retaliation regarding her 2021 PIP. EPA unduly narrows this claim to just the action of placing Walton on a PIP, and therefore ignores the discriminatory and retaliatory effects that blossomed throughout the 45 days she was under it.

### A.  Walton has adequately pleaded discrimination for the 2021 PIP.

Similarly to the performance evaluation claim, EPA again both ignores <u>Muldrow</u> and unduly narrows Walton's claim to argue that she has not adequately pleaded a *de minimis* amount of harm under <u>Hamilton</u>.

As a preliminary matter, EPA cherry-picks language from one part of <u>Lemonia v. Westlake</u> <u>Mgmt. Servs.</u>, No. 22-30630, 2023 WL 6878915 (5th Cir. Oct. 18, 2023), while ignoring language elsewhere in the decision to argue that <u>Lemonia</u> stands for the proposition that "[t]o be actionable, the PIP must negatively affect the employee's job title, hours grade, salary, or benefits."  ECF #47

at 20.  While the court did substantially say this, see Lemonia, 2023 WL 6878915, at *7 ("[A] PIP does not constitute an adverse employment action unless it affects job title, grade, hours, salary, or causes a diminution in prestige or change in standing among coworkers (internal quotations omitted)), it did so but three paragraphs after listing those categories as part of a non-exhaustive list of adverse employment actions that were potentially actionable under pre-Hamilton standards. Lemonia, 2023 WL 6878915, at *6 ("To determine if an employer's action is materially adverse, the court looks to indicia **such as** whether the action affected job title, grade, hours, salary, or benefits or caused 'a diminution in prestige or change in standing among co-workers.'" (quoting Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 332 (5th Cir. 2009)) (emphasis added)).  This inconsistent language from an unpublished case is not binding.  See Rules of the Fifth Circuit 47.5.4.  And it flies in the face of a subsequent, published decision of the court, which declined to address the issue and noted that it is an open question post-Hamilton whether performance-related plans could be actionable on their own. See Yates v. Spring Indep. Sch. Dist., 115 F.4th 414, 420 (5th Cir. 2024).

Nonetheless, Walton has successfully pleaded compensable adverse effects even under Lemonia's heightened standard.  EPA argues that Walton has failed to allege that her "placement on a performance improvement plan in 2021 negatively affected her job title, hours, grade, salary, or benefits."  ECF #47 at 20 (citing Lemonia v. Westlake Management Servs., Inc., 2023 WL 6878914, at *7 (5th Cir. Oct. 18, 2023)).[5]  This is not so.  To the contrary, Walton has consistently framed this claim as inclusive of its adverse effects, most striking of which was the drastic increase in workload that EPA dumped on her to complete the PIP, requiring her to work nights, weekends,

---

[5] Walton notes that Lemonia speaks only to the requirements for a retaliation claim. Even if it is still binding on a district court post-Muldrow, it would not be binding for a claim of discrimination.

15

and forego administrative leave for the Thanksgiving and Christmas holidays. App. at 132-33. She has likewise continuously framed the PIP as being designed to ensure she failed. See, e.g., App. at 117. Muldrow left no doubt that even the small changes in terms and conditions of employment are actionable so long as the employee has suffered some harm. Since Muldrow, even the court that has arguably been the most skeptical about whether being placed on a PIP would generally be actionable has acknowledged that when a plaintiff is placed on a PIP that has been designed for her to fail, she may allege that the PIP as an actionable harm. See, e.g., Arnold v. United Airlines, Inc., 142 F.4th 460, 476 (7th Cir. 2025) (noting that "[c]ertainly, an 'adverse action' occurs when an employer sets up an employee 'to fail by enforcing department policies against him in an unreasonable manner,'" and that a PIP could be such a policy (quoting Lang v. Ill. Dep't of Child & Fam. Servs., 361 F.3d 416, 420 (7th Cir. 2004))).

That is exactly the situation here. In her affidavit during the EEO investigation, Walton alleged that the PIP included "extreme scrutiny" that had both an "amount of work and deadlines required [that] were impossible to meet." App. at 110. Walton's PIP required her to complete 14 tasks in just 45 days, many of which on their own would have taken weeks to complete, in addition to her regular casework. ECF #20:1 ¶¶ 66-67. For example, Task 5 required that Walton analyze five years' worth of disorganized invoices provided by the subject of an investigation. Id. ¶ 68. This project was so complex and time-consuming that it remained unfinished two and a half months after the end of Walton's PIP. Id. Other tasks that were eventually reassigned to other agents also remained incomplete many months after being reassigned. Id. ¶ 70.

Moreover, as EPA itself admitted on April 22, 2022 when it found the proposal to remove her unsupported, these tasks were designed to be reviewed at near-perfect levels of accuracy and achievement that in effect completely transformed her position to one at a higher grade. Id. ¶¶

16

102, 108.  Roelke based his decision to vitiate the notice proposing Walton's termination because every bit of it was phony, unrealistic, and held Walton to a higher grade standard.  He set out his reasons in a single spaced, point-by-point repudiation of the proposed removal in his EEO Affidavit.  App. at 26-28.  Roelke's highly detailed findings led him to conclude that the tasks assigned to Walton by Westfall and the deadlines for completing them did not give Walton "an opportunity to be successful", id. at 4; that Walton was not "provided the environment to demonstrate acceptable performance," id. at 5; and that the evaluations of Walton's performance "were overly critical," id. at 5.  Roelke's reasons mirrored Walton's written and oral reply to the notice of her proposed removal.  ECF #20:1 ¶¶ 65-70.

Furthermore, when Walton thereafter failed to meet the targets of the impossible targets of the pretextual PIP—as was EPA's intent—Westfall proposed to remove her from her position, and in the interim removed her from a highly significant OIG Investigation into conspiracy and money laundering, thus further changing the terms and conditions of her position.  ECF #20:1 ¶¶ 64, 106.  The PIP and subsequent proposal were in turn used as the basis to place Walton under OIG investigation, an investigation that led to her being denied a FY 2022 performance evaluation, consideration for details, and consideration for transfer to other positions, and which Walton to this day has not been informed its results or whether it has been closed.  Id. ¶¶ 110-11.

Considered in tandem, the workload, deadlines, and standards evidenced that the PIP was not just a run-of-the-mill PIP but rather a concerted effort to set Walton up to fail.  Such a PIP changed the terms and conditions of her employment by rendering her helpless, unable to swim beneath an impossible load of work and equally unobtainable standards and targets.  This plainly would be "some harm" under Muldrow.  Moreover, even under the pre-Muldrow cases EPA relies on, EPA's argument falls apart: The PIP in effect required that she perform at a higher grade in a

17

different job position while increasing her hours to complete impossible assignments, while removing all opportunities for projects that would allow her to advance her career. That is sufficient even under EPA's argument. The Motion should be denied.

**B.  Walton has adequately pleaded discrimination for the 2021 PIP.**

For much the same reasons as discussed in the preceding subsection, Walton has likewise stated a retaliation claim regarding the 2021 PIP. EPA moves to dismiss Walton's retaliation claim for only one reason: Walton was placed on the PIP before she initiated her EEO contact.[6] While EPA is correct that Walton was placed on the PIP mere hours before she initiated EEO contact, the claim is not only the act of placement itself but rather the operation of that PIP, nearly all of which occurred after she initiated EEO contact. The impossible assignments and effective upgrading of her position in evaluating those assignments, each of which Walton alleged in concert with this claim, exclusively happened *after* Walton initiated EEO contact. Each roadblock to induce her failure was erected over the succeeding 45 days, culminating in the preconceived proposal to remove her based on her inability to get around those designedly insurmountable barricades. And Walton alleged that all this was done in retaliation for her filing her informal EEO complaint. ECF #20-1 ¶¶ 104-107, 116. That is plainly sufficient to allege retaliation.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully request that the Court deny defendant's Renewed Motion to Dismiss Complaint.

If the court does grant the Motion, Walton hereby requests leave to amend, as she pleaded her Amended Complaint prior to transfer with the details and specificity required by the District of Columbia Circuit, which does not follow <u>Hamilton</u>. Walton will file said motion simultaneously

---

[6] EPA does not argue that the 2021 PIP could not in and of itself constitute "some harm" in support of a retaliation claim. Therefore, Walton does not address that here.

with this opposition.[7]

Respectfully submitted,

s/ Robert C. Seldon
Robert C. Seldon, Esq.
 D.C. Bar No. 245100

Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
Phone: (202) 393-8200
Fax: (202) 318-2287

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Fax: (972) 777-6951
Email: don.uloth@uloth.pro

Counsel for Plaintiff

---

[7] To preserve the claims for appeal, Walton's proposed Second Amended Complaint includes the allegations and claims already dismissed from the case. Walton understands that unless the court explicitly reinstates those claims, granting leave to amend will not reinstate the dismissed claims.

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of August, 2025, I served a copy of this document by email to:

Andrea Hyatt
Assistant United States Attorney
Burnett Plaza, Suite 1700
801 Cherry Stret, Unit #4
Andrea.Hyatt@usdoj.gov

/s/ Donald E. Uloth
Donald E. Uloth

20