## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ALISA WALTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 3:25-cv-00535-S** |
| | ) | |
| **LEE ZELDIN,** | ) | |
| **Administrator, U.S. Environmental** | ) | |
| **Protection Agency,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Alisa Walton, by and through her undersigned attorneys, respectfully files this Amended Complaint and Demand for Jury Trial against Lee Zeldin, the Administrator of the U.S. Environmental Agency, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (incorporating 42 U.S.C. §§ 2000e-2, 2000e-3).

### PARTIES, JURISDICTION, AND VENUE

1.)      Plaintiff Alisa Walton is an African American female who engaged in the protected administrative EEO complaints process before the events that give rise to this case.  At all relevant times, Walton has been and is still employed as a Special Agent/Criminal Investigator in the Office of Inspector General of the U.S. Environmental Protection Agency in its Office of Investigations. Walton resides in Desoto, Texas.

2.)      Defendant Michael S. Regan is the Administrator of the U.S. Environmental Protection Agency and is sued in his official capacity only.  The Environmental Protection Agency is an agency of the federal government the mission of which includes, among other matters,

1

implementing federal environmental laws by promulgating regulations, enforcing federal environmental laws and regulations, studying the environment in the United States and elsewhere, developing environmental programs and policies, and awarding grants to study and promote healthy and safe environments.

3.)    Jurisdiction of this Court is based upon 28 U.S.C. § 1331; and 42 U.S.C. § 2000e-16 (incorporating 42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-5(c)).  Venue lies in this judicial district pursuant to 42 U.S.C. § 2000e-16 (incorporating 42 U.S.C. § 2000e-5(f)(3)), because plaintiff's duty station is in this district and most of the alleged conduct was committed within this district.

## STATEMENT OF FACTS

### Walton's Background and
### Structure of the EPA Office of Inspector General

4.)    Alisa Walton, an African American female who participated in the protected administrative EEO process, is employed as a GS-13 Special Agent/Criminal Investigator with the United States Environmental Protection Agency ("EPA") Office of Inspector General ("OIG" or "EPA OIG") Office of Investigations ("OI").

5.)    The mission of EPA OIG includes conducting independent investigations, audits, and evaluations to prevent and detect fraud, waste, abuse, mismanagement, and criminal activity in connection with federal environmental laws and regulations administered by EPA and the U.S. Chemical Safety and Hazard Investigation Board.  The subject matter of OIG investigations includes financial fraud, employee misconduct, intrusion into EPA systems and computers, and theft of EPA property and funds.  If a federal law is violated, OIG presents the evidence to the U.S. Attorney's Office, which determines if the subject(s) will be prosecuted.  The sanctions which OIG may seek as a result of its activities are administrative, civil, and criminal in nature.  OI is the component of EPA OIG responsible for investigations that are or potentially are criminal in nature.

6.)     EPA OIG is headquartered in Washington, D.C., as is OI.  EPA's Inspector General ("IG") heads OIG, the Deputy IG oversees its day-to-day activities and performs duties as assigned by the IG, and the Assistant Inspector General for Investigations ("AIGI") and the Deputy AIGI ("DAIGI") head OI.  The work of OIG and OI is carried out in EPA Headquarters and in five different Divisional Offices, twelve different Regional Offices, and a multitude of Field Offices and program offices around the country.  Each OI Regional Office is headed by a Special Agent in Charge ("SAC") with assistance from one or more Assistant SAC's ("ASAC's"). Walton is assigned to the OIG Field Office in Dallas, Texas and has had eight different supervisors as a Special Agent, only two of whom were stationed in Texas when the actions underlying this Complaint arose.  During the height of the COVID-19 pandemic, EPA OIG offices were closed and Special Agents including Walton and her supervisors worked remotely.  Today, OIG Special Agents have fully returned to the office.

### Walton's Career at OIG

7.)     Walton began her career with EPA OIG in 2002.  Walton started as a part-time GS-5 Management Analyst Trainee while she attended the University of Texas and pursued an undergraduate degree in Business.

8.)     Walton made consistent progress at OIG. In 2004, she became a Special Agent trainee, Grade GS-7, and assisted Special Agents with their investigations.  By that time, Walton had completed her undergraduate degree and she was actively pursuing her Master's Degree in Business Administration at the University of Texas A&M Commerce. Walton excelled as a trainee and earned Excellent performance appraisals.

9.)     With the encouragement of her then-supervisor, in 2006, Walton applied for a position as a Special Agent and was selected competitively for the OIG Dallas Field Office.

10.)   In the years leading up to the actions that comprise the subject matter of this Complaint, Walton served as the only Special Agent in the Dallas Field Office for almost a year and a half – from January 2019 to September 2020 – and was the only Special Agent physically present in the Dallas Field Office during the pandemic.  During this time, Walton was the lead Special Agent in eleven major OIG investigations.  In comparison, Special Agents are typically the lead investigator on five cases at any given time.

11.)   Walton actively pursued a specialty in computer forensics as a Special Agent, and focused on a desirable, rare sub-specialty in Seized Computers Evidence Recovery.  In 2010, Walton was selected for a two-year assignment on the Deepwater Horizon Criminal Investigative Team in New Orleans task force. Walton's achievement on the task force was recognized by the Attorney General of the United States.

12.)   Walton is currently the only female African American Special Agent in all of EPA OIG OI.

## Top of Walton's Supervisory Chain

13.)   Sean Earle, a Native American male, is the DAIGI and former acting DAIGI, and supervises Walton's current supervisors, is in Walton's supervisory chain, and has been Walton's second line supervisor in the past.  Earle frequently and often makes angrily discriminatory and derogatory remarks about women and African American Special Agents at the workplace. Earle pressured subordinates who were Walton's first and second-line supervisors and other officials in EPA OIG OI to take disparately harsh actions toward African American Special Agents including Walton and uses investigations against African American Special Agents.   Walton pursued an EEO complaint against an overtly racist Special Agent in the Dallas office who was a close colleague of Earle's, a complaint that the EPA OIG OI had to settled. As DAIGI, Earle supervises

all of EPA OIG OI's Field Operations, including all of SACs and ASACs who took action against Walton. Earle's permanent duty station is EPA OIG OI Headquarters in Washington, D.C. Previously, he kept an office in EPA OIG Field Office in Atlanta Georgia, and frequently works remotely from his home in Tennessee.

### Walton's Supporting Supervisors

14.)  Walton had an impressive track record under her supervisors throughout her career at the EPA with the only exceptions that are the subjects of this suit.  Walton's four former supervisors who were asked gave Affidavits and Declarations in support of Walton in the administrative proceedings that preceded this action all attested to her superior performance and value to their investigative teams.

15.)  Edwin Debiew, an African American male, was Walton's first-line supervisor from 2012 until his retirement in June 2020.  The two had a very strong working relationship.  Debiew's opinion of Walton is that she was an exceptionally capable Special Agent who worked independently, conducted thorough investigations, and produced Reports of Investigations that OIG officials responsible for prosecutorial decisions relied upon.  Debiew was particularly impressed with Walton's investigations that led to financial recoveries from, among others, the State of Arkansas and a Kansas university and successful civil actions against other entities. Debiew was stationed in the OIG Field Office in Dallas, Texas, when he supervised Walton. Debiew had seen a pattern in EPA OIG forcing African Americans out for pretextual reasons.  He would not be willing to terminate Walton on false grounds because both are African American.

16.)  Michael Fiore, a Caucasian male, was the SAC of the EPA OIG Field Office in Chicago, Illinois, and supervised Walton from around June of 2017 through November of 2019 and supervised Walton when he was stationed in Chicago and now resides in New York.  Fiore

was very impressed with Walton's diligence and expertise even before he became her supervisor. Fiore first worked with Walton in 2014, when she was assigned to support him with computer forensic expertise in a major, multi-agency search warrant for an operation in Gulfport, Mississippi. Fiore was so impressed with Walton that when the investigation was continued in Jacksonville, Florida, Fiore arranged for Walton to be assigned to conduct the forensic imaging of targets' electronic devices that provided crucial details and information that led to multiple arrests in the case. Fiore rated Walton "Exceeds Expectations" in the one full year appraisal he gave Walton.

17.) Earle told Fiore that two African American Special Agents under his supervision ought to be fired or demoted. Walton was one of these Special Agents.

18.) Earle pressured Fiore to take the first step in terminating an Asian male Special Agent. Referring to Walton, Earle told Fiore that "he would have fired her already."

19.) When Fiore refused, Earle was infuriated.

20.) Fiore's final rating of Walton was for the 2019 Fiscal Year ("FY") appraisal cycle. Fiore rated Walton at the "Exceeds Expectations" level, the second highest, for the entire year.

21.) Darryll Ahmad, an African American male, was a SAC in the EPA OIG OI Field Office in Chicago, Illinois and supervised Walton between February 2013 and January 2014. Ahmad found Walton to be a highly effective Special Agent who produced very professional Reports of Investigation and was a committed employee and great team player. When Ahmad supervised Walton, he was stationed in Chicago.

22.) Craig Clinton, an African American male, was the SAC of the one of the OI Resource Centers and supervised Walton from 2004 to 2012. It was Clinton who encouraged Walton to apply for a position as Special Agent on his staff and selected Walton when she was rated among

the top-rated candidates.  Clinton mentored Walton and watched as she developed into a Special Agent who worked independently on major investigations and coordinated investigative activities with prosecutors including US Attorneys' Offices and as liaison with EPA stakeholders.  When Clinton supervised Walton, he was stationed in Chicago, Illinois.

<u>**Debiew Resumes Walton's Supervision and Rates Walton Highly**</u>

23.)   After Fiore took a downgrade and a hardship transfer to New York where he now resides, Walton's supervision reverted to Debiew in November of 2019.

24.)   Debiew continued in that role until he retired at the end of June of 2020.  Before leaving OIG, Debiew gave Walton an appraisal for the first nine months of FY 2020.  Debiew gave Walton numerical ratings of 5, the Outstanding level, in two of the Critical Elements of her Performance Plan.  He gave Walton numerical ratings of 4, the Exceeds Fully Successful level, in the remaining four elements.

25.)   Debiew's overall rating of Walton for FY 2020 was 4.33, which was at the Exceeds Successful level and just a fraction of a point below Outstanding.  The rating was accurate and correct.

## **Walton's Lowered Ratings for FY 2020 and FY 2021**

26.)   Garrett Westfall (Caucasian male) was hired in mid-July of 2020 as ASAC of the Dallas Field Office and became Walton's first-line supervisor.  Westfall's first-line supervisor was Dan Hawthorne, SAC of the OI Field Office in Denver, Colorado. (Hawthorne has since retired in Denver).

27.)   Upon Hawthorne's retirement in April of 2021, Earle became Westfall's first-line supervisor.  Well before then, Earle's animus toward African American and female Special Agents was common knowledge in OI and therefore, Westfall had reason to know about it through Hawthorne and from working with Earle, who was his second-line supervisor.

28.)   Westfall and Hawthorne improperly took it upon themselves to rate Walton for the whole FY 2020.  Westfall and Hawthorne were not permitted to serve in that role because they had not supervised Walton for at least 90 days during that rating cycle.

29.)   Westfall and Hawthorne completely ignored Walton's rating by Debiew and made no attempt to contact Debiew to learn why he had rated Walton Exceeds Fully Successful.

30.)   Westfall and Hawthorne gave Walton the lowest possible score for a Fully Successful for FY 2020.

31.)   Walton spoke with Hawthorne for an explanation of the rating and how it could have been so much lower than Debiew's rating.  Hawthorne responded that Walton's Performance tailed off after Debiew left.

32.)   Hawthorne's response was a pretext. There was no decline in Walton's performance after Debiew's departure.

33.)   Just days before Debiew issued his rating, Walton contracted COVID and became very ill.  In addition to the common symptoms of COVID, Walton also lost her sense of smell and

had debilitating headaches.  From the end of June 2020 when Debiew retired until the end of the FY 2020 rating cycle on September 30, 2020, Walton was on approved leave for 89.5 hours. During that time, Walton was also the only Special Agent in the Dallas Field Office.

34.)   Westfall and Hawthorne both knew that Walton had contracted a severe case of COVID and that it was substantially limiting her work after Debiew left.

35.)   Walton's pretextually low rating by Westfall and Hawthorne made Walton ineligible to receive a performance bonus for FY 2020 that she would have received if she had been rated accurately at the Exceeds Fully Successful level as Debiew had done and Fiore had done before Debiew.

36.)   In FY 2021, Walton's major investigative work included nine cases leading to one conviction, and one citizen suspension and debarment from receiving federal funds. Walton continued her superior performance in all other Critical Elements in her Performance Plan.

37.)   Walton's performance for FY 2021 was at the Exceeds Fully Successful level and she was entitled to a rating at that level, just as Debiew and Fiore had been rating Walton since FY 2019. Walton's performance was equal to or exceeded the performance of Special Agents who are male and/or are not African American who were rated at an above Fully Successful.

38.)   Hawthorne retired in or around April of 2021, at which point Earle, still serving as acting DAIGI assigned to the Atlanta Field Office  working remotely from Tennessee, also took over as acting SAC of the Dallas Field Office.

39.)   At that point, Earle became Walton's second-line supervisor and Westfall fell directly under Earle's supervision.

40.)   Although Westfall's interest in becoming SAC in Dallas upon Hawthrone's retirement was keen, he was beholden to Earle's support for his promotion.  Earle could have

selected Westfall to serve as acting SAC when Hawthorne retired but did not. Instead, Earle took over as acting SAC for four months and made Westfall wait for a promotion indefinitely. Eventually, in August of 2021, Earle gave Westfall his support. During that four-month period, Westfall learned that Earle was going to be directing Westfall on every aspect of managing the Special Agents in his office and told the Special Agents that they would have to rely on him to protect them from Westfall, but he never protected Walton.

41.)  On October 12, 2021, Westfall gave Walton her FY 2021 appraisal.

42.)  Westfall improperly rated Walton against the performance criteria for a Senior Special Agent, which was a full grade higher in OI than the Special Agent position Walton held.

43.)  Westfall gave Walton a pretextually low Unacceptable rating, in contrast to her final two ratings under Debiew and Fiore that were at the Exceeds Fully Successful level. Westfall gave Walton an overall numerical overall score of 1.66, including scores of zero in two Critical Elements, Communication (No. 2) and Results Orientation (No. 30). Under Debiew and Fiore, Walton's most recent ratings had been Outstanding or Exceeds Fully Successful on those two elements.

44.)  The overall ratings that Debiew and Fiore gave Walton and their ratings of Walton in those two Critical Elements were correct and accurate. In addition, unlike Westfall and Hawthorne, Debiew and Fiore properly rated Walton against performance standards for the position she held as a Senior Agent.

45.)  Even the rating Westfall issued for FY 2021, the appraisal specifically recognized Walton for the large number of excellent briefings she regularly gave to EPA stakeholders; Assistant United States Attorneys assigned to her cases; and senior OIG management, including the Inspector General, Deputy Inspector General, the DAIGI, Earle, Westfall, and other senior OIG

management.  It also recognized that the DAIGI reached out to tell Walton that her briefing made OIG OI proud.

46.)   The next day, on October 13, 2021, Walton conferred with Westfall and her new ASAC Staci Gurin, whose permanent position was as ASAC in Kansas City, Kansas, to discuss her FY 2021 appraisal and question Westfall about it. (Gurin had not participated in Walton's rating because she had not been Walton's supervisor for 90 days).

47.)   Westfall's responses to Walton's questions about the appraisal were pretextual.  For example, Westfall responded to Walton's questions about her rating for Critical Element No. 2, Communication, by falsely stating that many of Walton's reports were handed in inaccurately or late.   In fact, Westfall knew that because of limitations in OI's upgraded electronic case management system, analytics involving performance measures for communication were unquantifiable and were not to be used for performance appraisals.  Further, a large portion of the information Walton used to fill out her investigative reports was derived from approved reports submitted by former Special Agents whose cases had been transferred to Walton upon their departures.

48.)   Westfall also falsely stated that Walton failed to communicate with him on a regular basis.   In truth, Westfall canceled the regular meetings that he scheduled with Walton once Hawthorne retired halfway through the performance cycle; held only one of the bi-weekly meetings with Walton required by Earle between the time Hawthorne retired and Earle promoted him to SAC; and canceled the remaining meetings once he became SAC.

49.)   Westfall also responded falsely to Walton's questions about her rating for Critical Element No. 3, Results Orientation, the other element Westfall rated Walton Unacceptable, allegedly because Walton did not update her cases in the OI Electronic Case Management System

("ECMS") updated.

50.)  Overall, Westfall singled Walton out by falsely claiming she did not properly document chain of custody forms, when in fact this occurred routinely in OI because it offered no guidance about a standard practice to follow. Casework and evidence was worked on and transferred between Special Agents in different offices and geographical locations.  In a particular incident, another Special Agent in the Dallas Field Office failed to keep track of a laptop that had been placed in evidence.  The laptop had been shipped to Headquarters and received, yet the Specials Agents who were responsible for logging this transaction failed to do so properly in the casefile, and blamed Walton for an issue that numerous Special Agents were all responsible for.

51.)  Westfall also falsely criticized Walton for an assignment he assigned to Walton to prepare memoranda about evidence that was not properly documented in closed cases.  Those cases were the responsibility of other agents who had retired.

52.)  Westfall also falsely stated that Walton had incorrectly documented some dates in several investigative memoranda.  In fact, Walton had followed procedures in place before Westfall became SAC in Dallas that Westfall had never changed.

53.)  Walton's pretextually low rating by Westfall for FY 2021 made Walton ineligible to receive a performance bonus for FY 2021 that her supervisor or supervisors would have automatically signed off on if Walton was appraised at the correct level, Exceeds Fully Successful, and was not African American and/or female as Debiew and Fiore had done.

54.)  Westfall prevented Walton from applying and qualifying for another position as a Special Agent by giving her an Unacceptable rating in FY 2021.  An application for a position as a Special Agent must be accompanied by the applicant's most recent Full Year performance appraisal, and nearly all positions require at a minimum a "Fully Successful" performance

evaluation for the most recent fiscal year to meet the minimum eligibility requirements. When Walton applied for another Special Agent position, she could only submit the second half, six-month appraisal for FY 2022 given to Walton by her supervisors that continued to be at a pretextually low level below the Exceeds Fully Successful level. The hiring manager for the position told Walton that she could not even be considered for the position. But for Westfall's pretextually low rating, Walton would have been eligible to apply and be selected for another Special Agent position even in OI outside of the Dallas Field Office, which routinely came open. This rating also rendered Walton ineligible for any internal promotion or career ladder advancements, and effectively prevented her from receiving high-level assignments. Walton remained ineligible for two years until she received her FY 2023 performance evaluation.

### Westfall Places Walton On A PIP

55.)  On November 10, 2021, Westfall placed Walton on a Performance Improvement Plan ("PIP").   A PIP is designed to give an employee notice that his or her performance is not at the Minimally Successful level in one or more of the Critical Elements in his or her Performance Plan provide them with specific examples of deficient performance, specific assignments, and clear directions how to succeed and schedule regular in-person mentoring.  The aim of a PIP is improving an employee's performance, and part of accomplishing that goal is giving the employee clear notice that he or she may be reassigned, demoted, or removed if their performance does not rise at least to the Minimally Successful level in a reasonable amount of time.

56.)  The PIP Westfall issued advised Walton that it was because of the Unacceptable ratings Westfall had given Walton several weeks earlier in her FY 2021 appraisal in Critical Element No. 2, Communication, and Critical Element No. 3, Results Orientation.  In other words, the PIP was issued for the identical false and pretextual reasons Westfall used in issuing Walton's

FY 2021 Unacceptable rating described above in paragraphs 36 through 54. Walton was placed under the PIP without grounds, despite performing at the Exceeds Successfully level, and despite the fact that her performance was equal to or exceeded the performance of Special Agents in EPA OIG OI who are male and/or are not African American who were not placed on PIPs. As detailed below in paragraphs 68 through 81, Westfall issued the PIP to set the basis for Walton's removal, as the PIP was designed to be impossible for any employee to successfully complete.

57.) Westfall took it upon himself to issue the PIP allegedly because Gurin had only begun as Walton's first line supervisor. That was false. Gurin began as Walton's first-line supervisor on September 12, 2021.

58.) Westfall's PIP also stated that he would administer it, monitor Walton's performance, and determine whether action should be taken toward Walton at the end of the PIP in order to provide continuity of supervision. For the same reason as stated in paragraph 57, above, that was false. Gurin had enough experience as Walton's first line supervisor to issue the PIP, and to make the determination about the future of Walton's career. Westfall not only issued the PIP, he reserved the right for himself to decide whether Walton passed. By issuing the PIP, Westfall ensured that a copy of the PIP would be placed in Walton's electronic Official Personnel File.

59.) The PIP was unwarranted as was the FY 2021 Year End Appraisal. By way of example, under Critical Element No. 2, Communication, Walton conducted 13 fraud awareness briefings, 11 of them independently. Walton was only required to conduct 8. Regularly, Walton briefed Assistant United States Attorneys assigned to her cases; senior OIG management, including the Inspector General, Deputy Inspector General, the DAIGI, Earle, Westfall, and other senior OIG management. The DAIGI reached out to Walton to inform Walton that her briefings were a credit to OIG. As demonstrated in paragraphs 36 through 54 above, the criticism of Walton

about allegedly not producing timely, acceptable investigative products was measured inaccurately; her alleged errors were actually made by other agents whose cases had been transferred to Walton; her alleged untimeliness was measured incorrectly; and Walton had followed procedures that were in place before Westfall arrived at OIG that Westfall had not replaced.

60.)   With regard to Critical Element No. 3, Results Orientation, the FY 2021 appraisal specifically recognized Walton's productivity, and that she properly updated investigative reports and uploaded information into the OIG case management system.  As shown earlier, in paragraphs 36 through 54, Walton's productivity and timeliness were both exceptional and in accordance with OIG policies in place before Westfall arrived at OIG. Westfall never created or replaced those OIG policies. Walton communicated frequently with Westfall and it was Westfall who curtailed further communication with Walton.

61.)   In order to attempt to meet the requirements of the PIP, Walton worked far beyond her regular duty hours.  She worked nights and weekends, including Christmas Eve, to produce the memoranda and reports required by the PIP.  She also made the decision to forgo the administrative leave, given by Inspector General Sean O'Donnell, for both the Thanksgiving and Christmas holidays, in order to attempt to complete each of the 14 tasks she was assigned under the PIP.  These 14 tasks were in addition to her regular caseload and collateral duties, which Walton remained responsible for throughout the PIP.

62.)   Starting when she was placed on the PIP, Walton was closely monitored, reducing the autonomy that an 1811 special agent normally operates with, which in turn increased the pressures of the job.  The PIP also created tensions between Walton and her supervisors, including Westfall and Gurin, as well as between Walton and her co-workers.  Walton progressively saw

other agents assigned to assist her on her projects, which Walton later realized was to prepare the projects for reassignment exclusively to those other agents once Walton failed the pretextual PIP. Westfall and Gurin also stopped assigning her to projects that she would ordinarily work alongside other agents, and she was no longer requested to assist on other projects, investigations, or search warrants—all of which she had routinely been requested to assist with in the past. As a result, Walton began hearing rumors from both other agents both within and outside EPA, as well as various other federal employees, about Walton being unreliable and unable to perform as a special agent.

### Walton Initiates the EEO Complaints Process

63.)  Walton initiated the EEO complaints process on November 10, 2021, over the PIP Westfall issued on November 10, 2021; the FY 2021 performance appraisal Westfall gave her; and the ongoing harassment to which she had been subjected since Debiew left the agency.

64.)  The PIP had an end date of December 24, 2021. By that time, Walton had fully demonstrated performance in those two Critical Elements far above the Minimally Successful level.

65.)  Walton filed her formal EEO complaint on February 15, 2022, which is incorporated into this Complaint by reference, and scrupulously fulfilled all of her obligations during the EEO process.

### Westfall Issues Walton A Notice of Proposed Removal

66.)  Two weeks after Walton filed her formal EEO Complaint, on March 1, 2022, Westfall issued Walton a Notice of Proposed Removal and contemporaneously removed her as lead Special Agent from a highly significant OIG investigation, *i.e.*, an investigation receiving close attention from the IG or AIGI due to its particular importance, the seriousness of the offenses

16

being investigated, the likelihood of significant monetary penalties, and likely interest by the Department of Justice and outside of EPA OIG. Being lead Special Agent in highly significant OIG investigations is a significant factor in job satisfaction and progression of a Special Agent's career. Walton received this Notice of Proposed Removal and was removed from the foregoing investigation without grounds, despite performing at the Exceeds Successfully level, and despite the fact that her performance was equal to or exceeded the performance of Special Agents in EPA OIG OI who are male and/or are not African American who did not receive a Notice of Proposed Removal.

67.)    Walton submitted her Reply to the Notice of Proposed Removal to Thomas Roelke, DAIGI at his assigned placed of duty in Washington, D.C. Walton also gave an oral reply and submitted a detailed written response to the Notice of the Proposed Removal that demonstrated the many errors, exaggerations, and fictions used as the basis for the proposal to remove Walton. These pretexts were explained in great detail in the written Reply sent by Walton's counsel to Roelke on March 17, 2022. The full account is contained in that Reply, which is incorporated into this Amended Complaint by reference. A number of the more important ones, but by no means all, are identified in the following paragraphs.

68.)    For one, Walton was expected to conclude 14 "tasks" within the 45-day PIP period. That number would have been insurmountable for any Special Agent regardless of their abilities, and made even more difficult because the PIP period extended over the Thanksgiving holiday up until Christmas and unfortunately coincided with the death of one of Walton's aunts. The unreasonable volume of Walton's assignments left no time for Walton to edit and revise her written product.

69.)    Westfall himself proved that the number of the "tasks" he assigned Walton to

complete in 45 days was excessive and unreasonable. Westfall had to remove Tasks 6, 9, 11, and 12 due to time constraints and to instruct Walton to disregard Task 3 because the supporting evidence was not received in time.

70.) The unreasonableness of the "tasks" Westfall assigned Walton is easily shown by Task 5, by which Westfall directed Walton to analyze five years' worth of disorganized invoices provided by the subject of the investigation. Neither Walton nor any other Special Agent could begin to get through the documents in a week, never mind write a flawless Memorandum of Activity, complete another, and perform her regular case work and collateral duties during that timeframe. Indeed, Task 5 was not complete even by the time of Walton's Reply two and a half months after the PIP concluded. Yet Westfall only gave Walton one week to do it.

71.) Westfall picked apart minute details of Walton's Memoranda of Activity with meaningless criticisms, up to and including disparaging her use of italics in one. Westfall repeatedly criticized Walton for his own idiosyncratic stylistic reasons, including formatting; and using discrepancies with dates and attachments in case files that were caused by changes in the electronic case management system and office policy.

72.) Westfall also contradicted instructions given to Walton by Gurin, even though Gurin was her immediate supervisor; criticized Walton for including an evidence date that was provided by a Special Agent from another federal agency in an investigative report that Gurin had approved; not completing an analysis of raw tax data that was inaccurately described as tax returns needing no more than quick review; including alleged discrepancies in underlying documents that Walton did not create or have access to; a review date that Westfall had not been clear about; relying on OIG-wide discrepancies in policies and procedures for preparing investigative reports; faulting Walton for not completing assignments that the Special Agent to whom Walton's work was

reassigned had not even completed months after the PIP period ended; baselessly accused Walton of falsifying computer screenshots that in fact were real screenshots taken by a Special Agent in EPA's Criminal Investigation Division; not completing an inventory of evidence to be disposed of from a case that was closed years earlier and was still not ready for disposal; and for errors made by other Special Agents that Westfall falsely attributed to Walton.

73.)   Walton's written Reply to Roelke also contained the affirmative defense that she had been the target of harassment and a hostile work environment orchestrated by Earle and offered Declarations from Debiew, Fiore, Clinton, and Ahmad as discussed earlier in paragraphs 14 through 22 to confirm it as well as the highly unusual circumstances surrounding Westfall's PIP and the FY 2020 appraisal by Westfall and Hawthorne, and FY 2021 appraisal by Westfall.

## Dismissal of the Notice of Proposed Removal

74.)   On April 22, 2022, Roelke issued his Decision on Walton's proposed removal, which is incorporated into this Amended Complaint by reference.  In Roelke's words, after "carefully and objectively" considering "the facts detailed in the Notice of Proposed Removal" and "the supporting documentation, as well as [Walton's] oral and written responses," he was "not sustaining the proposal to remove" Walton from her position.

75.)   That was the extent of the Decision provided by Roelke to Walton.

76.)   The extent of Roelke's analysis of the PIP and Westfall's assessment of Walton's performance during the PIP period only came to light as a result of the investigation of Walton's EEO complaint.  Roelke's analysis was not available to plaintiff, was not known to plaintiff, and could not have been known to plaintiff in the exercise of due diligence.

77.)   Roelke explained his analysis in the Affidavit he gave to the EEO investigator dated July 7, 2022, which is incorporated into this Amended Complaint by reference. A number of

Roelke's more important findings in his Affidavit, but by no means all, are identified in the following paragraphs. By definition they must also have been the basis of Walton's removal from the highly significant OIG investigation identified in paragraph 66 above.

78.) To begin, Roelke concluded that Westfall was in the wrong for even issuing the PIP; that was Gurin's job. Gurin supervised Walton during the PIP and, without coordination with Westfall, was responsible for mentoring Walton, which "could promote unclear expectations or conflicting guidance as stated during the employee's rebuttal."

79.) Roelke also "disagree[d]" that Walton "was provided the environment to demonstrate acceptable performance."

80.) Roelke concurred in all of the errors in the assignment of "tasks" identified in Walton's written Reply, Westfall's errors in evaluating Walton's performance of those "tasks," Westfall's assumption that Walton could somehow intuit his policies for report preparation, inventorying evidence and entering dates in OI's electronic case management system, and other similar requirements that Westfall had never articulated to Walton.

81.) In addition, Roelke agreed with Walton that Westfall was improperly evaluating Walton against the performance standards for a Senior Special Agent, a more highly graded position than Walton's as has been done by Westfall and Hawthorne since FY 2020.

**<u>Roelke's Decision Not To Reassign Walton</u>**

82.) Walton's Reply specifically raised the issue that she had been subject to a hostile work environment.

83.) Roelke had the option to reassign Walton upon dismissing the Notice of Proposed Removal and claims that he wanted to reassign Walton to a new supervisor. Roelke also claims to have decided against that option because Walton had a new first line supervisor, a decision and

ground that were not known and could not have been known in the exercise of reasonable diligence before Defendant issued the Report of Investigation of Walton's EEO complaint.

84.)  That was a pretext.  Gurin had been Walton's first-line supervisor since  September of 2021. One of the main reasons Roelke did not support the proposal to remove Walton was that Westfall improperly displaced Gurin role in the PIP and proposed removal processes.  Without being reassigned by Roelke, Walton stayed in Westfall's chain of command and her working environment remained unchanged.

85.)  During the EEO investigative process, Roelke claimed to have no knowledge that Walton had been alleging that she was subject to a hostile work environment.  That was a pretext to avoid reassigning Walton.  Walton's written reply to Roelke specifically stated that she had filed an EEO complaint over her FY 2021 rating, the PIP, and the Notice of Proposed removal; alleged that she had been subject to a hostile work environment; and identified Earle, Westfall, and Gurin as management officials responsible for discriminating and/or retaliating against her.  Defendant also did not restore Walton as lead Special Agent from the highly significant OIG Investigation referred to in paragraph 6 above.  Walton had been lead Agent on that investigation for approximately 32 months and had already obtained a confession from one co-conspirator.  Walton was replaced on that investigation by a less accomplished Caucasian male Special Agent who received EPA OIG's Special Agent of the Year in 2023 in great part due to Walton's work on that investigation.

## **Investigation of Walton**

86.)  Mark Perez, a Hispanic male who, at the relevant time was OIG's acting AIGI and stationed in Seattle, Washington and is still stationed there, learned about Walton's EEO complaint on or about March 2, 2022. As DAIGI, Perez is immediate supervisor.  No more than two weeks

after Roelke dismissed Walton's proposed removal, Perez authorized an OIG investigation into alleged misconduct by Walton to go forward, as Perez stated in the Affidavit he gave during the investigation of Walton's EEO Complaint dated September 13, 2022, which is incorporated into this Amended Complaint by reference. Perez initiated the investigation based upon Earle's advice and recommendation.

87.)    The charges against Walton duplicated or were derived from the grounds allegedly supporting Walton's proposed termination.  For that reason, OIG's HR department advised OI not to bring misconduct charges against Walton but to await the outcome of the removal process.  In other words, if Roelke dismissed the specifications in the Notice proposing Walton's removal, which he did, there would be no basis for taking any action against her.  Nonetheless, Perez went forward.  As a result of remaining under investigation, Walton continues to be eliminated from the highly significant OIG investigation described earlier in paragraph 66, and has received no further assignments of highly significant OIG investigations, a first in Walton's OIG career.

### Failure to Close Investigation of Walton

88.)    As DAIGI, Earl has the authority and discretion to decide how many of EPA OIG's OI resources, including investigative staff, are assigned to investigations. Despite the jeopardy in which Walton has been placed as a result of the foregoing investigation, EPA OIG OI has never closed out the investigation into Walton, although it has been completed or easily could have been completed since Perez authorized it to go forward in early May of 2022.

89.)    The official in a position to close this investigation into Walton has been Earle. Walton identified Earle as being a participant in discriminating and retaliating against her in the informal EEO complaint that Walton filed on November 10, 2021.   Earle gained further information about Walton's EEO complaint on or before December 1, 2021, when EPA OIG OI

rejected Walton's request for mediation. Earle gained further knowledge of Walton's EEO complaint beginning no later than May 25, 2022, when he was asked to give and then gave Affidavit testimony in the investigation of Walton's EEO complaint. Earle has been expressing his interest in firing Walton to her supervisors as far back as 2019, when Earle first told Fiore he would have fired Walton.

90.)   As a Special Agent, Walton is required to be available to testify at trial about investigations she conducts including the highly significant OIG investigation identified in paragraph 66. Under the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), an adverse finding against Walton from the investigation Perez commissioned would affect her credibility and have to be disclosed to the U.S. Attorney's Office prosecuting a criminal case based on one of Walton's investigations. In turn, that office would have to make the same disclosure to the defense. So compromised, Walton would be useless a witness and, therefore, she would not be called in any case emanating from an OIG investigation, in particular a highly significant OIG investigation. Further, another investigator could not be called to testify about an investigation conducted by Walton, because any adverse findings resulting from the investigation of Walton would have to be disclosed to the defense under *Brady v. United States,* 397 U.S. 742 (1970).

91.)   Removal of a Special Agent because he or she has <u>Giglio</u> or <u>Brady</u> issues is not appealable to the Merit Systems Protection Board, which means that Walton would have no defense to being terminated if Perez's investigation results in findings that were adverse to Walton, regardless of the fact that Roelke cleared Walton of these very same "offenses."

92.)   Walton has not been assigned any highly significant OIG Investigations on account of her alleged *Giglio* issues as a result of not being restored as lead Special Agent in the investigation referred to above. Failing to assign Walton to highly significant OIG investigations

is damaging to Walton's career progression and leaves Walton exposed to termination, because being lead case agent on those OIG Investigations is required as part of Walton's job duties and essential to her career satisfaction and progression. Keeping the investigation into Walton open, as Earle knows and Perez has stated under oath, carries with it profound consequences outside of the employment arena. Many of the charges are based on the false allegation that Walton inflated and falsified her Law Enforcement Availability Pay ("LEAP pay"). Federal Special Agents are law enforcement officers and, in recognition of the fact that they are on call 24/7, receive up to 25% more than their GS schedule pay for working 25% greater hours than other federal employees are scheduled to work. Once a year, a Special Agent seeking LEAP pay must certify that he or she worked the required number of hours to receive LEAP pay. As Earle knows, an adverse investigative finding would leave Walton open to prosecution under 18 U.S.C. § 1001 for making a false statement to the federal government and for recoupment of the amount of excess LEAP pay she received. Moreover, and despite the fact that the number of hours of LEAP pay Earle falsely accused Walton of obtaining was very small and not worth an investigation, and, might not even warrant a civil or criminal penalty, Walton would lose her job if the investigation reached findings adverse to her.

93.) As a result of being placed and remaining under investigation, Walton has been eliminated from receiving a performance bonus that she would be automatically entitled to. Additionally, since defendant improperly placed Walton under a PIP and issued the Notice of Proposed Removal, it has not issued Walton a Full Year appraisal. Ffailing to do so has and will result and has resulted in Walton's elimination for consideration for a new position as a Special Agent within or outside of EPA OIG OI because candidates' applications must be accompanied by Full Year appraisals from their most recent performance cycles. Walton's performance

appraisal for her most recent performance appraisal cycle is not a full year and even if Walton could apply using her most recent Full Year performance rating, that would be Walton's Unacceptable rating for FY 2021.

### Exhaustion of Administrative Remedies

94.)     Walton timely initiated the informal administrative EEO complaints process concerning employment actions and like and related employment actions that are at issue in this case on November 10, 2021.

95.)     Walton timely filed a formal administrative EEO complaint concerning employment actions and like and related employment actions that are at issue in this case on February 15, 2022.  Walton timely amended her formal administrative EEO complaint to include additional employment actions and like and related employment actions that are at issue in this case on May 9th and May 10th, 2022.

96.)     All of the foregoing employment actions and like and related employment actions were investigated during the EEO complaints process and during the investigation of Walton's administrative complaint, defendant was given notices of all such employment actions, and defendant declined to engage in mediation to resolve them.

97.)     Defendant issued the Final Agency Decision on Walton's formal administrative EEO complaint on May 2, 2023.[1]

98.)     Through the foregoing actions and all others required of her by law and regulation, Walton timely exhausted the administrative remedies available to her to utilize the administrative EEO complaints processes over all of the employment actions and like and related employment

---

[1]     On March 2, 2023, the U.S. Equal Employment Opportunity Commission, where plaintiff had been pursuing her EEO complaint since on or about November 29, 2022, remanded plaintiff's complaint to defendant for a Final Agency Decision.

actions that are at issue in this case, and initiated this action within the time prescribed by 42 U.S.C. § 2000e-16(c).

## COUNT I

### (Race, Sex, and Race Plus Sex Discrimination – Unacceptable Rating/Denial of Performance Bonus FY 2021; Performance Improvement Plan and/or Notice of Proposed Removal from Highly Significant OIG Investigations, Failure to Reassign; Initiation of Investigation; Failure to Close Investigation)

99.)    Plaintiff repeats the allegations contained in paragraphs 1 through 98 above, as though fully set forth here.

100.)   Walton is an African American female.

101.)   At all times relevant, Walton has been employed as a GS-13 Special Agent/Criminal Investigator with EPA OIG OI.

102.)   From FY 2019 forward, Walton's performance has been at the Exceeds Fully Successful and would have been rated at that level but for the fact that Walton is an African American female.

103.)   At no time during her employment has Walton engaged in misconduct.

104.)   On October 12, 2021, defendant issued Walton her performance appraisal for FY 2021 that rated Walton at the Unacceptable level on false and pretextual grounds including, among others, that Walton's performance during FY 2021 was at the Exceeds Fully Successful level; that Walton's performance was improperly rated against rating criteria for a Senior Special Agent GS-14, a different and more highly graded position than Walton's; that Walton's performance during FY 2021 was equal to or better than her performance in FY 2019 that was rated at the Exceeds Fully Successful rating; that Walton's performance during FY 2021 was equal to or better than her performance in FY 2020, the first eight months of which Walton previous supervisor correctly rated at the Exceeds Fully Successful level which Walton's next supervisors without basis ignored

in rating Walton at the Fully Successful level; Walton's investigative reports were all accurate and timely; a large portion of the information in Walton's investigative reports that defendant claims were inaccurate was derived from approved reports submitted by former Special Agents whose cases had been reassigned to Walton; Walton communicated actively and accurately with her supervisors at all times except for the occasions when Walton's supervisors canceled previously scheduled meetings; Walton correctly updated her case files in the OI Electronic Case Management System; Walton was not responsible for documenting evidence in cases that were assigned to other agents; that Walton followed procedures that were in place for documenting dates in investigative memoranda and had not been changed; that Walton conducted 13 fraud awareness briefings, 11 of them independently, when she was only required to conduct 8; that Walton conducted a large number of excellent briefings she regularly gave to EPA stakeholders; Assistant United States Attorneys assigned to her cases; and senior OIG management, including the Inspector General, Deputy Inspector General, and other senior OIG management; and for the foregoing and other reasons, Walton's performance on two Critical Elements in her performance plan, Critical Element No. 2, Communication, and Critical Element No. 3, Results Orientation, were and had been rated previously at the Exceeds Fully Successful standard or above.

105.)   Walton was denied a performance bonus for FY 2021 as a result of the false and pretextually low Unacceptable performance rating that defendant issued to Walton for that year that her supervisor or supervisors would have automatically signed off on if Walton was appraised at the correct level, Exceeds Fully Successful, and was not African American and/or female, as her previous supervisors had done.

106.)   On November 10, 2021, defendant placed Walton on a Performance Improvement Plan ("PIP").

107.)    The PIP was falsely and pretextually based on the same false and pretextual reasons that defendant used to rated Walton's performance in two Critical Elements in her performance plan, Critical Element No. 2, Communication, and Critical Element No. 3, Results Orientation, at the Unacceptable level; improperly issued by plaintiff's first line supervisor; and improperly identified plaintiff's first line supervisor to administer the PIP.

108.)    On March 1, 2022, defendant improperly issued Walton a false and pretextual Notice of Proposed Removal without grounds, despite performing at the Exceeds Successfully level, and despite the fact that her performance was equal to or exceeded the performance of Special Agents in EPA OIG OI who are male and/or are not African American who did not receive a Notice of Proposed Removal.  Contemporaneously, defendant removed Walton from a highly significant OIG Investigation into conspiracy and money laundering due to pretextual issues about Walton's performance and conduct, as well as *Giglio* and *Brady* issues with Walton's continued participation.  Since that time, Walton has not been assigned new highly significant OIG investigations, a marked departure from her career up until then, and Walton has had to reply upon personal referrals to obtain cases, while other agents who were not African American females were assigned such cases.

109.)    The Notice of Proposed Removal was based on many errors, exaggerations, and fictions, the full account of which was explained in great detail in the written Reply of March 17, 2022, submitted by Walton's counsel to defendant.  That account demonstrated, among other matters, that many of the assigned "tasks" given to Walton under the PIP was excessive, unreasonable, and could not have been completed during the 45-day PIP period; that Walton's work product under the PIP was picked apart for meaningless idiosyncratic formatting and stylistic preferences and differences in dates and attachments to investigative reports that were caused by

changes in the OI case management system and office policy; that Walton was given instructions by her first line supervisor to follow during the PIP that Walton was faulted for following in the Notice of Proposed Removal; that Walton had been the target of discrimination and harassment before and during the PIP; and that the individual who improperly selected himself to issue and administer the PIP also improperly selected himself to issue the Notice of Proposed Removal.

110.)   On April 22, 2022, after carefully and objectively considering the Notice of Proposed Removal and its accompanying documentation as well as Walton's oral and written replies, defendant determined that the proposed removal would not be sustained.  The grounds for that decision include, but were not limited to, that the official who had issued the PIP and made the proposal to remove Walton improperly inserted himself into both processes; that Walton was not provided with an environment to demonstrate acceptable performance; that Walton was not provided clear expectations and guidance for her performance; that the errors demonstrated in Walton's written and oral reply to the Notice of Proposed Removal were correct and accurate; and that Walton had been improperly evaluated against the performance standards for a Senior Special Agent, a different and more highly graded position than Walton encumbered.

111.)   The official who decided not to sustain Walton's proposed removal had the authority to reassign Walton and would have done so, but for the false and pretextual ground that since the PIP and Notice of Proposed Removal were issued, Walton was under a new supervisory structure, which she was not.  Defendant has failed to issue Walton a full year appraisal for FY 2022 regardless of the fact that her proposed removal was not sustained, which is eliminating her from consideration in applying for new Special Agent positions in OIG OI and throughout the federal government.

112.)   Defendant placed Walton under investigation for charges of misconduct for false and pretextual reasons including, among others:  that the charges against Walton duplicated or were derived from the alleged grounds for placing her on a PIP, despite advice from OIG's HR department that the investigation should not proceed unless a decision was made to remove Walton; and that the investigation was initiated over allegations that Walton was seeking Law Enforcement Availability Pay for an insignificant number of hours that Walton allegedly did not but had in fact worked.

113.)   Defendant has not closed out the investigation of Walton for false and pretextual reasons including, among others; that the investigation has already remained open for more than a year despite the fact that it concerns a small and finite number well-defined instances of alleged misconduct on Walton's part; as long as the investigation is open and/or until it is resolved in her favor, Walton is in jeopardy of not being able to fulfill essential elements of a Special Agent's position of testifying at trial in prosecutions emanating from her cases and having her investigations provide the basis for criminal prosecutions under *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. United States*, 397 U.S. 742 (1970); and so long as the investigation remains open and not concluded favorably to Walton, she remains in jeopardy of prosecution under 18 U.S.C. § 1001.

114.)   In taking one or more of the foregoing actions, defendant discriminated against plaintiff with respect to terms, conditions, or privileges of her employment and/or subjected plaintiff to adverse employment actions because of her race, her sex, or her race plus her sex and thereby violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2 (incorporated into 42 U.S.C. § 2000e-16).

115.)    Defendant's violation of plaintiff's civil rights caused her to suffer pecuniary loss, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life, and materially injured plaintiff's career.

## COUNT II

### (Retaliation – Proposed Removal, Failure to Reassign, Removal from Highly Significant OIG Investigations, Failure to Reassign, Initiation of Investigation, Failure to Close Investigation Failure to Issue Full Year Performance Appraisal)

116.)    Plaintiff repeats the allegations contained in paragraphs 1 through 115 above, as though fully set forth here.

117.)    Beginning on November 10, 2021, and continuing through the present, plaintiff has been continuously engaged in EEO activity protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3 (incorporated into 42 U.S.C. § 2000e-16(c)), with the initiation and pursuit of the administrative EEO complaints processes in EPA No. 2022-0009-R06, and pursuing her rights and remedies before the U.S. Equal Employment Opportunity Commission.

118.)    On November 10, 2021, defendant improperly placed Walton on a Performance Improvement Plan ("PIP") on false and pretextual grounds as stated in paragraphs 106 through 109 above.

119.)    On March 1, 2022, defendant improperly issued Walton a Notice of Proposed Removal on false and pretextual grounds mimicking the false and pretextual Performance Improvement Plan ("PIP") defendant issued to Walton on November 10, 2021, as stated in paragraphs 106 through 110.  Contemporaneously with the issuance of the Notice of Proposed Removal, defendant removed Walton from a highly significant OIG Investigation into conspiracy and money laundering due to

31

pretextual issues about Walton's performance and conduct, as well as *Giglio* and *Brady* issues with Walton's continued participation.  Since that time, Walton has not been assigned new highly significant OIG investigations, a marked departure from her career up until  then, and Walton has had to reply upon personal referrals to obtain cases, while other agents who were not African American females were assigned such cases.

120.)   On April 22, 2022, although defendant determined that the Notice of Proposed Removal would not be sustained, defendant failed to reassign Walton on false and pretextual grounds as stated in paragraphs 109 through 111.

121.)   After March 2, 2022, defendant moved forward with an investigation of plaintiff on false and pretextual grounds as stated in paragraph 112.  On or about May 2, 2022, defendant placed Walton under investigation for charges of misconduct for false and pretextual reasons including, among others:  that the charges against Walton duplicated or were derived from the alleged grounds for placing her on a PIP and proposing to remove Walton, ; and that the investigation was initiated over allegations that Walton was seeking Law Enforcement Availability Pay for an insignificant number of hours that Walton allegedly did not but had in fact worked. Since being placed under investigation, under the pretext that Walton had *Giglio* and *Brady* issues, Walton has not been assigned highly significant cases like the one identified in paragraph 66 above.

122.)   Defendant has failed to close out its investigation of plaintiff referred to in the preceding paragraphs on false and pretextual grounds as stated in paragraph 113.

123.) Defendant has failed to issue Walton a full year appraisal for FY 2022 regardless of the fact that her proposed removal was not sustained, which is eliminating her from consideration in applying for new Special Agent positions in OIG OI and throughout the federal government.

124.) In taking one or more of the foregoing actions, defendant retaliated against plaintiff with respect to terms, conditions, or privileges of her employment and/or subjected plaintiff to one or more materially adverse actions that would likely dissuade a reasonable worker from making or supporting a charge of discrimination and thereby violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3 (incorporated into 42 U.S.C. §2000e-16).

125.) Defendant's violation of plaintiff's civil rights caused her to suffer pecuniary loss, emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life, and materially injured plaintiff's career.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff Alisa Walton respectfully requests that the Court enter judgment in her favor and award her the following relief.

A.    An Order declaring that defendant violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the unlawful employment practices that are enumerated earlier in this Complaint.

B.    Issuance of a new performance appraisal for plaintiff for FY 2021 and all subsequent appraisals at the Exceeds Fully Successful level or higher.

C.    Awards of performance bonuses lost because of one or more of the unlawful

employment practices that are enumerated in this Complaint.

D.    Reassignment of plaintiff to a position in EPA OIG OI outside of the supervision of the individuals who took one or more of the unlawful employment practices that are enumerated in this Complaint or removal of the foregoing individuals from plaintiff's supervisory chain of command.

E.    Closure of defendant's investigation of Walton in Walton's favor and resumption of assignment of highly significant OIG investigations to plaintiff.

F.    Record correction taking the form of expunging any documents created because of one or more of the unlawful employment practices that are enumerated earlier in this Complaint.

G.    Issuance of a Full Year Performance Appraisal for Current Performance Cycle at Exceeds Fully Successful or above.

H.    Compensatory damages.

I.    An award of the attorneys' fees and costs incurred in the prosecution of this action and in the administrative EEO complaints processes that preceded it.

J.    Such other equitable relief as may be appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

*/s//* Robert C. Seldon, Esq.
Robert C. Seldon, Esq.
 D.C. Bar No. 245100
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
Phone: (202) 393-8200
Fax: (202) 318-2287

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Fax: (972) 777-6951
Email: don.uloth@uloth.pro

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August, 2025, I served a copy of this document by email to:

Andrea Hyatt
Assistant United States Attorney
Burnett Plaza, Suite 1700
801 Cherry Stret, Unit #4
Andrea.Hyatt@usdoj.gov

/s/ Donald E. Uloth
Donald E. Uloth