# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ALISA WALTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-CV-00535-S** |
| | ) | |
| **LEE ZELDIN,** | ) | |
| **Administrator, U.S. Environmental** | ) | |
| **Protection Agency,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION

Page Nos.  | Description

3 – 6      EEO Notice of Accepted Claims, Discrimination Complaint No. 2022-0009-R06

7 – 10     EEO Notice of Amended Claims, Discrimination Complaint No. 2022-0009-R06

11 – 70    EEO Report of Investigation, Investigative Summary, Agency Case No. 2022-0009-R06

71 – 98    First Affidavit of Alisa Walton, 5.22.2022

99 – 115   Second Affidavit of Alisa Walton, 6.13.2022

116 – 174  First Affidavit of Garrett Westfall and accompanying documents, 6.14.2022

175 – 189  Affidavit of Marc A. Perez, 9.13.2022

190 – 200  Affidavit of Sean Earle, 7.25.2022

201 – 237  Second Affidavit of Garrett Westfall and Accompanying documents, 6.15.2022

238 – 245  Affidavit of Thomas Roelke, 7.28.2022

1

Respectfully submitted,


s/ Robert C. Seldon
Robert C. Seldon, Esq., *pro hac vice*
 D.C. Bar No. 245100

Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C. 20004
Phone: (202) 393-8200
Fax: (202) 318-2287


Counsel for Plaintiff


## CERTIFICATE OF SERVICE


I hereby certify that on November 17, 2025, I served a copy of the Appendix to accompany Plaintiff's Motion for Reconsideration upon Assistant United States Attorney Andrea Hyatt, counsel for defendant, through the U.S. Courts' PACER system in accordance with Rule 5(b)(2)(e) of the Federal Rules of Civil Procedure.


*//s//* Robert C. Seldon, Esq.
 Robert C. Seldon, Esq., *pro hac vice*

2

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**WASHINGTON, D.C. 20460**

OFFICE OF
CIVIL RIGHTS

March 23, 2022

<u>**Return Receipt Requested**</u>                    <u>**In Response Refer To**</u>:
**SENT VIA EMAIL**                    Discrimination Complaint Number:
                                  **2022-0009-R06**

Ms. Molly Buie
meb@sba-pc.com

Dear Ms. Buie:

On February 15, 2022, your client filed, Alisa Walton (Complainant), filed the above-referenced discrimination complaint against the U.S. Environmental Protection Agency.

**STATEMENT OF CLAIM**

In Complainant's discrimination complaint, she alleges that she was subjected to discrimination and a hostile work environment based on race (African American), sex (female) and retaliation (prior EEO Activity) when:

1. On November 10, 2021, Complainant learned that she would be placed on a Performance Improvement Plan (PIP);
2. On October 21, 2021, Complainant received a rating of zero on Critical Elements 2 and 3 of her performance appraisal;
3. Complainant's 2020, performance appraisal was lowered without explanation; and,
4. In April 2019, Complainant was placed on a 30-day PIP

**ACCEPTANCE OF CLAIM**

Complainant's claims are accepted for investigation.

Specifically, the Agency will investigate claims 1-4, in support of Complainant's harassment and retaliation claims. A hostile work environment claim is based upon the cumulative effect of individual acts that may not themselves be actionable.[1] Although claims 3 and 4 are accepted as part of Complainant's hostile work environment claim and will be investigated, the acts in claims 3 and 4 occurring prior to September 26, 2021, are not independently actionable.[2] The Equal Employment Opportunity Commission (EEOC)

---

[1] E.g., *Complainant v. Cent. Intelligence Agency*, EEOC Decision No. 0120151921, 2015 EEOPUB LEXIS 2636, *11-13 (October 20, 2015) (an act that is not independently actionable means that a party is not entitled to relief (meaning, for example, no back pay for an untimely demotion, a discrete event, but a demotion could support the harassment claim. EEOC Compliance Manual, Threshold Issues, No. 915.003, at 2-IV.C.b., pages 2-76, 2-77 (July21, 2005)) (emphasis added).
[2] *Id.*

Claims to be Investigated
Page 5 of 8

Regulation 29 Code of Federal Regulations (C.F.R.) § 1614.105(a)(1) require that complaints of discrimination be brought to the attention of an EEO counselor within forty-five (45) days of the date of the matter alleged to be discriminatory. The record at Counselors Report, page 1, shows that Complainant contacted the Office of Civil Rights on November 10, 2021. Complainant did not report the claims occurring prior to September 26, 2021, to an EEO Counselor withing 45 days, therefore these claims are untimely. The Supreme Court in *National Railroad Passenger Corporation vs. Morgan*, and the EEOC in subsequent decisions, have held that discrete discriminatory acts are not actionable if time barred under 29 CFR 1614.105(a)(2), even when they are related to acts alleged in timely-filed charges. However, such untimely discrete acts may be used as background evidence in support of a timely harassment claim. As such, the untimely discrete acts in claims 3 and 4 will not be examined as discrete discriminatory acts and are not independently actionable as disparate treatment claims.[3]  They will, however, be evaluated as part of the overall harassment claim.

This investigation will be assigned to an Equal Employment Opportunity (EEO) Investigator, and will be factually thorough, impartial, and completed within 180 days from the date of the filing of your discrimination complaint or if amended, within the earlier of 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint.

Within these regulatory timeframes, Complainant and the Agency may agree in writing to extend the investigatory period up to an additional ninety (90) days. The EEO Investigator is authorized to contact all parties concerned; gather information and documents relevant to all situations precipitating the complaint; to require the cooperation of all employees; and, to take testimony from Complainant and other witnesses in the form of affidavits or sworn statements.

If you disagree with the manner in which the accepted claims have been identified, please contact the Assistant Director within five (5) calendar days from receipt of this letter. Otherwise, it will be assumed that the Agency has correctly identified Complainant's allegations. If Complainant wishes to amend the complaint, please submit a written statement to the Assistant Director of the Employment Complaints Resolution Staff, who will determine whether the proposed amendment is like or related to the allegations previously accepted for investigation.

The Agency shall acknowledge receipt of the amendment to a complaint in writing and inform you of the date on which the amendment was filed.

---

[3] Discrete acts are clearly defined events that affect an individual's terms, conditions or privileges of employment, such as promotions, detail assignments, performance evaluation, change in work assignments, exclusion from meetings, etc. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 *11 3, 1 14, 117 (June 10, 2002); *See also* EEOC Compliance Manual, No. 915.003, Section 2: Threshold Issues, Paragraph 2-IV (C)(1)(a), http://www.eeoc.gov/policy/docs/threshold.html#2-IV-C-i-b (stating that performance, work assignments, promotions, transfers, leave requests, etc. are discrete acts and that a complainant cannot be entitled to relief for untimely discrete acts themselves). *See Teamsters v. United States*, 431 U.S. 324, 335 n.15(1977) (describing disparate treatment as discrete acts where ·'[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin").

2

Proposed amendments and requests to change accepted allegations should be sent to:

> U.S. Environmental Protection Agency
> Employment Complaints Resolution Staff
> Cynthia Darden, Assistant Director
> Office of Civil Rights
> darden.cynthia@epa.gov

## RIGHTS AND RESPONSIBILITIES

Following the investigation, you will be provided with a copy of the Report of Investigation (ROI). After you receive the ROI, Complainant has the right to request either a hearing on the merits of this discrimination complaint or an immediate Final Agency Decision.

If Complainant decides to request a hearing, upload the request, within thirty (30) days, to the EEOC office:

> Equal Employment Opportunity Commission
> Washington Field Office
> https://publicportal.eeoc.gov

If Complainant requests a hearing, please send a copy of the request via email to the Office of Civil Rights at:

> darden.cynthia@epa.gov
> and
> clark.renee@epa.gov

Complainant also has the right to file a civil action in an appropriate United States District Court. If she chooses to file a civil action, Complainant may do so after 180 days from the date of filing this complaint if an appeal has not been filed and final action has not been taken.

If Complainant decides to file a civil action in a United States District Court, she must name Michael Regan, Administrator, U.S. Environmental Protection Agency as the defendant. Failure to provide Mr. Regan's name or official title may result in dismissal of the case.

If Complainant decides to file a civil action and she does not have or cannot afford the services of an attorney, she may request that the Court appoint an attorney to represent her. Complainant may also request that the Court permit her to file the action without payment of fees, cost, or other security. The granting or denial of the request is within the sole discretion of the Court. Filing a request for an attorney does not extend the time in which Complainant must file a civil action.

If Complainant files a civil action, we request that you mail a copy of the civil complaint on the date of the filing to:

3

U.S. Environmental Protection Agency
Office of General Counsel – Mail Code 2377A
1200 Pennsylvania Avenue, NW
Washington, D.C.  20460-0001

Further, consistent with EEOC's instructions regarding the processing of Federal sector EEO complaints in light of the President's Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, the Agency requests that Complainant submit a copy of the civil complaint on the date of the filing to:

nichols.nathanael@epa.gov.

To avoid possible dismissal of Complainant's entire discrimination complaint for failure to prosecute, you should promptly acknowledge receipt of all emails; provide the Office of Civil Rights with any change of address; cooperate with the EEO Investigator in the conduct of the investigation; and, if a hearing is requested, proceed with the hearing without undue delay. Failure to cooperate may result in dismissal of your discrimination complaint, pursuant to 29 C.F.R. § 1614.107(a)(7).

If you have any questions concerning this matter, please contact Renee Clark at (202) 564-7269 or email at clark.renee@epa.gov.

Sincerely,

*Cynthia R. Darden*

for JuanCarlos. M. Hunt
Director
Office of Civil Rights

4

Claims to be Appx00006
Page 8 of 8



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

WASHINGTON, D.C. 20460

OFFICE OF
CIVIL RIGHTS

May 23, 2022

<u>**Return Receipt Requested**</u>                    <u>**In Response Refer To:**</u>
**VIA EMAIL ONLY**

Discrimination Complaint Number:
**2022-0009-R06**

Ms. Molly Buie
meb@sba-pc.com

Dear Ms. Buie:

On February 15, 2022, Alisa Walton, (Complainant) whom you represent, filed the above-referenced discrimination complaint against the U.S. Environmental Protection Agency ("Agency") which the agency accepted for investigation, claims 1-4, on March 23, 2022.  On May 9, 2022, the agency received your client's request to amend the above-referenced complaint. This letter acknowledges receipt of the amendment request.

STATEMENT OF AMENDED CLAIMS

In the May 9, 2022, amendment request, Complainant alleged that she was subjected to a hostile work environment based on race (African American), sex (female) and retaliation (prior EEO Activity) when:

5.  On March 1, 2022, Complainant was issued a Notice of Proposed Removal for supposedly failing to successfully complete the PIP Complainant was placed on November 10, 2021. Complainant was notified on April 22, 2022, that a decision was made to not substantiate the Removal.

6. On May 2, 2022, Complainant was informed me that an internal investigation was initiated based on allegations of misconduct by Complainant.

ACCEPTANCE OF AMENDED CLAIMS

Complainant's claims 5 and 6 are accepted for investigation as a claim of hostile work environment and will be assigned to an Equal Employment Opportunity (EEO) Investigator.

The EEO Investigator is authorized to contact all parties concerned; to gather information and documents relevant to all situations precipitating the complaint; to require the cooperation of all employees; and to take testimony from you and other witnesses in the form of affidavits or sworn statements.

The accepted claims will be added to the pending complaint and will be assigned to Equal Employment Opportunity (EEO) Investigator, Nadine Jenkins.  The EEO Investigator is authorized to contact all parties concerned; to gather information and documents relevant to all situations precipitating the complaint; to require the cooperation of all employees; and to take testimony from complainant and other witnesses in the form of affidavits or sworn statements.

The investigation will be factually thorough, impartial, and completed within 180 days from the date of filing the discrimination complaint or if amended, within the earlier of 180 days after the last amendment to the complaint or 360 days after the filing of the original complaint. Within these regulatory timeframes, complainant and the Agency may agree in writing to extend the investigatory period of ninety (90) days.

If your client disagrees with the manner in which the accepted claims have been identified, she must contact the Assistant Director within 5 calendar days from receipt of this letter.  Otherwise, it will be assumed that the Agency has correctly identified your client's claims.  If your client wishes to amend her complaint, she must submit a written statement to the Assistant Director in order for the Agency to determine whether the proposed amendments are like or related to the allegations previously accepted for investigation. The Agency shall acknowledge receipt of the amendment to a complaint in writing and inform her of the date on which the amendment was filed.

Proposed amendments and requests to change accepted allegations should be sent to:

> U.S. Environmental Protection Agency
> Employment Complaints Resolution Staff, Assistant Director
> Office of Civil Rights
> darden.cynthia@epa.gov

RIGHTS AND RESPONSIBILITIES

Complainant has the right, after 180 days from the filing of this discrimination complaint, to request a hearing before an EEOC Administrative Judge. Complainant should refer to her Notice of Rights and Responsibilities for information on additional rights, including the right to file a lawsuit in a United States district court after prescribed time periods.

Following the investigation, your client will be provided with a copy of the report of investigation (ROI).  After your client receives the ROI, she has the right to request either a hearing on the merits of her discrimination complaint or an immediate Final Agency Decision.  If your client decides to request a hearing, she must send the request, within 30 days, to the Equal Employment Opportunity Commission (EEOC).

2

Any request for hearing should be sent to:

> Equal Employment Opportunity Commission
> Chicago District Office
> https://publicportal.eeoc.gov

If your client requests a hearing, she must serve a copy of the request to the Office of Civil Rights at:

> U.S. Environmental Protection Agency
> Employment Complaints Resolution Staff
> Cynthia Darden, Assistant Director
> Office of Civil Rights
> darden.cynthia@epa.gov

Your client also has the right to file a civil action in an appropriate United States District Court. If she chooses to file a civil action, she may do so after 180 days from the date of filing this complaint if an appeal has not been filed and final action has not been taken.

If your client decides to file a civil action in a United States District Court, she must name Michael Reagan, Administrator, U.S. Environmental Protection Agency as the defendant. Failure to provide Mr. Reagan's name or official title may result in dismissal of her case.

If your client decides to file a civil action, and if she does not have or cannot afford the services of an attorney, she may request that the Court appoint an attorney to represent her. Complainant may also request that the Court permit her to file the action without payment of fees, cost, or other security. The granting or denial of the request is within the sole discretion of the Court. Filling a request for an attorney does not extend the time in which Complainant must file a civil action.

If a civil action is filed, we request that a copy of the civil complaint be mailed on the date of the filing to:

> U.S. Environmental Protection Agency
> Office of General Counsel – Mail Code 2377A
> 1200 Pennsylvania Avenue, NW
> Washington, D.C.  20460-0001

To avoid possible dismissal of Complainant's discrimination complaint for failure to prosecute, she should promptly acknowledge receipt of all certified mail; provide the Office of Civil Rights with any change of address; cooperate with the EEO Investigator in the conduct of the investigation; and, if a hearing is requested, proceed with the hearing without undue delay. Failure to cooperate may result in dismissal of her discrimination complaint pursuant to

3

29 C.F.R. § 1614.107(a) (7).

  If Complainant has any questions concerning this matter, please contact Renee Clark at 202/564-7269 or clark.renee@epa.gov.

       Sincerely,

       *RClark*

      *for* JuanCarlos Hunt
       Director

cc: **VIA EMAIL ONLY**
  Alisa Walton
  Walton.Alisa@epa.gov

4

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

**INVESTIGATIVE SUMMARY**

| | |
|---|---|
| **ALISA WALTON** ) | |
| ██████████ ) | |
| ) | |
| ) | |
| Complainant, ) | |
| ) | |
| ) | Agency Case No.:  **2022-0009-R06** |
| ) | |
| MICHAEL S. REGAN ) | |
| Administrator ) | |
| U.S. Environmental Protection Agency ) | Date Formal Filed:  February 15, 2022 |
| ) | |
| Agency ) | |

**INVESTIGATIVE REPORT**

This investigative report was prepared by the undersigned and submitted to the Agency on this 25 day of Octobet, 2022.

*Nadine F. Jenkins*
_____
Nadine F. Jenkins
EEO Complaints Investigator
25565 Ramrock Drive
Porter, TX 77365-6326

NOTICE OF RESTRICTED USAGE

Access to, and usage of, this EEO complaint file is **RESTRICTED** by both the Freedom of Information Act and the Privacy Act to: (1) the Complainant (and his or her representative) and (2) Government officials who must have access to the files to discharge their OFFICIAL duties. The file and its contents must be safeguarded. Willful violations of these requirements are subject to criminal penalties (5 U.S.C. 552a(i)).

**ALISA WALTON**                                         **AGENCY NO. 2022-0009-R06**

## INDEX AND CONTENTS

| CONTENTS | PAGE # |
|---|---|
| Index of File | 2 |
| List of Affidavits | 2 – 10 |
| List of Exhibits | 11 |
| Investigative Summary | 12 – 60 |

### AFFIDAVITS:

A.  Alisa Walton                    Special Agent, GS-13
    Complainant                     United States Environmental
    Race (African American)         Protection Agency
    Sex (Female)                    Office of Inspector General/Office of
                                    Investigations
                                    1201 Elm St #500
                                    Dallas, TX 75270

B.  Garrett J. Westfall             Special Agent in Charge, GS-15
    Witness                         United States Environmental
    Race (White)                    Protection Agency
    Sex (Male)                      Office of Inspector General/Office of
                                    Investigations
                                    Western Region Field Office,
                                    1201 Elm St #500
                                    Dallas, TX 75270

C.  Staci Gurin                     Assistant Special Agent in Charge,  GS-14
    Witness                         United States Environmental
    Race (White)                    Protection Agency
    Sex (Female)                    Office of Inspector General/Office of
                                    Investigations (OIG OI)
                                    11201 Renner Boulevard
                                    Lenexa, KS 66219

**ALISA WALTON**                                          **AGENCY NO. 2022-0009-R06**

## AFFIDAVITS:

D.  Sean Earle                    Deputy Assistant Inspector General
    Witness                       for Investigations, GS-15
    Race (American Indian)        United States Environmental
    Sex (Male)                    Protection Agency
                                  Office of Inspector, General Office,
                                  Office of Investigations
                                  61 Forsyth Street
                                  Atlanta GA 30303

E.  Rufus Mabry                   Human Resource Specialist
    Race (Black)                  (Employee Relations), GS-13
    Sex (Male)                    United States Environmental
                                  Protection Agency
                                  Office of Investigation/Western Region
                                  Field Office/Western Division
                                  5 Post Office Square
                                  Boston MA 02109

F.  Thomas Roelke                 Deputy Assistant Inspector General
    Race (White)                  for Investigators, GS-15
    Sex (Male)                    United States Environmental
                                  Protection Agency
                                  HQ Operations Directorate, Office
                                  of Investigations
                                  1200 Pennsylvania Ave. NW
                                  Washington, DC 20460

G.  Christopher Huntington        Supervisory Criminal Investigator,
    Race (Caucasian)              Assistant Special Agent in Charge, GS-14
    Sex (Male)                    United States Environmental
                                  Protection Agency
                                  75 Hawthorne St.
                                  San Francisco, CA 94105

H.  Lori Ruk                      Attorney-Advisor, GS-14
    Race (White)                  United States Environmental
    Sex (Female)                  Protection Agency
                                  Office of Counsel
                                  1200 Pennsylvania Ave., NW
                                  Washington, DC 20460

Investigative Summary
Page 3 of 60

ALISA WALTON                                          AGENCY NO. 2022-0009-R06

**AFFIDAVITS:**

I.    Elizabeth Moreira                 Attorney-Advisor/Associate
      Race (White)                     Counsel, GS-14
      Sex (Female)                  United States Environmental
                                       Protection Agency
                                       Office of Counsel
                                       1301 Constitution Avenue NW.
                                       Washington, DC 20460

J.    Marc A. Perez                   Investigative Counsel, GS-15
      Race (White and of Latino Ethnicity)   United States Environmental
      Sex (Male)                     Protection Agency
                                       Office of Investigations
                                       1200 Sixth Ave., Ste. 155
                                       Seattle, WA 98101

| **Attachment to Affidavit A:** | **Affidavit Page #** |
|---|---|
| Summary of Interview for Complainant dated March 22, 2022 | 29-33 |
| Determination on Allegations of Harassment dated May 3, 2022, From Marc Perez to Complainant and Garrett Westfall | 34 |
| Emails dated November 10, 2021, between Garrett Westfall and Complainant regarding Initiation of Performance Improvement Plan | 35-37 |
| Memorandum dated April 24, 2019, from Michael Fiore to Complainant regarding Opportunity to Demonstrate Acceptable Performance | 38-44 |
| Employee Performance Appraisal and Recognition System Summary Level Rating from Michael Fiore for Complainant regarding October 2018-2019, 2017-2018 | 45-93 |
| Undated Declaration of Craig Clinton | 94-97 |
| Declaration of Darryll Ahmad dated March 14, 2022 | 98-99 |
| Declaration of Michael Fiore dated March 16, 2022 | 100-105 |
| Employee Performance Appraisal and Recognition System Summary Level Rating 2019-2020 | 106-124 |

Investigative Summary
Page 4 of 60

**ALISA WALTON**                                                    **AGENCY NO. 2022-0009-R06**

| **Attachment to Affidavit A:** | **Affidavit Page #** |
|---|---|
| Employee Performance Appraisal and Recognition System Summary Level Rating 2020 | 125-143 |
| Declaration of Edwin Debiew dated March 11, 2022 | 144-146 |
| Performance Plan for Non-Supervisory Staff-EPA-OIG  Performance and Recognition System | 147-160 |
| Appraisal Computation Worksheet for Non-Supervisory Employees for 2014 | 161-162 |
| Employee Performance Appraisal and Recognition System Summary Level Rating, 2014-2015 | 163-164 |
| Memorandum dated November 10, 2021, from Garrett Westfall to Complainant regarding Opportunity to Demonstrate Acceptable Performance and attachments | 165-186 |
| PMA Timesheets | 187-189 |
| United States Environmental Protection Agency, Office of Inspector General, dated October 19, 2021, Law Enforcement Availability Pay Annual Certification for Complainant signed by Staci Gurin | 190 |
| Emails dated December 6 and 13 2021, between Garrett Westfall, Paul Brezinski, Staci Gurin, and others regarding GS-13 Performance Standards | 191 |
| Memorandum dated December 14,  2020, from Helina Wong regarding Interim Guidance 2021-009 | 192 |
| Time Sheet History dated April 15, 2021 | 193-196 |
| Memorandum dated August 10, 2018, from Andrew Wheeler to all EPA employees regarding Anti-Harassment Policy Statement | 197-198 |
| Email dated June 10, 2022, from Paul Brezinski to Complainant regarding follow up | 199-201 |
| Email dated May 23, 2022, from Paul Brezinski to Complainant regarding May 25, 2022, Interview | 202 |

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

| **Attachment to Affidavit A:** | **Affidavit Page #** |
|---|---|
| PMA Timesheet PP25 for September 12, 2021 - September 25, 2021 | 203 |
| Emails dated December 6, 7, 8, 2021, from Paul Brezinski to Molly Bluie and Complainant regarding December 8, 2018 | 204-206 |
| Memorandum dated April 22, 2022, from Thomas Roelke regarding Decision on Proposed Removal | 226-227 |
| Memorandum dated March 1, 2022, from Garrett Westfall to Complainant regarding Notice of Proposed Removal for Unacceptable Performance | 228-387 |
| Letter dated March 17, 2022, from Molly Buie to Thomas Roelke regarding Reply to Proposed Removal | 388-394 |

| **Attachment to Affidavit B:** | **Affidavit Page #** |
|---|---|
| Email dated September 24, 2021, from Garrett Westfall to Rufus Mabry regarding PIP and conduct support for Complainant [Exhibit 1] | 60-240 |
| Email dated October 1, 2021, from Garrett Westfall to Rufus Mabry regarding meeting update to  issue under previous support records [Exhibit 2] | 241-243 |
| Email dated November 10, 2021, from Garrett Westfall to Complainant regarding Initiation of Performance Improvement Plan [Exhibit 3] | 244-268 |
| Email dated November 10, 2021, from Garrett Westfall to Complainant regarding Initiation of PIP Initiation [Exhibit 4] | 269 |
| EPARS Handbook [Exhibit 5] | 270-343 |
| Office of Inspector General, Supervisor's Guide to Dealing with Poor Performance [Exhibit 6] | 344-365 |
| Employee Performance Appraisal and Recognition System, Policy Number: 313 approved August 25, 2021 [Exhibit 7] | 366-392 |
| Memorandum dated March 1, 2022, Notice of Proposed Removal for Unacceptable Performance from Garrett Westfall to Complainant and November 10, 2021, Opportunity to Demonstrate Acceptable Performance [Exhibit 8] | 393-551 |

**ALISA WALTON**                                         **AGENCY NO. 2022-0009-R06**

| **Attachment to Affidavit B:** | **Affidavit Page #** |
|---|:---:|
| Email dated October 27, 2021, between Complainant and Garrett Westfall regarding FY 21 [Exhibit 9] | 552 |
| Email dated October 13, 2020, from Garrett Westfall to Rufus Mabry and Lori Ruk regarding Meeting 10/13 [Exhibit 10] | 553-557 |
| Case Administration, Procedure 206, By Patrick Sullivan approved and reviewed on October 31, 2019 [Exhibit 11] | 558-583 |
| Interviews, Advisement of Rights, Oaths, Statements and Record Reviews, Procedure 207, by Craig Ulmer approved and reviewed on April 19, 2022 [Exhibit 12] | 584-600 |
| Physical and Documentary Evidence, Procedure Number: 211 By Patrick Sullivan approved and reviewed on June 14,2020 [Exhibit 13] | 601-611 |
| Grand Jury Secrecy and Subpoenas Procedure Number: 212 By Allan Williams approved and reviewed on December 11, 2021 [Exhibit 14] | 612-619 |
| Investigative Reports, Procedure Number: 223 By Patrick Sullivan approved and reviewed on January 17, 2017 [Exhibit 15] | 620-647 |
| Email dated September 10, 2021, between Complainant and Garrett Westfall regarding EPARs FY21 Performance Standards [Exhibit 16] | 648-653 |
| Email dated September 10, 12, 13,17, 2021, between Complainant Garrett Westfall regarding EPARs FY21 Performance Standards [Exhibit 17] | 654-662 |
| Employee Performance Appraisal and Recognition System Summary Level Rating FY 2020 for Complainant by Garrett Westfall [Exhibit 18] | 663-681 |
| Employee Performance Appraisal and Recognition System Summary Level Rating 2020 for Complainant by Edwin Debiew [Exhibit 19] | 682 |
| Meeting Notes with Complainant on September 11, 2020 [Exhibit 20] | 683 |
| Email dated August 4, 2020, from Complainant to Garrett Westfall regarding document submitted requested [Exhibit 21] | 684 |
| Email dated April 3, 2020, and August 14, 2020, between Complainant and Garrett Westfall regarding computer evidence [Exhibit 22] | 685-687 |

Investigative Summary
Page 7 of 60

ALISA WALTON                                          AGENCY NO. 2022-0009-R06

| **Attachment to Affidavit B:** | **Affidavit Page #** |
|---|---|
| Email dated April 3, 2020, August 14, 2020 and August 27, 2020, between Complainant and Thomas Roelke regarding computer evidence [Exhibit 23] | 688-691 |
| Email dated August 6, 2020, between Complainant and Garrett Westfall regarding OI OI-DA-2019 [Exhibit 24] | 692-693 |
| Email dated August 31, 2020, between Complainant and Garrett Westfall regarding COR Southern Trenchless [Exhibit 25] | 694-697 |
| Email dated September 2, 2020, between Complainant and Garrett Westfall regarding Klinekole Update [Exhibit 26] | 698 |
| Email dated September 10, 2020 between Complainant and Garrett Westfall regarding Calls/Team [Exhibit 27] | 699-700 |
| Searches and Seizures, Procedure Number: 213 approved and reviewed by Helina Wong on February 9,2026 [Exhibit 28] | 701-713 |
| Memorandum dated May 3, 2022, from Marc Perez to Complainant Regarding Determination on Allegations of Harassment [Exhibit 29] | 714 |
| Email dated April 22, 2022, from Thomas Roelke to Complainant regarding Decision [Exhibit 30] | 715-717 |
| Email dated November 3, 2021 between Complainant and Garrett Westfall regarding Operation Reach [Exhibit 31] | 718-722 |
| Email dated November 10, 2020 between Complainant and Garrett Westfall regarding Completion of Fiscal Year 2020 EPARS Final Review [Exhibit 32] | 723-724 |
| Notice of Proposed Removal for Unacceptable Behavior dated June 9, 2022 from Garrett Westfall to Complainant [Exhibit 33] | 725 |
| Email dated November 10, 2021, from Garrett Westfall to Marc Perez regarding missing evidence [Exhibit 34] | 726-728 |
| Email dated November 15, 2021, from Garrett Westfall to Earle Sean regarding LEAP Certification for FY21 [Exhibit 35] | 729-742 |

Investigative Summary
Page 8 of 60

ALISA WALTON                                                    AGENCY NO. 2022-0009-R06

| **Attachment to Affidavit B:** | **Affidavit Page #** |
|---|---|
| Email dated January 8, 2022, from Garrett Westfall to Earle Sean regarding referral for possible investigation-conduct issue [Exhibit 36] | 743-772 |
| Emails dated February 17, 2022, May 3, 2022, between Garrett Westfall, Paul Brezinski and Staci Gurin [Exhibit 37] | 773-778 |
| Email dated May 11, 2022, between Garrett Westfall and Paul Brezinski regarding Attachments [Exhibit 38] | 779-788 |
| Email dated January 28, 2022, from Garrett Westfall to Marc Perez regarding conduct issue [Exhibit 39] | 789-791 |
| Law Enforcement Availability Pay, Procedure Number: 218, By Patrick Sullivan, approved and reviewed on October 23, 2020 [Exhibit 40] | 792-804 |

| **Attachment to Affidavit C:** | **Affidavit Page #** |
|---|---|
| Email dated September 13, 2021 between Complainant and Garret Westfall regarding EPARs - FY21 Performance Standards | 59-60 |
| Email dated September 17, 2021 between Complainant and Garret Westfall regarding EPARs - FY21 Performance Standards | 61-62 |
| Email dated January 5, 2022, from Garrett Westfall to unknown Regarding Chron Log modifications-OI-DA-2021-ADM-0025 | 70 |
| Email dated January 6, 2022, from Garrett Westfall to unknown Regarding Chron Log modifications-OI-DA-2021-ADM-0025 | 71-72 |
| OI-DA-2021-ADM-0025 investigative Event descriptions | 73-76 |

| **Attachment to Affidavit E:** | **Affidavit Page #** |
|---|---|
| EPA Order 4711 Fact-Finding Report, dated March 31, 2022, by Mark Miller | 12-15 |

| **Attachment to Affidavit F:** | **Affidavit Page #** |
|---|---|
| Memorandum dated March 17, 2022, regarding Summary of Alisa Walton's Oral Response to Notice of Proposed Removal | 170-172 |

Investigative Summary
Page 9 of 60

**ALISA WALTON**                                      **AGENCY NO. 2022-0009-R06**

| Attachment to Affidavit G: | Affidavit Page # |
|---|---|

Email dated September 8, 2021, from Christopher Huntington to              10-13
Complainant and others regarding Self-Assessment Tips and Example

**[Investigator's notes: The agency has indicated that Daniel Hawthorne and Mike Fiore have left the agency, and there is no email or contact information for both of them.**

**Complainant and/or Garrett, Gurin, Roelke, and Mabry provided documents which were duplicated and/or unrelated to the accepted issue; therefore, they will be summarized once or not at all, but will remain with their respective affidavits.**

**The Complainant provided testimony in regard to issues outside the scope of the accepted issues and/or testimony not accepted for this investigation; therefore, this information will not be summarized in this report.**

**All relevant policies submitted by the Complainant and Witness are summarized in the Applicable Policies section of this report.]**

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

## <u>EXHIBITS</u>

| <u>DOCUMENT</u> | <u># OF PAGES</u> |
|---|---|
| 1.    EPA Order No: 1000.31A4 | 14 |
| 2.    EPA Order No:  4711 | 17 |

ALISA WALTON                                                     AGENCY NO. 2022-0009-R06

## **INVESTIGATIVE SUMMARY**

**Statement of Claims and Issues Investigated:** Complainant's alleges that she was subjected to discrimination and a hostile work environment based on her race (African American), sex (female), and retaliation (prior EEO Activity) when:

    1. On November 10, 2021, Complainant learned that she would be placed on a Performance Improvement Plan ("PIP");

    2. On October 21, 2021, Complainant received a rating of zero on Critical Elements 2 and 3 of her performance appraisal;

    3. Complainant's 2020 performance appraisal was lowered without explanation;

    4. In April 2019, Complainant was placed on a 30-day PIP;

    5**.** On March 1, 2022, Complainant was issued a Notice of Proposed Removal for supposedly failing to successfully complete the PIP complainant as placed on November 10, 2021. Complainant was notified on April 22, 2022, that a decision was made to not substantiate the removal**;** and

    6**.** On May 2, 2022, Complainant was informed that an internal investigation was initiated based on allegations of misconduct by Complainant.

**Remedy Requested:** Complainant requests, as resolution to her complaint, the following remedies: (1) changing each of the Critical Elements in the Fiscal Year ("FY") 2020 Interim rating provided by Garrett Westfall and Dan Hawthorne to "Exceeds Fully Successful" and increase all Critical Elements as well as the overall rating for her FY 2021 performance rating to reflect her actual performance of "Exceeds Fully Successful"; (2) receiving retroactive payment for any monetary bonus, time off award, step increase, or any other benefit that she would have received had she been rated at the "Exceeds Fully Successful" level for FY 2021; (3) removing all records of the lowered performance appraisal from her official and unofficial federal personnel records, the 2019 and 2021 PIPs, and all documents that refer or relate to both PIPs; (4) seeking reassignment to a non-hostile work environment outside the chain of command of the management officials named in her complaint, preferably to an 1811 position commensurate with her background, skills, abilities, and current grade level; (5) receiving the maximum monetary amount available under the law for the emotional distress, pain and suffering, embarrassment, and harm to her reputation because of the agency's actions; (6) restoring the leave she took due to stress while dealing with and preparing for oral and written responses; and (7) payment of her incurred attorneys' fees and costs.

## **AFFIDAVIT TESTIMONY (Race and Sex Allegations)**

**Complainant** identified her race as African American and sex as female. She stated that she and Garrett Westfall met in person during August 2020, and she met Sean Earle during an All Hands conference after she became an agent. **[Affidavit A]**

**Garrett J. Westfall** identified his race as White and sex as male. He indicated that he was not aware of Complainant's race until he met her on August 7, 2020. He also indicated that he became aware of Complainant's sex on July 19, 2020, during a discussion with Daniel Hawthorne, who referred to Complainant using the pronouns "her/she." Mr**.** Westfall stated

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

that Complainant's sex was visually corroborated when he met her on August 7, 2020. **[Affidavit B]**

**Staci Gurin** identified her race as White and sex as female.  Ms. Gurin indicated that an agent engaged in unsolicited conversation with Complainant in October 2018, during which he informed her that Complainant is Black and a female. She further indicated that she has spoken to Complainant via Microsoft Teams ("Teams"), and that she has feminine traits in voice and appearance. **[Affidavit C]**

**Sean Earle** identified his race as American Indian and sex as male.  He stated that he has known Complainant for years, and she identifies as African American and female. **[Affidavit D]**

**Rufus Mabry** identified his race as Black and sex as male.  He stated that he became aware of her race on February 2, 2022, when she notified Human Resource Directorate that she believed she is being subjected to a hostile work environment on account of her race (African American), sex (female), and prior EEO activity.  He indicated that he became aware of Complainant's sex in 2020 when Complainant contacted him via her mobile phone to request information related to a paid leave option. **[Affidavit E]**

**Thomas Roelke** identified his race as White and sex as male.  He stated he does not know Complainant's race.  Mr. Roelke indicated that he assumes Complainant is a female based on Complainant's name. **[Affidavit F]**

**Christopher Huntington** identified his race as Caucasian and sex as male.  He stated that he was made aware of complainant's race and sex during a video conference call, which he attended in 2017 or 2018. **[Affidavit G]**

**Lori Ruk** identified her race as White and sex as female.  She stated she was made aware of Complainant's race in 2019 but does not recall when or how she was made aware of Complainant's race.  She stated she provided legal assistance to Complainant years ago and has spoken with her on the phone. **[Affidavit H]**

**Elizabeth Moreira** identified her race as White and sex as female.  She stated that she is aware that Complainant's race is African American based on a meeting or discussion in January or February 2022. Ms. Moreira indicated that she understands Complainant's sex is female based on the Complainant's first name and references she made to her gender in meetings.  **[Affidavit I]**

**Marc A. Perez** identified his race as White, ethnicity as Latino (Central American), and his sex as male. He stated he was aware of Complainant's race and sex and that he became aware of such when he met her on a video call in December 2020 or January 2021. **[Affidavit J]**

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

### AFFIDAVIT TESTIMONY (Retaliation Allegation)

**Complainant** stated that on April 1, 2015, she filed a discrimination complaint against former Special Agent Susan Chandler.  Complainant identified her prior EEO case number as 2015-0049-R06, in which she alleged that agency management failed to take action to stop Susan Chandler from subjecting her to a discriminatory hostile work environment based on race**.** She indicated that Sean Earle and Susan Chandler are close associates.  **[Affidavit A]**

**Mr. Westfall** stated that he does not have knowledge of any EEO activity with Complainant prior to this complaint and was not named as a Responsible Management Official.  **[Affidavit B]**

**Ms. Gurin** stated that she had no awareness of Complainant's involvement in EEO activity prior to this complaint, and that she was not named as a Responsible Management Official or witness.  **[Affidavit C]**

**Mr. Earle** stated that he had no recall of Complainant being involved in any EEO activity. **[Affidavit D]**

**Mr. Mabry** stated that he had no awareness of Complainant's EEO activity and that he was not involved in her retaliation complaint.  **[Affidavit E]**

**Mr. Roelke** stated that he had no awareness of Complainant's EEO activity prior to this complaint. **[Affidavit F]**

**Mr. Huntington** stated that he is not aware of any prior EEO activity involving the complainant.  **[Affidavit G]**

**Ms. Ruk** stated that she was aware of the Complainant being involved in EEO activity prior to this complaint but does not recall when she became aware of Complainant's prior EEO activity.  **[Affidavit H]**

**Ms. Moreira** stated that she was not aware of the Complainant being involved in prior EEO activity.  **[Affidavit I]**

**Mr. Perez** stated he was not aware of Complainant's prior EEO activity when he initiated an internal investigation into her alleged misconduct.  He stated he became aware that Complainant claimed she had been involved in "prior EEO activity" on or about March 2, 2022. He stated he was provided a copy of her allegations under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, in which she claimed she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity.  **[Affidavit J]**

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

**CLAIM 1: ON NOVEMBER 10, 2021, COMPLAINANT WAS PLACED ON A PERFORMANCE IMPROVEMENT PLAN (PIP)**

**AFFIDAVIT TESTIMONY (Race and Sex Allegations)**

**Complainant, Special Agent**, **Office of Inspector General/Office of Investigations, Dallas, Texas** stated that she has been employed by the agency since June 2, 2002, and has been employed in her current position since August 2006. She identified Staci Gurin, Assistant Special Agent in Charge ("ASAC"), and Garrett Westfall, Special Agent in Charge ("SAC"), as her current first and second level supervisors, respectively.

Complainant identified Garrett Westfall as the alleged management official who was responsible for placing her on a PIP that began on November 10, 2021, and ended on December 24, 2021. She stated that Sean Earle knew of the PIP since he had to approve it. According to Complainant, she received an email on November 10, 2021, from Mr. Westfall who stated that she is being placed on a PIP effective that day. Complainant also stated that she needed to prepare for discussions regarding expectations and assignments on a Teams call with Mr. Westfall and Ms. Gurin. Complainant avowed that, on October 13, 2021, she met via Teams with Garrett Westfall, and Staci Gurin, who gave her a 1.66 performance rating. She attested that Mr. Westfall rated her as zero on Critical Element 2 (Communication) and Critical Element 3 (Results Orientation). Complainant also attested that Westfall and Gurin rated her as 2 on Critical Element 4 (Teamwork) and Critical Element 6 (Resource Management), and had given her a rating of 3 on Critical Element 1 (Leadership) and Critical Element 3 (Customer Relations). Complainant averred that she received a rating below fully successful on this annual appraisal.

Complainant contended that she informed Mr. Westfall that she did not agree with the PIP and did not believe it was warranted nor justified. Complainant attested that, in June 2021, Mr. Westfall told her that she and the previous agents had not properly documented evidence nor chain of custody forms since a laptop remained in evidence when documentation indicated otherwise. She continued that the laptop had actually been sent to the EPA-OIG-OI electronic crimes division. Complainant indicated that Mr. Westfall instructed her to ensure that she properly documented evidence and the respective chains of custody. Complainant explained that Mr. Westfall instructed her to go through all the evidence in the evidence room and ensure all evidence had been properly documented by its chain of custody. Complainant indicated that she prepared memoranda over the course of a few months to address the improperly documented evidence for closed cases.

Complainant averred that they should not have placed her on a PIP because the performance rating of 1.66 was unjustified. She indicated that her performance as documented in her FY 2021 self-assessment warranted a significantly higher rating. Complainant indicated that the reason they gave her for the PIP placement relied upon her rating of zero (unacceptable) for Critical Element 2 (Communication) and Critical Element 3 (Results Orientation). Complainant contended she found that reason as not acceptable. Complainant indicated that during FY 2021 regarding Critical Element 2 (Communication), she was required to conduct eight fraud awareness briefings and to conduct thirteen fraud

awareness briefings, which regularly briefed Assistant United States Attorneys on her cases as well as other managers such as Sean O'Donnell, Charles Sheehan, Allan Williams, Sean Earle, and Garrett Westfall. Complainant indicated for Critical Element 3 (Results Orientation) that her results for the FY 2021 statistics were as follows: one conviction, one suspension, and debarment of a subject. She also indicated that for Critical Elements 2 (Communication) and 3 (Results Orientation), she should not have received an unacceptable rating of zero since she had one criminal action and two administrative actions during FY 2021. Complainant attested that they initiated the PIP for discriminatory and retaliatory reasons. Therefore, she reasoned that the agency violated its own policies, federal statutes, and regulations that prohibit discrimination and retaliation against employees.

Complainant attested she is physically and mentally embarrassed and emotionally distressed, which she described using myriad causes and symptoms. Complainant asserted that the PIP is unmanageable given the impossible amount of work and deadlines to meet, and Mr. Westfall and Ms. Gurin subjected her work to extreme scrutiny. She declared that the PIP is designed to set her up for failure rather than an effort to improve her performance.

Complainant testified that her race was a factor on November 10, 2021, when she learned that she was being placed on a Performance Improvement Plan because she was singled out for ratings of zero even though she accomplished more than some of her other, non-African American, colleagues. Complainant testified that her sex remained a factor because they singled her out for zero ratings even though she accomplished more than some of her male colleagues. **[Affidavit A]**

**Garrett J. Westfall, Special Agent in Charge, Dallas, Texas** indicated that, as of June 5, 2022, his first line supervisor is Sean Earle, and his second line supervisor is Jason Abend. He further indicated that he worked with Complainant as her first line supervisor from July 19, 2020, through August 14, 2021, and as her second line supervisor since August 15, 2021.

Mr. Westfall affirmed that he, is the management official responsible for placing Complainant on a PIP, and based that decision on her unacceptable performance under her FY 2021 performance standards within two Critical Elements. He indicated that Staci Gurin was also involved in the PIP as a management official, Complainant's first-line supervisor. He explained that his involvement in the PIP comprised of initiating it, which included coordinating with Human Resources Directorate ("HRD") and Office of Counsel ("OC") on the proposed action. Mr. Westfall stated that on September 24, 2021, he submitted a referral report and the supporting records to Rufus "Erik" Mabry on October 1, 2021. He stated that he submitted an update to the report for Mr. Mabry, which included records documenting Complainant's performance and conduct related issues observed during FY 2021. Mr. Westfall indicated that the PIP that commenced on November 10, 2021, ended on December 24, 2021, as it was designed for a 45-day evaluation period. Additionally, Mr. Westfall avowed to supporting the decision to initiate a PIP because supervisory intervention (i.e. counseling and mentoring) failed to correct the performance issues in several performance standards. Mr. Garett averred that HR or OC did not advise him that there was insufficient evidence to pursue a PIP with Complainant in an attempt to improve her performance.

Mr. Westfall stated that he notified Complainant via email of the PIP on November 10, 2021, and conducted a Teams meeting (video conference) to discuss the PIP. He explained that he followed the EPA OIG's policy and procedures for a PIP which are detailed in the OIG EPARS Handbook, Supervisor's Guide to Dealing with Poor Performance, and OIG Policy and Procedure 313. Mr. Westfall indicated that the PIP was developed and implemented with guidance from HRD and OC, in conjunction with the above guidelines and handbooks. Prior to the PIP referral to HRD, Mr. Westfall avowed he evaluated Complainant's performance for the entire rating period of FY 2021 against her performance standards and Critical Elements for FY 2021. Mr. Westfall stated that, on September 20, 2021, he informed HRD that he discussed performance and conduct related issues with Complainant and detailed those performance and conduct issues in an email to HRD on or about September 24, 2021.

Mr. Westfall stated that he initiated the PIP with Complainant, assigned tasks related to the PIP, met with her on a weekly basis to discuss assignments and clarify any questions, and documented any performance deficiencies related to the PIP. He indicated that Ms. Gurin participated in all but one PIP meeting with Complainant, reviewed his assessment of Complainant's work products for concurrence, and reviewed his meeting summaries with Complainant for completeness and accuracy.

Mr. Westfall stated that he decided to provide additional supervisory intervention (e.g. counseling and mentoring) to Complainant and that the final recommendation for the PIP was based on the entire rating period as Complainant failed to correct the performance issues. Mr. Westfall stated that there were several relevant discussions during the appraisal period in which he discussed performance deficiencies with Complainant involving two performance counseling sessions and mid-year/year-end meetings on the following dates: November 10, 2020; November 30, 2020; March 29, 2021; April 12, 2021; and October 13, 2021.

Mr. Westfall declared that Complainant made no improvements and the deficiencies that were noted during the year represented significant credibility and integrity concerns for the OIG. He attested that Complainant failed to document investigative activity in several instances or provide timely work products in accordance with policy and procedures, provided inaccurate information and incorrectly sourced information in her written reports, and failed to follow guidance and direction from her supervisor. He stated that Complainant did not improve in her communication with her supervisor(s), even though it had been requested that she initiate and increase communication with her supervisor. Accordingly, he stated that, during multiple discussions with Complainant, he never stated that if her improvement did not improve then she would be placed on a PIP. However, he stated that he told her on multiple occasions that failure to improve her performance would be reflected in her performance rating and that she was being given an opportunity to improve her skills and performance to a successful level. Mr. Westfall indicated that he offered to coach and mentor her to improve her performance but while she was receptive to being mentored, she never initiated communication with him regarding work products or other facets of her position. Mr. Westfall avowed he does not recall Complainant discussing her concerns with him regarding being placed on a PIP.

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

Mr. Westfall stated that, during the initiation of the PIP on or about November 10, 2021, he explained to Complainant that the reason for the PIP was a result of the unacceptable rating in the FY 2021 for two Critical Elements – Results Orientation and Communication – and she was being given the opportunity to demonstrate her improvement in those areas.  He continued to explain that a memorandum named "Opportunity to Demonstrate Acceptable Performance" was provided to Complainant with an explanation as to the need for the PIP. Mr. Westfall indicated that during the ratings meeting on or about October 13, 2021, Complainant disagreed with the ratings and later refused to sign for them.  He stated that, in an email on October 27, 2021, Complainant stated that, ". . . I am replying to inform you I chose not to sign the performance rating. I do not agree with the performance ratings."

Mr. Westfall declared he participated in one meeting on or about January 5, 2022, with Complainant and Ms. Gurin to discuss the resolution of a PIP task (i.e. a case-closing report) based on a previous discussion with Complainant on December 22, 2021, and as a result of this meeting he submitted a misconduct referral to the Office of Investigations (OI) leadership because it appeared Complainant inappropriately manipulated two chronology log entries.

Mr. Westfall indicated that he was provided guidance by Erik Mabry, Elizabeth Moreira, and Lori Ruk since his guidance has been ongoing and began as soon as he observed performance issues with Complainant in approximately October 2020. He further indicated that he had held multiple meetings with both Mr. Mabry and Ms. Ruk on several performance issues observed during FY 2021.  Mr. Westfall stated that Mr. Mabry and Ms. Ruk provided guidance on drafting and issuing the PIP memo, assignment of tasks, needed documentation, expectations and role as the manager, and other aspects of the PIP process. Mr. Westfall stated that he proposed and initiated a PIP that was not punitive, as she was given the opportunity to illustrate improved performance in several Critical Elements.  Mr. Westfall averred that he concluded that Complainant did not successfully pass the PIP, showed no improvement during the 45-day evaluation period, and subsequently recommended her removal from federal service.

Mr. Westfall avowed Complainant never made any harassment claims or reported to him that she felt she was being harassed or there was a hostile work environment.  Mr. Westfall identified the applicable policy and procedures for a PIP that are detailed in OIG EPARS Handbook, OIG Supervisor's Guide to Dealing with Poor Performance, and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System.

Mr. Westfall testified Complainant's race and sex were not factors when, on November 10, 2021, she was placed on a Performance Improvement Plan.  **[Affidavit B]**

**Staci Gurin, Assistant Special Agent in Charge, OIG-OI, Lenexa, Kansas** stated that she has been in her current position since September 12, 2021, and in September 2021, became Complainant 's first line supervisor.  She indicated that her first line supervisor is Garrett Westfall, and her second line supervisor is Sean Earle.

Ms. Gurin avowed that she was not responsible for placing the Complainant on a PIP but was involved in the process. Ms. Gurin stated that the PIP that she reviewed was initiated by

**ALISA WALTON**                                         **AGENCY NO. 2022-0009-R06**

Garrett Westfall. She indicated that her involvement entailed reviewing the PIP, the assignments related to the PIP, participated in the weekly PIP meetings, and was made aware of feedback given to the Complainant.

Ms. Gurin stated that Rufus "Erik" Mabry, Human Resource Specialist/Employee Relations, and Lori Ruk, Office of Counsel, were consulted about placing Complainant on the PIP. She also indicated that Complainant was given verbal and written notifications. She further indicated that Mr. Westfall informed her that he had a meeting with Complainant on November 10, 2021, regarding the PIP. Ms. Gurin stated that the PIP also included the Complainant's FY 2021 Performance Appraisal and the Complainant's self-assessment.

Ms. Gurin explained the agency followed 5 U.S.C. Chapter 43 which governs Performance Law as well as EPA-OIG Policy and Procedure 313 – "Employee Performance Appraisal and Recognition System" ("EPARS"). She explained Procedure 313 Section 3: Elements of Performance Management includes EPARS Monitoring, EPARS Development Discussions, and EPARS Ratings, which are all stages in the EPARS Section that may involve a PIP. She further explained during the PIP she and Mr. Westfall met weekly with the Complainant and Mr. Westfall also provided the Complainant with a summary of the weekly meeting, which included a detailed description of the assignments covered during the meeting. According to Ms. Gurin, during each weekly meeting, the Complainant was encouraged to ask questions and get clarification on all assignments, especially assignments where there were still deficiencies. She stated that Mr. Westfall provided weekly updates to HR and OC on the PIP and performance of the Complainant, and sought additional guidance when questions came up. Ms. Gurin attested she continued to meet with the Complainant on bi-weekly basis for required case reviews. At the end of the PIP period, Ms. Gurin declared that she and Mr. Westfall met with HR and OC, and determined that the Complainant failed the PIP. Ms. Gurin averred that a proposed removal was prepared by Mr. Westfall, which went through HR and OC for review, and was provided to the Complainant and the Deciding Official.

Ms. Gurin averred that she did not have direct knowledge of nor direct participation in any discussions conducted with the Complainant during the performance appraisal period regarding her performance since she became her direct supervisor on September 12, 2021. Ms. Gurin stated that during the time period of the PIP but prior to the PIP concluding, she did not observe improvement in the Complainant's performance. She explained Complainant continued to submit reports that had incorrect dates, incorrect information, unsupported information, improperly documented information, and irrelevant information. Ms. Gurin avowed Complainant was determined to have been unsuccessful after being placed on a PIP by Mr. Westfall. She indicated that, in February 2022, she and Complainant talked about her "feeling overwhelmed and underwater," how they may alleviate some of the stress, and, as a result of the Complainant's concerns, how one of the Complainant's cases was reassigned to another agent. She declared that Complainant's performance continued to fluctuate and her performance was not consistent. Ms. Gurin attested that since the meeting with Complainant on May 12, 2022, her reports have improved while requiring minimal edits.

Ms. Gurin stated that Complainant had received from Mr. Westfall a counseling email dated November 30, 2020, that discussed performance and how to be considered satisfactory per

**ALISA WALTON**                                      **AGENCY NO. 2022-0009-R06**

the performance standards, but it does not specifically address PIP placement.  After
the PIP commenced on November 10, 2021, and ended on December 24, 2021, Ms. Gurin
stated that subsequent to the implementation of the PIP, she had discussions with the
Complainant about her performance and cited deficiencies as they relate to specific
performance standards, but did not discuss the Complainant being placed on a PIP if her
performance did not improve.  She indicated that the discussion dates associated with Case
Reviews were on the following dates: September 13, 2021; September 27, 2021; October 13,
2021; October 27, 2021; November 4, 2021; November 22, 2021; December 6, 2021;
December 20, 2021; January 3, 2022; January 18, 2022; April 12, 2022; while Weekly PIP
meetings were on October 17, 2021; November 24, 2021; December 1, 2021; December 8,
2021; December 15, 2021; and December 22, 2021.

Ms. Gurin indicated that the reason for Complainant being placed on the PIP was provided in
the email on November 10, 2021, and was not aware if Complainant disputed the reason.
She stated that a Final Notice of Performance Evaluation for Performance Improvement Plan
(PIP) was issued on approximately March 1, 2022, and a Notice of Proposed Removal for
Unacceptable Performance was issued on the same date. Ms. Gurin averred that
Complainant's performance deficiencies have been well documented and supported. She
stated that the Complainant was provided with several opportunities to improve performance,
including during the PIP period, but improvements to those deficiencies were not made.  Ms.
Gurin identified the applicable policies as listed in 5 U.S.C. Chapter 43, Policy and Procedure
313, and guidance received from HR and OC.

Ms. Gurin testified she has no personal knowledge that Complainant's race and sex were
factors when, on November 10, 2021, she was placed on a Performance Improvement Plan.
**[Affidavit C]**

**Sean Earle, Deputy Assistant Inspector General for Investigations, Office of Inspector
General, Office of Investigations** stated that he was appointed to his current position in
April 2022. He stated that he has not been a direct supervisor of Complainant.

Mr. Earle avowed he was not the management official responsible for placing Complainant
on the Performance Improvement Plan (PIP) on November 10, 2021.  He identified the
management official who placed Complainant on the PIP as Garrett Westfall.  Mr. Earle
indicated that Attorney Lori Ruk and Rufus Eric Mabrey would have had to review and
approve the issuance of any PIP action. He stated that he was unaware of all the agency
policies and procedures regarding the placing of an employee on a PIP.  Mr. Earle indicated
that he had no discussion with Complainant about her performance or the PIP. Mr. Earle
indicated that he scheduled a meeting during mid-January with all field agents to be briefed
on cases they had in their inventory and Complainant briefed her cases on January 18, 2022.
Mr. Earle stated that Complainant's supervisor consulted with OIG Office of Counsel and
Office of Human Resources concerning her performance, and any PIP action would have
been warranted based on the guidance provided.

Mr. Earle testified race and sex were not factors when, on November 10, 2021, Complainant was placed on a Performance Improvement Plan.  He continued by stating that he had no involvement in placing the employee on a PIP.  **[Affidavit D]**

**Rufus Mabry, Human Resource Specialist (Employee Relations), Office of Chief of Staff / Office of Mission Support, Boston, Massachusetts** stated that he was assigned to his current position in December 2019.  He stated that he has no past or current working relationship with the Complainant.

Mr. Mabry avowed he advised management officials on the policy and procedures of placing the Complainant on a Performance Improvement Plan. He stated that as an HR Official, he advised management on the criteria of placing the complainant on a PIP, per the agency's policy.  Additionally, Mr. Mabry indicated that he assisted management in drafting the PIP, which was issued to the Complainant.  Mr. Mabry averred that management officials contacted him regarding Complainant's continued performance deficiencies in two Critical Elements, and inquired if the Complainant could be placed on a Performance Improvement Plan. Mr. Mabry declared that he advised, per policy, that the OIG supervisors shall provide an opportunity for employees to improve at any time during the appraisal period when performance is determined to be unacceptable in one or more Critical Element. He indicated that employees will be placed under a Performance Improvement Plan and given an opportunity to demonstrate acceptable performance. Mr. Mabry attested he did not provide a recommendation on the issuance of the PIP.

Mr. Mabry indicated that the PIP began on November 10, 2021, and concluded on December 24, 2021.  He further indicated that Complainant received the disposition of the PIP on April 22, 2022.  Mr. Mabry indicated that Complainant received written notification for unsuccessful performance in two Critical Elements, namely Communication and Results Orientation. He explained that the Office of Inspector General is governed by OIG Policy and Procedure 313 Employee Performance and Appraisal Recognition System (EPARS), which stipulate that when an employee fails to perform at the minimally successful level in at least one Critical Element, a Performance Improvement Plan must be implemented to give the employee an opportunity to demonstrate acceptable performance. Mr. Mabry attested that the Complainant was given a reasonable opportunity to demonstrate acceptable performance, as required under 5 CFR § 432.104.  He indicated that Complainant and her counsel presented an oral and written response to the deciding official on March 17, 2021.

Mr. Mabry testified Complainant's race and sex were not factors when, on November 10, 2021, she was placed on a Performance Improvement Plan.  **[Affidavit E]**

**Lori Ruk, Attorney-Advisor, Office of Counsel, Washington, DC** stated that she has been in her current position for ten (10) years. Ms. Ruk indicated that she and Complainant are in different component offices. However, she had been assigned to provide legal assistance to Complainant for at least one of her cases.

Ms. Ruk avowed she was assigned to provide legal assistance to Complainant's management regarding the issuance of a PIP.  Ms. Ruk averred that her involvement,

including legal advice provided, is subject to the attorney-client and/or work product privileges. She identified that the management officials involved in or who had input on the placement of Complainant on a PIP as Garrett Westfall and Staci Gurin. She indicated that the Memorandum dated November 10, 2021, entitled "Opportunity to Demonstrate Acceptable Performance" informed Complainant that she was being placed on a PIP as well as the reasons for the placement.  Ms. Ruk further indicated that the PIP became effective on November 10, 2021, and continued for forty-five calendar days, ending on December 24, 2021.

Ms. Ruk testified race and sex were not factors when, on November 10, 2021, Complainant was placed on a Performance Improvement Plan.  **[Affidavit H]**

**[Investigator's note:  For the remaining questions, Ms. Ruk responded "The question seeks information subject to the attorney-client and / or attorney work product privileges."]**

**Elizabeth Moreira, Attorney-Advisor / Associate Counsel, Office of Counsel, Washington, DC** stated that she has been in her current position for three (3) years. She stated that she has never met, either in person or virtually, nor spoken with the Complainant.

Ms. Moreira stated that the Office of Counsel management assigned her to this matter in late September 2021 to provide supporting assistance, as requested, for the lead attorney, Lori Ruk. Ms. Moreira avowed she assisted by providing legal advice with respect to the issuance of the Performance Improvement Plan, the Notice of Proposed Removal, and attended meetings with Ms. Ruk, Rufus ("Erik") Mabry, Garrett Westfall, and Staci Gurin. She identified Mr. Westfall and/or Ms. Gurin as being involved with and/or having input into the decision to place the Complainant on a PIP.

Ms. Moreira indicated that Mr. Westfall notified the Complainant via memorandum dated November 10, 2021, that she was being placed on a PIP. She stated Mr. Westfall had determined that the Complainant's performance was Unacceptable on Critical Element 2 (Communication) and Critical Element 3 (Results Orientation) in the Complainant's Employee Performance and Recognition System (EPARS) plan for fiscal year 2021. Ms. Moreira stated that the PIP became effective on November 10, 2021, and continued for forty-five calendar days, until December 24, 2021.  She further indicated that she does not advise on employment matters and/or PIPs as part of her routine job duties, and was not familiar with what Agency policies or procedures would be associated with Performance Improvement Plans.  Ms. Moreira indicated that she was not made aware of the reasons Complainant was being placed on a PIP.

Ms. Moreira testified that she has no knowledge that would indicate that Complainant's race and sex were factors when, on November 10, 2021, she was placed on a Performance Improvement Plan.  **[Affidavit I]**

ALISA WALTON                                              AGENCY NO. 2022-0009-R06

**[Investigator's note:  For the remaining questions, Ms. Moreira responded "Any details regarding my decisions and/or actions regarding the issuance of the PIP are protected by the attorney-client and/or attorney work product privileges."]**

**AFFIDAVIT TESTIMONY (Retaliation Allegation)**

**Complainant** testified that the PIP was unjustified because she was singled out for ratings of zero even though she had accomplished more than some of her colleagues who had not engaged in protected EEO activity.  **[Affidavit A]**

**Mr. Westfall** testified that he has no knowledge or involvement in Complainant's prior EEO activity. **[Affidavit B]**

**Ms. Gurin** testified that she has no personal knowledge that Complainant's prior EEO activity was a factor when, on November 10, 2021, she was placed on a Performance Improvement Plan.  **[Affidavit C]**

**Mr. Earle** testified Complainant's prior EEO activity was not a factor when, on November 10, 2021, she was placed on a Performance Improvement Plan. He stated that he had no involvement in placing the employee on a PIP.  **[Affidavit D]**

**Mr. Mabry** testified that prior EEO activity was not a factor when, on November 10, 2021, she was placed on a Performance Improvement Plan.  **[Affidavit E]**

**Ms. Ruk** testified that prior EEO activity was not a factor when, on November 10, 2021, she was placed on a Performance Improvement Plan. **[Affidavit H]**

**Ms. Moreira** testified that she has no knowledge of Complainant's prior EEO activity or any knowledge that would indicate that Complainant's prior EEO activity was a factor. **[Affidavit I]**

**CLAIM 2: ON OCTOBER 12, 2021, COMPLAINANT RECEIVED A RATING OF ZERO ON CRITICAL ELEMENTS 2 AND 3 OF HER PERFORMANCE APPRAISAL.**

**AFFIDAVIT TESTIMONY (Race and Sex Allegations)**

**Complainant** identified Sean Earl, Garrett Westfall, Staci Gurin, and Christopher Huntington as the rating officials who were involved in and had input into her FY 2021 performance appraisal. Complainant indicated that she received ratings of zero on two elements. Complainant indicated that her performance goals were to exceed the required briefings, obtain an administrative stat (suspension and/or debarment), obtain additional training, meet with more State stakeholders. Complainant averred that she accomplished the briefing goal and exceeded it by five. Additionally, Complainant stated that she obtained a suspension and a "debarment stat" but, due to COVID-19 and travel restrictions, she did not accomplish the two goals relating to training and meeting with State stakeholders.

Investigative Summary
Page 23 of 60

Complainant attested that she believes she should have received a four (4) or higher based on her statistics. She added that she met the deadlines for her accomplishments. Complainant stated that on June 9, 2021, August and/or September 2021, and November 3, 2021, Mr. Westfall spoke to her about not properly documenting evidence that was in the Dallas evidence room.  She indicated that Mr. Westfall informed her that she incorrectly documented some dates on several Memorandum of Activity (MOA) and was told to make sure the dates were accurate. Complainant stated that she informed Mr. Westfall that she never made up dates or made assumptions. Complainant stated that she informed Mr. Westfall that she was following procedures that were in place prior to him joining the EPA and becoming her supervisor. Complainant indicated that she changed the dates on the documents, but the process of changing the report date and the activity date continuously changed, which caused the activity and report dates to be inconsistent. Complainant further indicated that she mentioned that to both Mr. Westfall and Ms. Gurin. Complainant stated that Mr. Westfall continued to indicate Complainant was making up dates and incorrectly documenting dates on MOAs, and that Ms. Gurin seemed to understand. Complainant stated that when she discussed her concerns with Mr. Westfall and Ms. Gurin on October 13, 2021, they discussed the rating with her.

Complainant contended Mr. Westfall told her the reason she was given a 1 rating for Critical Elements 2 and 3 but the system defaults to zero, as well as for Critical Element 2 (Communication). Complainant attested that Mr. Westfall stated that she had seven reports that had inaccurate information, which were never received. Complainant stated that Mr. Westfall noted in her performance review, "Due to an upgraded transition and limitations of the electronic case management system, the analytics involving performance measures for communication were unquantifiable, and as such, will not be used as a basis for rating the performance standard."  Additionally, Mr. Westfall stated, "For FY 2021, SA Walton produced sixty-four investigative reports.  Of that number, only 35 (54%) were within the policy timeframes at the time, as calculated by her supervisor." Complainant declared she was not given evidence of how the timeliness was calculated when the system was being upgraded and often down.  Furthermore, Complainant stated that Mr. Westfall also commented that, "While her supervisor requested that SA Walton proactively communicate with him on a consistent and weekly basis, SA Walton has failed to routinely communicate with her supervisor."  Complainant declared this statement is not factual. Complainant explained Mr. Westfall stated that she received a zero for Critical Element 3 (Results Orientation), stating that Complainant did not keep her cases in the Electronic Case Management System (ECMS) updated. Complainant stated that in October or November before her FY 2020 Performance Rating, Mr. Westfall stated that he felt Mr. Debiew did not mentor her but he wanted to mentor her. Complainant indicated that Mr. Westfall wanted to meet regularly with her, and he placed MS Teams meetings titled "Weekly Status of Cases" on their calendars. According to Complainant's calendar, she and Mr. Westfall met for a myriad of reasons on the following dates: November 2, 2020; November 10, 2020; April 6, 2021; and May 18, 2021.  Complainant provided the following statement:

*"*Note: It is not common, and I have never heard of a GS-13 receiving mentorship from a GS-14.  Therefore, I was not certain why Westfall felt Debiew should have mentored me.  I have had a professional mentor and my meetings with Westfall would not be what I would*

**ALISA WALTON**                                                    **AGENCY NO. 2022-0009-R06**

*call mentorship. The meetings were more like weekly case updates and to see if I had any questions."*

Complainant indicated that they were told Mr. Earle required bi-weekly case reviews, which she had on July 20, 2021, and in August 2021. Complainant further indicated that Mr. Westfall was promoted to SAC and no longer conducted bi-weekly reviews with her. According to Complainant, on August 18, 2021, Mr. Christopher Huntington conducted a bi-weekly case review and on September 13, 2021, Ms. Staci Gurin conducted a bi-weekly case review after she became her first line supervisor. Complainant attested that she did not agree with the reasons given to her. Complainant stated that she did not appeal the decision; instead, she stated to both Mr. Westfall and Ms. Gurin that she did not agree with the ratings for the two Critical Elements. Complainant avowed Mr. Westfall proposed to remove her for supposedly failing the PIP. She stated that she submitted written and oral replies to the proposed removal and the removal was not sustained by the deciding official.

Complainant declared she was harmed because she was ineligible to apply for other 1811 positions with the EPA or within the federal government and was also ineligible for cash awards, promotions, special assignments, details, bonuses, etc. Additionally, Complainant indicated that Mr. Westfall attempted to fire her in March of 2022 for failing the PIP. Complainant attested that the unjustified performance ratings, PIP, unrelenting scrutiny of her work, as well as the constant negative comments about Mr. Debiew and her mishandling of evidence were part of an ongoing, pervasive effort to make her work environment intolerable. She declared that the stress of this environment caused her to experience severe mental and physical symptoms. Complainant indicated that she did not file a grievance since she is not affiliated with the union. Complainant further indicated that the applicable policies ratings were unjustified, given discriminatory and retaliatory reasons. Therefore, she stated the agency violated its own policies, as well as federal statutes and regulations that prohibit discrimination and retaliation against employees.

Complainant testified that her race was a factor in her FY 2021 performance zero rating for Critical Elements 2 and 3 since she is the only African American female throughout the EPA-OIG-OI. She avowed that Mr. Westfall continuously had negative comments about the performance of Mr. Debiew (also African American), although he had not worked with him when Mr. Earle (Caucasian male) became Mr. Westfall's immediate supervisor and things rapidly changed for her. **[Affidavit A]**

**Mr. Westfall** avowed that he was the management official who rated the Complainant's performance for Fiscal Year ("FY") 2021 that assessed and rated Complainant's performance for Critical Elements 2 and 3 as unacceptable. He identified the supervisors/managers for Complainant as himself, Christopher Huntington, and Ms. Gurin during Complainant's FY 2021 rating period; October 1, 2020 through September 30, 2021. Mr. Westfall indicated that there were several rating officials for Complainant during FY 2020: himself, Edwin Debiew, and Daniel Hawthorne. Mr. Westfall stated that Mr. Debiew provided an Interim Performance Rating to Complainant but without narrative or explanation as to his rating. He stated that narrative entries noted under the six Critical Elements were provided by him and Mr. Hawthorne, which were used to support the final rating of Complainant. Mr. Westfall averred

ALISA WALTON                                          AGENCY NO. 2022-0009-R06

that Complainant was not rated for the same project performance deficiencies for both FY 2020 and FY 2021 appraisal ratings.

Mr. Westfall identified Complainant's rating on each of the elements of her FY 2020 and FY 2021 appraisals as follows:

**FY 2020:**

| Critical Element | Rating Level | Rating Value | |
|---|---|---|---|
| Critical Element 1 (Leadership): | Exceeds Fully Successful | 4 | |
| Critical Element 2 (Communication): | Minimally Successful | 2 | |
| Critical Element 3 (Results Orientation): | Fully Successful | 3 | |
| Critical Element 4 (Teamwork): | Fully Successful | 3 | |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 | |
| Critical Element 6 (Resource Management): | Fully Successful | 3 | |
| Total Rating: | Total Rating: | 3 | Unacceptable |

**FY 2021:**

| Critical Element | Rating Level | Rating Value |
|---|---|---|
| Critical Element 1 (Leadership): | Fully Successful | 3 |
| Critical Element 2 (Communication): | Unacceptable | 0 |
| Critical Element 3 (Results Orientation): | Unacceptable | 0 |
| Critical Element 4 (Teamwork): | Minimally Successful | 2 |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 |
| Critical Element 6 (Resource Management): | Minimally Successful | 2 |
| Total Rating: | Unacceptable | |

Mr. Westfall explained that, based on consultation with HRD, he and Mr. Hawthorne considered and incorporated Mr. Debiew's rating into the final rating for Complainant. He stated that during FY 2021, he rated and assessed Complainant's performance for a full year, as opposed to a limited timeframe in FY 2020 (July 19, 2020, through September 30, 2020), and determined that the lower rating was commensurate of the assessed

performance.  Mr. Westfall attested that he rated Complainant a zero on both Critical Elements 2 and 3, as Complainant's performance for those elements and associated performance standards, were assessed and determined to be unacceptable.  He stated that during the rating MS Teams meeting on October 13, 2021, Complainant disagreed with the ratings and later refused to sign the rating.  Mr. Westfall indicated that Complainant believed her self-narrative was not considered in the final rating.  Mr. Westfall further explained that while Complainant's self-assessment was considered, there were too many examples of documented performance deficiencies in several performance standards, which have not improved over the year, including inaccurate relevant information, incorrectly sourced records, undocumented relevant records, improperly handled evidence, and lack of improved communication.  In response to Mr. Westfall's email dated October 27, 2021, Complainant stated ". . .  am replying to inform you I chose not to sign the performance rating. I do not agree with the performance ratings."

Mr. Westfall avowed that Complainant, as part of her FY 2021 evaluation, provided a self-evaluation that was included in the rating on September 10, 2021.  He averred that Complainant submitted via email her self-assessment, but she did not use the correct performance measures for FY 2021 as provided to her on several different occasions as well as cited in USA Performance system.  Mr. Westfall stated that, on September 17, 2021, Complainant submitted via email a revised self-assessment that incorporated the correct FY 2021 performance standards, but did not include a numeric rating or a summary rating as discussed with her during the performance evaluation on October 13, 2021.

Mr. Westfall stated he explained to Complainant that she received a zero on both Critical Elements 2 and 3, as her performance for those elements and associated performance standards were assessed and determined to be unacceptable.  He identified the applicable policies as OIG's policy and procedures for documenting and conducting performance ratings as detailed in OIG EPARS Handbook, OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6), and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System, and he also was provided guidance by Erik Mabry, Elizabeth Moreira, and Lori Ruk.

Mr. Westfall testified Complainant's race and sex were not factors when she was rated as zero for Critical Elements 2 and 3 of her FY 2021 performance appraisals. **[Affidavit B]**

**Ms. Gurin** identified Garrett Westfall as the management official who gave Complainant's FY 2021 performance appraisal a rating of zero on Critical Elements 2 and 3**.**  She indicated that the FY 2021 Elements Ratings were as follows:

| | |
|---|---|
| Leadership: | Fully Successful – 3 |
| Communication: | Unacceptable – 0 |
| Results Orientation: | Unacceptable – 0 |
| Teamwork: | Minimally Successful – 2 |
| Customer Relations: | Fully Successful – 3 |
| Resource Management: | Minimally Successful – 2 |

**ALISA WALTON**                                          **AGENCY NO. 2022-0009-R06**

Ms. Gurin stated that she was present during the year-end evaluation meeting on October 13, 2021, but did not recall what Mr. Westfall said to Complainant. She indicated Complainant did not complain to her that she should have received a higher rating. Ms. Gurin indicated that she was copied on an email dated September 12, 2021, from Mr. Westfall to the Complainant stating that he had received the Complainant's self-assessment and had looked into USA Performance, but that she had used the wrong standards. She further indicated that Complainant responded to Mr. Westfall in an email received on September 17, 2021, "will review and revise the narratives".

Ms. Gurin averred that Complainant's performance deficiencies have been well documented and supported with several opportunities to improve performance, including during the PIP period, but improvements to those deficiencies were not made.

Ms. Gurin testified she has no personal knowledge if Complainant's race and sex were factors when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal. **[Affidavit C]**

**[INVESTIGATOR'S NOTE: For the remaining questions, Ms. Gurin responded "I have no personal knowledge."]**

**Mr. Earle** identified Garrett Westfall and Ms. Gurin as Complainant's supervisors during the reporting period. He stated that the supervisory change was due to Ms. Gurin being promoted during the rating period. Mr. Earle averred that he had no involvement in her performance appraisal or any rating Complainant was provided. He explained that performance rating periods are from October 1 to September 30, the start date of the performance period. Mr. Earle indicated that Mr. Westfall rated Complainant in FY 2020 and Ms. Gurin was assigned as supervisor during the FY 2021. He indicated performance appraisals evaluate the employee performance during the rating period specified, and achievements and performance of the employee are to be rated for that period.

Mr. Earle attested he does not recall having any discussion with Complainant regarding her rating. He stated that the supervisor rated Complainant's performance at the level indicated, that throughout this document the supervisor would have had to be in contact with OIG Office of Counsel and Office of Human Resources prior to the rating being issued, and advised if the rating was warranted based on the employee's performance.

Mr. Earle testified Complainant's race and sex were not factors when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisals, since he had no role in her rating. **[Affidavit D]**

**[INVESTIGATOR'S NOTE: For the remaining questions, Mr. Earle stated "I was not her supervisor."]**

**Christopher Huntington, Supervisory Criminal Investigator, Assistant Special Agent in Charge, Office of Investigation / Western Region Field Office / Western Division, San Francisco, California** stated that he was not aware that the Complainant received a rating of

zero on Critical Elements 2 and 3. Mr. Huntington indicated that he was the Complainant's supervisor for approximately two weeks of the FY 2021 rating period. Mr. Huntington identified Garrett Westfall as the management official who was also involved as the rating official. Mr. Huntington avowed he provided input to the rating official as to the interaction he had with the Complainant. He stated that he provided her with an official rating that would have involved the work he observed she had conducted on the investigations assigned to her. Mr. Huntington averred that during FY 2021, there was nothing about Complainant's performance that he can recall as standing out. He indicated that Complainant did not contact him regarding the rating she received. Mr. Huntington further indicated that on September 8, 2021, he emailed the Complainant and her peers assigned to the Western Region Field Office regarding the importance of submitting a self-assessment, and that he was not the supervisor of the Complainant at the time of the email.

Mr. Huntington testified that he has no awareness of what factors were taken into account to determine a zero rating on any Critical Element for the Complainant. **[Affidavit D]**

**[INVESTIGATOR'S NOTE: For the remaining questions, Mr. Huntington responded that he was not the Complainant's rating official and had no ability to rate the Complainant for any Critical Element of the performance appraisal**.]

## AFFIDAVIT TESTIMONY (Retaliation Allegation)

**Complainant** stated that her prior EEO activity was a factor since Mr. Earle was close friends with former Special Agent Susan Chandler (Caucasian female), who was the subject of her 2015 EEO complaint and was made aware of her protected activity. **[Affidavit A]**

**Mr. Westfall** testified that Complainant's prior EEO activity was not a factor when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisals since he had no knowledge or involvement in her prior EEO**. [Affidavit B]**

**Ms. Gurin** testified that she has no personal knowledge of Complainant's prior EEO activity, and that it was not a factor when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal. **[Affidavit C]**

**Mr. Earle** testified he was not aware of any EEO activity for Complainant. **[Affidavit D]**

**Mr. Huntington** testified he was not aware of any prior EEO activity relating to the Complainant nor was he aware of what factors were taken into account to determine a zero rating on any Critical Element for the complainant. **[Affidavit G]**

## CLAIM 3. COMPLAINANT'S 2020, PERFORMANCE APPRAISAL WAS LOWERED WITHOUT EXPLANATION

## AFFIDAVIT TESTIMONY (Race and Sex Allegations)

**Complainant** explained that Mr. Debiew left the agency in late June of 2020, prior to the close of the performance rating cycle, but because he had supervised her for the majority of the year he provided an "interim rating" of 4.33 for Complainant.  She avowed that her FY 2020 annual rating was baselessly downgraded to 3.0 by Dan Hawthorne (Caucasian male) and Mr. Westfall.  Complainant indicated that she was informed by Mr. Hawthorne of her downgrade because she missed a meeting on July 1, 2020, due to being sick with COVID.  However, each one of her Critical Elements, with the exception of 1 (Leadership), was lowered on the final appraisal without explanation.

Complainant explained that Communication was lowered from a four (4) to a two (2), and the others were lowered from ratings of four (4) or five (5) to three (3). Complainant stated that when she expressed her dissatisfaction and disagreement with Mr. Hawthorne and Mr. Westfall, Mr. Hawthorne stated that a three (3) is not bad – "It means you did what you were supposed to do."  Complainant averred that she ended the conversation by saying she does not agree with the lowering of her rating and their reasons were not justified.  Additionally, Complainant indicated that Mr. Earle was known to express his opinion on how other agents whom he did not supervise should be reprimanded, and believed that Earle had some involvement in her FY 2020 rating.  Complainant attested her performance goals were to obtain more cases, attend more professional trainings, and provide more fraud awareness briefings which she accomplished, with the exception of professional trainings due to COVID.

Complainant attested she should have received a rating of at least a four (4) – 4.5 (Exceeds Fully Successful / Outstanding).  She explained that from January 2019 - September 2020, she was the only case agent in the Dallas office and was responsible for reviewing all complaints and preliminary inquiries that were received by Region 6 OIG-Investigations.  Complainant stated that the FY 2020 standards required that she maintain at least eight (8) cases, but instead she maintained eleven (11) cases.  Complainant indicated that during the 2020 performance appraisal period, Mr. Debiew regularly provided feedback on her performance.  Specifically, she stated that in April 2020 during her mid-year review, Mr. Debiew stated that she was doing a great job and encouraged her to keep up the great work because he was retiring. Complainant indicated that she discussed her 2020 performance rating with Mr. Hawthorne and Mr. Westfall, and that she discussed the changed rating with Mr. Debiew after he retired.

Complainant stated that she did not appeal the decision in connection with the FY 2020 performance rating. Complainant indicated that after contracting COVID, which manifested through late December, she expected retaliation. Complainant stated that she is not a part of a union. Complainant stated that the agency violated its own policies, federal statutes, and regulations that prohibit discrimination and retaliation against employees.

Complainant declared that she was harmed since she was unable to apply for 1811 positions within or outside the EPA.  Complainant added she was embarrassed, mentally and emotionally disturbed, and stressed that those symptoms affected her physically as she was often unable to eat or sleep.  Complainant stated that the unjustified lowering of her performance FY 2020 ratings was one of the first actions that followed after Mr. Debiew's retirement.  Additionally, she stated that unjustified ratings on her FY 2021 appraisal,

Investigative Summary
Page 30 of 60

placement on a PIP, and subjection to unrelenting scrutiny of her work as well as constant negative comments about Mr. Debiew and her supposed mishandling of evidence have made her work environment intolerable.

Complainant testified that she is the only African American female throughout the EPA-OIG-OI, and Mr. Westfall continuously had negative comments about the performance of Debiew (also African American) although he had not worked with him. **[Affidavit A]**

**Mr. Westfall** stated that during FY 2020, Complainant fell under the supervision of three separate supervisors during FY 2020, and all three raters contributed to her rating. Mr. Westfall indicated that, when Mr. Debiew departed, he provided an Interim Performance Rating to Complainant, without narrative, explanation, nor rationale as to his rating. He further indicated that HRD advised him that Complainant would need to be provided a Final FY 2020 Performance Rating. Mr. Westfall attested that narrative entries noted under the six Critical Elements were provided by him and Mr. Hawthorne, which were used to support the final rating of Complainant.

Mr. Westfall explained that he was Complainant's first-line supervisor from July 19, 2020, through September 30, 2020, and that the FY 2020 performance appraisal rating period was from October 1, 2019, through September 30, 2020. He identified the FY 2020 performance appraisal rating as follows:

**FY 2020**

| Critical Element | Rating Level | Rating Value |
|---|---|---|
| Critical Element 1 (Leadership): | Exceeds Fully Successful | 4 |
| Critical Element 2 (Communication): | Minimally Successful | 2 |
| Critical Element 3 (Results Orientation): | Fully Successful | 3 |
| Critical Element 4 (Teamwork): | Fully Successful | 3 |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 |
| Critical Element 6 (Resource Management): | Fully Successful | 3 |
| Total Rating: | Fully Successful | 3 |

Mr. Westfall avowed that Complainant's FY 2020 appraisal was (1) not lowered, and (2) not derived nor provided without explanation, and in full consultation with HRD. He stated that Complainant received one FY 2020 final rating that was not lowered. Mr. Westfall explained that Complainant received an interim rating from her retiring supervisor, Edwin Debiew, on June 5, 2020, with a higher interim rating, but that rating did not cover nor extend through the entire rating period, as she was on the same performance standards through September 30, 2020. Mr. Westfall further explained that, based on consultation with HRD, the June 5, 2020, rating was not a final rating as it did not encompass the entire rating period. He stated that he

Investigative Summary
Page 31 of 60

**ALISA WALTON**                                           **AGENCY NO. 2022-0009-R06**

gave an explanation to Complainant during a MS Teams meeting on or about November 10, 2020; with Mr. Hawthorne explaining that the rating provided by Mr. Debiew was an interim rating as of June 5, 2020, and was considered and incorporated into her rating. He stated that Mr. Hawthorne further advised that her final rating included input provided by both him and Mr. Hawthorne for the remainder of the rating period. Mr. Westfall indicated that during the Teams call on November 10, 2020, Mr. Hawthorne discussed the reason behind the rating under each Critical Element, and discussed several performance deficiencies with her including but not limited to timeliness, poor communication, and the factual case inaccuracy she highlighted in her FY 2020 self-assessment. He added that during the meeting, he informed Complainant that for FY 2021 she needed to prioritize communication with her supervisor, upload accurate case information, and respond to inquiries in a timely fashion.

Mr. Westfall declared during the rating MS Teams meeting on November 10, 2020, Complainant disagreed with the rating, specifically the assessment in Communication and Teamwork. He stated that in her email to him on November 10, 2020, Complainant stated that, "As discussed during my 2020 EPARS final year review, I did not and do not agree with the numerical ratings. Specifically for the Critical Elements of Communication and Teamwork." Mr. Westfall indicated that he had discussions with Complainant regarding her performance and deficiencies on July 19, 2020, through September 30, 2020. Mr. Westfall identified the applicable agency policies as OIG's policy and procedures for preparing and conducting performance ratings as detailed in the OIG EPARS Handbook, the OIG Supervisor's Guide to Dealing with Poor Performance, and consulted with HRD and Mr. Hawthorne in providing input to her FY 2020 rating. Mr. Westfall avowed Complainant never made any harassment claims or reported to him that she felt she was being harassed nor that there was a hostile work environment.

Mr. Westfall testified Complainant's race and sex were not factors when allegedly her FY 2020 performance appraisal rating was lowered without explanation. **[Affidavit B]**

**Ms. Gurin** stated that she and Complainant were co-workers in FY 2020, she had no involvement in appraising her work, and was not involved in a decision or action to lower the performance appraisal. She indicated that Complainant did not complain to her that she should have received a higher rating.

Ms. Gurin testified that she has no personal knowledge if Complainant's race and sex were factors when her FY 2020 performance appraisal rating was lowered without explanation. **[Affidavit C]**

**[INVESTIGATOR'S NOTE: For the remaining question for Claim 3, Ms. Gurin responded "I have no personal knowledge."]**

**Mr. Earle** identified Mr. Westfall as Complainant's rating official and that he was unaware of her rating being lowered. He explained that performance periods are from October 1 through September 30. Mr. Earle declared he had no discussion with Complainant about her performance. Mr. Earle avowed he made no decision to lower Complainant's rating since he was not her supervisor.

Mr. Earle testified that Complainant's race and sex were not and should never be factors regarding her FY 2020 performance appraisal rating, which was lowered without explanation. **[Affidavit D]**

**AFFIDAVIT TESTIMONY (Retaliation Allegation)**

**Complainant** stated that her prior EEO activity was a factor since Mr. Earle was close friends with former Special Agent Susan Chandler (Caucasian female), who was the subject of her 2015 EEO complaint and was made aware of her projected activity. **[Affidavit A]**

**Mr. Westfall** testified that Complainant's prior EEO activity was not a factor when allegedly her FY 2020 performance appraisal rating was lowered without explanation, since he had no knowledge or involvement in any prior EEO activity. **[Affidavit B]**

**Ms. Gurin** testified that she has no personal knowledge if Complainant's prior EEO activity was a factor when her FY 2020 performance appraisal rating was lowered without explanation. **[Affidavit C]**

**Mr. Earle** testified that Complainant's prior EEO activity should never be a factor when her FY 2020 performance appraisal rating was lowered without explanation, and he was not aware of any prior EEO activity. **[Affidavit D]**

**CLAIM 4: IN APRIL 2019, COMPLAINANT WAS PLACED ON A 30-DAY PIP**

**AFFIDAVIT TESTIMONY (Race and Sex Allegations)**

**Complainant** identified Michael Fiore and Sean Earle as the management officials who were responsible for placing her on a 30-day Performance Improvement Plan (PIP) in April 2019. Complainant indicated that the PIP began on April 24, 2019, and ended on May 21, 2019. Complainant explained that a couple of weeks before being placed on the PIP, she was told that Mr. Debiew would no longer be supervising her day-to-day activities.  She stated that Mr. Fiore, who was located in the Chicago office, would be assuming that role.  Complainant indicated that Mr. Debiew, who had been her supervisor for years, was not informed nor consulted about the 2019 PIP before it was imposed upon her.

Complainant stated that she received a call from Mr. Fiore on April 24, 2019, and received a written notification via email the same day. She indicated that management did not meet with her prior to placing her on the 30-day Performance Improvement Plan.  Complainant stated that she discussed this matter with Mr. Debiew, specifically stating that the PIP was unexpected.  Furthermore, Complainant stated that she informed Mr. Debiew that she received a call from Mr. Fiore about some documents not being uploaded into the Electronic Case Management System ("ECMS").  She stated that she informed Mr. Fiore that she had completed the documents, and he replied that he did not see them uploaded in the ECMS upon review of her folders, and realized the documents had not been uploaded.

Investigative Summary
Page 33 of 60

Complainant indicated that she advised Mr. Fiore she would upload the documents into the ECMS; in his response, he instructed her to hold off on uploading the documents and he would let her know when to upload them.  Complainant indicated that she received a call from Mr. Fiore stating that she was being placed on a PIP for Critical Element 3 (Results Orientation) and Critical Element 6 (Resource Management). Complainant avowed that prior to being placed on the 30-day PIP in April 2019 she had been made aware that she needed to be timely with submitting her reports and timesheets. Complainant asserted that she attempted to correct it by timely submitting timesheets and reports. She explained that there were three (3) timekeeping systems and only got a reminder for one system, which was the payroll timekeeping system.

Complainant indicated that the reason for the 30-day Performance Improvement Plan in April 2019 was provided on the PIP.  She stated that she did not agree with being placed on a PIP when she had already completed the work but had not uploaded it into the ECMS. Complainant stated that she was harmed when her professional reputation was damaged, was not given opportunities for advancement or special projects, and was no longer asked to conduct or assist with computer forensics.  Complainant indicated that the PIP was one part of the hostile work environment to which she has been subjected by the agency.

Complainant testified that she does not believe that Mr. Fiore discriminated against her for her race, sex, or EEO activity; however, she does believe that Mr. Earle was involved in this action. Complainant averred that Mr. Earle has made statements in the past that women do not belong in law enforcement. **[Affidavit A]**

**Mr. Westfall** avowed that he was not employed by EPA OIG in 2019, and not involved in the decision to place Complainant on a 30-day PIP in April 2019. **[Affidavit B]**

**Ms. Gurin** avowed that she had no involvement with placing the Complainant 30-day PIP, as she was a non-supervisory field agent. **[Affidavit C]**

**Mr. Earle** avowed that he has no knowledge of Complainant's Performance Improvement Plan (PIP) in April 2019.  He explained that a supervisor placed an employee on a PIP if the employee's performance falls to an unsatisfactory level during the rating period in any Critical Element. Mr. Earle stated that prior to the employee being placed on a PIP, OIG Office of Counsel, and the Office of Human Resources are consulted for guidance in this process.  He stated that he was not aware of any discussions conducted with Complainant during this performance period.  Mr. Earle averred that he made no decision to place Complainant on the 30-Day PIP.

Mr. Earle testified Complainant's race and sex should never have been factors when Complainant was placed on a 30-Day PIP in April 2019. **[Affidavit D]**

**[INVESTIGATOR'S NOTE: For the remaining questions, Mr. Earle stated "I Was Not Her Supervisor."]**

Investigative Summary
Page 34 of 60

**Mr. Mabry** stated that he was not involved with this action, since he became an employee of EPA/Office of Inspector General on December 9, 2019. **[Affidavit E]**

**Ms. Ruk** stated that she was assigned to provide legal assistance to the supervisor who placed Complainant on a PIP, and further details of her involvement are subject to the attorney-client and/or work product privileges. She stated that Complainant did not make her aware of any concerns, but was aware that she expressed concerns to a management official.

Ms. Ruk avowed that the memorandum dated April 24, 2019, and with the subject line "Opportunity to Demonstrate Acceptable Performance", was issued to the Complainant, and states the reasons why Complainant was placed on the PIP.

Ms. Ruk testified that race and sex were not factors when Complainant was placed on a 30-Day PIP in April 2019. **[Affidavit H]**

**[Investigator's note:  For the remaining answers, Ms. Ruk responded "Any advice provided to an OIG supervisor would be subject to the attorney-client and/or attorney work product privileges, and the questions seek information subject to the attorney client and/or work product privileges."]**

**Ms. Moreira** avowed that she was not aware of the April 2019 PIP, the issuance of which predated her EPA OIG employment. **[Affidavit I]**

**AFFIDAVIT TESTIMONY (Retaliation Allegation)**

**Complainant** testified that she does not believe that Mr. Fiore discriminated against her for her EEO activity; however, she does believe that Mr. Earle was involved in this action. Complainant averred that Mr. Earle was close friends with Susan Chandler, who was the subject of an EEO complaint filed in 2015 based on her racist comments towards her. **[Affidavit A]**

**Mr. Earle** testified that he was not aware of any prior EEO activity for Complainant. **[Affidavit D]**

**Ms. Ruk** testified that Complainant's prior EEO activity was not a factor when Complainant was placed on a 30-Day PIP. **[Affidavit H]**

**CLAIM 5: ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

**Complainant** affirmed she was issued a Notice of Proposed Removal on or about March 1, 2022, for failing to successfully complete the PIP Complainant was placed on November 10,

2021. On April 22, 2022, Complainant was notified that a decision was made to not substantiate the Removal. Complainant identified Garrett Westfall as the one who initiated and signed the Notice of Proposed Removal, and Sean Earle gave Mr. Westfall guidance and approval for the issuance of the Notice of Proposed Removal. Complainant stated that, on March 1, 2022, she received a Microsoft (MS) Teams invitation entitled "FY 2021 Performance Meeting" from Mr. Westfall, which requested her to meet him. She indicated that Rufus Mabry, Human Resource Directorate, was also included on the invitation. Complainant further indicated that during the MS Teams meeting, Mr. Westfall stated that he was sending a Notice of Proposed Removal to her. Complainant contended that Mr. Earle has a great influence on performance matters and would have reviewed and given input on the decision and process. Complainant identified Thomas Roelke as the management official who made the decision to not substantiate the removal.

Complainant indicated the reason stated in the Notice of Proposed Removal for Unacceptable Performance was "due to unacceptable performance on Critical Element 2: Communication and Critical Element 3: Results Orientation in your Employee Performance Appraisal and Recognition System (EPARS) performance plan for fiscal year 2021." Complainant stated that she disputed the reason because the FY 2021 EPARS rating Mr. Westfall gave her was inaccurate and unsupported, which led to the unsupported and unwarranted PIP. She contended, based on the amount of work and the type of assignments, it is her belief that the PIP was a pretext for setting her up for removal from the federal service.

Complainant averred that she submitted an oral and written response to the Notice of Proposed Removal.  She stated that she provided copies of her prior performance ratings from four of her five previous supervisors (Craig Clinton, Darryl Ahmad, Michael Fiore, and Edwin Debiew) containing information regarding her communication, results performed, writing ability, integrity, and teamwork throughout her sixteen years as a Special Agent. Complainant avowed that Mr. Roelke stated "In making this decision, I have carefully and objectively considered the facts detailed in the Notice of Proposed Removal for Unacceptable Performance and the supporting documentation, as well your oral and written responses. After carefully reviewing the totality of materials and information that I was provided, I am not sustaining the proposal to remove you from your position."

Complainant contended that she was embarrassed, humiliated, and fearful that she was going to lose her job and not be able to provide for her family. For these reasons, Complainant stated that she experienced severe headaches, sleepless nights, loss of appetite, needed therapy, medical appointments, constant anxiety to cease extracurricular activities, and had to pay additional attorney fees which caused financial strain on her household.

Complainant attested that she believes Mr. Westfall's actions constituted harassment since he lowered her FY 2020 EPARS from 4.33 to 3.0., rated FY 2021 EPARS a 1.66. and placed her on an unattainable and overwhelming PIP on November 10, 2021.  She contended that the lowering of her FY 2020 EPARS was the beginning of management's plan to terminate her. Complainant identified the applicable policies as Title VII of the Civil Rights Act, EPA

Anti-Harassment policy, EPA Mass Mailer, and EPA's Commitment to Equal Employment Opportunity.

Complainant testified that her race and sex were factors in her being issued a Notice of Proposed Removal and notified on April 22, 2022, that a decision was made to not substantiate the Removal since she is the only Black female special agent in EPA-OIG-OI throughout the nation.  **[Affidavit A]**

**Mr. Westfall** avowed that he made the decision to issue Complainant a Notice of Proposed Removal in consultation and concurrence with HRD and OC. He indicated that he provided via email a Notice of Proposed Removal to Complainant on March 1, 2022, based on the results of the failed PIP and her inability to improve her performance to a minimally successful level.  Mr. Westfall avowed that he recommended the action because Complainant failed to improve her performance to a minimally successful level in the cited Critical Elements during the 45-day PIP evaluation.  Mr. Westfall indicated that an agent's work product is relied upon by both internal and external stakeholders to the government that include the Agency, prosecutors, judges, victims, and the subjects of our investigations.  He further indicated that all work products must be accurate, including information provided to prosecutors to support criminal or civil prosecutions.  Mr. Westfall avowed that, during the 45-day PIP evaluation, Complainant failed to provide accurate, relevant, correctly sourced records, and clear and concise work products.  As a management official, Mr. Westfall averred that he was responsible to ensure OIG work products are relevant, clear, concise, accurate, and supported with facts, and he did not have confidence that Complainant could submit accurate, factual work products to internal and external stakeholders.

Mr. Westfall stated that he consulted and concurred with Erik Mabry, Elizabeth Moreira, and Lori Ruk regarding the proposed action.  He stated that Complainant was notified via email and MS Teams to discuss the proposed action, and that Erik Mabry was also present.  During the meeting on March 1, 2022, Mr. Westfall indicated that he informed Complainant that she was being issued a Notice of Proposed Removal because of her failure to improve her performance in two critical performance elements during the PIP.  Mr. Westfall stated that he did not provide any warning to Complainant prior to being issued the Notice of Proposed Removal, and was unaware of any a requirement for prior notification.  In response to the Notice of Proposed Removal, Mr. Westfall declared that Complainant provided verbal or written response to the Notice of Proposed Removal as part of the PIP process to the decision official, Thomas Roelke.  He averred that on April 22, 2022, Mr. Roelke did not substantiate the removal recommendation of Complainant.  As a result of this decision, Mr. Westfall stated that Complainant's current work status has remained unchanged.  Mr. Westfall attested that Complainant never made any harassment claims or reported to him that she felt she was being harassed or there was a hostile work environment.  Mr. Westfall identified the applicable policies as the EPA OIG's policy and procedures for a PIP and related actions as detailed in OIG Supervisor's Guide to Dealing with Poor Performance, and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System.

**ALISA WALTON**                                          **AGENCY NO. 2022-0009-R06**

Mr. Westfall testified that Complainant's race and sex were not factors in his decision when she was given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 2020. **[Affidavit B]**

**Mr. Earle** avowed that he was not the Complainant's supervisor and had no knowledge if she received a Notice of Proposed Removal on March 1, 2022, for failing to successfully complete the PIP. Mr. Earle averred that he had no involvement in this action. He identified Complainant's supervisors as Garrett Westfall and Staci Gurin.

Mr. Earle stated that he was not involved in the issuance of the Notice of Proposed Removal and did not consult with anyone regarding the issuance of it. Mr. Earle indicated that he was not aware of what reasons were provided to Complainant. He indicated that Complainant is currently working cases as expected.

Mr. Earle testified that he was not involved in the issuance of a Notice of Proposed Removal and Complainant's race and sex were not factors in his decision-making. **[Affidavit D]**

**Mr. Mabry** affirmed that Complainant received a Notice of Proposed Removal for Unacceptable Performance on March 1, 2021, and was issued a Decision on Proposed Removal to not sustain the removal on April 22, 2022. Mr. Mabry stated that as a Human Resource Specialist, he does not make a decision to issue an employee a Notice of Proposed Removal. He indicated that his responsibility is to advise management officials based on regulations, policy, and procedures. Mr. Mabry avowed that he did not make a recommendation on the issuance of the Notice of Proposed Removal. He identified Garrett Westfall as the management official who issued the Notice of Proposed Removal to Complainant. Mr. Mabry averred that Complainant was issued the Notice of Proposed Removal due to management's decision that the employee failed to improve to the minimally successful level for either of the two Critical Elements during the PIP period.

Mr. Mabry stated that the PIP Memorandum provided to Complainant advised that failure to improve her performance to at least the Minimally Successful level for both Critical Element 2 and Critical Element 3 could result in reassignment, reduction in grade, or removal from federal service based on unacceptable performance. He indicated that during this opportunity period, it was determined by management that Complainant failed to demonstrate acceptable performance. Therefore, he contended management proposed the Complainant be removed from federal service**.**

Mr. Mabry testified that he made no decision associated with Complainant's Notice of Proposed Removal for failing to successfully complete the PIP she placed on November 10, 2020, and notified on April 22, 2022, that a decision was made to not substantiate the Removal. **[Affidavit E]**

**Thomas Roelke, Deputy Assistant Inspector General for Investigators, HQ Operations Directorate, Office of Investigations, Washington, DC** stated that he began as Acting Deputy Assistant Inspector General for Investigators in 2021 and was subsequently selected

for his current position. He indicated that Complainant is assigned to the Dallas Office and he does not work with her.

Mr. Roelke affirmed that Complainant received a Notice of Proposed Removal for Unacceptable Performance on March 1, 2021, and was issued a Decision on the Proposed Removal to not sustain the removal on April 22, 2022. Mr. Roelke avowed he made the decision not to substantiate the removal that was proposed by Garrett Westfall.

Mr. Roelke averred that Complainant provided to him an oral and a written response. He stated that he was informed by Human Resources that he could support the proposed removal, recommend reassignment, or take no action. Mr. Roelke indicated that his preference was to reassign Complainant; however, Complainant was under new supervision, so he decided to take no action by not sustaining the proposal to remove her. Mr. Roelke attested that after review of the totality of materials and information provided to him, he decided to not sustain the proposal to remove Complainant from her position.

Mr. Roelke testified that Complainant's race and sex were not factors in his decision. **[Affidavit F]**

**Ms. Ruk** stated that a Notice of Proposed Removal for Unacceptable Performance dated March 1, 2022, was issued to Complainant. She indicated that the decision on the proposed removal was to not sustain the proposed removal, which was dated April 22, 2022.

Ms. Ruk avowed that she was assigned to provide legal assistance to the management officials in this matter and did not have the authority to make management decisions. She identified the Notice of Proposed Removal for Unacceptable Performance was issued by Garrett Westfall. She attested that the Notice of Proposed Removal for Unacceptable Performance and accompanying documents indicate why the proposed removal was issued to Complainant. Ms. Ruk stated that Complainant and her attorney provided written and oral responses to the Notice of Proposed Removal to Thomas Roelke, who served as the Deciding Official for the proposed removal. She declared that Mr. Roelke issued a memorandum titled "Decision on Proposed Removal" in which he did not sustain the proposed removal.

Ms. Ruk testified that Complainant's race and sex were not factors since she is not a management official and made no management decisions pertaining to this matter. **[Affidavit H]**

**Ms. Moreira** stated that in late March 2022, she was instructed by Office of Counsel management to no longer be substantively involved in this matter due to other work priorities. She stated that the Notice of Proposed Removal indicated the reasons provided to the Complainant.

Ms. Moreira testified that she has no knowledge that would indicate that Complainant's race and sex were factors in the decision regarding the Notice of Proposed Removal for failing to successfully complete the PIP. She stated that Complainant was given notice on November

10, 2020, and notified on April 22, 2022, that a decision was made to not substantiate the Removal. **[Affidavit I]**

**[Investigator's note: Ms. Moreira responded to the remaining questions as follows: "Any details regarding any involvement and/or recommendations from me regarding the issuance of the Notice of Proposed Removal, are protected by the attorney-client and/or attorney work product privileges."]**

### AFFIDAVIT TESTIMONY (Retaliation Allegation)

**Complainant** testified her prior EEO activity was a factor in her being issued a Notice of Proposed Removal and notified on April 22, 2022, that a decision was made to not substantiate the Removal because she previously filed an EEO complaint against a woman who was close friends with Mr. Earle. **[Affidavit A]**

**Mr. Westfall** testified that Complainant's prior EEO activity was not a factor in his decision since he has no knowledge or involvement in Complainant's prior EEO activity.  **[Affidavit B]**

**Mr. Earle** testified that he was unaware of any prior EEO activity, nor would that be a factor in any decision he would make. **[Affidavit D]**

**Mr. Mabry** testified that he made no decision associated with Complainant's Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 2020, and notified on April 22, 2022, that a decision was made to not substantiate the Removal. **[Affidavit E]**

**Mr. Roelke** testified that Complainant's prior EEO activity was not a factor in his decision to sustain the Notice of Proposal Removal.  **[Affidavit F]**

**Ms. Ruk** testified that Complainant's prior EEO activity was not a factor since she is not a management official and made no management decisions pertaining to this matter. **[Affidavit H]**

**Ms. Moreira** testified that she was not involved in or aware of the prior EEO activity. **[Affidavit I]**

### CLAIM 6: ON MAY 2, 2022, COMPLAINANT WAS INFORMED THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT.

**Complainant** stated that she was initially informed about an internal investigation in December of 2021, but after she was issued the Notice of Proposed Removal, that investigation was placed on hold. She indicated that she was informed on April 22, 2022, that the proposed removal was not sustained and advised that she would be interviewed as part of an internal investigation. Complainant identified Garrett Westfall and Sean Earle as the management officials responsible for the internal investigation.

Complainant avowed that, based on the interview she had on May 25, 2022, with Paul Brezenski and Jeremy Campbell, her timesheets for FY 2022 pay period 1, FY 2021 pay periods (13, 15, 23, 24, 25), and her Projected Management Actuals ("PMA"), her timesheets were reviewed because she worked and charged time to Law Enforcement Availability Pay ("LEAP") on Sunday/Saturday.  She stated that Mr. Brezenski stated the entry of her working on a Saturday and a few Sundays were anomalies. Complainant declared the pay periods were because of her low performance rating. Complainant attested she received LEAP and expected to be available 24 hours a day, 7 days a week. She explained she is allowed to work and charge time at any time or day of the week. Complainant averred that throughout the years, she has worked on a Saturday and/or Sunday, and there has never been an issue or question.

Complainant avowed that on December 1, 2021, she received a phone call from Mr. Brezenski stating he and Mr. Campbell wanted to meet her in the office on December 8, 2021, to talk about her official duties. She told Mr. Brezenski she would contact Mr. Westfall to see about rescheduling their meeting for that date and time. Complainant stated that the interview was not rescheduled until after Mr. Roelke issued the April 22, 2022, decision declining to sustain the proposed removal. She indicated that on May 2, 2022, Mr. Brezinski sent another email to her and counsel requesting to schedule an in-person interview with her on May 25, 2022.

Complainant attested that Mr. Brezenski stated that she was being interviewed because her PMA timesheets reflect time charged on one Saturday and four Sundays.  She stated that Mr. Brezenski stated she charged time to particular cases, but did not have chronological entries in the case management system to reflect those dates.  During the interview, Complainant stated that she explained to Mr. Brezenski and Mr. Campbell what matters she was working on during the dates in question. She explained that she informed the investigators that to her knowledge she was never presented with a policy or procedure specifying that in order to charge time to a case on any given period, especially on a Saturday or Sunday, it was required to document what work was completed.  She indicated raised similar issues in her reply to proposed removal regarding conflicting directions by management about how to enter information in the case management system. Complainant further indicated that she confirmed in the interview that she never falsely entered time on a case that she did not actually work.

Complainant avowed management alleged she charged time for work not performed and a case entry she accidentally placed in the same entry her supervisor created. She explained a matter such as this would not have been noticed or addressed. Complainant averred that she believed the misconduct investigation was a pretext to remove her for discriminatory and retaliatory reasons. Complainant stated that in the sixteen years she worked for the EPA, she worked on Saturdays and/or Sundays on occasion, and has never been questioned and certainly other agents have worked on Saturdays and Sundays and charged time without being subjected to an internal investigation. Complainant contended she was not and has never been personally involved in any misconduct and did not communicate with any management officials her concerns regarding the internal investigation. She identified the

applicable policies as Title VII of the Civil Rights Act and the EPA EEO and Harassment Policy.

Complainant testified her race and sex were factors when she was informed that an internal investigation was initiated based on allegations of misconduct leading her to be singled out for this baseless investigation due to her race and sex because she is the only Black female with the EPA-OIG-OI. **[Affidavit A]**

**Mr. Westfall** stated that he referred possible misconduct allegations involving Complainant to HRD and OC as early as October 2021.  Based on consultation with HRD and OC on several occasions, Mr. Westfall opined that any possible conduct-related issues could not be addressed until the PIP and possible recommending action were resolved.  Accordingly, he stated that the conduct issues were tabled until the PIP action, Complainant response, and the decision were concluded on her removal.  Mr. Westfall indicated that managerial discussions with Marc Perez and Sean Earle occurred as early as November 2021, when Mr. Perez decided to initiate an internal investigation directed by the Office of Investigations' Eastern Region Field Office, based on two matters that were brought to his attention.  Mr. Westfall avowed he did not make the decision to initiate an internal investigation but relayed concerns and related relevant documents regarding several alleged misconduct issues.  Mr. Westfall stated that the case was investigated by Paul Brezinski and Joey Campbell, and that he had no visibility or oversight of the case. Accordingly, Mr. Westfall indicated that he had no detailed knowledge of the investigative plan, steps taken, or findings.

Mr. Westfall contended that the internal investigation of Complainant was derived based on four referrals from him, which are as follows: (1) the circumstances surrounding the loss of computer evidence in the Dallas office; (2) concerns with the possible inflation of Complainant's Law Enforcement Availability Pay (LEAP) hours to achieve the required 2.0 FY 2021 LEAP average; (3) the modification and manipulation of the case chronology log in the ECMS, including his supervisory case review, to support a previously unsupported investigative activity; (4) the modification of another separate case and occurrence than (3), involving a case chronology log in the ECMS to support a previously undocumented investigative activity, which was later reported falsely after the PIP; and (5) the allegation concerning the modification of a subject matter expert (SME) report without the SME's knowledge, that was not included in the internal investigation.

Mr. Westfall indicated that he was excluded from involvement and oversight of the internal investigation and had no direct involvement in the internal interview on May 25, 2022, other than coordination with the interviewing agents for EPA Region 6 entry.  He further indicated that the interviewing agents informed him that they intended to take Complainant's EPA government-owned laptop computer and requested that he obtain a replacement laptop from IT.  Mr. Westfall indicated that the management officials with involvement in the interview involved Marcella Phelps, Marc Perez, and Sean Earle.

Mr. Westfall contended he brought the misconduct allegations to the attention of both Eric Mabry and Lori Ruk, for guidance purposes.  Mr. Westfall stated that the following management officials were responsible for the internal investigation in the following manners:

**ALISA WALTON**                                                    **AGENCY NO. 2022-0009-R06**

• Garrett J. Westfall coordinated and referred the misconduct allegations to HRD, OC, and OI Senior Leadership (Acting AIGI Perez / DAIGI Earle)
• Staci Gurin observed four of the misconduct allegations and provided support records on two of the allegations
• Marc Perez, one of the senior leaders that decided the alleged conduct warranted an internal investigation.
• Sean Earle another senior leader that decided the alleged conduct warranted an internal investigation.

Mr. Westfall stated that he has not been briefed or provided information on the planned investigative steps nor subsequent findings of the internal investigation. He asserted Complainant has not communicated with him any aspect of the internal investigation, including her concerns. He indicated that there are OIG procedures, which he applied as criteria when evaluating Complainant's alleged misconduct in drafting the referrals, including Procedure 206, Procedure 207, Procedure 211, Procedure 223, and Procedure 218.

Mr. Westfall testified Complainant's race and sex were not factors when an internal investigation was initiated based on allegations of misconduct. He clarified that race and sex were not factors when he made the referrals. **[Affidavit B]**

**Ms. Gurin** stated she had knowledge that an internal investigation had been initiated. She indicated that she did not make the decision to initiate an internal investigation. Ms. Gurin indicated that she was aware that Garrett Westfall spoke with Marc Perez and Sean Earle about the issue of the Complainant making a change to a case entry made by SAC Westfall in the Electronic Case Management System. She further indicated she does not know who was responsible for initiating the investigation.

Ms. Gurin explained that, on December 22, 2021, she participated in a weekly assignment meeting with Mr. Westfall and Complainant that involved a Case Closing Report (CCR), involving an investigation that had been submitted by Complainant. Ms. Gurin avowed that she and Mr. Westfall concluded that Complainant may have made "two entries after the fact" and confirmation was received on January 6, 2022, by Mr. Westfall. Ms. Gurin attested she has an email from Mr. Westfall, which identifies the date and person who made the changes to the following changes:

1. Chron Log modifications – backend data – OI-DA-2021-ADM-0025_Redacted
2. Re_ Chron Log modifications – backend data – OI-DA-2021-ADM-0025_Redacted
3. OI-DA-2021-ADM-0025_chron_log_Redacted

Ms. Gurin stated she has no personal knowledge of how and when Complainant was notified of the duration of the internal investigation. Ms. Gurin indicated she was not present when the investigation took place.

Ms. Gurin testified she has no personal knowledge of the Complainant's race and sex as factors when an internal investigation was initiated. **[Affidavit C]**

**ALISA WALTON**                                                          **AGENCY NO**. **2022-0009-R06**

**Mr. Earle** avowed he was not Complainant's supervisor and was unaware of the facts of an internal investigation.  Mr. Earle averred that he had no involvement in this investigation and has made no decisions in this investigation.  He identified Marc Perez as the person who would have requested the opening of the investigation.

Mr. Earle stated that he was not aware of the facts that led up to this internal investigation. He stated that Complainant did not communicate with him and was not aware of the dates for the internal investigation.  Mr. Earle attested he does not know what was obtained from the internal investigation and was not aware of why an internal investigation was conducted.

Mr. Earle testified Complainant's race and sex would never be factors in the initiation of an investigation. **[Affidavit D]**

**[INVESTIGATOR'S NOTE: For the remaining questions, Mr. Earle responded, "I do not have information concerning this investigation."]**

**Mr. Mabry** avowed he was not aware of nor involved in an internal investigation regarding the Complainant.  He indicated he has no knowledge of an internal investigation of the Complainant or the responsible management official.  Mr. Mabry further indicated he was not aware of the facts that led to an internal investigation involving the Complainant. Mr. Mabry stated he was not aware of any information that was obtain from the internal investigation regarding Complainant's alleged misconduct. He stated complainant did not communicate with him regarding an internal investigation.

Mr. Mabry testified he was not aware if the Complainant's race and sex were not factors when an internal investigation was initiated. **[Affidavit E]**

**Ms. Ruk** stated she does not make the decision for an internal investigation to be conducted based on allegations of misconduct. She indicated she does not know what reason was given for the internal investigation. Ms. Ruk further indicated Complainant did not communicate any concerns to her regarding an internal investigation.

Ms. Ruk testified that Complainant's race and sex were not factors when the internal investigation was initialed. **[Affidavit H]**

**[Investigator's note: For the remaining questions, Ms. Ruk responded "The question seeks information subject to the attorney-client and/or work product privileges."]**

**Marc A. Perez, Investigative Counsel, Office of Investigations, Seattle, Washington,** stated he has served in this position since September 2020.  He stated he has been working with Complainant since September 2020.

Mr. Perez avowed Complainant is the subject of an ongoing internal investigation into allegations that she inflated her Law Enforcement Availability Pay (LEAP) hours prior to her submission of her FY2021 annual certification to ensure she attained the average of 2.0

hours of unscheduled duty per regular work day as required by federal law and agency policy; and that, on several occasions, Complainant manipulated data in the Electronic Case Management System to support investigative activity that never occurred. Mr. Perez averred he made the decision to initiate an internal investigation into allegations of misconduct. He stated that during the time he initiated the internal investigation into allegations of misconduct, he was the acting Assistant Inspector General for Investigations.

Mr. Perez explained Complainant was notified verbally of the allegations on or about May 25, 2022, when she was interviewed. Mr. Perez identified allegations of misconduct were first raised in October 2021 and the internal investigation was initiated in November 2021.

Mr. Perez indicated each criminal investigator who receives availability pay (LEAP) must certify annually that she has "read the requirements for availability pay authorized by 5 U.S.C. § 5545a and set forth in OIG Policy 218" and "met the requirements to perform an annual average of 2 hours of unscheduled duty per regular work day." He further indicated a false certification could expose a criminal investigator to criminal and/or civil liability. Similarly, he attested that entering false data into the electronic case management system could expose a criminal investigator to criminal liability and compromise the integrity of an ongoing criminal or civil investigation.

Mr. Perez attested Complainant did not communicate with him about any concerns regarding the internal investigation, and was not aware if she communicated any concerns about the internal investigation to any other management official. Mr. Perez stated he did not maintain any evidence or documentation related to this internal investigation. He stated he was not present during the internal investigation.

Mr. Perez declared if Complainant believes he initiated an internal investigation into the allegations of misconduct as a form of harassment, then she is mistaken. He proffered that falsely certifying LEAP could expose a criminal investigator to criminal and/or civil liability. He stated a Criminal Investigator must enter correct and accurate information into the Electronic Case Management System because incorrect and inaccurate information can compromise the integrity of an investigation. Additionally, he indicated the nature of a Criminal Investigator's activities creates a special need for high standards of professionalism and integrity.

Mr. Perez testified Complainant's race and sex were not factors when an internal investigation was initiated based on allegations of misconduct. **[Affidavit J]**

## AFFIDAVIT TESTIMONY (Retaliation Allegation)

**Complainant** testified that her prior EEO activity was a factor when she was informed that an internal investigation was initiated based on allegations of misconduct, which singled her out for this investigation. Complainant alleges that Mr. Earle was a close associate with the individual involved, who filed an EEO complaint on April 1, 2015. **[Affidavit A]**

Investigative Summary
Page 45 of 60

**Mr. Westfall** testified that he has no knowledge of Complainant's prior EEO activity and it was not a factor when he made the referrals. **[Affidavit B]**

**Mr. Earle** testified that Complainant's prior EEO activity would never be a factor in the initiation of an investigation. **[Affidavit D]**

**Ms. Gurin** testified she has no personal knowledge of the Complainant's prior EEO activity as a factor when an internal investigation was initiated. **[Affidavit C]**

**Mr. Mabry** testified he is not aware if the Complainant's prior EEO activity was a factor when an internal investigation was initiated**. [Affidavit E]**

**Ms. Ruk** testified that Complainant's prior EEO activity was not a factor when the internal investigation was initialed. **[Affidavit H]**

**Mr. Perez** testified Complainant's Prior EEO activity was not a factor when an internal investigation was initiated based on allegations of misconduct. **[Affidavit J]**

### HARASSMENT / HOSTILE WORK ENVIRONMENT:

**Complainant** stated that she did not tell anyone within the EPA-OIG-OI since she believed no one would do anything about the behavior and/or that she would be retaliated against by supervisors. Complainant indicated that during the incident in August or September 2021 in the evidence room, she told Mr. Westfall that if she was documenting evidence incorrectly it was because she was improperly trained. She further indicated that the purpose of her statement was to end the conversation because he was speaking to her in a fast-paced, loud tone. Complainant stated that on November 17, 2021, she informed Mr. Westfall that she had a lot of things going on and she did not have the headspace to deal with his continuous interrogations.

Complainant stated that this EEO investigation was conducted on March 22, 2022, by Mark Miller, Investigative Attorney, Office of Special Review, Office of the Inspector General. Complainant attested that Miller was advised on May 3, 2022, by Marc Perez, Acting Assistant Inspector General, Office of Investigations, that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under the EPA Order 4711. Complainant indicated that the harassment she experienced caused her to have severe headaches and inability to eat or sleep.  Additionally, Complainant stated that within the past twelve (12) months, the EPA-OIG-OI has hired at least twenty-four (24) new employees and agents, none of them were African American, and these statistics for an organization/division that investigates, is supposed to provide fair treatment, and impartial judgement then paints a picture of discrimination and racism.  She indicated that in the EPA-OIG-OI there are only two African American males, and she is the only African American female.

Complainant indicated that because of harassment and hostile work environment, all of her work was scrutinized, unusual and unnecessary changes were made, and work was sent

Investigative Summary
Page 46 of 60

back to her with edits numerous times before being approved.  She added the constant changes caused her to spend more time on reports, be hesitant and second guess every report or email she sent.  Complainant stated that she is afraid when submitting her reports that they will be scrutinized and returned for changes, and that she continues to be anxious and spends a lot of time contemplating prior to submitting a completed report.  Complainant stated that she received training in EPA's Anti-Harassment Policy Statement 2021 and was familiar with EPA's anti-harassment/hostile work environment policy.

In her amended testimony, Complainant stated that she told Mr. Westfall during a call on November 17, 2021, that she saw where things were going and did not have the capacity to go there with him. She stated that Mr. Westfall was speaking to her in a derogatory and interrogatory manner. Complainant indicated that Staci Gurin was also present on the MS Teams call. Complainant further indicated that she asked that the alleged behavior be stopped.

Complainant stated that, on March 22, 2022, Mark Miller investigated the hostile work environment; however, Mr. Miller's investigation only covered one isolated exchange she had with Westfall regarding the evidence room, but did not concern the majority of the hostile incidents she raised in this complaint. Complainant indicated that, on May 3, 2022, Marc Perez, provided her with a memo stating, "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711." **[Affidavit A]**

**Mr. Westfall** stated that Complainant never told him verbally or written form that his actions constituted harassment and/or a hostile work environment.  He stated that on March 22, 2022, he was notified that he was to be interviewed as part of EPA Order 4711, "Procedure for Addressing Allegations of Workplace Harassment," regarding harassment in the workplace. Mr. Westfall stated that on March 24, 2022, he was interviewed by the fact finder, Mark Miller, Investigative Attorney, Administrative Investigations Directorate, regarding his conversation he had with Complainant regarding evidentiary issues in the Dallas evidence room on August 24, 2021. He stated that he was not present during the evidence inventory on August 24, 2021, on the alleged date of the harassment. Mr. Westfall stated that he received a memorandum from Acting Assistant Inspector General for Investigation Marc Perez on May 3, 2022, that stated "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711."  He indicated that he participated in anti-harassment training regarding Anti-Harassment Procedures Training for EPA Employees on August 11, 2020.

In his amended testimony, Mr. Westfall stated that he was not aware if Complainant was informed of the outcome and was not aware of any action taken. **[Affidavit B]**

**Ms. Gurin** stated that she met with the Complainant via MS Teams on May 12, 2022, to discuss performance issues on a specific case during the meeting, at which time Complainant told her that she was feeling harassed regarding her performance issues.

**ALISA WALTON**                                    **AGENCY NO. 2022-0009-R06**

Additionally, Ms. Gurin stated that Complainant told her that "they" tried getting rid of her, but it did not work.  In her response, Ms. Gurin indicated that she told Complainant that she was sorry that she was feeling that way, but that her intention was for her to succeed in the job.  According to Ms. Gurin, she told Complainant that while she may not agree with her, the performance issues they were discussing mattered as they involved wrong dates, wrong names, and inaccurate citing in reports.  In her response, Complainant agreed that there were mistakes, but Ms. Gurin stated that Complainant did not believe that they were unacceptable performance issues.  Furthermore, she stated that Complainant told her that she got caught up in something that started long before Ms. Gurin became a manager, but she was tired of it.  Ms. Gurin stated that she was informed by Mr. Westfall that Complainant had filed a 4711 complaint against him.  Ms. Gurin stated that she received training on anti-harassment information on February 8, 2022. **[Affidavit C]**

**Mr. Earle** stated that he had no conversations with Complainant regarding his actions that constituted harassment and/or a hostile work environment for her, and was not aware of the issue being raised.  He stated that OIG employees are provided training in anti-harassment/hostile work environment through their Office of Human Resources. **[Affidavit D]**

**Mr. Mabry** stated that Complainant did not inform him that his actions constituted harassment and/or a hostile environment for her.  He indicated that on February 2, 2022, the Complainant notified Human Resource Directorate that Complainant believed she was subjected to a hostile work environment on account of her race (African American), sex (female), and prior EEO activity.  He indicated that as a result of these allegations, they initiated a 4711 Investigation.  He stated that on March 11, 2022, the decision-maker concluded that the allegations failed to constitute harassment under EPA Order 4711, and Complainant received notice of the determination via email on May 3, 2022, that did not involve any corrective or preventative action.  **[Affidavit E]**

**Mr. Roelke** stated that Complainant did not tell him that his actions or anyone else's constituted harassment and/or a hostile work environment for her.  He stated that he did not know of any investigation conducted into Complainant's allegations of harassment/hostile work environment. **[Affidavit F]**

**Mr. Huntington** stated that he was not aware of any complaint of harassment and/or hostile work environment filed against him or anyone else by the Complainant.  He stated that he was not aware of an investigation involving allegations of harassment and/or a hostile work environment involving the Complainant. **[Affidavit G]**

**Ms. Ruk** stated that Complainant did not tell her that her actions constituted harassment and/or a hostile work environment for her.  She stated that on January 10, 2022, EEO Specialist Dorothy Whaley informed the OIG of Complainant's allegation of a hostile work environment.  Ms. Ruk stated that pursuant to EPA Order 4711, a fact-finding was conducted in early 2022 by Mark Miller, an Investigative Attorney in the OIG's Administrative Investigations Directorate.  She indicated that the decision-maker issued a decision concluding that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under EPA Order 4711.  Ms. Ruk further indicated that

a decision memorandum with the subject "Determination on Allegations of Harassment" dated May 3, 2022, was issued to the Complainant that the decision-maker did not find that harassment under EPA Order 4711 had occurred based on the information gathered as part of the fact-finding inquiry. She stated that she completed all mandatory annual trainings, including the No FEAR Act training. **[Affidavit H]**

**Ms. Moreira** stated that she does not recall having met with or spoken with the Complainant at any time, either in person or virtually, and was unable to locate any emails to or from the Complainant. She indicated that she had no knowledge of the underlying allegation of harassment or hostile work environment, nor whether an investigation was conducted. **[Affidavit I]**

**Mr. Perez** stated Complainant never told him that his actions constituted harassment or a hostile work environment for her. He informed that on March 2, 2022, he became aware that Complainant filed a complaint under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, and alleged she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity.

Mr. Perez stated he has reviewed the fact-finding results and consulted with agency's legal counsel and Human Resources officials, then concluded that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under EPA Order 4711. He stated Complainant was provided a written determination on her allegation of harassment. Mr. Perez indicated there was no corrective or preventative action necessary and that he determined that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment.

Mr. Perez stated that during his annual training requirements at EPA's Office of Inspector General, in Fiscal Year 2022, he completed the No FEAR Act (Notification & Federal Employee Anti-Discrimination & Retaliation Act) training. **[Affidavit J]**

**REBUTTAL TESTIMONY BY COMPLAINANT**

**Rebuttal to Claim 1: Mr. Westfall**

In Complainant's response to Mr. Westfall's testimony, she stated the PIP reveals at least part of the problem: the 14 "tasks" or assignments that she was expected to complete within the 45-day PIP period would have been insurmountable for any agent, regardless of their abilities. Complainant contended she was required to keep up with her regular caseload and collateral duties throughout the PIP as well as removal of Tasks 6, 9, 11, and 12 by Mr. Westfall. Complainant indicated she made every effort to complete the PIP assignments in a timely manner and worked far beyond her regular duty hours to try to meet the PIP's unreasonable schedule. Complainant indicated Mr. Westfall's statement that he discussed the performance and conduct-related issues with her is an untrue statement.

**Rebuttal for Claim 1: Staci Gurin**

Complainant explained to Ms. Gurin that the PIP, bi-weekly meetings, constant questioning, and changes were overwhelming. Complainant contended it is her belief the case was assigned to another agent in preparation to remove her from the federal government.

**Rebuttal for Claim 1: Sean Earle**
Complainant stated Mr. Earle provided guidance and likely suggested that Mr. Westfall place her on the PIP as he did with former SAC Mike Fiore in FY19.

**Rebuttal for Claim 2: Mr. Westfall**

Complainant claims she was never provided an explanation and would like to know how the rating of zero was determined and what were the basis, calculation, weight, etc., if any, of the self-narrative. Complainant contends she was never provided information on how the zeros for Critical Elements 1: Results and Critical Elements 2: Communication were calculated. She states she found the reasons for the low ratings to be completely wrong and unsupported.

**Rebuttal for Claim 2: Mr. Earle**
Complainant contends that Mr. Earle is very involved and takes pride in placing individuals on PIPs, then having them terminated.

**Rebuttal for Claim 3: Mr. Westfall**
Complainant contends that, for her FY20 rating with Mr. Hawthorne and Mr. Westfall, she never received a written explanation of the final rating. Complainant states she would like an explanation of the lowered final rating.

**Rebuttal for Claim 4: Mr. Earle**
Complainant contends that Mr. Earle and former supervisor Mike Fiore were close friends and, based on their shared knowledge and information, despite Mr. Earle never serving as her manager or in her chain of command, he had a great amount of influence to persuade Mr. Fiore to place her on the PIP in April 2019.

**Rebuttal for Claim 6: Mr. Westfall**
Complainant contends Mr. Westfall informed her that he believed the missing laptop was the responsibility of the Electronic Crimes Division (ECD), and there were other offices that had a computer missing. She states, based on the interview she had on May 25, 2022, with Paul Brezenski and Jeremy Campbell, regarding her timesheets for FY2022 pay period 1, FY2021 pay periods (13, 15, 23, 24, 25), and her Projected Management Actuals (PMA) timesheets were reviewed because she worked and charged time to Law Enforcement Availability Pay (LEAP) on Sundays and Saturdays, and there has never been an issue or question. Complainant contends the case entry was during the time she was on a PIP, and was an accident on her part. She states the entry was a mistake because the language she entered was not the same as management's language, and the entry was not substantial.

Investigative Summary
Page 50 of 60

ALISA WALTON                                              AGENCY NO. 2022-0009-R06

**Rebuttal for Claim 6: Mr. Earle**
Complainant contends this contradicts Mr. Westfall's statement, since Mr. Earle was and is Westfall's supervisor, and he was aware of these matters, specifically the laptop issue. Additionally, Mr. Earle's contradictory statement is an example of his deception towards his involvement in her performance Ratings, PIP, Proposed Removal, and Internal Investigation.

**Rebuttal for Claim 6: Ms. Gurin**
Complainant contends there is no way to enter information without the system showing the date the information was entered and updated. Therefore, she claims there is no way she or anyone else can manipulate the ECMS so it would not show the date information was entered and/or updated. Complainant states the changes made in the ECMS were after the fact and were done at the guidance of Westfall. On November 29, 2021, Complainant states she completed an activity, and again Westfall stated if it was an activity or in a report, then it needed to be in the system.

**Rebuttal for Claim 6: Perez**
Complainant contends the records Mr. Brezenski and Mr. Campbell showed her did not indicate any inflation of her LEAP hours prior to submission. She claims Mr. Brezenski stated she worked on a Saturday and Sunday and charged time, which was an anomaly and caused attention. Complainant contends that she worked those hours that she reported to reflect those hours worked. Complainant contends she has NEVER falsified her timesheets, LEAP, the ECMS, or any aspect of her work.

**[Investigator's note: Comparator employees will be discussed in the Comparative Data section of the summary. See Pages 57-59.]**

**RECORD EVIDENCE**

Performance Plan for Non-Supervisory Staff-EPA-OIG Performance and Recognition System for performance period October 1, 2013-September 30, 2014, indicates "Exceeds Fully Successful" by Edwin Debiew. **[Attachment to Affidavit A, pages 147-160]**

Appraisal Computation Worksheet for Non-Supervisory Employees for 2014 indicates 4.27 rating. **[Attachment to Affidavit A, pages 161-162]**

Employee Performance Appraisal And Recognition System Summary Level Rating, 2014-2015 indicates a summary rating of 4.00 by rating official Edwin Debiew. **[Attachment to Affidavit A, pages 163-164]**

Employee Performance Appraisal and Recognition System Summary Level Rating from Michael Fiore for Complainant regarding October 2018-2019 and 2017-2018. **[Attachment to Affidavit A, pages 45-93]**

Memorandum dated April 24, 2019, from Michael Fiore to Complainant regarding Opportunity to Demonstrate Acceptable Performance indicates unacceptable performance on Critical Element #3 Results Orientation and Critical Element #6 Resource Management of her

Employee Performance and Recognition System (EPARS) plan. **[Attachment to Affidavit A, pages 38-44]**

Employee Performance Appraisal And Recognition System Summary Level Rating 2019-2020 indicates a summary total of 4.33. by Edwin Debiew. **[Attachment to Affidavit A, pages 106-124]**

Employee Performance Appraisal And Recognition System Summary Level Rating 2020 of 3.00 by Garrett Westfall. **[Attachment to Affidavit A, pages 125-143]**

Email dated September 13, 2021 between Complainant and Garret Westfall regarding EPARs - FY21 Performance Standards indicates that Complainant will revise the narrative since she had submitted incorrect performance standards for FY21 as a basis for your narrative. **[Attachment to Affidavit C, pages 59-60]**

Email dated September 17, 2021 between Complainant and Garret Westfall regarding EPARs - FY21 Performance Standards indicates that Complainant will revise the narrative FY21 standards. **[Attachment to Affidavit C, pages 61-62]**

Emails dated November 10, 2021, between Garrett Westfall and Complainant regarding Initiation of Performance Improvement Plan indicates rating for FY 2021, as a result of your unacceptable rating in two of the Critical Elements, the following Performance Improvement Plan will be initiated and the revised memo, with the self-assessment is included. **[Attachment to Affidavit A, pages 35-37**]

Memorandum dated November 10, 2021, from Garrett Westfall to Complainant regarding Opportunity to Demonstrate Acceptable Performance indicates Unacceptable on Critical Element 2: Communication and Critical Element 3: Results Orientation, in Complainant's Employee Performance and Recognition System (EPARS) plan. Attachment: FY 2021 Performance Appraisal and Assignments to be completed during the Performance Improvement Plan. **[Attachment to Affidavit A, pages 165-189]**

Undated Declaration of Craig Clinton indicates affirmation of his experience with Complainant. **[Attachment to Affidavit A, pages 94-97]**

Declaration of Darryll Ahmad dated March 14, 2022, indicates his observation of Complainant's Performance. **[Attachment to Affidavit A, pages 98-99]**

Declaration of Michael Fiore dated March 16, 2022, indicates his observation as Complainant's first line supervisor for Fiscal Years 2017, 2018, and 2019. **[Attachment to Affidavit A, pages 100-105]**

Declaration of Edwin Debiew dated March 11, 2022, indicates as first-line supervisor of Complainant from 2012 until June 2020 performed duties above the "fully successful" level. **[Attachment to Affidavit A, pages 144-146]**

Email dated September 24, 2021, from Garrett Westfall to Rufus Mabry indicates that attached write up and support records for the issuance of the PIP and conduct support to Complainant.   [Exhibit 1] **[Attachment to Affidavit B, pages 60- 240]**

United States Environmental Protection Agency, Office of Inspector General, dated October 19, 2021, Law Enforcement Availability Pay Annual Certification for Complainant signed by Staci Gurin indicates that Complainant performed 2 hours of unscheduled duty per regular day for Leap Year 2021. **[Attachment to Affidavit A, page 190]**

Emails dated December 6, 7, 8, 2021 from Paul Brezinski to Molly Bluie and Complainant regarding December 8, 2018, indicates a need to reschedule until the new year. **[Attachment to Affidavit A, pages 204-206]**

Emails dated December 6, 13, 2021 between Garrett Westfall, Paul Brezinski, Staci Gurin, and others regarding GS-13 Performance Standards indicates two investigations were performed with supported with supported resolutions. **[Attachment to Affidavit A, page 191]**

PMA Timesheets for Complainant dated September 26, 2021-October 9, 2021 (Notation not submitted.) that was approved on October 14, 2021. **[Attachment to Affidavit A, pages 187-189]**

PMA Timesheet PP25 for September 12, 2021- September 25, 2021, indicates approval on September 30, 21021. **[Attachment to Affidavit A, page 203]**

Time Sheet History dated April 15, 2021, indicates for Period 13 from March 28, 2021, to April 10, 2021, as approved on April 15, 2021.  **[Attachment to Affidavit A, pages 193-196]**

Email dated October 1, 2021, from Garrett Westfall to Rufus Mabry indicates an update to the issue under previous support records [Exhibit 2] **[Attachment to Affidavit B, pages 241-243 pages]**

Email dated October 27, 2021, between Complainant and Garrett Westfall regarding FY 21 in part indicates a decision by Complainant to not sign her performance rating for FY 21 EPARs.   [Exhibit 9] **[Attachment to Affidavit B, page 552]**

Email dated November 10, 2021, from Garrett Westfall to Complainant indicates an initiation of Performance Improvement Plan and revised memo and self-assessment and attachments. [ Exhibit 3] **[Attachment to Affidavit B, pages 244-268]**

Email dated November 10, 2021, from Garrett Westfall to Complainant indicates communication regarding Initiation of the Performance Improvement Plan (PIP) and discussion. [Exhibit 4] **[Attachment to Affidavit B, page 269]**

Email dated October 13, 2020, from Garrett Westfall to Rufus Mabry and Lori Ruk regarding their Meeting on 10/13 to discuss performance related issues for Complainant. [Exhibit 10] **[Attachment to Affidavit B, pages 553-557]**

Meeting Notes with Complainant dated September 11, 2020 [Exhibit 20] **[Attachment to Affidavit B, page 683]**

Employee Performance Appraisal and Recognition System Summary Level Rating 2020, dated October 1, 2019, to June 21, 2020, for Complainant by Edwin Debiew indicates a rating of 4.33, Exceeds Fully Successful. [Exhibit 19] **[Attachment to Affidavit B, page 682]**

Employee Performance Appraisal and Recognition System Summary Level Rating FY 2020, dated June 22, 2020, to September 30, 2020, for Complainant by Garrett Westfall indicates a rating of 3.00, Fully Successful.  [Exhibit 18] **[Attachment to Affidavit B, pages 663-681]**

Email dated August 4, 2020, from Complainant to Garrett Westfall indicates communication regarding document resubmitted requested [Exhibit 21] **[Attachment to Affidavit B, page 684]**

Email dated April 3, 2020, and August 14, 2020, between Complainant, Garrett Westfall, Edwin Debiew, and Thomas Roelke indicates communication regarding computer evidence. [Exhibit 22] **[Attachment to Affidavit B, pages 685- 687]**

Email dated April 3, 2020, August 14, 2020, and August 27, 2020, between Complainant and Thomas Roelke indicates email thread regarding computer evidence. [Exhibit 23] **[Attachment to Affidavit B, pages 688- 691]**

Email dated August 6, 2020, between Complainant and Garrett Westfall indicates communication  regarding OI-DA-2019. [Exhibit 24] **[Attachment to Affidavit B, pages 692-693]**

Email dated August 31, 2020, between Complainant and Garrett Westfall indicates communication regarding CCR Southern Trenchless. [Exhibit 25] **[Attachment to Affidavit B, pages 694- 697]**

Email dated September 2, 2020, between Complainant and Garrett Westfall indicates communication regarding Klinekole update. [Exhibit 26] **[Attachment to Affidavit B, page 698]**

Email dated September 10, 2020, between Complainant and Garrett Westfall indicates communication regarding Calls/Team. [Exhibit 27] **[Attachment to Affidavit B, pages 699-700]**

Email dated November 10, 2020, between Complainant and Garrett Westfall indicates communication, in part, regarding disagreement with the numerical ratings for Fiscal Year 2020 EPARS Final Review. [Exhibit 32] **[Attachment to Affidavit B, pages 723-724]**

Email dated September 10, 2021, between Complainant and Garrett Westfall indicates communication regarding Self-Assessment EPARs FY21 Performance Standards

ALISA WALTON                                          AGENCY NO. 2022-0009-R06

EPARs FY21 Performance Standards. [Exhibit 16] **[Attachment to Affidavit B, pages 648-653]**

Email dated September 10, 12, 13,17, 2021 between Complainant and Garrett Westfall indicates communication of incorrect performance standards regarding EPARs FY21 Performance Standards. [Exhibit 17] **[Attachment to Affidavit B, pages 654-662]**

Email dated November 3, 2021, between Complainant and Garrett Westfall regarding Operation Reach indicates communication regarding new and existing evidence assignments. [Exhibit 31] **[Attachment to Affidavit B, pages 718-722]**

Email dated November 10, 2021, from Garrett Westfall to Marc Perez indicates missing laptop evidence by Complainant. [Exhibit 34] **[Attachment to Affidavit B, pages 726-728]**

Email dated November 15, 2021, from Garrett Westfall to Earle Sean indicates there are allegations against Complainant regarding her LEAP Certification for FY21. [Exhibit 35] **[Attachment to Affidavit B, pages 729-742]**

Email dated January 5, 2022, from Garrett Westfall to unknown indicates a request to Determine whether two chron log entries were modified after the entry date, what data was added and by whom regarding Chron Log modifications-OI-DA-2021-ADM-0025. **[Attachment to Affidavit C, page 70]**

 Email dated January 8, 2022, from Garrett Westfall to Earle Sean indicates referral for possible investigation-conduct issue against Complainant. [Exhibit 36] **[Attachment to Affidavit B, pages 743-772]**

Email dated January 6, 2022, from unknown to Garrett Westfall indicates the investigation log and the chron log need to be compared to determine what was updated regarding Chron Log modifications-OI-DA-2021-ADM-0025**[Attachment to Affidavit C, pages 71-72]**

Email dated January 28, 2022, from Garrett Westfall to Marc Perez indicates communication as raised by Staci Gurin regarding Complainant as a conduct issue [Exhibit 39] **[Attachment to Affidavit B, pages 789-791]**

OI-DA-2021-ADM-0025 investigative event descriptions indicate who made changes and the date of the change codes. **[Attachment to Affidavit C, pages 73-76]**

Email dated February 17, 2022, May 3, 2022, between Garrett Westfall, Paul Brezinski and Staci Gurin indicates information chron log revision regarding I2M MOA/Attachment Memo that support conduct regarding Complainant. [Exhibit 37] **[Attachment to Affidavit B, pages 773-778]**

Email dated March 1, 2022Memorandum dated March 1, 2022, from Garrett Westfall to Complainant regarding Notice of Proposed Removal for Unacceptable Performance indicates an intent to propose to remove her from your position as a Criminal Investigator, GS-1811-

13, with the Office of Investigations, Office of Inspector General, U.S. Environmental Protection Agency, due to unacceptable performance on Critical Element 2Communication and Critical Element 3: Results Orientation in your Employee Performance Appraisal and Recognition System (EPARS) performance plan for fiscal year 2021 and multiple attachments.**[Attachment to Affidavit A, pages 228- 387]**

Memorandum dated March 1, 2022, Notice of Proposed Removal for Unacceptable Performance from Garrett Westfall to Complainant and November 10, 2021, Opportunity to Demonstrate Acceptable Performance indicates proposal to remove Complainant from her position as a Criminal Investigator due to unacceptable performance on Critical Element 2: Communication and Critical Element 3: Results Orientation in your Employee Performance Appraisal and Recognition System (EPARS). [Exhibit 8] **[Attachment to Affidavit B, pages 393-551]**

Memorandum dated March 17, 2022, from Lisa Peterson indicates an oral response to the Notice of Proposed Removal for Unacceptable Performance issued to Complainant on March 1, 2022, by the proposing official, Garrett Westfall, regarding Summary of Complainant's Oral Response to Notice of Proposed Removal. **[Attachment to Affidavit F, pages 170-172]**

Letter dated March 17, 2022, from Molly Buie to Thomas Roelke regarding Reply to Proposed Removal indicates the letter and the attachments constitute Special Agent (SA)Complainant's written reply to the Notice of Proposed Removal that was issued to her on March 1, 2022. **[Attachment to Affidavit A, pages 388-394]**

Summary of Interview for Complainant dated March 22, 2022, indicates a summary of the interview conducted on March 22, 2022, signed by Complainant on March 29, 2022. **[Attachment to Affidavit A, pages 29-33]**

Memorandum dated April 22, 2022, from Thomas Roelke regarding Decision on Proposed Removal indicates have carefully and objectively considered the facts detailed in the Notice of Proposed Removal for Unacceptable Performance and the supporting documentation, as well as your oral and written responses, he was not sustaining the proposal to remove you from your position. **[Attachment to Affidavit A, pages 226-227]**

Email dated April 22, 2022, from Thomas Roelke to Complainant regarding Decision of Proposed Removal indicates a decision to sustain the proposal. [Exhibit 30] **[Attachment to Affidavit B, pages 715-717]**

Memorandum dated May 3, 2022, from Marc Perez to Complainant and Garrett Westfall indicates Determination on Allegations of Harassment details of workplace harassment filed by Complainant. [Exhibit 29] **[Attachment to Affidavit B, page 714]**

Determination on Allegations of Harassment dated May 3, 2022, from Marc Perez to Complainant and Garrett Westfall indicates a review of the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the

information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711. **[Attachment to Affidavit A, page 34]**

Email dated May 11, 2022, between Garrett Westfall and Paul Brezinski indicates Attachments-D&5 Shield issue as submitted by Complainant.  [Exhibit 38] **[Attachment to Affidavit B, pages 779-788]**

Email dated May 23, 2022, from Paul Brezinski to Complainant regarding May 25, 2022, interview indicates for her to bring the laptop. **[Attachment to Affidavit A, page 202]**

Notice of Proposed Removal for Unacceptable Behavior dated June 9, 2022, from Garrett Westfall to Complainant indicates a screen shot of message to Complainant with copy to Thomas Roelke and Rufus Mabry. [Exhibit 33] **[Attachment to Affidavit B, page 725]**

Email dated June 10, 2022, from Paul Brezinski to Complainant regarding follow up indicates Communication about LEAP Hours. **[Attachment to Affidavit A, pages 199-201]**

Email dated September 8, 2021, from Christopher Huntington to Complainant and others indicates information regarding Self-Assessment Tips and Example. **[Attachment to Affidavit G, pages 10-13]**

EPA Order 4711 Fact-Finding Report, dated March 31, 2022, by Mark Miller indicates an allegation of harassment made by Complainant regarding missing evidence. **[Attachment to Affidavit E, pages 12-15]**

## COMPARATIVE DATA

## CLAIM 1: ON NOVEMBER 10, 2021, COMPLAINANT WAS PLACED ON A PERFORMANCE IMPROVEMENT PLAN (PIP)

**Complainant** stated that she was not aware of any other employee(s) in the same chain of command and rated by the same Rating Official), and in similar circumstances as her colleagues who were or were not also placed on a PIP.  **[Affidavit A]**

**Mr. Westfall** stated that other than Complainant, he has not issued a PIP to any other employee under his supervision. **[Affidavit B]**

**Ms. Gurin** stated that there are no other employees she supervises who had similar performance as the Complainant and were or were not issued a Performance Improvement Plan. **[Affidavit C]**

**Mr. Earle** stated that none of the other employees of which he has been their first line supervisor have been placed on a PIP in the last two years. **[Affidavit D]**

## CLAIM. 2: ON OCTOBER 12, 2021, COMPLAINANT RECEIVED A RATING OF ZERO ON CRITICAL ELEMENTS 2 AND 3 OF HER PERFORMANCE APPRAISAL

**ALISA WALTON**                                                                    **AGENCY** NO. **2022-0009-R06**

**Complainant** stated that she was not aware of any other employee(s) in her same chain of command and rated by the same Rating Official and in similar circumstances as her who did or did not are a zero rating on any of their Critical Elements on their performance appraisal. **[Affidavit A]**

**Mr. Westfall** stated that other than Complainant he has not rated a supervised employee a zero or unacceptable on a Critical Element in their performance rating. **[Affidavit B]**

**Ms. Gurin** stated that there are no other employees who she supervises who had similar performance as the Complainant and were or were not rated a zero on Critical Elements of their Performance Appraisal. **[Affidavit C]**

**Mr. Earle stated** that he has no employees that he supervises that rated a zero in any Critical Element. **[Affidavit D]**

**Mr. Huntington** stated that within the past two years, he has not had employees who have received a zero rating on any Critical Element of their performance appraisal. **[Affidavit G]**

**CLAIM 5: ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT AS PLACED ON NOVEMBER 10, 2021.  COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL**

**Complainant** stated that she was not aware of any other employee(s) in her same chain of command who were or were not issued a Notice of Proposed Removal for the same reason as she. **[Affidavit A]**

**Mr. Westfall stated that** other than Complainant he has not issued a Notice of Proposed Removal any other employee under his supervision. **[Affidavit B]**

**Mr. Earle** indicated that there are no employees that he supervises have been or have not been issued a Notice of Proposed Removal. **[Affidavit D]**

**CLAIM 6: ON MAY 2, 2022, COMPLAINANT WAS INFORMED THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT**

**Complainant** stated that she was assigned work that other agents perform on the weekend, and was not aware of any other employees who have been investigated for misconduct for entering time on a Saturday or Sunday.  She stated that she was not aware of other employees in a similar situation as you who were not subjected to an internal investigation. **[Affidavit A]**

**Mr. Westfall** stated that other than Complainant, he has not referred allegations of misconduct, which resulted in an internal investigation of any other employee under his supervision. **[Affidavit B]**

**Mr. Earle** indicated that there are no employees under his supervision that were involved in allegations of misconduct.  He further indicated that he has not had any employees under his supervision who meet the criteria who were not given an internal investigation. **[Affidavit D]**

## APPLICABLE POLICIES

EPA Order No: 1000.31A4. **[Exhibit 1]**

EPA Order No:  4711. **[Exhibit 2]**

Memorandum dated December 14, 2020, from Helina Wong to Office of Investigations Staff regarding Interim Guidance 2021-009 indicates changes made to Procedure 207. **[Attachment to Affidavit A, page 192]**

Memorandum dated August 10, 2018, from Andrew Wheeler to all EPA employees regarding Anti-Harassment Policy Statement. **[Attachment to Affidavit A, pages 197-198]**

Employee Performance Appraisal and Recognition System, Policy Number: 313 approved August 25, 2021 [Exhibit 7] **[Attachment to Affidavit B, pages 366-392]**

Employee Performance Appraisal and Recognition System EPARS Handbook, Version 3-1.9, dated 2015. [Exhibit 5] **[Attachment to Affidavit B, pages 270-343]**

Case Administration, Procedure 206, By Patrick Sullivan approved and reviewed on October 31, 2019 [Exhibit 11] **[Attachment to Affidavit B, pages 558-583]**

Interviews, Advisement of Rights, Oaths, Statements and Record Reviews, Procedure 207, by Craig Ulmer approved and reviewed on April 19, 2022 [Exhibit 12] **[Attachment to Affidavit B, pages 584-600]**

Physical and Documentary Evidence, Procedure Number: 211 By Patrick Sullivan approved and reviewed on June 14,2020[Exhibit 13] **[Attachment to Affidavit B, pages 601-611]**

Law Enforcement Availability Pay, Procedure Number:  218, By Patrick Sullivan approved and Reviewed on October 23, 2020[Exhibit 40] **[Attachment to Affidavit B, pages 792-804]**

Searches and Seizures, Procedure Number: 213 approved and reviewed by Helina Wong on February 9,2026 [Exhibit 28] **[Attachment to Affidavit B, pages 701-713]**

Grand Jury Secrecy and Subpoenas Procedure Number: 212 By Allan Williams approved and reviewed on December 11, 2021 [Exhibit 14] **[Attachment to Affidavit B, pages 612-619]**

Investigative Reports, Procedure Number: 223 By Patrick Sullivan approved and reviewed on January 17, 2017 [Exhibit 15] **[Attachment to Affidavit B, pages 620-647]**

Office of Inspector General, Supervisor's Guide to Dealing with Poor Performance **[Exhibit 6] [Attachment to Affidavit B, pages 344-365]**

## COMPENSATORY DAMAGES

**Complainant** stated that due to the agency's discrimination and reprisal, she experienced loss of income, which included her need to take a significant amount of sick leave; loss of a cash award as a result of the pretextually low rating received; and her need to seek increased medical treatment, which required the payment of co-pays and other related costs. She indicated that she was extremely concerned that she might be fired and lose her income entirely. Complainant further indicated that, as a result of these financial difficulties, she was not able to take family vacations or even short getaways to de-stress. Complainant stated that she has incurred significant legal fees in responding to the proposed removal during the internal investigation, and in pursuing her EEO complaint to protect her rights.

Complainant stated that she experienced continuous anxiety, which caused serious and constant headaches, chest pains, nausea, and rapid heartbeat, which has intensified when she has had to meet with Garrett Westfall, Staci Gurin, and Sean Earle. She continued to state that the constant medical issues have caused her to seek increased medical treatment. Complainant indicated that she had previously attended counseling that provided her with the tools to cope with the stress and her life, which she resumed after placement on the PIP.

Complainant stated that the constant trauma and anxiety from the agency's discriminatory and retaliatory acts have caused her health issues, loss of sleep, focus, eating difficulties, and she has not had consistent days without experiencing constant anxiety. Complainant indicated that it became normal for her to experience headaches and brain fog before or after meeting with SAC Westfall or ASAC Gurin. Complainant indicated that a doctor advised her to take prescription medication for anxiety and headaches, of which the cost is recurring. She further indicated that her symptoms were exacerbated by the stress she experiences. **[Affidavit A]**

**Record Evidence (Compensatory Damages)**

**[Investigator's Note:  No other evidence was presented or discovered regarding the Complainant's entitlement to compensatory damages.]**

**EEO Investigative Affidavit (Complainant)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 1 | 27 | **2022-0009-R06** |

| 1.                                    Affiant's<br>Name (Last, First, MI)<br>**Walton, Alisa, A** | | 2. Employing Federal Agency and Office<br>EPA-OIG | |
|---|---|---|---|
| 3. Position Title<br>**Special Agent** | 4. Grade and Series<br>GS13-1811 | 5. Address and Zip +4<br><br>1201 Elm St #500, Dallas, TX 75270 | 6. Organizational Unit<br><br>OI |

**Privacy Act Notice and Rehabilitation Act Notice**

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

**Important Information Regarding Your Complaint**

This *EEO Investigative Affidavit (Complainant),* and the other form mentioned below, are being provided for you to use to fully respond to the accompanying questions. Mail or deliver your completed statement to the EEO complaints investigator within 15 calendar days of the date you received the forms. Use *EEO Investigative Affidavit (Continuation Sheet)* as needed to complete your written statement. Remember to number the top of each page and sign and date the bottom of each page of your statement. If you return your statement by mail, the return envelope must be postmarked on or before the 15th calendar day after the date that you received the affidavit forms. Failure to complete your statement and return the forms within the allotted time period could result in your complaint being dismissed based upon your failure to proceed. EEOC complaints processing regulation, 29 C.F.R. 1614.107(a)(7), states, in part, [A complaint may be dismissed] "Where the agency has provided the complainant with the written request to provide relevant information or otherwise proceed with the complaint, and the complainant has failed to respond to the request within 15 days of its receipt, or the complainant's response does not address the agency's request, provided that the request included a notice of the proposed dismissal."

7. Statement (*Continue on Form 2569 if additional space is required.  Form will auto-create if using Microsoft Word*)

<u>**Affidavit of:**</u>  **Complainant**

1.      Please state your name, personal mailing address, personal telephone number, and personal e-mail address.

**Name: Alisa Walton**
**Personal mailing address: 929 Cherry Hil Ln, Desoto, TX 75115**
**Personal telephone number: 214-529-3841**
I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature<br>*Alisa Walton* | Date Signed<br>May 5, 2022 |
|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **2** | **27** | **2022-0009-R06** |

**Personal email address:  alisawalton43@gmail.com**

*If any changes have occurred since the initial EEO complaint processing stage, please identify those changes; e.g., name change, new place of residence, new designated representative.*
  **Answer:**

2.     **You have the right to be assisted by a representative of your choice at all times during the EEO process**.  Please indicate that you are aware of this right and choose to either exercise it or waive it at this time.  (If you do have a representative, state his/her name, position title, address, and telephone number.)
  **Answer: Molly E. Buie, Esq., Seldon Bofinger& Associates, P.C., 1319 F Street, NW, Suite 200, Washington, DC 20004; 202-393-8200 (office)**

3.     Are you currently employed by **United States Environmental Protection Agency (EPA)**?  If so, identify your department/division/work group.
  **Answer: Yes, Office of Inspector General/Office of Investigations**

4.     State the dates you have been employed by EPA.
  **Answer: June 2, 2002 to present**

5.     State your current position and grade level with EPA.
  **Answer: Special Agent, GS13**

6.     State the dates/period of time you have held this position.
  **Answer: August 2006 to present**

7.     State your work telephone number, e-mail address, and mailing address.
  **Answer: 214-287-1551, Walton.alisa@epa.gov, 1201 Elm St. #500, Dallas, TX 75270**

8.     Identify by full name and position your current first and second-level supervisors.
  **Answer: Staci Gurin, Assistant Special Agent in Charge (ASAC) and Garrett Westfall, Special Agent in Charge (SAC)**

9.     If different, identify by full name and position your first and second-level supervisors during the time of the alleged incidents.
  **Answer: Same as above**

10.     Identify by full name and position title the individuals who you believe have discriminated against you.   **Answer: SAC Garrett Westfall and Sean Earle, Acting Deputy Inspector General of Investigations (ADAIGI)**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature  *Alisa Walton* | Date Signed  May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **3** | **27** | **2022-0009-R06** |

## RACE AND SEX ALLEGATIONS:

11.    Please identify your **race**.
   **Answer: African American**

12.    Do you believe the individual(s) who you allege discriminated against you was/were aware of your **race** at the time of the incident/action you allege?  If so, **how, and when** do you believe he/she/they became aware of your **race**?
   **Answer: Yes, Garrett Westfall and I met in person shortly after he began employment with the EPA-OIG-OI, in August 2020. Sean Earle met during an EPA-OIG All Hands conference shortly after I became an agent. Earle was also close friends with Susan Chandler, against whom I filed an EEO complaint regarding racial discrimination in 2015.**

13.    Please identify your **sex**.
   **Answer: Female**

14.    Do you believe the individual(s) who you allege discriminated against you was/were aware of your **sex** at the time of the incident/action you allege?  If so, **how, and when** do you believe he/she/they became aware of your **sex**?
   **Answer: Same as above for Garrett Westfall. Same as above for Sean Earle.**

## RETALIATION ALLEGATION:

15. You alleged discrimination based on Retaliation.  What was the EEO activity you engaged in that you believe is being used to retaliate against you?  *(Protected EEO Activity may include: filing a charge of discrimination or harassment; testifying, assisting another, or participating in a discrimination proceeding; or otherwise opposing discrimination, such as writing a letter or vocally protesting against discrimination or harassment.)*
 **Answer: Filing a charge of discrimination**

16. Identify the date(s) of the activity.
 **Answer: In 2015, I filed a complaint against former Special Agent Susan Chandler.**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Affiant's Signature | Date Signed |
| *Alisa Walton* | May 5, 2022 |
| October  2015 | |

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **4** | **27** | **2022-0009-R06** |

17. If a prior EEO case, please identify the case number(s) and date(s) for your previous EEO case.
 **Answer: On or about March 23, 2015, I filed an EEO and mediation was on or about June 16, 2015.**

18. Was/were the management official(s) you cited in this complaint involved in your protected EEO activity?  If so, explain **how** and **when** each management official was involved.
 **Answer: I alleged that agency management failed to take action to stop Susan Chandler from subjecting me to a discriminatory hostile work environment on account of my race.**

19. If they were not involved in the protected EEO activity, were they aware of your protected activity, and if so, **how,** and **when** did they become aware?
 **Answer: DAIGI Sean Earle was close associates with former SA Susan Chandler and also was responsible for taking Chandler's weapon upon her being placed on administrative leave/suspension.**

**CLAIM 1: ON NOVEMBER 10, 2021, COMPLAINANT WAS PLACED ON A PERFORMANCE IMPROVEMENT PLAN (PIP)**

20. Identify by full name and position the management official(s) that was responsible for placing you on a Performance Improvement Plan (PIP).
 **Answer: Garrett Westfall, Special Agent in Charge**

21. To your knowledge, was/were any other management official(s) involved in the decision to place you on a Performance Improvement Plan?  If so, identify him/her/them by full name and position and explain his/her/their involvement in and/or input in detail.
 **Answer: On information and belief, Sean Earle, Special Agent in Charge/ Acting Deputy Assistant Inspector General - at a minimum - would have been informed of the PIP and had to approve it.**

22. You have alleged that on November 10, 2021, you were placed on a Performance Improvement Plan.  Please explain the facts that led up to this action/decision.
 **Answer: On October 13, 2021, I met via MS Teams with Special Agent in Charge (SAC) Garrett Westfall, and Assistant Special Agent in Charge (ASAC) Staci Gurin gave me a 1.66 performance rating. Westfall rated me a zero on Critical element 2: Communication and Critical Element 3: Results Orientation. I was also given a rating of 2 for Critical Element 4: Teamwork and Critical Element 6: Resource Management, and a**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature  *Alisa Walton* | Date Signed  May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **5** | **27** | **2022-0009-R06** |

rating of 3 for Critical Element 1: Leadership and Critical Element 3: Customer Relations. I have never received a rating below fully successful on an annual appraisal.

23. How were you informed, verbally or in writing, that you were being placed on PIP? If verbally, state what was communicated to you, by whom and when? If in writing, state the contents of the notification, who notified you and when. **Please provide a copy of the notification.**
   **Answer: On November 10, 2021, I received an email from Westfall at 12:30 CST stating effective today I was being placed on a PIP. The email also stated I should be prepared to discuss expectations and the assignments at 1:00 CST. At 1:00 CST, I had an MS Teams call with Westfall and Gurin (see attached).**

24. Did management attempt to schedule any meetings with you when placing you on a PIP? If so, were you available for and did you attend these meetings? If so, state the dates of the meetings, describe in detail what was stated during the meetings, and the outcomes. If you were not available or did not attend the meetings, explain in detail why.
   **Answer: See #23.**

25. Did you discuss your concerns regarding being placed on a PIP with any management official(s)? If so, identify the management official(s) by full name and position, state the date of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s). If you did not discuss your concerns regarding the PIP, explain in detail why you did not.
   **Answer: Garrett Westfall, Special Agent in Charge, November 10, 2021. I informed Westfall I did not agree with the PIP and did believe it was warranted/justified.**

26. If not previously addressed, were any performance issues brought to your attention prior to or during any discussion(s) involving the PIP? If so, describe in detail what you were told.
   **Answer: Prior to being placed on the PIP, in June 2021, I was told by Westfall that previous agents and I had not properly documented evidence and chain of custody forms. Specifically, a laptop was still in evidence when documentation showed the laptop had actually been sent to the EPA-OIG-OI electronic crimes division. I had not opened the banker box, which the laptop was originally stored inside. Westfall instructed me to ensure I was properly documenting evidence and the chain of custody.**

27. If you were notified of any performance issues, did you attempt to correct the issues? If so, what did you do? If not, explain in detail why you did not.
   **Answer: Westfall instructed me to go through all the evidence in the evidence room and ensure they were properly documented and the chain of custody was properly documented. Over the course of a few months, I prepared memorandums to file to**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa A. Walton* | May 5, 2022 |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **6** | **27** | **2022-0009-R06** |

**address the improperly documented evidence for closed cases, which were not my cases. When cases are closed, the case agent is supposed to notify the evidence custodian and instruct if evidence related to the case is to be returned to the subject or destroyed.**

28. Please explain in detail why you believe you should not have been placed on a Performance Improvement Plan.
    **Answer: I should not have been placed on a PIP because the performance rating of 1.66 was unjustified. My performance, which is documented in my FY21 self-assessment, warranted a significantly higher rating.**

29. Did management give you any documentation regarding your placement on the Performance Improvement Plan? If yes, please provide a copy.
    **Answer: Yes (see attached)**

30. Were you given a reason(s) for being placed on a Performance Improvement Plan?  If so, state the reason(s) you were given.
    **Answer: I was told I was being placed on a PIP because I received a rating of zero (unacceptable) for Critical Element 2: Communication and Critical Element 3: Results Orientation.**

31. If you were given a reason(s) for being placed on PIP, please explain in detail how you find the reason(s) unacceptable.
    **Answer: I found the reasons to be unacceptable because, during FY21 regarding Critical Element 2: Communication, I was required to conduct eight fraud awareness briefings. I conducted 13 fraud awareness briefings. I conducted 11 briefings independently and two briefings were conducted with other agents. I also regularly briefed Assistant United States Attorneys on my cases. In addition, I briefed senior management, which included Sean O'Donnell, EPA, Inspector General; Charles Sheehan, EPA-OIG, Deputy Inspector General; Allan Williams, Assistant Deputy Inspector General; Sean Earle, Special Agent in Charge; Garrett Westfall, Special Agent in Charge; and other managers. The briefing to senior management was related to a case in which I had received a confession from the subject. After the briefing I received an email from Williams stating I did a great job and made the Office of Investigations proud.**

    **In regards to Critical Element 3: Results Orientation, my results for FY21 statistics were: one conviction, one suspension and debarment of a subject.**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |
| October  2015 | |

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 7 | 27 | **2022-0009-R06** |

**My statistics for both Critical Element 2: Communication and Critical Element 3: Results Orientation, clearly prove that I should not have received an unacceptable rating of zero. It is very common for agents to complete a fiscal year and not have any criminal or administrative actions. I had one criminal action and two administrative actions during FY21.**

32. What was the beginning and end date for the Performance Improvement Plan issued to you on November 10, 2021? Has the Performance Improvement Plan been terminated and if so, when (date)?
    **Answer: November 10, 2021, was the beginning date for the PIP and December 24, 2021, was the end date.**

33. Did you appeal the decision in connection with being placed on a PIP? If so, explain in detail what has occurred during the process so far. *[Provide all relevant documentation regarding the process.]*
    **Answer: No**

34. Cite the Agency policies that you feel apply or were violated when you were placed on a PIP. Explain in detail how each policy applies. If applicable, explain in detail how you believe each policy was violated.
    **Answer: I believe the PIP was initiated for discriminatory and retaliatory reasons; therefore, the agency violated its own policies, as well as federal statutes and regulations that prohibit discrimination and retaliation against employees.**

35. Why do you believe your **race** was a factor in your allegation when on November 10, 2021, you learned that you were being placed on a Performance Improvement Plan?
    **Answer: The PIP was unjustified as explained above, and because I was singled out for ratings of zero even though I accomplished more than some of my other colleagues who are not African American.**

36. Why do you believe your **sex** was a factor in your allegation when on November 10, 2021, you learned that you were being placed on a Performance Improvement Plan?
    **Answer: The PIP was unjustified as explained above, and because I was singled out for ratings of zero even though I accomplished more than some of my male colleagues.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **8** | **27** | **2022-0009-R06** |

37. Why do you believe your **prior EEO activity** was a factor in your allegation when on November 10, 2021, you learned that you were being placed on a Performance Improvement Plan?

   **Answer:  The PIP was unjustified as explained above, and because I was singled out for ratings of zero even though I accomplished more than some of my colleagues who had not engaged in protected EEO activity.**

38.     How were you harmed when you were placed on a PIP on November 10, 2021?
**Answer: I was embarrassed, physically, mentally and emotionally distressed. I had constant headaches, was often unable to eat or sleep for extended periods. I often withdrawn from my friends and family. I felt depressed and extreme tension in my neck, shoulders and back. On the nights I would finally go to sleep, I would not want to get up and begin work. I would often have headaches when I began work. The headaches would get more intense when I would get an email from Westfall or Gurin. Whenever I would meet via MS Teams with Westfall and Gurin I would experience anxiety and feel my heart racing. On some occasions I experienced the same feeling when I met with Gurin alone and she continuously requested unnecessary information for reports to follow up on Westfall's request.**

**The PIP caused me to become hesitant and fearful of submitting reports because I knew they would be unjustly scrutinized and sent back for rewriting.**

39. Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
**Answer:  As an initial matter, the PIP I was placed on was completely unmanageable as I explained in my reply to proposed removal (see attached).  The amount of work and deadlines required were impossible to meet.  The PIP seemed designed as a set up for failure rather than a legitimate effort to help me improve my performance.**

**Throughout the PIP, my work was subjected to extreme scrutiny, and I was continuously told to rewrite reports. Westfall and Staci Gurin, Assistant Special Agent in Charge, would make edits to reports, add information, ask numerous unnecessary questions and request that I add information that was not required to complete the report. Some reports would be sent back for changes at least three to five times. The edits and changes would often change the purpose of the report.**

**A similar pattern existed even before I was placed on the PIP.  Weekly and sometimes daily Westfall would bring up the issues with the evidence storage room and**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature   *Alisa Walton* | Date Signed   May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | 9 | 27 | **2022-0009-R06** |

**continuously let me know how he was a stickler for evidence. Westfall had me write memorandums to file for closed cases that were not my cases. In addition to writing the memorandums, I had to give detailed case summaries, which was completely unnecessary for a closed case.**

40.     Did you file a union grievance with regard to this allegation/claim? If so, at what stage is the grievance?  If a final decision was reached, what was the result?  (If applicable, please include copies of documentation.)
**Answer: No, I am not a part of a union.**

41. In the past year, are you aware of any other employee(s) in your same chain of command (those at your job level and rated by the same Rating Official) and in similar circumstances as you who were also placed on a PIP?  Provide the following information for each identified comparator employee:

a. Name, position, and grade level.
b. Identify the race and sex of each named comparator.
c. Whether or not the person engaged in prior protected EEO activity. (state yes, no, or unknown)
d.     The name(s) of the agency official(s) responsible for the PIP.
e.     Please explain why you believe that you were treated the same under similar circumstances
        **Answer: No**

42. In the past year, are you aware of any other employee(s) in your same chain of command (those at your job level and rated by the same Rating Official) and in similar circumstances as you who were <u>not</u> placed on a PIP?  Provide the following information for each identified comparator employee:

a. Name, position, and grade level.
b. Identify the race and sex of each named comparator.
c. Whether or not the person engaged in prior protected EEO activity. (state yes, no, or unknown)

d.     The name(s) of the agency official(s) responsible for the PIP.
e.     Please explain why you believe that you were treated less favorably under similar circumstances.
        **Answer: No**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **10** | **27** | **2022-0009-R06** |

**CLAIM. 2: ON OCTOBER 12, 2021, COMPLAINANT RECEIVED A RATING OF ZERO ON CRITICAL ELEMENTS 2 AND 3 OF HER PERFORMANCE APPRAISAL.**

43.    You have alleged on October 12, 2021 you received a rating of zero on critical elements 2 and 3 of your FY 2021 Performance Appraisal. Please explain this allegation in detail.
   **Answer: See #31**

44.    Identify by full name and position of the Rating Official(s) and any other management official that was involved in and/or had input into your FY 2021 performance appraisal. Explain each identified person involvement in and/or their input in detail.
   **Answer: Sean Earl, Special Agent in Charge and Acting Deputing Inspector General; Garrett Westfall, Special Agent in Charge; Staci Gurin, Assistant Special Agent in Charge (Caucasian female); Christopher Huntington, Assistant Special Agent in Charge (Caucasian male) ;**

   **In August 2021, Westfall was promoted from ASAC to SAC. Huntington was ASAC for the Western Division, but became Acting ASAC for the Southwest Division until Gurin was promoted to ASAC for the Southwest Division in September 2021.**

   **During the period Huntington (Caucasian male) was Acting ASAC for the Southwest Division, he returned each of my submitted documents and requested I make changes that were according to his preferred report writing style/format. The format/changes were personal preferences and not written policy or report writing standards. Some of the requests were reverting back to changes that were made numerous years ago, such as listing and citing attachments throughout the documents. Prior to Huntington's supervision of me, all of my reports were written in the same manner, which I submitted to him and they were approved.**

45.    Please clarify what is meant by zero rating and its relevance to the rating you received on your performance appraisal.
   **Answer: The ratings are on a scale of 0-5. A rating of 0-1.99= Unacceptable; 2-2.99 = Minimally Successful; 3-3.79 = Fully Successful; 3.8-4.49 = Exceeds Fully Successful; 4.5-5.0 = Outstanding.  As stated above, I received ratings of zero on two elements.**

46.    What were your performance goals for the FY2021 appraisal period?  Did you accomplish these goals?  Please describe how.
   **Answer: My performance goals were to exceed the required briefings, obtain an administrative stat (suspension and/or debarment), obtain additional training and meet with more State stakeholders. I accomplished the briefing goal and exceeded it by five. I**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **11** | **27** | **2022-0009-R06** |

obtained both a suspension and a debarment stat. Due to COVID-19 and travel restrictions, I did not accomplish the last two goals relating to training and meeting with State stakeholders.

47.     State the rating you believe you should have been given for Critical Elements 2 and 3 for the subject rating period.  Explain in detail why you believe you earned this rating and include supporting documentation.
       **Answer: I believe I should have received a 4 or higher based on my statistics. See #31.**

48.     Did the rating official provide you with a deadline to submit your written accomplishments for the fiscal year?  If so, did you meet this deadline?  Please supply a copy of your accomplishments.
       **Answer: Yes, I submitted them and met the deadline (see attached).**

49.     During the FY2021 performance appraisal period and prior to being given your final FY 2021 rating, did you and your Rating Official and/or other management official(s) engage in any discussions regarding your performance?  If so, identify the management official(s) by full name and position, state the date(s) of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).
       **Answer: See #26. Also on June 9, 2021, August and/or September 2021, and November 3, 2021, SAC Garrett Westfall spoke to me about not properly documenting evidence. As previously stated, Westfall stated at different times that I had not properly documented evidence in the Dallas evidence room.**

50.     If not previously addressed, were any other performance issues brought to your attention during any performance discussion(s)?  If so, describe in detail what you were told.
       **Answer: Westfall told me that I incorrectly documented some dates on several Memorandum of Activity (MOA). I was told to make sure the dates were accurate. I was also told I made assumptions at times and should have asked Westfall about investigative procedures. I informed Westfall I never made up dates or made any assumptions. I also informed Westfall I was following procedures that were in place prior to him joining the EPA and becoming my supervisor.**

51.     If you were notified of any performance issues, did you attempt to correct the issues?   If so, what did you do?  If not, explain in detail why you did not.
       **Answer: I attempted to correctly document the dates, but the process of changing the report date and the activity date continuously changed. That process caused my activity and report dates to be inconsistent. I mentioned that to both Westfall and Gurin,**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 12 | 27 | 2022-0009-R06 |

but Westfall continued to make it seem as if I was just making up dates and incorrectly documenting dates on MOA's. I explained to Gurin and she seemed to understand, but it did not appear to matter because Westfall continued to point out what he considered inaccurate dates. In regards to Westfall stating I made assumptions, Westfall spoke negatively regarding the majority of the procedures or processes former ASAC Edwin Debiew (African American) put in place prior to Westfall joining EPA. Westfall stated I should ask before doing certain things or making certain decisions. I informed Westfall I did not ask questions because the process/procedures had been in place since before Westfall came and I was never told to do anything differently.

52.    Did you discuss your concerns regarding your zero ratings with your Rating Official or with any other management official(s)?  If so, identify the management official(s) by full name and position, state the date of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).  If you did not discuss your concerns regarding your rating, explain in detail why you did not.

   **Answer: Yes, I discussed my concerns with Westfall and Gurin on the day, October 13, 2021, they discussed the rating with me.**

53.    Were you given a reason why you were given a zero rating for Critical Elements 2 and 3 of your FY 2021 performance appraisal?  If so, state the reason you were given, by whom, and when.

   **Answer: Westfall told me that I was given a 1 for Critical Elements 2 and 3, but the system defaults to zero. For Critical Elements 2: Communication, Westfall stated I had seven reports that had inaccurate information. However, I never received the seven reports with inaccurate information. Westfall noted in my performance review: "Due to an upgraded transition and limitations of the electronic case management system, the analytics involving performance measures for communication were unquantifiable, and as such, will not be used as a basis for rating the performance standard." However, Westfall stated, For FY21, SA Walton produced 64 investigative reports. Of that number, only 35 (54%) were within the policy timeframes at the time, as calculated by her supervisor." I was not given evidence of how the timeliness was calculated when our system was being upgraded and often down.**

   **Westfall also stated, "While her supervisor requested that SA Walton proactively communicate with him on a consistent and weekly basis, SA Walton has failed to routinely communicate with her supervisor." This statement is not factual.**

   **Westfall stated I received a zero for Critical Elements 3: Results Orientation, Westfall stated I did not keep my cases in ECMS updated.**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature  *Alisa Walton* | Date Signed May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | 13 | 27 | 2022-0009-R06 |

Sometime in October or November before my FY20 Performance Rating, Westfall stated he felt ASAC Debiew did not mentor me and he wanted to mentor me. Westfall wanted to meet regularly with me, and he placed MS Teams meetings titled "Weekly Status of Cases" on our calendars. According to my calendar, Westfall and I met November 2, 2020, to discuss my cases. On November 10, 2020, Westfall and I met for my FY20 Performance Rating. Although the meetings were titled "Weekly Status of Cases," the calendar dates were bi-weekly. According to my calendar, the last meeting listed was April 6, 2021. I do not recall the date, but Westfall told me we would no longer be meeting and he would be available if I needed him.

*Note: It is not common and I have never heard of a GS-13 receiving mentorship from a GS-14. Therefore, I was not certain why Westfall felt Debiew should have mentored me. I have had a professional mentor and my meetings with Westfall would not be what I would call mentorship. The meetings were more like weekly case updates and to see if I had any questions.*

On April 13, 2021, SAC Daniel Hawthorne retired. I do not see any more meetings on the schedule for Westfall and me. On May 18, 2021, I have on my calendar that I had a call with Westfall. Westfall also deleted future meetings from our calendar. The calendar invite is titled "Case and Evidence check-in". My calendar also shows a MS Teams meeting with Westfall dated May 25, 2021. June 1, 2021, the team had a meeting with SAC Sean Earle, who was Acting SAC for Western Division. *Prior to that meeting Westfall had a Team meeting with the Western Division and told us he would "protect" his people from Sean. Westfall also called me and told me, "You know how Sean is. If you ever get a call from Sean and he starts to go off, do not argue with him. Because you know he likes to get under peoples skin. Do not argue with him, but politely say, "Let me get Garrett on the phone" and I will take care of everything. I will make sure I protect my people."*

We were told Acting SAC Earle began to require bi-weekly case reviews. According to my calendar, on July 20, 2021, I had my first bi-weekly case review. In August 2021, Westfall was promoted to SAC and no longer conducted bi-weekly reviews with me. On August 18, 2021, ASAC Christopher Huntington, conducted a bi-weekly case review. On September 13, 2021, ASAC Staci Gurin conducted a bi-weekly case review after she became my first line supervisor.

54.  If you were given a reason for the FY 2021 zero rating on Critical Elements 2 and 3 of your performance appraisal, did you disagree with the reason you were given? If so, explain in detail why you disagree with the reason you were given.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature *Alisa Walton* | Date Signed May 5, 2022 |
|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 14 | 27 | 2022-0009-R06 |

**Answer: See #53. No, I did not agree with the reason.**

55.    Did you appeal the decision in connection with the zero rating for Critical Elements 2 and 3?  If so, explain in detail what has occurred during the appeal process so far.  *[Provide all relevant documentation regarding the appeal process.]*

**Answer: No, I did not appeal the decision, but I did clearly state to both Westfall and Gurin that I did not agree with the ratings for the two critical elements.  Later, Westfall proposed to remove me for supposedly failing the PIP.  I submitted written and oral replies to the proposed removal - I have attached my written reply here.  The removal was <u>not</u> sustained by the deciding official - see the attached decision of April 22, 2022 (see attached).**

56.    Explain in detail why you believe your <u>race</u>  was a factor(s) in your FY 2021 performance zero rating for Critical Elements 2 and 3.

**Answer: I am the only African American female throughout the EPA-OIG-OI. Westfall continuously had negative comments about the performance of Debiew (also African American), although he had not worked with him. I am aware that Earle and Debiew did not have a great relationship. Earle became Westfall's immediate supervisor and things rapidly changed for me. Also, to my knowledge, no other individual within the Western Field Office received a zero rating for any Critical Elements. On information and belief, many of the actions have been encouraged by Earl (Caucasian male). Earle has been known to be close friends with Hawthorne. At one point, Earle was close friends with former Special Agent Susan Chandler (Caucasian female), who was the subject of my 2015 EEO complaint. It is therefore likely that Earle has been aware of my projected activity since that time.  Additionally, Earle has allegedly made statements in the past to the effect that women do not belong in law enforcement. *Prior to the June 1, 2021,  meeting Westfall had a Team meeting with the Western Division and told us he would "protect" his people from Sean. Westfall also called me and told me, "You know how Sean is. If you ever get a call from Sean and he starts to go off, do not argue with him. Because you know he likes to get under peoples skin. Do not argue with him, but politely say, "Let me get Garrett on the phone" and I will take care of everything. I will make sure I protect my people."***

57.    Explain in detail why you believe your <u>sex</u> was a factor(s) in your FY 2021 performance zero rating for Critical Elements 2 and 3.

**Answer: See #56.**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature  *Alisa Walton* | Date Signed  May 5, 2022 |
|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 15 | 27 | 2022-0009-R06 |

58.    Explain in detail why you believe your **prior EEO activity** was a factor(s) in your FY 2021 performance zero rating for Critical Elements 2 and 3.
     **Answer:  See #56.**

59.    How were you harmed when you were rated a zero on Critical Elements 2 and 3 of your performance appraisal?
**Answer: I became ineligible to apply for other 1811 positions with the EPA or within the federal government. I also became ineligible for cash awards, promotions, special assignments, details, bonus, etc.  Outside the COVID Maximum Unscheduled Telework, I would be ineligible to telework. Additionally, Westfall tried to fire me in March of 2022 for supposedly failing the PIP.  Having a pretextual basis to remove me seemed to be the point of the PIP to begin with.**

60. Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
**Answer: The unjustified performance ratings, PIP, and unrelenting scrutiny of my work, as well as the constant negative comments about Debiew and my supposed mishandling of evidence were part of an ongoing, pervasive effort to make my work environment intolerable.  As I explained above in response to #38, the stress of this environment caused me to experience severe mental and physical symptoms.  The constant negativity directed at me was in stark contrast to my experience with my previous supervisors, as confirmed in my reply to proposed removal (see attached).**

**Although Westfall stated his reasons for lowering my rating were due to lateness in uploading reports and entering information into the system, Westfall continued to talk about what Debiew did not do. Westfall did not rate me for any of my accomplishments. He only rated me on what he stated I did not do properly.**

**On April 22,2022, I received the notification that the proposed removal was not sustained. On April 26, 2022, I submitted a six page report. The report included a review of five years of bank statements from seven bank accounts. Within less than 24 hours, Gurin approved the report with no questions or returns for edits. This proves management's harassment and does not support Westfalls claims in his proposed removal.**

61.    Cite the Agency policies that you feel apply or were violated when you received the zero rating for Critical Elements 2 and 3.  Explain in detail how each policy applies.  If applicable, explain in detail how you believe each policy was violated.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 16 | 27 | 2022-0009-R06 |

**Answer: I believe the ratings were unjustified and given discriminatory and retaliatory reasons; therefore, the agency violated its own policies, as well as federal statutes and regulations that prohibit discrimination and retaliation against employees.**

62. In the past year, are you aware of any other employee(s) in your same chain of command (those at your job level and rated by the same Rating Official) and in similar circumstances as you who received a zero rating on any of their Critical Elements on their performance appraisal?  Provide the following information for each identified comparator employee:

a)        Name, position, and grade level.
b)        Identify the  race  and sex of each named comparator.
c)        Whether or not the person engaged in prior protected EEO activity. (state yes, no, or unknown)
d)        The evaluation he/she received for FY 2021.
e)        The name(s) of the agency official(s) responsible for the evaluation.
f)        Please explain why you believe that you were treated the same under similar circumstances.
    **Answer: No**

63.  In the past year, are you aware of any other employee(s) in your same chain of command (those at your job level and rated by the same Rating Official) and in similar circumstances as you who did not receive a zero rating on any of their Critical Elements on their performance appraisal? Provide the following information for each identified comparator employee:

a)        Name, position, and grade level.
b)        Identify the race and sex of each named comparator.
c)        Whether or not the person engaged in prior protected EEO activity. (state yes, no, or unknown)
d)        The evaluation he/she received for FY 2021.
e)        The name(s) of the agency official(s) responsible for the evaluation.
f)        Please explain why you believe that you were treated less favorably under similar circumstances.
    **Answer: No**

64.  Did you file a union grievance with regard to this allegation/claim? If so, at what stage is the grievance?  If a final decision was reached, what was the result?  (If applicable, please include copies of documentation.)
**Answer: No, I am not a part of a union.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature *Alisa Walton* | Date Signed May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **17** | **27** | **2022-0009-R06** |

**CLAIM 3. COMPLAINANT'S 2020, PERFORMANCE APPRAISAL WAS LOWERED WITHOUT EXPLANATION**

65.   You have alleged your 2020 Performance appraisal rating was lowered without explanation.  Please explain this allegation in detail.

**Answer: Debiew left the agency in late June of 2020, prior to the close of the performance rating cycle. Because he had supervised me for the majority of the year, he provided an "interim rating" of 4.33 for me. Even though I became sick with COVID and was out of work for a period of time between Debiew's departure and the end of the FY2020 rating cycle three months later, my annual rating was baselessly downgraded to 3.0 by then SAC Dan Hawthorne (Caucasian male) and Westfall.**

**Hawthorne told me that I had been downgraded because I missed a meeting on July 1, 2020, when I was sick with COVID; however, each one of my Critical Elements, with the exception of No. 1 (Leadership), was lowered on the final appraisal without explanation. The communication was lowered from a 4 to a 2. The others were lowered from ratings of 4 or 5 to 3. When I expressed my dissatisfaction and disagreement with Hawthorne and Westfall. Hawthorne stated a 3 is not bad. It means you did what you were supposed to do. Westfall stated you only took off two weeks for COVID, as if to say COVID had no effect. I ended the conversation by saying I still do not agree with the lowering of my rating and their reasons were not justified.**

**None of the lowered ratings were justified, particularly given my illness and the fact that I had carried a heavier case load than any other agent in the Western Region Field Office (WRFO) in FY2020. During March 2020, Debiew advised Hawthorne to reassign some of my cases to another agent. None of my cases were assigned to another agent until September 2020.**

66.    Identify by full name and position of the Rating Official(s) and any other management official that was involved in and/or had input in lowering your 2020 performance appraisal without explanation. Explain each identified person's involvement in and/or their input in detail.

**Answer:  See my response to #56 and #65.  On information and belief, Sean Earle and Hawthorne were close business associates, and both were SAC's.  Earle was known to express his opinion on how other agents, who he did not supervise, should be reprimanded. It is possible that Earle had some involvement in my FY 2020 rating as well.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 18 | 27 | 2022-0009-R06 |

67.    What were your performance goals for the 2020 appraisal period?  Did you accomplish these goals?  Please describe how.

**Answer: My performance goals were to obtain more cases, attend more professional trainings/developments and provide more fraud awareness briefings. Yes, I accomplished my goals with the exception of professional trainings, due to COVID.**

68.    State the rating you believe you should have been given for the subject rating period. Explain in detail why you believe you earned this rating and include supporting documentation.

**Answer: I should have been given a fair rating of at least a 4 - 4.5 (Exceeds Fully Successful/ Outstanding). From January 2019 - September 2020, I was the only case agent in the Dallas office. I was responsible for reviewing all complaints and preliminary inquiries that were received by Region 6 OIG-Investigations. Although our FY20 standards required us to maintain at least eight cases, I maintained 11 cases. I opened two cases within the first two months of COVID. I also opened another case later in the year and closed one case. I was responsible for coordinating with all contractors to get new office set up before and after our move into the new building, July 2019 (see attached).**

69.    During the 2020 performance appraisal period and prior to being given your final 2020 rating, did you and your Rating Official and/or other management official(s) engage in any discussions regarding your performance?  If so, identify the management official(s) by full name and position, state the date(s) of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).

**Answer: Yes, ASAC Edwin Debiew, regularly provided me feedback on my performance. Specifically, in April 2020 during my mid-year review Debiew stated I was doing a great job and encouraged me to keep up the great work because he was retiring soon (June 2020).**

70.    If not previously addressed, were any performance issues brought to your attention during any performance discussion(s) prior to your 2020 appraisal being lowered?  If so, describe in detail what you were told by whom and when.

**Answer: See #69**

71.    If you were notified of any performance issues, did you attempt to correct the issues?   If so, what did you do?  If not, explain in detail why you did not.

**Answer: No issues. See #69**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| Alisa Walton | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 19 | 27 | 2022-0009-R06 |

72.    Did you discuss your concerns, with your Rating Official or with any other management official(s), regarding your 2020 performance appraisal rating being lowered? If so, identify the management official(s) by full name and position, state the date of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).  If you did not discuss your concerns regarding your rating, explain in detail why you did not.
    **Answer: I discussed my 2020 performance rating with Hawthorne and Westfall. I also discussed the changed rating with Debiew after he retired. See #65**

73.    Were you given a reason for why your 2020 performance rating was lowered without explanation?  If so, state the reason you were given.
    **Answer: See #65**

74.    If you were given a reason for the FY 2020 lowered performance rating, did you disagree with the reason? If so, explain in detail why you disagree with the reason you were given.
    **Answer: See #65**

75.   Did you appeal the decision in connection with the FY 2020  lowered performance rating? If so, explain in detail what has occurred during the appeal process so far.  *[Provide all relevant documentation regarding the appeal process.]*
    **Answer: No, I did not appeal the decision in connection with the FY2020 performance rating. After contracting COVID, I remained positive for approximately two months and was still dealing with COVID symptoms until late December. By the time I was physically/mentally in a position to appeal, the appeal period had passed. Also, I believed I would be retaliated against.**

76.   Cite the Agency policies that you feel apply or were violated when you received the FY 2020 lowered performance rating.  Explain in detail how each policy applies.  If applicable, explain in detail how you believe each policy was violated.
    **Answer: I believe the ratings were lowered for discriminatory and retaliatory reasons; therefore, the agency violated its own policies, as well as federal statutes and regulations that prohibit discrimination and retaliation against employees.**

77.   Explain in detail why you believe your **race** was a factor when your FY 2020 performance rating was lowered without explanation.
    **Answer: See# 56**

78.   Explain in detail why you believe your **sex** was a factor when  your FY 2020 was lowered  on your performance rating.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 20 | 27 | 2022-0009-R06 |

**Answer: See 56**

79.    Explain in detail why you believe your **prior EEO activity** was a factor when your FY 2020 was lowered on your performance rating.
    **Answer: See #56**

80.    How were you harmed when in 2020 your performance appraisal was lowered without explanation?
**Answer: I was unable to apply for 1811 positions within or outside the EPA. I was embarrassed, mentally and emotionally disturbed and stressed. The stress began to affect me physically and I was often unable to eat or sleep.**

81.    Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
**Answer: The unjustified lowering of my performance FY20 ratings was one of the first actions the agency took to go after me after Debiew's retirement.  Subsequently, I was given the unjustified ratings on my FY 21 appraisal, placed on a PIP, and subjected to unrelenting scrutiny of my work as well as constant negative comments about Debiew and my supposed mishandling of evidence.  These were all part of an ongoing, pervasive effort to make my work environment intolerable.  As I explained above in response to #38, the stress of this environment caused me to experience severe mental and physical symptoms.  The constant negativity directed at me was in stark contrast to my experience with my previous supervisors, as confirmed in my reply to proposed removal (see attached).**

82.    Did you file a union grievance with regard to this allegation/claim? If so, at what stage is the grievance?  If a final decision was reached, what was the result?  (If applicable, please include copies of documentation.)
**Answer: No, I am not a part of a union.**

**CLAIM 4: IN APRIL 2019, COMPLAINANT WAS PLACED ON A 30-DAY PIP**

83.    Identify by full name and position the management official(s) who was responsible for placing you on a 30-day PIP in April 2019.
    **Answer: former SAC Michael Fiore**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| _Alisa Walton_ | May 5, 2022 |

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **21** | **27** | **2022-0009-R06** |

84.    To your knowledge, was/were any other management official(s) involved in the decision to issue you a Performance Improvement Plan?  If so, identify him/her/them by full name and position and explain his/her/their involvement in and/or input in detail.

**Answer: On information and belief, Acting Deputy Assistant Inspector General/SAC Sean Earle was involved in this action. Earle has been known to strongly express his thoughts and opinions regarding agents performance and/or reprimands (see Attachment**

85.    Please explain what led up to your being placed on a 30-day PIP in April 2019.

**Answer: A couple of weeks before being placed on the PIP, I was told that Debiew would no longer be supervising my day-to-day activities – that Fiore, who was located in the Chicago office, would be taking over that role.  Even though Debiew had been my supervisor for years, he was not informed nor consulted about the 2019 PIP before it was imposed on me.**

86.    How were you notified, verbally or in writing, that you were being placed on a 30-day Performance Improvement Plan?  If verbally, state what was communicated to you, by whom and when?  If in writing, state the contents of the notification, who notified you and when. Please provide a copy of the notification.

**Answer: I received a call from former SAC Fiore on April 24, 2019, and was notified verbally. I also received a written notification via email the same day (see attached).**

87.    Did management meet with you prior to placing you the 30-day Performance Improvement Plan?  If so, state the dates of the meetings, describe in detail what was stated during the meetings, and the outcomes.  If you were not available or did not attend the meetings, explain in detail why.

**Answer: No**

88.    Did you discuss your concerns regarding being placed on a 30-day Performance Improvement Plan with any management official(s)?  If so, identify the management official(s) by full name and position, state the date of the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).  If you did not discuss your concerns regarding the PIP, explain in detail why you did not.

**Answer: As I discussed with former ASAC Debiew, the PIP was unexpected. I informed Debiew that I received a call from Fiore about some reports/documents not being uploaded into the electronic case management system (ECMS). Fiore called me and asked about some reports/documents. I informed him I had completed the documents and he stated he did not see them uploaded in the ECMS. I looked in my file folders on my computer and realized the reports/documents had not been uploaded. I**

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| _Alisa Walton_ | May 5, 2022 |

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **22** | **27** | **2022-0009-R06** |

**advised Fiore I would upload the reports/documents into the ECMS. Fiore instructed me to hold off on uploading the reports/documents and he would let me know when to upload them. A few days/weeks later I received a call from Fiore stating I was being placed on a PIP for Critical Element 3: Results Orientation and Critical Element 6: Resource Management.**

89.    If not previously addressed, were any performance issues brought to your attention prior to your being placed on a 30-day Performance Improvement Plan in April 2019.  If so, describe in detail what you were told, by whom, and when.
    **Answer: Yes, I need to be timely with submitting my reports and timesheets**

90.    If you were notified of any performance issues, did you attempt to correct the issues? If so, what did you do?  If not, explain in detail why you did not.
    **Answer: Yes, I attempted to correct it and submit timesheets and reports on time. However we had three timekeeping systems and we only got a reminder for one system, which was our payroll timekeeping system.**

91.    Were you given a reason(s) for being placed on a 30-day  Performance Improvement Plan in April 2019?  If so, state the reason(s) you were given.
    **Answer:  Yes, they were stated in the PIP.**

92.    If you were given a reason(s) for being placed on the 30-day Performance Improvement Plan in April 2019, did you disagree with reason. If so, why did you disagree?
    **Answer: No, I did not agree with being placed on a PIP when I had already completed the work, but had not uploaded it into the ECMS.**

93.    Did management give you any documentation regarding being placed on a 30-day Performance Improvement Plan in April 2019? If yes, please provide a copy.
    **Answer: Yes (see attached)**

94.    What was the beginning and end date for the Performance Improvement Plan 30-day in April 2019?
    **Answer: April 24, 2019 - May 21, 2019**

95.    Why do you believe your __race__ was a factor in your allegation when you were placed on a  Performance Improvement Plan 30-day  in April 2019?
    **Answer:  I do not believe that Fiore discriminated against me for my race, sex, or EEO activity; however, if Earle was involved in this action, I assert that he was**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature    _Alisa Walton_ | Date Signed May 5, 2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | 23 | 27 | **2022-0009-R06** |

motivated by race and sex discrimination and reprisal for the reasons discussed above. In particular, Earle has supposedly made statements in the past that women do not belong in law enforcement.  Additionally, Earle was close friends with Susan Chandler, who was the subject of an EEO complaint I filed in 2015 based on her racist comments towards me. Earle was also close associates with Fiore and often expressed how other African American agents, who he did not manage, should be reprimanded.

96.    Why do you believe your **sex** was a factor in your allegation  you were placed on a Performance Improvement Plan 30-day  in April 2019?
    **Answer:  See #95.**

97.    Why do you believe your **prior EEO activity** was a factor in when  you  were placed on a   Performance Improvement Plan 30-day  in April 2019?
    **Answer: See #95.**

98.    How were you harmed when you were placed on the 30-day Performance Improvement Plan in April 2019?
     **Answer:  I later found out others knew about it and felt my professional reputation was damaged. I was not given opportunities for advancement or special projects. I was no longer asked to conduct or assist with computer forensics, although I am a trained Seized Computer Evidence Recovery Specialist (SCERS).
Also see #99.**

99.    Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
    **Answer: The PIP was one part of the hostile work environment to which I have been subjected by the agency.  Subsequently, my performance ratings for FY20 were baselessly lowered, I was given the unjustified ratings on my FY 21 appraisal, placed on a PIP, and subjected to unrelenting scrutiny of my work as well as constant negative comments about Debiew and my supposed mishandling of evidence.  As I explained above in response to #38, the stress of this environment caused me to experience severe mental and physical symptoms.  The constant negativity directed at me was in stark contrast to my experience with my previous supervisors, as confirmed in my reply to proposed removal (attached). The FY19 PIP was baseless and after completing the PIP I received a rating of a 4.0. According to Fiore, I completed the PIP with "flying colors". (see attached)**


**HARASSMENT/HOSTILE WORK ENVIRONMENT:**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *Alisa Walton* | May 5, 2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 24 | 27 | 2022-0009-R06 |

100.    Other than as previously addressed, did you or anyone acting on your behalf tell the alleged harasser or person that created the hostile work environment that you found his/her behavior unacceptable, unwelcome, and/or offensive? If so, provide the following:
a. Who did you tell? **Answer: I did not tell anyone within the EPA-OIG-OI. I felt and believed no one would do anything about the behavior and/or I would be retaliated against.**
b. When did you tell them?
c. What did you/they tell him/her?
d. What was his/her response?

(If in writing, please provide a copy.)

101.    Did you ask that the alleged behavior stop?  If not, please explain why.
   **Answer: During the incident in August/September 2021, while in the evidence room, I told Westfall that if I was documenting evidence incorrectly it was because I was improperly trained. The purpose of this statement was to end the conversation because he was speaking to me in a fast-paced, loud tone. On November 17, 2021, I informed Westfall I had a lot of things going on and I did not have the headspace to deal with his continuous interrogation.**

102.    Did you or did anyone else acting on your behalf bring your concerns regarding the alleged harassment/hostile work environment to the attention of other management officials? If so, provide the following:
a.      Who did you tell? **Answer: See #100**
b.      When did you tell them?
c.      What did you/they tell him/her?
d.      What was his/her response?

   (If in writing, please provide a copy.)

103.    Was an investigation conducted into your allegations of harassment/hostile work environment?  If so, who conducted the investigation and when was it conducted?
   **Answer: Yes, apart from this EEO investigation, Mark Miller, Investigative Attorney, Office of Special Review, Office of Inspector General, conducted an investigation on March 22, 2022.**

104.    If an investigation was conducted, were you advised of the outcome? If so, when, by whom and what was the outcome?

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature *Alisa Walton* | Date Signed May 5, 2022 |
|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 25 | 27 | 2022-0009-R06 |

**Answer: Yes, I was advised on May 3, 2022, by Marc Perez, Acting Assistant Inspector General, Office of Investigations, that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under the EPA Order 4711 (see attached)**

(If in writing, please provide a copy.)

105.  What, if any, effect did the harassment/hostile work environment have on your physical or emotional well-being?

**Answer: The harassment caused me to have severe headaches, unable to eat or sleep.  In addition, within the past 12 months the EPA-OIG-OI has hired at least 24 new employees/agents and none of them were African American. Three of the individuals were Caucasian females, one was an Asian male and the other 20 were Caucasian males. These statistics for an organization/division that investigate and is suppose to provide fair treatment and impartial judgement paints the picture of discrimination and racism. Throughout the EPA-OIG-OI there are only two African American males. As stated in an earlier response, I am the only African American female. Knowing I am still the only African-American female throughout the EPA-OIG-OI, after a recent hire of 24 agents, causes me to experience anxiety whenever I think about it or have to discuss it. For further response, see my answer to #38, above.**

106.  What, if any, effect did the alleged harassment/hostile work environment have on your work performance?

**Answer: Because of harassment/hostile work environment all of my work was scrutinized, unusual and unnecessary changes were made and work was sent back to me with edits numerous times before being approved. The constant changes caused me to spend more time on reports and be hesitant and second guess every report or email I sent.**

**As previously stated in #60, on April 22,2022, I received the notification that the proposed removal was not sustained. On April 26, 2022, I submitted a six page report. The report included a review of five years of bank statements from seven bank accounts. Prior to submitting the report, although it was complete, I spent several days reviewing the report and contemplating when to submit it, due to fear of it being scrutinized and returned for changes. Less than 24 hours after submitting the report, Gurin approved the report with no questions or returns for edits. This proves management's harassment and does not support Westfalls claims in his proposed removal.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature  *Alisa Walton* | Date Signed  May 5, 2022 |
|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 26 | 27 | 2022-0009-R06 |

Due to fear of my reports being scrutinized and returned for changes, I still get anxious and spend a lot of time contemplating when to submit a completed report.

107.  Have you received training in harassment and/or a hostile work environment, and if so, when and what training did you receive?

Answer: EPA Anti-Harrassment Policy Statement 2021

108.  Are you familiar with the Agency's policy on anti-harassment/hostile work environment? Is the policy displayed for employees to view in your work area?  If so, where is the policy displayed?

Answer: Yes, I am familiar with EPA's anti-harassment/hostile work environment policy. I am not certain where the policy is located in the EPA work area, but I have received emails throughout the years.

109.   How would you like to see this EEO Complaint resolved? **Please be specific.**

Answer: I am seeking for each of the critical elements in the FY 2020 Interim rating provided by Garrett Westfall/Dan Hawthorne to be changed to "Exceeds Fully Successful;" and all critical elements and the overall rating for my FY 2021 performance rating to be increased to reflect my actual performance of "Exceeds Fully Successful." I am seeking retroactive payment for any monetary bonus, time off award, step increase, or other benefit that I would have received had I been rated at the "Exceeds Fully Successful" level for FY 2021. I am also seeking to have all records of the lowered performance appraisal removed from my official and unofficial personnel records and all other federal records. In addition, I am seeking to have the 2019 and 2021 Performance Improvement Plans (PIPs), and all documents that refer or relate to both PIPs, removed from my official and unofficial personnel records and all other federal records.

I am seeking to be reassigned to a non-hostile work environment, outside the chain of command of the management officials who have been named in my complaint, to an 1811 position that commensurate with my background, skills, abilities, and current grade level.

I am seeking the maximum amount available under the law for the emotional distress, pain and suffering, embarrassment, and harm to my reputation the agency's actions have caused. I am also seeking the restoration of leave taken due to stress while dealing with and/or preparing for oral and written responses for proposed removal and payment of my attorneys' fees and costs.

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature   *Alisa Walton* | Date Signed   May 5, 2022 |
|---|---|

October  2015

| EEO Investigative Affidavit (Continuation Sheet) | Page No. 27 | No. Pages 27 | Case No. 2022-0009-R06 |
| --- | --- | --- | --- |

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
| --- | --- |
| _Alisa Walton_ | May 5, 2022 |

October  2015

# Certification

Case Number
**2022-0009-R06**

I have read the proceeding attached statement, consisting of __27__ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

## Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the A g e n c y or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

## Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of_____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | *Alisa Walton* |

## Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
|---|---|
| X  *Alisa Walton* | X  May 5, 2022 |

Form 2571 October 2015

**EEO Investigative Affidavit (Complainant)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **1** | **17** | **2022-0009-R06** |

| 1. Affiant's Name (Last, First, MI) | | 2. Employing Federal Agency and Office |
|---|---|---|
| **Walton, Alisa** | | **Environmental Protection Agency, Office of Inspector General** |

| 3. Position Title | 4. Grade and Series | 5. Address and Zip +4 | 6. Organizational Unit |
|---|---|---|---|
| **Special Agent** | **GS13 - 1811** | **1201 Elm St., #500 Dallas, Texas 75270-2102** | **Office of Investigation** |

**Privacy Act Notice and Rehabilitation Act Notice**

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

**Important Information Regarding Your Complaint**

This *EEO Investigative Affidavit (Complainant)*, and the other form mentioned below, are being provided for you to use to fully respond to the accompanying questions. Mail or deliver your completed statement to the EEO complaints investigator within 15 calendar days of the date you received the forms. Use *EEO Investigative Affidavit (Continuation Sheet)* as needed to complete your written statement. Remember to number the top of each page and sign and date the bottom of each page of your statement. If you return your statement by mail, the return envelope must be postmarked on or before the 15th calendar day after the date that you received the affidavit forms. Failure to complete your statement and return the forms within the allotted time period could result in your complaint being dismissed based upon your failure to proceed. EEOC complaints processing regulation, 29 C.F.R. 1614.107(a)(7), states, in part, [A complaint may be dismissed] "Where the agency has provided the complainant with the written request to provide relevant information or otherwise proceed with the complaint, and the complainant has failed to respond to the request within 15 days of its receipt, or the complainant's response does not address the agency's request, provided that the request included a notice of the proposed dismissal."

7. Statement (*Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word*)

## AMENDED AFFIDAVIT

**CLAIM 5: ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| | 6-13-2022 |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **2** | **17** | **2022-0009-R06** |

107. Were you issued a Notice of Proposed Removal on or about March 1, 2022, for failing to successfully complete the PIP Complainant was placed on November 10, 2021, and notified on April 22, 2022, that a decision was made to not substantiate the Removal? If yes, please explain in detail the facts that led up to this action. **Provide a copy of the action.**
**Answer: Yes (see attached)**

108. Identify by full name, position title and work location the management official(s) whom you claim discriminated against you by issuing you a Notice of Proposed Removal. Please describe each manager's role in the decision.
**Answer: Garrett Westfall, Special Agent in Charge (SAC), Western Resource Field Office (WRFO), Dallas, Texas; Sean Earle, Deputy Assistant Inspector General of Investigations (DAIGI), Field Operations, Atlanta, Georgia. Westfall was the supervisor who initiated and signed the Notice of Proposed Removal. As the DAIGI Earle would have given Westfall guidance and had to approve the Notice of Proposed Removal. Prior to being a DAIGI, Earle had been a SAC for numerous years. Westfall was new to being a SAC and would not have had knowledge or experience in that type of action against an employee. (Note: Both Westfall and Earle were involved in previous claims.)**

**On March 1, 2022, at 11:38 AM, I received a Microsoft (MS) Teams invitation titled FY21 Performance Meeting from Westfall, requesting to meet me within the hour. Rufus Mabry, Human Resource Directorate, Washington, DC, was also included on the invitation. I sent an email proposing another time and met Westfall and Mabry at 2:30PM via MS Teams. During the MS Teams meeting Westfall stated he was sending a Notice of Proposed Removal to me and would like me to review it and send an email stating I received it. At 2:31 PM, Westfall sent an email with the Notice of Proposed Removal attached. The meeting was scheduled for 30 minutes, but only lasted approximately seven minutes. Mabry did not say anything.**

**Earle has a great influence on performance matters. As the DAIGI, Earle would likely have reviewed and given input on the decision and process. Since Westfall had only been in management for 19 months and a SAC for a little over six months, it is my belief Earle encouraged the Proposed Removal and provided Westfall guidance.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 3 | 17 | 2022-0009-R06 |

109. Identify the management official by name, position title and work location and phone number who concurred with the decision to issue you a Notice of Proposed Removal and his/her involvement.

**Answer:**

**Sean Earle, DAIGI, Field Operations, Atlanta, Georgia, 423-240-7735. As the DAIGI, Earle has a great influence on performance matters and would have likely reviewed and given Westfall guidance on the decision and process. Since Westfall had only been in management for 19 months (July 2020) and a SAC for a little over six months (August 2021), it is my belief Earle encouraged the Proposed Removal and provided Westfall guidance.**

**        ****As I previously explained, Westfall did not have enough management experience or knowledge of my performance to make a determination that I was incapable of performing as a GS13 Special Agent.**

110. Please explain in detail the reason(s), if any, management provided for issuing you a Notice of Proposed Removal.

**Answer:**

**The reason stated in the Notice of Proposed Removal for Unacceptable Performance was "due to unacceptable performance on Critical Element 2: Communication and Critical Element 3: Results Orientation in your Employee Performance Appraisal and Recognition System (EPARS) performance plan for fiscal year 2021."**

**\*\*Note: The claim my performance was unacceptable for Critical Element 2: Communication and Critical Element 3: Results Orientation in my EPARS performance plan for fiscal year 2021 contradicts the actual FY2021 performance self-assessment I provided to Westfall on September 17, 2021, and the comments written by Westfall in the section titled *Rating Official Element Narrative* on my official EPARS.**

**\*\*As a reminder, Westfall had only been my first line supervisor for approximately 45 days when he reduced my FY2020 EPARS rating from 4.33 to a 3.0. In addition, Westfall was my only second line for approximately 60 days when he rated my FY2021 EPARS 1.66.**

111. Did you dispute the reason? If yes, please explain why.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **4** | **17** | **2022-0009-R06** |

**Answer:**
**Yes, I disputed the reason, because the FY2021 EPARS rating Westfall gave me was inaccurate and unsupported, which led to the unsupported and unwarranted PIP by Westfall. Based on the amount of work and the type of assignments I was given during the PIP, it is my belief that the PIP was merely a pretext to set me up for removal from the federal service.**

**112.** Did management give you any documentation to support you being issued a Notice of Proposed Removal? *If so, identify the document and contents and provide a copy.*
**Answer: Yes, Westfall provided me with a 159-page memorandum, including attachments, titled *Notice of Proposed Removal for Unacceptable Performance, dated March 1, 2022*. The memorandum included information from the PIP for Critical Element 2: Communication, and Critical Element 3: Results Orientation, and Westfall's PIP overall assessment and alleged basis for the proposed removal action.**

113. Do you have any documentation to support that you should not have been issued a Notice of Proposed Removal?  If so, what does it indicate and from whom? Please provide a copy.
 **Answer: Yes, I submitted an oral and written response to the Notice of Proposed Removal. Included with my oral and written responses are copies of my prior performance ratings, which were at the "Exceeds Fully Successful" level. Also included in the support documentation are affidavits from four of my five previous supervisors, former SAC Craig Clinton, former SAC Darryl Ahmad, former SAC Michael Fiore, and former Assistant Special Agent in Charge (ASAC) Edwin Debiew. Each supervisor included information regarding my communication, results performed, writing ability, integrity, and teamwork throughout my sixteen years as a Special Agent. The information provided contradicts the claimed reason I was given the Notice of Proposed Removal.**

114. Identify the management official by name, position title and work location and phone number who made the decision to not substantiate the Removal.
 **Answer: Thomas Roelke, DAIGI, Washington, DC, 202-617-6730**

115. What reason did management give for not substantiating the Removal?
 **Answer: Roelke stated, "In making this decision, I have carefully and objectively considered the facts detailed in the Notice of Proposed Removal for Unacceptable Performance and the supporting documentation, as well your oral and written**

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 5 | 17 | 2022-0009-R06 |

responses.  After carefully reviewing the totality of materials and information that I was provided, I am not sustaining the proposal to remove you from your position."

116. How were you harmed when Management issued you a Notice of Proposed Removal?
**Answer: I was confused as to why Management would try to remove me after 16 years of Fully Successful and Exceeds Fully Successful performance ratings. I was embarrassed, I felt humiliated, I was fearful I was going to lose my job and not be able to provide for my family. I felt I was subjected to discrimination based on my race, harassment, and retaliation.**

**I began to experience severe headaches, sleepless nights, loss of appetite, the need for therapy, medical appointments, and constant anxiety. The Notice of Proposed Removal also caused me and my family to cease extracurricular activities and have to pay additional attorney fees, which caused financial strain on my household. The financial strain has caused me and my family a high amount of stress and fear of uncertainty.**

117. Why do you believe your **race** was a factor in you being issued a Notice of Proposed Removal and  notified on April 22, 2022, that a decision was made to not substantiate the Removal?
**Answer: I believe my race was a factor in me being issued a Notice of Proposed Removal because I am the only black female special agent in EPA-OIG-OI throughout the nation. I also believe I was subjected to harassment for the same reason.**

**Throughout 2020 and 2021, the EPA-OIG-OI hired many individuals and none of the individuals were black females. Approximately four black males were hired during that period and from information obtained at least three of the males experienced issues with Earle and left the agency. Within the past 30 days, one black male was hired out of 25 individuals.**

**Currently the EPA-OIG-OI has 37 special agents and I am the ONLY black female.**

**Additionally, the stark difference in the evaluation of my performance by Westfall, compared to my previous supervisors, raises an inference of discrimination and/or reprisal.  Likewise, the fact that the PIP was completely unreasonable, as explained in my written and oral replies to the proposed removal, demonstrates that the entire thing was an unjustified attempt to force me out of my job as opposed to a legitimate effort to address any alleged performance concerns.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| | 6-13-2022 |

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **6** | **17** | **2022-0009-R06** |

118. Why do you believe your **<u>sex</u>** was a factor in you being issued a Notice of Proposed Removal and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
**Answer: I am the only black female with the EPA-OIG-OI. Although they hired over 25 individuals within the past 12 months none were black females.**

**As previously stated, currently the EPA-OIG-OI has 37 special agents, and I am the ONLY black female. Earle has also been known to say women do not belong in law enforcement.**

**Additionally, the stark difference in the evaluation of my performance by Westfall, compared to my previous supervisors, raises an inference of discrimination and/or reprisal. Likewise, the fact that the PIP was completely unreasonable, as explained in my written and oral replies to the proposed removal, demonstrates that the entire thing was an unjustified attempt to force me out of my job as opposed to a legitimate effort to address any alleged performance concerns.**

119. Why do you believe your **prior EEO activity** was a factor in you being issued a Notice of Proposed Removal and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
**Answer: As I explained in my earlier responses, I previously filed an EEO complaint against a woman who was close friends with Earle. I believe that gave him the motivation to retaliate against me once he was in a position to do so.**

120. Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
**Answer: Westfall lowered my FY2020 EPARS from 4.33 to 3.0. Westfall rated my FY2021 EPARS a 1.66. Westfall placed me on an unattainable, overwhelming PIP on November 10, 2021, just before the Thanksgiving holiday, which ended on December 24, 2021, Christmas eve. On March 1, 2022, Westfall gave me the Notice of Proposed Removal. It is my belief the lowering of my FY2020 EPARS was the beginning of management's plan to terminate me. It is also my belief management made the decision to remove me and reassigned my "best" case to another agent. The subject had already made a confession. Management reassigned some of my duties or had others perform my duties, such as evidence custodian, vehicle coordinator. Management also had me request the results of my prior technical request be sent to another agent, which I believe was due to their plans to terminate me.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October 2015

| **EEO Investigative Affidavit (Continuation Sheet)** | Page No. **7** | No. Pages **17** | Case No. **2022-0009-R06** |
|---|---|---|---|

**Additionally, as I explained in response to #116, above, I experienced severe stress and anxiety as a result of the PIP and proposed removal.**

121. What, if any, agency policies/rules/regulations do you believe applied and/or violated when you were issued a Notice of Proposed Removal? **Please explain how this policy applies to your circumstances and provide a copy of the relevant policy.**
**Answer: Title VII of the Civil Rights Act, EPA Anti-Harassment policy, EPA Mass Mailer: EPA's Commitment to Equal Employment Opportunity**

122. **Other than this EEO complaint,** did you file any other kind of administrative action/ appeal, grievance and/or meet with higher level management when you were issued the Notice of Proposed Removal? If so, to whom (name and title) did you complain, when (what date), explain in detail what has occurred during this process so far and what was the resolution/response and the status of your appeal? **Please provide a copy of the appeal and any correspondence related to the appeal.**
**Answer:  I provided an oral and written response (see attached).**

116. Are you aware of other employees who were charged with the same or similar circumstance as you and under the same management official(s) who **were** issued a Notice of Proposed Removal for the same reason as you?
   **Answer: No**

   a.   If so, identify each employee by full name, work location, and position title.
   **Answer: n/a**

   b. Explain in detail when each cited comparator was issued a Notice of Proposed Removal   who issued it and the reason(s).
   **Answer: n/a**

   c.   For each person listed, identify their race and sex?
   **Answer: n/a**

   d.   For each person listed, are you aware of the employee having engaged in prior EEO protected activity?
   **Answer: n/a**

123. Are you aware of other employees who were charged with the same or similar infractions as you and under the same management official(s) and they **were not** not issued a Notice of Proposed Removal?

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed 6-13-2022 |
|---|---|

October  2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **8** | **17** | **2022-0009-R06** |

a.  If so, identify each employee by full name, work location, and position title.
    **Answer: No**

b.  Explain in detail why each cited comparator was not issued a Proposed Notice of Removal.
    **Answer: n/a**

c.  For each person listed, identify their race and sex?
    **Answer: n/a**

d.  For each person listed, are you aware of the employee having engaged in prior EEO protected activity?
    **Answer: n/a**


**CLAIM 6:  ON MAY 2, 2022, COMPLAINANT WAS INFORMED THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT**

124.  You allege you were informed that an internal investigation was initiated based on allegations of misconduct by you. Is this your allegation? If not, please explain.
      **Answer: Yes.  I was initially informed about an internal investigation in December of 2021, but after I was issued the Notice of Proposed Removal, that investigation apparently was placed on hold.  Very shortly after I was informed on April 22, 2022 that the proposed removal was not sustained, I was once again advised that I would be interviewed as part of an internal investigation.**

125.  Identify by full name, position title and work location the management official(s) whom you claim was responsible for the internal investigation.  Please describe each manager's role in the decision.
      **Answer: Garrett Westfall, SAC, WRFO, Dallas, Texas; Sean Earle, DAIGI, Field Operations, Atlanta, Georgia**

126.  Please explain in detail the facts that led up to the internal investigation.
      **Answer: Based on the interview I had on May 25, 2022, with SA Paul Brezenski and SA Jeremy Campbell, my timesheets for FY2022 pay period 1, FY2021 pay periods 13, 15, 23, 24, 25 and my Projected Management Actuals (PMA) timesheets were reviewed because I worked and charged time to Law Enforcement Availability Pay (LEAP) on**

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 9 | 17 | 2022-0009-R06 |

Sunday/Saturday. Brezenski stated the entry of my working on a Saturday and a few Sundays was an anomaly. The pay periods in question were just before I was given a low performance rating.

Because I receive LEAP, I am expected to be available 24/7. That also means I am allowed to work and charge time any time or day of the week.

Throughout the years, I have worked on a Saturday and/or Sunday and there has never been an issue or question.

It is my belief that this investigation was further harassment based on my race and prior EEO activity.

*Note: The first pay period in question was pay period 1 (August 26, 2021 - October 9, 2021), which was also the end of the fiscal year and three days (October 12, 2021) before Westfall issued me the FY2022 EPARS rating of 1.66.

127. How were you notified (verbally or in writing) and who notified you regarding the internal investigation? ***If in writing, please provide a copy. If verbally, explain what was said or done.***
Answer: Verbally and in writing (see below and attached)

On December 1, 2021, I received a phone call at approximately 2:00 PM CST from Brezenski stating he and Campbell wanted to meet me in the office on December 8, 2021, at 10:00 AM to talk to me about my official duties.

I informed Brezenski I had a meeting that same time and date with Westfall. Brezenski asked if the meeting was in person or video. I informed him it was via MS Teams meeting. I told Brezenski I would contact Westfall to see about rescheduling our meeting for that date and time.

I called Westfall and informed him of the conversation I had with Brezenski. Westfall stated they had called him as well and he forgot to tell me on our call approximately 2.5 hours earlier.

*Note: Since the PIP, November 10, 2021, I met weekly with Westfall on Wednesdays at 10:00 AM via MS Teams. I had also met with Westfall via MS Teams that same day.

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October 2015

App 0107

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **10** | **17** | **2022-0009-R06** |

On December 6, 2021, I sent Brezenski an email stating I retained counsel and would like to postpone our meeting until I was able to meet with my counsel.

On December 7, 2021, my attorney, Molly Buie, Seldon Bofinger & Associates, P.C., Washington, DC, sent an email to Brezenski including a designation of representative form and requested to reschedule the interview, possibly the following week.

On December 8, 2021, Brezenski replied, "I am currently on travel. My schedule is also full next week, Due to scheduling issues this matter will not be re-scheduled until sometime after the new year."

The interview was not rescheduled until after DAIGI Roelke issued the April 22, 2022 decision declining to sustain the proposed removal. Ten days later, on May 2, 2022, Mr. Brezinski sent another email to me and my counsel requesting to schedule an in-person interview of me.

127. When did the (dates- to and from) internal investigation take place?
**Answer: The date of the interview for the internal investigation was May 25, 2022.**

128. If an internal investigation has taken place, please explain what happened and why.
**Answer: On May 25, 2022, at 10:00 AM, I met Brezenski and Campbell in a conference room on the fourth floor of the EPA Region 6 office building at 1201 Elm St., Dallas, Texas. Brezenski stated I was being interviewed because my PMA timesheets reflect I had time charged on one Saturday and four Sundays. Brezenski stated I charged time to particular cases, but did not have chron log entries in the case management system to reflect those dates.**

**In the interview, I explained to Brezenski and Campbell what matters I was working on on the dates in question. As I told the investigators – to my knowledge, I was never presented with a policy or procedure specifying that in order to charge time to a case on any given period, especially on a Saturday or Sunday, it was required to document what work was completed. I raised similar issues in my reply to proposed removal regarding conflicting directions by management about how to enter information in the case management system. I confirmed in my interview that I have never falsely entered time on a case that I did not actually work.**

128. Please state what information you believe was provided by the management official responsible to be false.

_____
_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **11** | **17** | **2022-0009-R06** |

**Answer: Management alleged I charged time for work I did not perform and a case entry I accidentally placed in the same entry my supervisor created. The case entry was during the time I was on a PIP and was clearly an accident on my part. Management presented the accidental case entry as if it affected any case outcome or information. The entry was clearly a mistake because my language entered was not the same as management's language. The entry was not substantial. Under normal circumstances, a matter such as this would not have been noticed or addressed. At most, my supervisor would have simply asked me about any questions he or she had about my time entries rather than initiating an internal investigation.  The fact that this was elevated to that level demonstrates that this is merely another form of harassment, discrimination and retaliation against me.**

129. Please explain why you believe there was an investigation into your misconduct.
     **Answer: I believe the misconduct investigation was a pretext to remove me for discriminatory and retaliatory reasons. That much is clear from the fact that the agency paused the investigation when I received the notice of proposed removal and reinitiated it after that effort to remove me failed.**

     **In the 16 years I have worked for the EPA, I have worked on Saturdays and/or Sundays on occasion and have never been questioned. I am certain other agents have worked on Saturdays and Sundays and charged time without being subjected to an internal investigation.**

     **The pay periods in question were just before I was given a low performance rating.**

130. Were you personally involved in any misconduct?  If so, please explain your involvement.  If not, why?
     **Answer: No, I was not and have never been personally involved in any misconduct.**

131. Did you communicate with any management official(s) your concerns regarding the internal investigation?
     a. Date(s) of the communication(s). **No**
     b. Full name and position of the management official(s) with whom you had the communication(s).
     c. How you communicated with him/her/them (orally or in writing, and if in writing, provide a copy).
     d. What was stated during the communication(s)?
     e. What was the response you received?
     **Answer: N/a**

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| *[signature]* | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 12 | 17 | 2022-0009-R06 |

132. Do you have any documentation or evidence regarding the internal investigation?  If so, what and provide a copy with your affidavit.
   **Answer: Yes, I have copies of the timesheets in question and the case management chronicle log entry in question.**

133. Were you given a reason/explanation/justification for the internal investigation of your misconduct?
    **Answer: Yes.**

134. If so, state the reason/explanation you were given and identify by full name and position the management official(s) who gave you the reason/explanation.
      **Answer: The reason given was by Brezenski during the interview.**

135. If you were given a reason/explanation, do you disagree with it?  If so, explain in detail why.
    **Answer:  Please see my response to Questions 126 & 128, above.**

135. Why do you believe your **race** was a factor when you were informed that an internal investigation was initiated based on allegations of misconduct?
    **Answer:  I believe I was singled out for this baseless investigation due to my race because I am the only black female with the EPA-OIG-OI.  As I stated above, this was a matter that easily could have and should have been addressed with a simple conversation with my supervisor.  Instead, it was elevated to an internal misconduct investigation in a pretextual effort to force me out of my job.**

136. Why do you believe your **sex** was a factor when you informed that an internal investigation was initiated based on allegations of misconduct?
     **Answer: I believe I was singled out for this baseless investigation due to my sex because I am the only black female with the EPA-OIG-OI.  As I stated above, this was a matter that easily could have and should have been addressed with a simple conversation with my supervisor.  Instead, it was elevated to an internal misconduct investigation in a pretextual effort to force me out of my job.**

137. Why do you believe your **prior EEO activity** when you were informed that an internal investigation was initiated based on allegations of misconduct?
    **Answer: Earle was close associates with the individual I filed an EEO complaint against on April 1, 2015, alleging race discrimination and was aware of that complaint.  Additionally, I raised claims of race and sex discrimination and reprisal in my reply to proposed removal, which was submitted on March 17, 2022.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | *[signature]* | 6-13-2022 |

October  2015

App 0110

| **EEO Investigative Affidavit (Continuation Sheet)** | Page No. 13 | No. Pages 17 | Case No. 2022-0009-R06 |
|---|---|---|---|

138. Please explain why you believe the action(s) taken against you in this claim constitutes harassment. (Please be specific.)
**Answer: As I have explained previously, the internal investigation was the culmination of a series of pretextual, hostile actions that were clearly designed to force me out of my position.  First, Westfall baselessly downgraded my FY2020 performance rating; then placed me on the completely unreasonable PIP and issued me an unjustified appraisal for FY2021; then initiated the internal investigation.  All of these actions caused me a huge amount of personal and professional stress, which I have detailed in my previous responses. Additionally, my name and professional reputation have been severely tarnished.**

139. What, if any, policies/rules/regulations do you believe applied and/or violated when you were informed of an internal investigation? **Please explain how this policy applies to your circumstances and provide a copy of the relevant policy.**
**Answer: Title VII of the Civil Rights Act and the violation of the EPA EEO and Harassment Policy**

140. **Other than this EEO complaint,** did you file any other kind of administrative action/ appeal, grievance and/or meet with higher level management when you were informed of an internal investigation? If so, to whom (name and title) did you complain, when (what date), explain in detail what has occurred during this process so far and what was the resolution/response and the status of your appeal? **Please provide a copy of the appeal and any correspondence related to the appeal**
**Answer: No**

140. Are you aware of other employees in a similar situation as you who **were** issued an internal investigation?  If so, identify each individual by full name, position title, supervisor, race, sex, and prior protected activity and please explain how their situation was similar to yours.
**Answer: No.  As I said earlier, many agents perform work on the weekend, and I am not aware of any who have been investigated for misconduct for entering time on a Saturday or Sunday.**

141. Are you aware of other employees in a similar situation as you who **were not** subjected to an internal investigation?  If so, identify each individual by full name, position title,

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6-13-2022 |
|---|---|---|

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 14 | 17 | 2022-0009-R06 |

supervisor, race, sex and prior protected activity and please explain how their situation was different from yours.
**Answer: No**

## HARASSMENT/HOSTILE WORK ENVIRONMENT:

142. Other than as previously addressed, did you or anyone acting on your behalf tell the alleged harasser or person that created the hostile work environment that you found his/her behavior unacceptable, unwelcome, and/or offensive? If so, provide the following:
**Yes**
a. Who did you tell? **I told Westfall**
b. When did you tell them? **During a call on November 17, 2021**
c. What did you/they tell him/her? **I told Westfall something along the line of… I saw where things were going and I did not have the capacity to go there with him. I also told him that had a lot going on (I was going to the funeral home to view the body of my deceased aunt in two hours) and I did not have the ability to go "there" back and forth with him. I would get the information he wanted at a later date. Westfall was speaking to me in a derogatory/interrogating manner.**

**ASAC Staci Gurin was present on the MS Teams call.**
d. What was his/her response? **He continued to speak to me in a derogatory/interrogating manner.**

(If in writing, please provide a copy.)

143. Did you ask that the alleged behavior stop? If not, please explain why.
**Answer: Yes**

144. Did you or did anyone else acting on your behalf bring your concerns regarding the alleged harassment/hostile work environment to the attention of other management officials? If so, provide the following: **I raised that issue in my reply to the proposed removal, which went to DAIGI Roelke.**
a. Who did you tell?
b. When did you tell them?
c. What did you/they tell him/her?
d. What was his/her response?

(If in writing, please provide a copy.)

_____
_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **15** | **17** | **2022-0009-R06** |

145. Was an investigation conducted into your allegations of harassment/hostile work environment?  If so, who conducted the investigation and when was it conducted?
   **Answer: On March 22, 2022, Mark Miller investigated the hostile work environment; however, Mr. Miller's investigation only covered one isolated exchange I had with Westfall regarding the evidence room.  It did <u>not</u> concern the majority of the hostile incidents I have raised in this complaint.**

146. If an investigation was conducted, were you advised of the outcome? If so, when, by whom and what was the outcome?
   **Answer: Yes, on May 3, 2022, Marc Perez, Acting Assistant Inspector General, provide me with a memo stating, "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711." (See attached)  As I stated above, this decision did not concern the majority of the hostile incidents I have raised in this EEO complaint.**

(If in writing, please provide a copy.)

147. What, if any, effect did the harassment/hostile work environment have on your physical or emotional well-being?
   **Answer: During the various periods of me talking to Westfall, knowing I was going to meet with and/or actually meeting with him, I felt sick, nervous, afraid and threatened I would lose my job. I was humiliated and embarrassed because they took one of my best cases and gave it to a Caucasian male. I had to notify an individual in another division and ask him to send information for my case to the Caucasian male. It was totally humiliating to see my 16 years of experience and professionalism be cast away and for me to be treated as an incompetent agent. It is my belief they began to eliminate my role and minimize some of my responsibilities because their plan was to remove me.**

148. What, if any, effect did the alleged harassment/hostile work environment have on your work performance?
   **Answer: I was nervous and tried to make sure I crossed all my T's and dotted my I's. I became nervous, afraid, and hesitant to upload reports for fear of them being rejected. I would often spend days working on reports and wait until the last minute to turn in the reports. It caused me to have constant headaches, sleepless nights, constant anxiety, and feel less than adequate.**

_____
_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 16 | 17 | 2022-0009-R06 |

During the PIP, I was given a lot of busy work. During the PIP period and even after, I worked on assignments for weeks and occasionally months, but the assignments were never approved or included in the case. Although during the period the assignments were allegedly pertinent and imperative to the case.

149. Have you received training in harassment and/or a hostile work environment, and if so, when and what training did you receive?
Answer: Yes, periodically we received Agency Mass Mailer emails. They emails include links to EPA harassment policies and procedures. In January/February 2022, the Office of Civil Rights provided an anti-harassment informational session via MS Teams

150. Are you familiar with the Agency's policy on anti-harassment/hostile work environment? Is the policy displayed for employees to view in your work area?  If so, where is the policy displayed?
Answer: Yes, I am familiar with EPA's policy on anti-harassment/hostile work environment. The policy has been emailed, from the Agency Mass Mailer, throughout the past few years and as recently as June 7, 2022.

151. How would you like to see this EEO Complaint resolved? **Please be specific.**
Answer: I am seeking for each of the critical elements in the FY 2020 Interim rating provided by Garrett Westfall/Dan Hawthorne to be changed to "Exceeds Fully Successful;" and all critical elements and the overall rating for my FY 2021 performance rating to be increased to reflect my actual performance of "Exceeds Fully Successful." I am seeking retroactive payment for any monetary bonus, time off award, step increase, or other benefit that I would have received had I been rated at the "Exceeds Fully Successful" level for FY 2021. I am also seeking to have all records of the lowered performance appraisal removed from my official and unofficial personnel records and all other federal records. In addition, I am seeking to have the 2019 and 2021 Performance Improvement Plans (PIPs), all documents that refer or relate to both PIPs, and all documents related to the Notice of Proposed Removal and internal misconduct investigation removed from my official and unofficial personnel records and all other federal records.

I am seeking to be reassigned to a non-hostile work environment, outside the chain of command of the management officials who have been named in my complaint, to an 1811 position that is commensurate with my background, skills, abilities, and current grade level.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | | 6-13-2022 |

October  2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **17** | **17** | **2022-0009-R06** |

I am seeking the maximum amount available under the law for the emotional distress, pain and suffering, embarrassment, and harm to my reputation the agency's actions have caused. I am also seeking the restoration of leave taken due to stress while dealing with and/or preparing for oral and written responses for proposed removal and payment of my attorneys' fees and costs.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| | *[signature]* | 6-13-2022 |

October 2015

**EEO Investigative Affidavit *(Witness)***

| Page No. | No. Pages | Case No. |
|---|---|---|
| **1** | **38** | **2022-0009-R06** |

| 1. Affiant's Name (Last, First, MI) **Westfall, Garrett, J.** | 2. Employing Federal Agency and Office **EPA OIG, OI, Dallas, TX** |
|---|---|

| 3. Position Title **Special Agent in Charge** | 4. Grade and Series GS-1811-15 | 5.Address and Zip +4 1201 Elm Street, Suite 500 Dallas, TX 75270 | 6. Organizational Unit **OIG Office of Investigations** |
|---|---|---|---|

### Privacy Act Notice and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Response to Complaint
Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word*)

**Please complete the top section of this form, boxes #2 thru #6.**

1. Please state your name, position title, grade level, work location, work address (include zip+4), work telephone number, and work e-mail address.

   Name: Garrett J. Westfall
   Position title and grade level: Special Agent in Charge, GS-1811-15
   Department/division/work group: EPA OIG, Office of Investigations, Western Region Field Office, Dallas, TX
   Work address:  1201 Elm Street, Suite 500, Dallas, TX 75270-2102
   Work telephone number: (214) 846-9402
   Work e-mail address: westfall.garrett@epa.gov

   **\*\*Please note: certain data within Exhibits/Attachments will be redacted due to active OIG investigations, including case titles/subject names, and or information containing grand jury or Bank Secrecy Act restrictions.\*\***

2. State the period of time you have held your current position.
   **Answer:**  on or about August 15, 2021 to current.

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:17:57 -05'00' | Date Signed  6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 2 | 38 | 2022-0009-R06 |

3. Identify your first and second line supervisors.
   **Answer:** First Line – Deputy Assistant Inspector General for Investigations (DAIGI), Sean Earle, EPA OIG, Office of Investigations;
Second Line – Acting Assistant Inspector General for Investigations (AIGI), Marc Perez, EPA OIG, Office of Investigations.  As of June 5, 2022, AIGI Jason Abend, EPA OIG, Office of Investigations.

4. Describe your past or current working/reporting relationship with Complainant, Lisa Walton (i.e., co-worker, supervisor, etc.).  State the period of time of the working/reporting relationship with Complainant.
   **Answer:** I was not employed by the EPA OIG, in a management capacity, until July 2020.  I was previously employed by EPA OIG from approximately February 1999 through March 2001, as an Auditor in Denver, CO.  I was then employed by EPA from approximately January 2003 through May 2007, as a Special Agent in Seattle, WA.  During both of my earlier tenures with EPA OIG, I was unaware of Special Agent (SA) Alisa Walton (not Lisa Walton as cited above).

   Work Relationship with SA Walton:
   First Line Supervisor – Assistant Special Agent in Charge (ASAC) – approximately July 19, 2020 through August 14, 2021;
   Second Line Supervisor – Special Agent in Charge (SAC) – on or about August 15, 2021, to current.
   As the first-line supervisor, I directly supervised SA Walton, which included assigning her tasks, reviewing her work product, providing guidance, assessing her performance, approving her time and attendance, and providing her coaching/mentorship.  As the second-line supervisor, I oversee the Western Region Field Office and two ASACs, covering the Southwest Division and Western Division.  As a SAC (second-level supervisor), I did not have day-to-day interaction/supervision with SA Walton and oversight of her performance.  However, for the purpose of the Performance Improvement Plan (PIP) involving SA Walton in November 2021, I initiated the PIP, assigned her tasks, reviewed her work product, provided feedback, and assessed her performance as it related to the PIP.

<u>**RACE AND SEX ALLEGATION:**</u>

5. Please identify your **race.**
   **Answer:** White

6. Were you aware of Complainant's **race** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **race**?
   **Answer:** I was unassociated with SA Walton in 2019 and most of 2020 (on or about July 19, 2020).  I was not aware of SA Walton's race until I met her on or about August 7, 2020,

_____
_____
**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:18:43 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 3 | 38 | 2022-0009-R06 |

at the Dallas office parking garage to obtain records and possibly garage keycard for the GOV – Dodge Charger.

7. Please identify your **sex.**
   **Answer:** Male

8. Were you aware of Complainant's **sex** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **sex**?
   **Answer:** I was unassociated with SA Walton in 2019 and most of 2020 (on or about July 19, 2020). I first became aware of SA Walton's sex during my first week as the ASAC for the EPA OIG Southwest Division, beginning July 19, 2020.  During the first week, I had a discussion with my supervisor at the time, SAC Daniel Hawthorne, regarding the agents that comprised the SW Division, including SA Walton. The discussion included information such as tenure with EPA OIG, covered time as an 1811, current caseload, and other background.  While an individual's sex was not specific to the discussion, SAC Hathorne used pronouns "her/she" when providing details regarding SA Walton. It was during this timeframe, I became aware of SA Walton's sex, although I did not visually corroborate her sex until I met her at the Dallas office parking garage on or about August 7, 2020, to obtain records and possibly garage keycard for the GOV – Dodge Charger.

**RETALIATION ALLEGATION:**

9. Were you aware of the Complainant being involved in EEO activity prior to this complaint? (EEO activity includes filing a charge, testifying, assisting another, or participating in a discrimination proceeding; or otherwise opposing discrimination.) If so, when did you become aware of the Complainant's EEO activity?
   **Answer:**  I do not have knowledge of any EEO activity with SA Walton prior this this complaint.

10. If you were named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he/she filed or was involved in, please identify the case number(s) and identify the issue(s) involved in the complaint.
    **Answer:**  No, I am unaware of being named in any prior EEO complaint.

11. If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?
    **Answer:** I was not involved in any prior EEO activity at this Agency or anytime during my federal career beginning in approximately February 1999.

12. If not involved, how did you become aware of the EEO activity?
    **Answer:** I am unaware of any prior EEO activity.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:22:23 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **4** | **38** | **2022-0009-R06** |

13. If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?

   **Answer:** I have not been involved in any prior EEO activity at this Agency or anytime during my federal career beginning in approximately February 1999.


**CLAIM 1: ON NOVEMBER 10, 2021, COMPLAINANT WAS PLACED ON PERFORMANCE IMPROVEMENT PLAN (PIP)**

14. Are you the Management Official responsible for placing the Complainant on a Performance Improvement Plan (PIP) on November 10, 2021? If so, describe in detail your involvement.

**Answer:** Yes, I was the management official responsible for placing SA Walton on a PIP, based on her unacceptable performance under her FY2021 performance standards within two critical elements of performance. My involvement in the PIP comprised of initiating the PIP, which included coordinating with EPA OIG Human Resources Directorate (HRD) and Office of Counsel (OC), on the proposed action. On or about September 24, 2021, I submitted a referral report and support records to Rufus "Erik" Mabry, EPA OIG, HRD (Exhibit 1). On October 1, 2021, I submitted, via email, an update to the report to Mabry (Exbibit 2). The records included documented performance and conduct related issues observed during FY21 involving SA Walton. The report was in support of possible personnel action to address the unacceptable performance and conduct related matters. In addition to the performance rating, the decision to initiate a PIP was because supervisory intervention (e.g., counseling and mentoring) failed to correct the performance issues in several performance standards. Between approximately September 24, 2021, and November 9, 2021, I coordinated the implementation of the PIP with HRD and OC. At no point did HR or OC advise me that there was insufficient evidence to pursue a PIP with SA Walton in attempt to improve performance.

Regarding the PIP, I initiated the PIP with SA Walton, assigned tasks related to the PIP, met with SA Walton on a weekly basis to discuss assignments and clarify any questions, and documented any performance deficiencies related to the PIP. I concluded that SA Walton did not successfully pass the PIP and showed no improvement during the 45-day evaluation period; and as such, I recommended her removal from federal service. This conclusion and recommendation were coordinated with HRD and OC.

15. If you did not have any involvement in this claim, please identify the Management Official(s) who did (by name, position title, business unit/location, and contact information).

**Answer:** N/A. See Answer to Question 14.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:28:09 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **5** | **38** | **2022-0009-R06** |

16. Was/Were any other management official(s) involved in and/or did he/she/they have input into the decision to place the Complainant on a PIP?  If so, identify him/her/them by full name and position and describe his/her/their involvement and/or input in detail.
   **Answer:**  ASAC Staci Gurin, EPA OIG, Southwest Division, was also involved in the PIP as a management official.  As SA Walton's first-line supervisor at the time (beginning in approximately August 29, 2021), ASAC Gurin was involved in the PIP process, but not the recommendation to initiate the PIP.  I made the decision to place SA Walton on a PIP based on a year of documented unacceptable performance under several performance standards within two critical elements and numerous consultations with HRD and OC regarding SA Walton's poor performance. Regarding ASAC Gurin's involvement, she participated in all but one PIP meeting with SA Walton, reviewed my assessment of SA Walton's work products for concurrence, and reviewed my meeting summaries with SA Walton for completeness and accuracy.

17. How was Complainant notified she was being placed on a PIP?  If verbal notification was given, please explain what was said, when and why.  If written notification was provided, please provide a copy of the notification.
   **Answer:**  I notified SA Walton, via email, of the PIP on November 10, 2021, at approximately 12:30 pm CST (Exhibit 3).  On November 10, 2021, at approximately 2:00 pm CST, I conducted a Microsoft (MS) Teams meeting (video conference) with SA Walton to discuss the PIP.  I sent an email summarizing the above MS Teams meeting on November 10, 2021, at approximately 3:28 pm CST (Exhibit 4).

18. Please explain the Agency's policy(s) or procedure(s) associated with Performance Improvement Plans?
   **Answer:** EPA OIG's policy and procedures for a PIP are detailed in OIG EPARS Handbook (Exhibit 5), OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6), and OIG Policy and Procedure 313 – Employee Performance Appraisal and Recognition System (Exhibit 7).

19. Please describe the process(es) and procedures followed when placing Complainant on a PIP.
   **Answer:** The PIP was developed and implemented with guidance from HRD and OC, in conjunction the above guidance/handbooks/guides (Exhibits 5-7).

   Prior to the PIP referral to HRD, I evaluated SA Walton's performance for the entire rating period of FY21 against her performance standards/critical elements for FY21 (Exhibit 3).

   I evaluated SA Walton's performance in comparison to the EPA OIG EPARS Handbook (Exhibit 5), and the OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6).  Specifically, the performance noted during the rating period was most closely described in

---

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:28:53 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **6** | **38** | **2022-0009-R06** |

Level 1-Unacceptable level in the EPARS Handbook - Definitions of Summary Rating Levels and Generic Performance Expectations, as described below:

> The quantity and quality of the employee's work under this element are not adequate for the position. The employee's work products fall short of the requirement for this element. They arrive late or often require major revision to their work products because they are incomplete or inaccurate in content. The employee fails to apply adequate technical knowledge to complete the work of this element. Either the knowledge applied cannot produce the needed products, or it produces technically inadequate products or results. Lack of adherence to required procedures, instructions and formats contributes to inadequate work products. Because the employee's work planning lacks logic or realism, critical work remains incomplete or is unacceptably late. Lack of attention to priorities causes delays or inadequacies in essential work: the employee has concentrated on incidental matters. The employee's behavior obstructs the successful completion of the work by lack of cooperation with customers, supervisor, and/or co-workers, or by loss of credibility due to irresponsible speech or work activity. In dealing with special projects, the employee either sacrifices essential regular work or fails to complete the projects. The employee fails to adapt to changes in priorities, procedures or program direction, and therefore, cannot operate adequately in relation to changing requirements. The oral and written expression the employee uses in accomplishing the work of this element lacks the necessary clarity for successful completion of the required tasks. Communication failures interfered with completion of the work.

On or about September 20, 2021, I informed HRD of my desire to discuss performance and conduct related issues with SA Walton. I detailed those performance and conduct issues in an email to HRD on or about September 24, 2021 (Exhibit 1).  Between approximately September 24, 2021, and November 9, 2021, I coordinated the implementation of the PIP with HRD and OC, in combination with following guidance outlined in the OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6).

Please note that discussions regarding SA Walton's poor performance and conduct issues with HRD and OC began as early as October 2020. While I proposed placing SA Walton on a PIP on two separate occasions (October 2020 and March 2021) in FY21 with HRD and OC, I decided to provide additional supervisory intervention (e.g., counseling and mentoring) to SA Walton.  The final recommendation for the PIP was based on the entire rating period as the intervention failed to correct the performance issues.

_____

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:29:47 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 7 | 38 | 2022-0009-R06 |

20. During the relevant performance appraisal period were any discussions conducted with Complainant regarding her performance?  If so, identify by full name and position the management official(s) who was/were involved in the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).

**Answer:** Yes, there were several relevant discussions during the appraisal period, in which I discussed performance deficiencies with SA Walton, as described in Exhibit 1, including two performance counseling sessions and mid-year/year-end meetings - November 10, 2020, November 30, 2020, March 29, 2021, and April 12, 2021. Please note, that while the year-end meeting (November 10, 2020) was a meeting to discuss SA Walton's performance for FY20, the meeting was held during the performance period in FY21. Management official involved at the time – ASAC Garrett Westfall, approximately July 19, 2020 through August 14, 2021; SAC Garrett Westfall, August 15, 2021 through September 30, 2021. SAC Hawthorne (now retired) – November 10, 2020 meeting; and ASAC Staci Gurin – October 13, 2021 meeting.

- November 10, 2020 – FY20 Year-end rating, MS Teams meeting with SAC Dan Hawthorne and myself.  During the MS Teams meeting on or about November 10, 2020, SAC Hawthorne discussed the reasons behind the rating, under each critical element, and discussed several performance deficiencies with her, including but not limited to, timeliness, poor communication, and the factual case inaccuracy she highlighted in her FY2020 self-assessment. During the meeting, I informed SA Walton that for FY21, she needed prioritize communication with her supervisor, upload accurate case information, and respond to inquiries in a timely fashion.

- November 30, 2020 – MS Teams meeting to provide a performance counseling email regarding observed performance deficiencies.  During the meeting, I discussed several performance deficiencies found on several cases, which included untimely documentation of relevant information and several instances of inaccurate information and case facts. I discussed with her the importance of ensuring information and facts were accurate in reports, as any inaccurate information could affect the integrity of the case in discovery proceedings.  I outlined what would be needed, per policy, to be considered satisfactory.

- March 29, 2021 – MS Teams meeting to provide counseling regarding observed performance deficiencies and obtain a status on several cases.  During the meeting, I discussed several performance deficiencies found in a few ongoing matters, which included untimely documentation of relevant information, including the exclusion of exculpatory information, and lack of communication with me. I discussed with her the importance of ensuring relevant information, including exculpatory information, is timely and accurately documented. SA Walton recognized the gravity of the issue and the potential discovery/Brady issues surrounding the lack of documentation.  I discussed what would be needed, per policy, to be considered satisfactory, and my expectation for increased and improved communication.

---

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | | Date Signed 6/14/2022 |
|---|---|---|---|
| | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:30:38 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **8** | **38** | **2022-0009-R06** |

- April 12, 2021 – MS Teams meeting to discuss mid-year evaluation.  During the meeting, I discussed several performance deficiencies including documentation of relevant information, timeliness, accuracy in work products, and the lack of consistent communication with me.
- October 13, 2021 – FY21 Year-end rating, MS Teams meeting with ASAC Staci Gurin and myself.  I thoroughly explained to SA Walton the scores I assessed for her performance, including the unacceptable performance in two critical elements.  During the rating meeting, I provided examples of her poor performance, specific to work product timeliness and accuracy; identification and documentation of relevant records; proper evidence procedures, and insufficient communication.

21. If not previously addressed, during the discussion(s), was Complainant notified of any performance issues?  If so, what was he told?
**Answer:**  See response to Question 20.

22. If Complainant was informed of any performance issues, was any improvement observed subsequent to her being placed on PIP?  If so, describe in detail how he improved.
**Answer:** No improvement was noted, and the deficiencies noted during the year represented significant credibility and integrity concerns for the OIG.  SA Walton failed to document investigative activity in several instances or provide timely work products in accordance with policy and procedures, provided inaccurate information and incorrectly sourced information in her written reports, and failed to follow guidance and direction from her supervisor.  She also did not improve in her communication with her supervisor(s), even though it had been requested that she initiate and increase communication with her supervisor.

23. During the discussions regarding Complainant's performance issues, was Complainant made aware if her performance did not improve she would be placed on a PIP?
**Answer:** No, not with the use of the verbiage "Performance Improvement Plan" or "PIP".  I was provided specific instruction and direction from HRD that a supervisor could not mention a PIP during a performance discussion as it would seen as a threat.  Accordingly, during multiple discussions with SA Walton, I never stated that if her improvement did not improve, she would be placed on a PIP.  However, I told her on multiple occasions that failure to improve her performance would be reflected in her performance rating and that she was being given an opportunity to improve her skills and performance to a successful level.  I offered to coach and mentor her to improve her performance, but while she was receptive to being mentored, she never initiated communication with me regarding work products or other facets of her position.

24. If so, state the dates of any meetings, describe in detail what was stated during the meeting and the outcomes.  If no meeting took place, explain in detail why.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:31:33 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 9 | 38 | 2022-0009-R06 |

**Answer:** N/A. There were no meetings in which SA Walton was told if her performance did not improve, she would be placed on a PIP (See answer to Question 23).

25. Did the Complainant discuss with you or any other management official her concerns associated with being placed on a PIP?  If so, state the date(s) of the discussion(s) and describe in detail what was stated during the discussion(s).  If you did not discuss Complainant's concerns with her, explain in detail why you did not.
**Answer:** I do not recall any time SA Walton discussed her concerns with me regarding being placed on a PIP.  I am unaware of any other management official, in which she discussed concerns about being placed on a PIP.

26. What documentation or other evidence exists concerning Complainant being placed on a PIP? Provide a copy of the supporting documentation.
**Answer:** There are records provided to HRD and OC in support of the PIP (Exhibit 1, Exhibit 3); and extensive records on the implementation and results of the PIP (Exhibit 8).

27. What reason(s), explanation(s), or justification(s) if any, were given to Complainant for placing her on a PIP?
**Answer:** During the initiation of the PIP on or about November 10, 2021, I explained to SA Walton that reason for the PIP was as a result of the unacceptable rating in the FY21 for two critical elements – Results Orientation and Communication, and she was being given the opportunity to demonstrate her improvement in those areas. During the meeting, I detailed those deficiencies and what improvement would be needed to be considered minimally successful.  The memorandum, Opportunity to Demonstrate Acceptable Performance, also provided an explanation as to the need for the PIP (Exhibit 3).

During the FY21 performance evaluation on or about October 13, 2021, I thoroughly explained to her the scores I assessed for her performance rating, including the unacceptable performance in two critical elements.  During the rating meeting, I provided examples of her poor performance and reminded her of the counseling sessions held during the year to discuss her poor performance, specific to work product timeliness and accuracy; identification and documentation of relevant records; proper evidence procedures, and insufficient communication.

28. Did she dispute the reason(s)/explanations or justifications given?  Please explain.
**Answer:** Yes.  During the rating meeting on or about October 13, 2021, SA Walton disagreed with the ratings and later refused to sign the rating.  In the meeting she conveyed that she believed her self-narrative was not considered in the rating.  I explained that while her self-assessment was considered, there were too many examples of documented performance deficiencies related to several performance standards, which have not improved over the year including inaccurate relevant information (e.g., dates), incorrectly

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:32:29 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 10 | 38 | 2022-0009-R06 |

sourced records, undocumented relevant records, improperly handled evidence, and lack of improved communication.

Subsequently, in an email on October 27, 2021, SA Walton stated that, "…I am replying to inform you I chose not to sign the performance rating. I do not agree with the performance ratings" (Exhibit 9).

29. If Complainant was informed of any performance issues, was any improvement observed subsequent to her being issued the Performance Improvement Plan?  If so, describe in detail how she improved. Please provide any supporting documentation.
 **Answer:** No improvement was noted, and the deficiencies noted during the year represented significant credibility and integrity concerns for the OIG.  SA Walton failed to document investigative activity in several instances or provide timely work products in accordance with policy, provided inaccurate information and incorrectly sourced information in her written reports, and failed to follow guidance and direction from her supervisor.  She also did not improve in her communication with her supervisor(s), even though it had been requested that she initiate and increase communication with her supervisor.

30. Did you schedule any meetings with Complainant  before or after she was placed on a PIP?  If so, state the dates of the meetings, describe in detail what was stated during the meetings, and the outcomes. If in writing, please provide a copy. If no meetings were scheduled, explain in detail why.
 **Answer:** This is a very broad question.  I have scheduled and held multiple meetings with SA Walton prior to the PIP, dating back to when I first encountered performance issues related to her work product in approximately August 2020, including but not limited to, the meetings outlined in Exhibit 1. However, after approximately August 15, 2021, I was no longer SA Walton's first-line supervisor.  ASAC Staci Gurin oversaw the day-to-day supervision of SA Walton and conducted biweekly meetings with her.  I participated and scheduled two meetings with SA Walton after August 15, 2021, as a second-line supervisor – October 13, 2021 (FY21 EPARS Performance Rating), and November 3, 2021, (Discussion regarding evidentiary issues on several cases).  After the initiation of the PIP, I scheduled and held weekly PIP meeting from November 10, 2021, through December 23, 2021, which were documented and sent to her, via email for review (Exhibit 8).

- October 13, 2021 – FY21 Year-end rating, MS Teams meeting with ASAC Staci Gurin and myself.  I thoroughly explained to SA Walton the scores I assessed for her performance, including the unacceptable performance in two critical elements. During the rating meeting, I provided examples of her poor performance, specific to work product timeliness and accuracy; identification and documentation of relevant records; proper evidence procedures, and insufficient communication.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:33:31 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **11** | **38** | **2022-0009-R06** |

- November 3, 2021 – Meeting with ASAC Staci Gurin, SA Walton, and myself to discuss evidentiary issues, including two memoranda to file, in which SA Walton cited an incorrect evidence inventory date (Exhibit 31).

Regarding meetings after the PIP, I participated in one meeting on or about January 5, 2022, with ASAC Gurin and SA Walton, to discuss the resolution of a PIP task (i.e., a case closing report) based on a previous discussion with SA Walton on December 22, 2021 (See Exhibit 8 for summary regarding the December 22, 2021 meeting).  As a result of this meeting, I submitted a misconduct referral to OI leadership because it appeared SA Walton inappropriately manipulated two chronology log entries in the electronic case management system (ECMS) to support a revised closing report submitted by SA Walton after management feedback on December 22, 2022.  These unapproved modifications were done five months after original entry and conflicted with a previously approved memorandum of the same activity in the ECMS. The alleged activity included the manipulation to a supervisory case review (i.e., a chronology entry entered by me to document the bi-weekly management review of the case) entered the ECMS on June 27, 2021. The case closing report submitted by SA Walton remains unapproved, as I believe the report to include false information, in direct contradiction to previous statements and work products submitted by SA Walton.

Other meetings regarding performance after the PIP were conducted by SA Walton's first-line supervisor, ASAC Gurin.

31. What was the beginning and end date for the PIP? Has the PIP been terminated, when and why? Please provide any supporting documentation.
    **Answer:**  November 10, 2021 – December 24, 2021.  The PIP concluded on December 24, 2021, as it was designed for a 45-day evaluation period (Exhibit 8).

32. Were you provided instruction/guidance prior to issuing Complainant a Performance Improvement Plan? If so, please provide their name and title and explain what instruction/guidance you were given.
    **Answer:**  Yes.  I was provided guidance by Erik Mabry, HRD, EPA OIG; Elizabeth Moreira, OC, EPA OIG; and Lori Ruk, OC, EPA OIG.  This guidance has been ongoing and began as soon as I began to observed performance issues with SA Walton in approximately October 2020.  I have held multiple meetings with both Mabry and Ruk on several performance issues observed during FY21.  Both Mabry and Ruk provided guidance on drafting and issuing the PIP memo, assignment of tasks, needed documentation, expectations and role as the manager, and other aspects of the PIP process.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:34:33 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 12 | 38 | 2022-0009-R06 |

33.  In the past two years, were there other employees that you supervise who had similar performance as Complainant who was/were **also issued** a Performance Improvement Plan?  If so, identify each individual by:
   a.  full name
   b.  position title
   c.  your awareness of their race
   d.  your awareness of their sex
   e.  your awareness of their prior EEO activity
   f.   explain how and why the cited comparators were treated the same as the Complainant.
   **Answer:** Since approximately July 2020, I have not supervised any other employees who had similar unacceptable performance in their performance standards, like SA Walton.  Other than SA Walton, I have not issued a PIP to any other employee under my supervision.

34.  In the past two years, were there other employees that you supervise who had similar performance as Complainant who was/were **not issued** a Performance Improvement Plan. If so, identify each individual by:
   a.  full name
   b.  position title
   c.  your awareness of their race
   d.  your awareness of their sex
   e.  your awareness of their prior EEO activity
   f.  explain how and why the cited comparators were treated differently than the Complainant.
   **Answer:** Since approximately July 2020, I have not supervised any other employees who had similar unacceptable performance in their performance standards, like SA Walton.  Other than SA Walton, I have not issued a PIP to any other employee under my supervision.

35.  Was Complainant's **race**  a factor when on November 10, 2021 she was placed on a Performance Improvement Plan? If so, explain in detail how and why it was a factor.
   **Answer:** No.

36. Was Complainant's **sex**  a factor when on November 10, 2021 she was placed on a Performance Improvement Plan? If so, explain in detail how and why it was a factor.
   **Answer:** No.

37. Was Complainant's **prior EEO activity** a factor when on November 10, 2021 she  was placed on a Performance Improvement Plan? If so, explain in detail how and why it was factor.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:35:54 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **13** | **38** | **2022-0009-R06** |

**Answer:** No., I have no knowledge or involvement in SA Walton's prior EEO activity.

38. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her.
**Answer:**  I disagree with above statement that the cited action is a form of harassment. I did not propose and initiate the cited action based on race, sex, religion, national origin, age, disability, or genetic information.  I proposed and initiated a PIP for the reasons previously stated. The PIP was not punitive, as she was given the opportunity to illustrate improved performance in several critical elements.  Furthermore, SA Walton never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.

As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or lacking in credibility.

When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance in several performance standards to include product timeliness and accuracy; identification and documentation of relevant records; and poor communication. As her performance could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues and ways to improve her performance and engage SA Walton in communication (Exhibit 10).  I repeatedly told her I was open to mentor her to assist in her performance.  SA Walton chose not to engage me as a coach/mentor and failed to communicate with me on a regular basis.  While I could have placed SA Walton on a PIP in as early as October 2020, with advisement from HRD and OC, I chose to give her an opportunity to work closely with me and demonstrate improved performance during the fiscal year.

39. Did Complainant file an appeal or an administrative grievance (non EEO complaint) for being issued a Performance Improvement Plan on November 10, 2021?  If so, identify by full name and position the management official to whom she appealed and describe the

_____

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:40:39 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **14** | **38** | **2022-0009-R06** |

outcome of the appeal. Please provide copies of all documentation related to the administrative grievance.

**Answer:** I am unaware whether SA Walton filed an appeal or an administrative grievance for being issued a PIP.

For clarification, SA Walton provided a verbal and/or written response to the PIP/Notice of Proposed Removal, as part of the PIP process, to the decision official, Thomas Roelke, Deputy Assistant Inspector General for Investigations, Headquarters Operations, EPA OIG. I am neither aware of the response nor been given a copy or information regarding the response by SA Walton. On April 22, 2022, DIAGI Roelke did not sustain the removal action of SA Walton (Exhibit 30). As stated above, I do not have copies of documentation related to SA Walton's response.

40. Cite the policies and/or contract provisions that apply or were relied upon in your decisions and/or actions when Complainant was issued a Performance Improvement Plan? Explain in detail how each policy and/or contract provision applies.   Please provide copies of the policies and/or contract provisions.

 **Answer:** EPA OIG's policy and procedures for a PIP are detailed in OIG EPARS Handbook (Exhibit 5), OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6), and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System (Exhibit 7).  I was also provided guidance by Erik Mabry, HRD, EPA OIG; Elizabeth Moreira, OC, EPA OIG; and Lori Ruk, OC, EPA OIG.

There are multiple procedures and interim guidance, which I applied as criteria when evaluating SA Walton's performance, including:

- Procedure 206: Case Administration, and related interim guidance to the procedure in effect during the rating – This procedure outlines the specific guidelines, expectations, and timeframes related to case work (Exhibit 11). Section 3.1 outlines general investigative standards such as any investigative product should be complete, concise, accurate and objective; and communicate the pertinent facts in clear, simple language. Section 4.1 outlines requirements for the official case file in that all investigative activity, both exculpatory and incriminating, should be recorded in the official investigative file. Section 7.1 outlines complaint documentation and requires that the SA open the complaint within 10 business days from approval or referral by SAC or designee. Section 8.3 outlines that the agent has 30 days from the last investigative activity to submit the case closing report.  Section 12.1 outlines that an agent must report actions in a Significant Incident Report and in the ECMS within 10 business days of receiving supporting documentation. Interim Guidance 2021-008 (now rescinded) provided additional requirements during the rating period, including that complaint evaluations

---

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:41:54 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **15** | **38** | **2022-0009-R06** |

were to be conducted for a period for business 10 days, and that all investigative activity needed to be documented into the ECMS Chron log within 3 business days.

- Procedure 207: Interviews, Advisement of Right, Oaths, Statements and Record Reviews – This procedure outlines specific guidelines, expectations, and requirements for conducting interviews, advisement of rights, documenting interviews and record reviews, and obtaining statements (Exhibit 12). Section 5.3 outlines that the agent report an interview in a memorandum of activity within 10 days from the date of the interview. Section 7.2 outlines that record reviews will be similarly written within 10 days from the activity.  Interim Guidance 2021-010 (now rescinded) provided updated guidance on report timeframes including MOAs within five business days and closing reports within 15 days of the last activity.

- Procedure 211: Physical and Documentary Evidence – This procedure outlines the specific guidelines, expectations, and requirements regarding the receipt, custody, and disposition of evidence as an agent, as well as an evidence custodian (Exhibit 13). As SA Walton was an evidence custodian during the rating period, this procedure was used to evaluate her performance in that collateral duty.

- Procedure 212: Grand Jury Secrecy and Subpoenas, and related interim guidance to the procedure in effect during the rating – This procedure outlines the specific guidelines, expectations, and rules surrounding the handling of grand jury material (Exhibit 14).  Interim Guidance 2021-014 provided additional requirement that the agent is responsible for marking case memorandums and associated documents. SAs must properly identify grand jury material in case documents by labeling them as grand jury.

- Procedure 223: Investigative Reports – this procedure outlines the specific guidelines, expectations, and requirements in preparing investigative reports (Exhibit 15).  Section 2.1 provides the following report requirements, pertinent to SA Walton's performance:
  - All investigative reports will be complete, clear, concise, accurate and logically organized, and communicate the pertinent facts in clear, simple language. Unnecessary, obscure and confusing language should be avoided.
  - The report will contain facts discovered during the investigation, such as those learned during interviews, record reviews, searches, surveillances or other investigative activities. The report will not include any information that was not obtained during the course of the investigation.
  - Irrelevant material will not be included in investigative reports.
  - Referral Reports (see Section 4) must contain exculpatory evidence and relevant mitigating information. Exculpatory evidence must be brought to the attention of the assigned prosecutor or agency action official.
  - Investigative reports should be understandable by those with no prior knowledge of the investigation.
  - Investigative reports will address all aspects of the allegations and no issues will be left unaddressed.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:42:55 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 16 | 38 | 2022-0009-R06 |

- o All statements in the investigative report will be supported by exhibits. When an exhibit is referenced, the reader will be directed to the specific page and/or paragraph of the exhibit.
- o Investigative reports will contain the necessary supporting information so the reader does not have to make computations, question how amounts were determined, or review voluminous documents.
- o Tables, schedules or charts may be included in the report to clearly present information as long as they are supported by and referenced to the appropriate exhibits.

**CLAIM. 2: ON OCTOBER 21, 2021, COMPLAINANT RECEIVED A RATING OF ZERO ON CRITICAL ELEMENTS 2 AND 3 OF HER PERFORMANCE APPRAISAL**

41. Please identify the name and title of the management official who rated the Complainant's performance for Fiscal Year (FY) 2021. Please explain your involvement in Complainant's FY 2021  performance appraisal when she received a rating of zero on Critical Elements 2 and 3.
   **Answer:** Management Official – myself, Garrett J. Westfall, SAC, EPA OIG. My involvement was as the rating official, who assessed and rated SA Walton's performance for Critical Elements 2 and 3 as unacceptable, based on the entirety of her performance in FY2021.

   During FY2021, SA Walton fell under the supervision of three separate supervisors/managers: From approximately October 1, 2020, to August 14, 2021: ASAC Garrett J Westfall; from approximately August 15, 2021 to August 28, 2021: ASAC Christopher Huntington; and from approximately August 29, 2021 to September 30, 2021: ASAC Staci Gurin.  SAC Westfall provided the rating for FY2021 for SA Walton with input from ASAC Gurin and ASAC Huntington.

42. Please identify the period (dates) covered for the Complainant's FY 2021 performance appraisal.
   **Answer:** October 1, 2020, through September 30, 2021.

43. Was the Complainant evaluated by the same management official for FY 2020 and FY 2021?  If not, please identify the name and title of the management officials who rated the Complainant's performance for FY 2020.
   **Answer:** Yes and no. During FY20, SA Walton fell under the supervision of three separate supervisors/managers: From approximately October 1, 2019, to June 21, 2020: (now retired) ASAC Edwin Debiew; from approximately June 22, 2020, to July 18, 2020: SAC Daniel Hawthorne (now retired); and from approximately July 19, 2020, to September 30, 2020: ASAC Garrett Westfall. During the entirety of FY20, SA Walton fell

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:44:12 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **17** | **38** | **2022-0009-R06** |

under the same Critical Elements and associated performance standards. Upon departure by ASAC Debiew, he provided an Interim Performance Rating to SA Walton but without narrative or explanation/rationale as to his rating (Exhibit 19). Since SA Walton continued to fall under the same standards for the remainder of FY20 and that time amounted to at least 90 days, HRD advised that SA Walton would need to be provided a Final FY20 Performance Rating. All narrative entries noted under the six Critical Elements were provided by SAC Hawthorne and me and were used to support the final/close-out rating of SA Walton (Exhibit 18). ASAC Debiew did not provide any narrative entries to support SA Walton's interim rating.

During FY2021, SA Walton fell under the supervision of three separate supervisors/managers: From approximately October 1, 2020, to August 14, 2021: ASAC Garrett J Westfall; from approximately August 15, 2021 to August 28, 2021: ASAC Christopher Huntington; and from approximately August 29, 2021 to September 30, 2021: ASAC Staci Gurin.  SAC Westfall provided the rating for FY2021 for SA Walton with input from ASAC Gurin and ASAC Huntington.

44. Did any work performed by the Complainant during FY 2020 factor into her FY 2021 performance appraisal?  If so, please identify what work, when it was performed, and how the Complainant was rated for that work on the both the FY 2020 and FY 2021 appraisal.
 **Answer:**  SA Walton was not rated for the same project performance deficiencies for both FY2020 and FY2021 appraisal ratings.  However, there were several instances, in which I discovered performance issues in FY2021, where the original investigative activity was performed by SA Walton in either FY2019 or FY2020.  In these cases, since the discovery of the individual project performance issues was discovered in FY2021, the deficiencies were included in the FY2021 rating, at the direction and consultation of HRD. For example, SA Walton conducted two separate interviews in March 2020, which were approved by me in FY2020.  However, in preparation to close the case in FY2021, I obtained additional information (i.e., original interview notes) which disclosed that SA Walton used the incorrect dates of interview in both her previous work products. Accordingly, while SA Walton conducted the work in FY2020, the deficiency was undiscovered and unassessed until FY2021.  Similarly, SA Walton received an email from an investigative subject in August 2019, which included a relevant spreadsheet.  In March 2021, while cleaning the Dallas office, I found a copy of the said email in a stack of miscellaneous papers on a common-area counter in the office.  The email from the subject, while in FY2019, was never documented or reviewed by SA Walton according to policy and procedures.  In consultation with HRD, the failure to adequately document relevant records and information was addressed in FY2021 and factored into her FY2021 rating. Please see Exhibit 1 for additional information on both instances.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:45:16 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **18** | **38** | **2022-0009-R06** |

45.  Please identify the Complainant's overall rating, as well as her rating on each of the elements of her FY 2020 and FY 2021 appraisals.

FY 2020:

| Critical Element | Rating Level | Rating Value |
|---|---|---|
| Critical Element 1 (Leadership): | Exceeds Fully Successful | 4 |
| Critical Element 2 (Communication): | Minimally Successful | 2 |
| Critical Element 3 (Results Orientation): | Fully Successful | 3 |
| Critical Element 4 (Teamwork): | Fully Successful | 3 |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 |
| Critical Element 6 (Resource Management): | Fully Successful | 3 |
| Total Rating: | Fully Successful | 3 |

FY 2021:

| Critical Element | Rating Level | Rating Value |
|---|---|---|
| Critical Element 1 (Leadership): | Fully Successful | 3 |
| Critical Element 2 (Communication): | Unacceptable | 0 |
| Critical Element 3 (Results Orientation): | Unacceptable | 0 |
| Critical Element 4 (Teamwork): | Minimally Successful | 2 |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 |
| Critical Element 6 (Resource Management): | Minimally Successful | 2 |
| Total Rating: | Unacceptable | |

46. Why did the Complainant receive a lower rating for her FY 2021 annual performance appraisal in comparison to her FY 2020 rating?
    **Answer:** SA Walton's FY20 rating consisted of three separate managers that provided input, including the rating provided by ASAC Edwin Debiew, where he provided no narrative or explanation/rationale as to the rating scores.  Based on consultation with HRD, SAC Hawthorne and I considered and incorporated ASAC Debiew's rating into the final rating.  During FY21, I rated and assessed her performance for a full year, as opposed to a limited timeframe in FY20 (July 19, 2020 through September 30, 2020).  During that timeframe, SA Walton's lower rating was commensurate of the assessed performance.  While ASAC Gurin and ASAC Huntington provided input into the rating, I assessed her FY21 rating.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:46:20 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 19 | 38 | 2022-0009-R06 |

47. Why was Complainant rated a zero on Critical Elements 2 and 3 of her FY 2021 performance appraisal?

**Answer:** I rated SA Walton a zero on both critical elements 2 and 3, as her performance for those elements and associated performance standards were assessed and determined to be unacceptable (Exhibit 3).  Some of the deficiencies noted in her review for each critical elements included:

> Critical Element No. 2 – SA Walton needs to improve her ability to produce logical and concise written products that convey substantial and meaningful progress in furtherance of her cases. Further, SA Walton should ensure products are timely, accurate, and include relevant facts. On at least two instances, SA Walton's supervisor counseled her on investigative activities that were not documented in a timely fashion and contained inaccurate facts. Although SA Walton communicated in an open manner in both oral and written communications, it is expected that as a Senior Special Agent she would pose questions to her supervisors regarding her investigations when issues needed to be clarified instead of making assumptions that potentially lead to investigative work needing to be reworked; thereby causing unnecessary delays in the furtherance of her investigations. Her supervisors often returned work products to SA Walton for corrections which delayed the availability of products to stakeholders. While her supervisor requested that SA Walton proactively communicate with him on consistent and weekly basis, SA Walton has failed to routinely communicate with her supervisor. For FY21, SA Walton produced 64 investigative reports. Of that number, only 35 (54%) where within the required policy timeframes at the time, as calculated by her supervisor. At least 7 reports contained inaccurate facts.

> Critical Element 3 - While SA Walton planned and conducted activity in all open investigations, several investigations have been untimely investigated and required additional supervision and instruction. SA Walton needs to continue to work on identifying relevant information to further cases to their logical conclusion. While SA Walton was receptive of feedback, she should ensure she takes timely action in response to management feedback. SA Walton exceeded the expected number of investigations to be worked during the reporting year with nine cases, including three closures. SA Walton routinely updated and memorialized case information in the ECMS, including maintaining investigative plans for cases. However, SA Walton needs to ensure she provides timely, accurate, and complete submission of all relevant data in the ECMS within the required timeframes and in the appropriate case file.  In several instances, SA Walton's supervisor identified investigative activity that was undocumented and never annotated in the ECMS until discovery by the supervisor.

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:47:41 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 20 | 38 | 2022-0009-R06 |

In addition, I evaluated SA Walton's performance in comparison to the EPA OIG EPARS Handbook – Definitions of Summary Rating Levels and Generic Performance Expectations (Exhibit 5). Specifically, the performance noted during the rating period was most closely described in Level 1-Unacceptable level in the EPARS Handbook, as described below:

> The quantity and quality of the employee's work under this element are not adequate for the position. The employee's work products fall short of the requirement for this element. They arrive late or often require major revision to their work products because they are incomplete or inaccurate in content. The employee fails to apply adequate technical knowledge to complete the work of this element. Either the knowledge applied cannot produce the needed products, or it produces technically inadequate products or results. Lack of adherence to required procedures, instructions and formats contributes to inadequate work products. Because the employee's work planning lacks logic or realism, critical work remains incomplete or is unacceptably late. Lack of attention to priorities causes delays or inadequacies in essential work: the employee has concentrated on incidental matters. The employee's behavior obstructs the successful completion of the work by lack of cooperation with customers, supervisor, and/or co-workers, or by loss of credibility due to irresponsible speech or work activity. In dealing with special projects, the employee either sacrifices essential regular work or fails to complete the projects. The employee fails to adapt to changes in priorities, procedures or program direction, and therefore, cannot operate adequately in relation to changing requirements. The oral and written expression the employee uses in accomplishing the work of this element lacks the necessary clarity for successful completion of the required tasks. Communication failures interfered with completion of the work

48. Did the Complainant complain to you that she should have received a higher rating? If so, when did she express her concerns, and what did the Complainant complain about? What was your response to her concerns?

    **Answer:** Yes. During the rating MS Teams meeting on or about October 13, 2021, SA Walton disagreed with the ratings and later refused to sign the rating. In the meeting she conveyed that she believed her self-narrative was not considered in the final rating. I explained that while her self-assessment was considered, there were too many examples of documented performance deficiencies in several performance standards, which have not improved over the year including inaccurate relevant information (e.g., dates), incorrectly sourced records, undocumented relevant records, improperly handled evidence, and lack of improved communication.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:49:10 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 21 | 38 | 2022-0009-R06 |

Subsequently, in an email to me on October 27, 2021, SA Walton stated that, "…I am replying to inform you I chose not to sign the performance rating. I do not agree with the performance ratings" (Exhibit 9).

49. What rating did Complainant believe she should receive in Critical Elements 2 and 3 of her FY 2021 performance appraisal?
   **Answer:** I do not recall SA Walton providing an explanation as to what she believed her ratings should be on critical elements 2 and 3, other than she disagreed with the rating provided.

50. Did the Complainant submit a self-evaluation as a part of her FY 2021 appraisal process? If so, what was the rating and explain your response to her rating. **Provide a copy of the documentation.**
   **Answer:** Yes, SA Walton provided a self-evaluation as part of her FY21 evaluation and was included in the rating. On September 10, 2021, SA Walton submitted, via email, her self-assessment to me; however, she did not use the correct performance measures for FY2021, as provided to her on several different occasions, as well as being cited in USA Performance system (Exhibit 16). On September 17, 2021, SA Walton submitted, via email, a revised self-assessment that incorporated the correct FY21 performance standards. The self-assessment provided by SA Walton did not include a numeric rating or a summary rating (e.g., meets expectations, fully successful, etc.) (Exhibit 17). As discussed with her during the performance evaluation on October 13, 2021, I explained that while her self-assessment was considered and included in her final rating within the USA Performance rating system, there were too many examples of documented performance deficiencies in several performance standards, which had not improved over the year including inaccurate relevant information (e.g., dates), incorrectly sourced records, undocumented relevant records, improperly handled evidence, and lack of improved communication.

51. What reason was given to the Complainant for her Performance Appraisal rating of zero in Critical Elements 2 and 3?
   **Answer:** I explained that she received a zero on both critical elements 2 and 3, as her performance for those elements and associated performance standards were assessed and determined to be unacceptable. Multiple examples were provided to SA Walton during the rating MS Teams meeting on or about October 13, 2021.

   In her rating, I rated SA Walton a zero on both critical elements 2 and 3, as her performance for those elements and associated performance standards were assessed and determined to be unacceptable (Exhibit 3). Some of the deficiencies noted in her review for each critical elements included:

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:50:27 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet*)***

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **22** | **38** | **2022-0009-R06** |

Critical Element No. 2 – SA Walton needs to improve her ability to produce logical and concise written products that convey substantial and meaningful progress in furtherance of her cases. Further, SA Walton should ensure products are timely, accurate, and include relevant facts. On at least two instances, SA Walton's supervisor counseled her on investigative activities that were not documented in a timely fashion and contained inaccurate facts. Although SA Walton communicated in an open manner in both oral and written communications, it is expected that as a Senior Special Agent she would pose questions to her supervisors regarding her investigations when issues needed to be clarified instead of making assumptions that potentially lead to investigative work needing to be reworked; thereby causing unnecessary delays in the furtherance of her investigations. Her supervisors often returned work products to SA Walton for corrections which delayed the availability of products to stakeholders. While her supervisor requested that SA Walton proactively communicate with him on consistent and weekly basis, SA Walton has failed to routinely communicate with her supervisor. For FY21, SA Walton produced 64 investigative reports. Of that number, only 35 (54%) where within the required policy timeframes at the time, as calculated by her supervisor. At least 7 reports contained inaccurate facts.

Critical Element 3 - While SA Walton planned and conducted activity in all open investigations, several investigations have been untimely investigated and required additional supervision and instruction. SA Walton needs to continue to work on identifying relevant information to further cases to their logical conclusion. While SA Walton was receptive of feedback, she should ensure she takes timely action in response to management feedback. SA Walton exceeded the expected number of investigations to be worked during the reporting year with nine cases, including three closures. SA Walton routinely updated and memorialized case information in the ECMS, including maintaining investigative plans for cases. However, SA Walton needs to ensure she provides timely, accurate, and complete submission of all relevant data in the ECMS within the required timeframes and in the appropriate case file.  In several instances, SA Walton's supervisor identified investigative activity that was undocumented and never annotated in the ECMS until discovery by the supervisor.

52. What documentation or other evidence exists to support the Complainant receiving a rating of zero for Critical Elements 2 and 3 on her FY 2021 Performance Appraisal?
   **Answer:** There are documents and evidence, including but not limited to Exhibits 1 and 3, to collectively illustrate that SA Walton did not perform at an acceptable level for both critical elements 2 and 3 in FY21.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:51:36 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 23 | 38 | 2022-0009-R06 |

53. In the past two years, were there other employees that you supervise who had similar performance as Complainant and who was/were **also rated** a zero on Critical Elements of their Performance Appraisal?  If so, identify each individual by:
   a.  full name:
   b.  position title
   c.  your awareness of their race
   d.  your awareness of their sex
   e.  your awareness of their prior EEO activity
   f.   explain how and why the cited comparators were treated the same as the Complainant.
   **Answer:** Since approximately July 2020, I have not supervised any other employees who had similar unacceptable performance in their performance standards, like SA Walton.  Other than SA Walton, I have not rated a supervised employee a zero or unacceptable on a critical element in their performance rating.

54. In the past two years, were there other employees that you supervise who had similar performance as Complainant and who was/were **not rated** a zero on Critical Elements of their  Performance Appraisal. If so, identify each individual by:
   a.  full name
   b.  position title
   c.  your awareness of their race
   d.  your awareness of their sex
   e.  your awareness of their prior EEO activity
   f.  explain how and why the cited comparators were treated differently than the Complainant.
   **Answer:** Since approximately July 2020, I have not supervised any other employees who had similar unacceptable performance in their performance standards, like SA Walton.  Other than SA Walton, I have not rated a supervised employee a zero or unacceptable on a critical element in their performance rating.

55. Was the Complainant's  **race** a factor when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal? If so, explain in detail how and why it was a factor.
   **Answer:** No.

56. Was the Complainant's  **sex** a factor when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal? If so, explain in detail how and why it was a factor.
   **Answer:** No.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
|  | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 22:52:49 -05'00' |  |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 24 | 38 | 2022-0009-R06 |

57. Was the Complainant's  **prior EEO activity** a factor when she was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal? If so, explain in detail how and why it was a factor.

   **Answer:** No., I had no knowledge or involvement in any prior EEO activity involving SA Walton.

58. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her.

   **Answer:**   I disagree with above statement that the cited action is a form of harassment. I did not propose and initiate the cited action based on race, sex, religion, national origin, age, disability, or genetic information.  SA Walton also never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.

   As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or lacking in credibility.

   When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance in several performance standards to include product timeliness and accuracy; identification and documentation of relevant records; and poor communication. As her performance could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues and ways to improve her performance and engage SA Walton in communication (Exhibit 10).  I repeatedly told her I was open to mentor her to assist in her performance.  SA Walton chose not to engage me as a coach/mentor and failed to communicate with me on a regular basis.

59. Did Complainant file an appeal or an administrative grievance (non EEO complaint) for receiving a rating of zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal?  If so, identify by full name and position the management official to whom she appealed and describe the outcome of the appeal. Please provide copies of all documentation related to the administrative grievance.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:54:02 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **25** | **38** | **2022-0009-R06** |

**Answer:** I am unaware of any grievance by SA Walton regarding her FY21 rating other than refusing to sign the rating in USA Performance rating system.

60. Cite the policies and/or contract provisions that apply or were relied upon in your decisions and/or actions when Complainant was rated a zero for Critical Elements 2 and 3 of her FY 2021 performance appraisal? Explain in detail how each policy and/or contract provision applies. Please provide copies of the policies and/or contract provisions.

   **Answer:** EPA OIG's policy and procedures for documenting and conducting performance ratings are detailed in OIG EPARS Handbook (Exhibit 5), OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6), and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System (Exhibit 7). I was also provided guidance by Erik Mabry, HRD, EPA OIG; Elizabeth Moreira, OC, EPA OIG; and Lori Ruk, OC, EPA OIG.

   There are multiple procedures and interim guidance, which I applied as criteria when evaluating SA Walton's performance, including:

- Procedure 206: Case Administration, and related interim guidance to the procedure in effect during the rating – This procedure outlines the specific guidelines, expectations, and timeframes related to case work (Exhibit 11). Section 3.1 outlines general investigative standards such as any investigative product should be complete, concise, accurate and objective; and communicate the pertinent facts in clear, simple language. Section 4.1 outlines requirements for the official case file in that all investigative activity, both exculpatory and incriminating, should be recorded in the official investigative file. Section 7.1 outlines complaint documentation and requires that the SA open the complaint within 10 business days from approval or referral by SAC or designee. Section 8.3 outlines that the agent has 30 days from the last investigative activity to submit the case closing report. Section 12.1 outlines that an agent must report actions in a Significant Incident Report and in the ECMS within 10 business days of receiving supporting documentation. Interim Guidance 2021-008 (now rescinded) provided additional requirement during the rating period, including that complaint evaluations were to be conducted for a period for business 10 days, and that all investigative activity needs to be documented into the ECMS Chron log within 3 business days.
- Procedure 207: Interviews, Advisement of Right, Oaths, Statements and Record Reviews – This procedure outlines specific guidelines, expectations, and requirements for conducting interviews, advisement of rights, documenting interviews and record reviews, and obtaining statements (Exhibit 12). Section 5.3 outlines that the agent report an interview in a memorandum of activity within 10 days from the date of the interview. Section 7.2 outlines that record reviews will be similarly written within 10 days from the activity. Interim Guidance 2021-010 (now rescinded) provided updated

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:55:20 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

guidance on report timeframes including MOAs within five business days and closing reports within 15 days of the last activity.

- Procedure 211: Physical and Documentary Evidence – This procedure outlines the specific guidelines, expectations, and requirements regarding the receipt, custody, and disposition of evidence as an agent, as well as an evidence custodian (Exhibit 13). As SA Walton was an evidence custodian during the rating period, this procedure was used to evaluate her performance in a collateral duty.

- Procedure 212: Grand Jury Secrecy and Subpoenas, and related interim guidance to the procedure in effect during the rating – This procedure outlines the specific guidelines, expectations, and rules surrounding the handling of grand jury material (Exhibit 14). Interim Guidance 2021-014 provided additional requirement that the agent is responsible for marking case memorandums and associated documents. SAs must properly identify grand jury material in case documents by labeling them as grand jury.

- Procedure 223: Investigative Reports – this procedure outlines the specific guidelines, expectations, and requirements in preparing investigative reports (Exhibit 15). Section 2.1 provides the following report requirements, pertinent to SA Walton's performance:
  - All investigative reports will be complete, clear, concise, accurate and logically organized, and communicate the pertinent facts in clear, simple language. Unnecessary, obscure and confusing language should be avoided.
  - The report will contain facts discovered during the investigation, such as those learned during interviews, record reviews, searches, surveillances or other investigative activities. The report will not include any information that was not obtained during the course of the investigation.
  - Irrelevant material will not be included in investigative reports.
  - Referral Reports (see Section 4) must contain exculpatory evidence and relevant mitigating information. Exculpatory evidence must be brought to the attention of the assigned prosecutor or agency action official.
  - Investigative reports should be understandable by those with no prior knowledge of the investigation.
  - Investigative reports will address all aspects of the allegations and no issues will be left unaddressed.
  - All statements in the investigative report will be supported by exhibits. When an exhibit is referenced, the reader will be directed to the specific page and/or paragraph of the exhibit.
  - Investigative reports will contain the necessary supporting information so the reader does not have to make computations, question how amounts were determined, or review voluminous documents.
  - Tables, schedules or charts may be included in the report to clearly present information as long as they are supported by and referenced to the appropriate exhibits.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:56:35 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 27 | 38 | 2022-0009-R06 |

### CLAIM 3. COMPLAINANT'S 2020, PERFORMANCE APPRAISAL WAS LOWERED WITHOUT EXPLANATION

61. Please identify the name and title of the management official who rated the Complainant's performance for Fiscal Year (FY) 2020 that was lowered without explanation. Please explain your involvement in Complainant's FY 2020 performance appraisal.

    **Answer:** During FY20, SA Walton fell under the supervision of three separate supervisors/managers: From approximately October 1, 2019, to June 21, 2020: (now retired) ASAC Edwin Debiew; from approximately June 22, 2020, to July 18, 2020: SAC Daniel Hawthorne (now retired); and from approximately July 19, 2020, to September 30, 2020: ASAC Garrett Westfall. During the entirety of FY20, SA Walton fell under the same Critical Elements and associated performance standards. Upon departure by ASAC Debiew, he provided an Interim Performance Rating to SA Walton but without narrative or explanation/rationale as to his rating (Exhibit 19). Since SA Walton continued to fall under the same standards for the remainder of FY20 and that time amounted to at least 90 days, HRD advised that SA Walton would need to be provided a Final FY20 Performance Rating. All narrative entries noted under the six Critical Elements were provided by SAC Hawthorne and ASAC Westfall and were used to support the final/close-out rating of SA Walton (Exhibit 18). ASAC Debiew did not provide any narrative entries to support SA Walton's interim rating.

    I was SA Walton's first-line supervisor from approximately July 19, 2020, through September 30, 2020. Based on coordination and direction from HRD, I could not alone assign SA Walton her rating, as I had not been her supervisor for a period of 90 days. However, since she had been under the same standards, all three raters contributed to SA Walton's rating.

62. Please identify the period (dates) covered for the Complainant's FY 2020 performance appraisal.
    **Answer:** October 1, 2019, through September 30, 2020.

63. Please identify the Complainant's overall rating, as well as her rating on each of the elements of her FY 2020 appraisal.
    **Answer:** For SA Walton's 2020 appraisal, she was rated the following:

| Critical Element | Rating Level | Rating Value |
|---|---|---|
| | | |

---

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL<br>Date: 2022.06.14 22:57:52 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **28** | **38** | **2022-0009-R06** |

| | | |
|---|---|---|
| Critical Element 1 (Leadership): | Exceeds Fully Successful | 4 |
| Critical Element 2 (Communication): | Minimally Successful | 2 |
| Critical Element 3 (Results Orientation): | Fully Successful | 3 |
| Critical Element 4 (Teamwork): | Fully Successful | 3 |
| Critical Element 5 (Customer Relations): | Fully Successful | 3 |
| Critical Element 6 (Resource Management): | Fully Successful | 3 |
| Total Rating: | Fully Successful | 3 |

SA Walton was rated as "fully sucessful" at a level 3.0 (Exhibit 18).

64. Why was the Complainant's FY 2020 performance appraisal lowered without explanation?
 **Answer:** SA Walton's FY2020 appraisal was (1) not lowered, and (2) was not derived and provided without explanation and in full consultation with HRD. SA Walton received one FY2020 final rating and was not lowered. While SA Walton received an interim rating from her retiring supervisor, ASAC Edwin Debiew, on June 5, 2020 (Exhibit 19) with a higher interim rating, the rating did not cover or extend the entire rating period, as she was on the same performance standards through September 30, 2020. The rating provided by ASAC Debiew also did not include a rating narrative that provided an explanation or rationale as to the rating (Exhibit 19). Based on consultation with HRD, the June 5, 2020, rating was not a final rating as it did not encompass the entire rating period. Regarding explanation to SA Walton, during a MS Teams meeting on or about November 10, 2020, SAC Hawthorne explained that the rating provided by ASAC Debiew was an interim rating as of approximately June 5, 2020, and was considered and incorporated into her rating. SAC further advised that her final rating included input provided by both SAC Hawthorne and I for the remainder of the rating period. During the Teams call on or about November 10, 2020, SAC Hawthorne discussed the reason behind the rating, under each critical element, and discussed several performance deficiencies with her, including but not limited to, timeliness, poor communication, and the factual case inaccuracy she highlighted in her FY2020 self-assessment. During the meeting, I informed SA Walton that for FY21, she needed prioritize communication with her supervisor, upload accurate case information, and respond to inquiries in a timely fashion. (Exhibit 1).

65. Did the Complainant complain to you that she should have received a higher rating? If so, when did she express her concerns, and what did the Complainant complain about? What was your response to her concerns?
 **Answer:** Yes. During the rating MS Teams meeting on or about November 10, 2020, SA Walton disagreed with the rating, specific to the assessment in Communication and Teamwork. I do not recall the details of her concerns other than she believed her rating was too low based on her work. SAC Hawthorne led the meeting and discussed the reason behind the rating, under each critical element, and discussed several performance deficiencies with her including but not limited to, timeliness, poor communication, and the

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 22:59:12 -05'00' | |

October 2015

factual case inaccuracy she highlighted in her FY2020 self-assessment. During the meeting, I informed SA Walton that for FY21, she needed prioritize communication with her supervisor, upload accurate case information, and respond to inquiries in a timely fashion.

Subsequently, in an email to me on November 10, 2020, SA Walton stated that, "As discussed during my 2020 EPARS final year review, I did not and do not agree with the numerical ratings. Specifically for the Critical Elements of Communication and Teamwork" (Exhibit 32).

66. What rating did Complainant believe she should have received for FY 2020 and why?
 **Answer:** I do not recall SA Walton providing an explanation as to what she believed her ratings should be, other than disagreeing with the ratings specific for Communication and Teamwork.

67. During the 2020 performance appraisal period and prior to being given her 2020 rating, did you discuss Complainant's performance with her? If so, describe in detail what was stated during the discussion and the outcome.
 **Answer:** I can only provide information related to my involvement and discussions with SA Walton regarding her performance during from the start of my employment with EPA OIG and as her first-line supervisor on July 19, 2020, through September 30, 2020. I had a MS Teams meeting with SA Walton regarding the status of her complaints and cases on September 11, 2020, at approximately 2:30 pm CST (Exhibit 20). The meeting included a discussion on her poor performance and deficiencies noted in her case work and related products including inactivity, inaccurate information, and timeliness. There were other relevant information discussions and/or written communication with SA Walton during that timeframe on case by case or specific work product issues. The following are several examples of poor performance brought to SA Walton's attention:

- On or about August 4, 2020, I requested that SA Walton resubmit a memorandum of activity as the work product included the incorrect case and title (Exhibit 21).
- On or about August 14, 2020, SA Walton submitted a form to the OIG Electronic Crimes Division (ECD) to initiate the forensic analysis (i.e., search) of a subject's cell phone (Exhibit 22). When I asked her whether she obtained a signed consent to search to provide to ECD prior to the search, SA Walton stated that "We should have received something in our earlier documents. Let me locate it." Obtaining legal authority to search a computer is imperative, as failure to do so would violate the subject's reasonable expectation of privacy and constitutional rights and have detrimental effects on the case and the credibility/integrity of the OIG. SA Walton did not ensure the OIG had legal authority to search the cell phone prior to the initiating the process with ECD until questioned by me. Consent or legal authority

I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:00:33 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 30 | 38 | 2022-0009-R06 |

was provided by the subject company on August 26, 2020, indicating that no such consent was previously provided or found by SA Walton (Exhibit 23).

- On or about August 5, 2020, SA Walton uploaded a work product in the wrong case within the ECMS (Exhibit 24).
- On or about August 28, 2020, SA Walton uploaded a case closing report (CCR) into the ECMS. On August 31, 2020, I provided comments as to the CCR on a variety of issues, including that she included case information/facts within the document that pertained to another case (Exhibit 25).
- On or about September 2, 2020, I informed SA Walton that she was using the incorrect date in a recently submitted work product regarding an indictment date (Exhibit 26).
- On or about September 10, 2020, SA Walton informed she was closing a case and that she had recently found agent notes from the interview in the truck (Exhibit 27). There had been no documented investigative activity in the ECMS before this statement regarding case closure. In response to inquiry about activity, on or about September 15, 2020, SA Walton submitted two memoranda of interview, from two separate interviews conducted on March 11, 2020 (Note: the interview notes found in the truck were presumably used to draft the memoranda). Further, it was found during the review of the memorandum of interview for one of the subjects that the subject provided records to SA Walton. These interviews conducted and records received were not documented or reviewed until questioned by me.
- On or about October 13, 2020, I sent an email to HRD and OC requesting guidance on how to address and document performance deficiencies with SA Walton (Exhibit 10). Within the email, I provided a chronology of performance issues with SA Walton.
- On or about October 16, 2020, SA Walton submitted a self-assessment for her FY20 performance evaluation. On October 16, 2020, I requested that SA Walton review and modify a statement in her self-assessment related to a case where she cited inaccurate case facts (Exhibit 1, Attachment 6). Please note, while the above email was sent during FY21, I included it as it related to her performance for FY20.

68. If not previously addressed, were any performance issues brought to Complainant's attention prior to lowering her 2020 appraisal?
    **Answer:** See answer to Question 67.

69. What documentation or other evidence exists to support the Complainant receiving a lower rating on her FY 2020 Performance Appraisal?
    **Answer:** There are documents and evidence, including but not limited to, documentation attached to this affidavit (Exhibits 10,18, 20-27), to collectively illustrate SA Walton's poor performance in several performance standards in FY20, which factored into her rating.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:02:09 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 31 | 38 | 2022-0009-R06 |

70. What reason was given to the Complainant for her lowered performance appraisal in 2020? Please explain if Complainant disputed the reason.
**Answer:** During the Teams call on or about November 10, 2020, SAC Hawthorne discussed the reason behind the rating, under each critical element, and discussed several performance deficiencies with her, including but not limited to, timeliness, poor communication, and the factual case inaccuracy she highlighted in her FY2020 self-assessment.

71. Did Complainant file an appeal or an administrative grievance (non EEO complaint) for receiving a lower performance appraisal without explanation in FY 2020? If so, identify by full name and position the management official to whom she appealed and describe the outcome of the appeal. Please provide copies of all documentation related to the administrative grievance.
**Answer:** I am unaware of any grievance filed by SA Walton regarding her FY2020 performance rating.

72. Cite the policies and/or contract provisions that apply or were relied upon in your decisions and/or actions when Complainant received a lower performance appraisal without explanation in FY 2020? Explain in detail how each policy and/or contract provision applies. Please provide copies of the policies and/or contract provisions.
**Answer:** EPA OIG's policy and procedures for a preparing and conducting for performance ratings are detailed in the OIG EPARS Handbook (Exhibit 5), and the OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6). I also consulted HRD and SAC Hawthorne in providing input to her FY20 rating.

There are multiple procedures, which I applied as criteria when evaluating SA Walton's performance during FY20, including:

- Procedure 206: Case Administration – This procedure outlines the specific guidelines, expectations, and timeframes related to case work (Exhibit 11). Section 3.1 outlines general investigative standards such as any investigative product should be complete, concise, accurate and objective; and communicate the pertinent facts in clear, simple language. Section 4.1 outlines requirements for the official case file in that all investigative activity, both exculpatory and incriminating, should be recorded in the official investigative file. Section 7.1 outlines complaint documentation and requires that the SA open the complaint within 10 business days from approval or referral by SAC or designee. Section 8.3 outlines that the agent has 30 days from the last investigative activity to submit the case closing report. Section 12.1 outlines that an agent must report actions in a Significant Incident Report and in the ECMS within 10 business days of receiving supporting documentation.

---

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:03:37 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **32** | **38** | **2022-0009-R06** |

- Procedure 207: Interviews, Advisement of Right, Oaths, Statements and Record Reviews – This procedure outlines specific guidelines, expectations, and requirements for conducting interviews, advisement of rights, documenting interviews and record reviews, and obtaining statements (Exhibit 12). Section 5.3 outlines that the agent report an interview in a memorandum of activity within 10 days from the date of the interview. Section 7.2 outlines that record reviews will be similarly written within 10 days from the activity.

- Procedure 211: Physical and Documentary Evidence – This procedure outlines the specific guidelines, expectations, and requirements regarding the receipt, custody, and disposition of evidence as an agent, as well as an evidence custodian (Exhibit 13). As SA Walton was an evidence custodian during the rating period, this procedure was used to evaluate her performance in a collateral duty.

- Procedure 212: Grand Jury Secrecy and Subpoenas – This procedure outlines the specific guidelines, expectations, and rules surrounding the handling of grand jury material (Exhibit 14).

- Procedure 223: Investigative Reports – this procedure outlines the specific guidelines, expectations, and requirements in preparing investigative reports (Exhibit 15). Section 2.1 provides the following report requirements, pertinent to SA Walton's performance:
  - All investigative reports will be complete, clear, concise, accurate and logically organized, and communicate the pertinent facts in clear, simple language. Unnecessary, obscure and confusing language should be avoided.
  - The report will contain facts discovered during the investigation, such as those learned during interviews, record reviews, searches, surveillances or other investigative activities. The report will not include any information that was not obtained during the course of the investigation.
  - Irrelevant material will not be included in investigative reports.
  - Referral Reports (see Section 4) must contain exculpatory evidence and relevant mitigating information. Exculpatory evidence must be brought to the attention of the assigned prosecutor or agency action official.
  - Investigative reports should be understandable by those with no prior knowledge of the investigation.
  - Investigative reports will address all aspects of the allegations and no issues will be left unaddressed.
  - All statements in the investigative report will be supported by exhibits. When an exhibit is referenced, the reader will be directed to the specific page and/or paragraph of the exhibit.
  - Investigative reports will contain the necessary supporting information so the reader does not have to make computations, question how amounts were determined, or review voluminous documents.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 23:05:03 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 33 | 38 | 2022-0009-R06 |

- o Tables, schedules or charts may be included in the report to clearly present information as long as they are supported by and referenced to the appropriate exhibits.
- Procedure 213: Searches and Seizure – this procedure outlines the specific guidelines, expectations, and requirements in preparing, documenting, and executing searches (Exhibit 28). Section 5.3 outlines the information and required documentation for searches based on consent.

73. Was the Complainant's <u>**race**</u> a factor when her FY 2020 performance appraisal rating was lowered without explanation? If so, explain in detail how and why it was a factor.
    **Answer:** No.

74. Was the Complainant's <u>**sex**</u> a factor when her FY 2020 performance appraisal rating was lowered without explanation? If so, explain in detail how and why it was a factor.
    **Answer:** No.

75. Was the Complainant's <u>**prior EEO activity**</u> a factor when her FY 2020 performance appraisal rating was lowered without explanation? If so, explain in detail how and why it was a factor.
    **Answer:** I have no knowledge or involvement in any prior EEO activity with SA Walton.

76. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her.
    **Answer:** I disagree with above statement that the cited action is a form of harassment. I did not propose and initiate the cited action based on race, sex, religion, national origin, age, disability, or genetic information.  SA Walton also never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.

    As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or lacking in credibility.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 23:06:33 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **34** | **38** | **2022-0009-R06** |

When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance in several performance standards to include product timeliness and accuracy; identification and documentation of relevant records; and poor communication. As her performance could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues and ways to improve her performance and engage SA Walton in communication (Exhibit 10).  I repeatedly told her I was open to mentor her to assist in her performance.  SA Walton chose not to engage me as a coach/mentor and failed to communicate with me on a regular basis.

### CLAIM 4: IN APRIL 2019, COMPLAINANT WAS PLACED ON A 30-DAY PIP

77. Are you the Management Official responsible for placing the Complainant on a 30-Day Performance Improvement Plan (PIP) in April 2019?  If so, describe in detail your involvement. If not, explain your involvement.
**Answer:** No. I was not employed by EPA OIG in 2019. I was not involved in the decision to place SA Walton on a 30-day PIP in April 2019.  I began employment with EPA OIG in July 2020.

78. Was/Were any other management official(s) involved in and/or did he/she/they have input into the decision to place the Complainant on a PIP?  If so, identify him/her/them by full name and position and describe his/her/their involvement and/or input in detail.
**Answer:** Unknown. Please see answer to Question 77.

79. Please explain what led up to Complainant being placed on a 30-day PIP in April 2019.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

80. How was Complainant notified she was being placed on a 30-Day PIP?  If verbal notification was given, please explain what was said, when and why.  If written notification was provided, please provide a copy of the notification.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

81. Please explain the Agency's policy(s) or procedure(s) associated with Performance Improvement Plan?
**Answer:** Unknown; I have no knowledge during the covered timeframe. Please see answer to Question 77.

82. Please describe the process (es) and procedures followed when placing Complainant on a 30-Day PIP.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:08:37 -05'00' | Date Signed 6/14/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 35 | 38 | 2022-0009-R06 |

83. During the relevant period were any discussions conducted with Complainant regarding her performance?  If so, identify by full name and position the management official(s) who was/were involved in the discussion(s), describe in detail what was stated during the discussion(s), and the outcome(s).
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

84. If not previously addressed, during the discussion(s), was Complainant notified of any performance issues?  If so, what was he told?
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

85. During the discussions regarding Complainant's performance issues, was Complainant made aware if her performance did not improve, she would be placed on a PIP?
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

86. If Complainant was informed of any performance issues, was any improvement observed subsequent to her being placed on PIP?  If so, describe in detail how he improved.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

87. Did you have a discussion with the Complainant regarding being place on a 30-Day PIP?
**Answer:** No. I was not employed by the Agency at that time. Please see answer to Question 77.

88. If so, state the dates of any meetings, describe in detail what was stated during the meeting and the outcomes. If no meeting took place, explain in detail why.
**Answer:** None, as stated previously, I was not employed by the Agency during this timeframe. Please see answer to Question 77.

89. Did the Complainant discuss with you or any other management official her concerns associated with being placed on a 30-Day PIP?  If so, state the date(s) of the discussion(s) and describe in detail what was stated during the discussion(s).  If you did not discuss Complainant's concerns with her, explain in detail why you did not.
**Answer:** No, I was not employed by the Agency at that time. Please see answer to Question 77.

90. What documentation or other evidence exists concerning Complainant being placed on a 30-Day PIP? Provide a copy of the supporting documentation.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 23:10:20 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **36** | **38** | **2022-0009-R06** |

91. If Complainant was previously informed of any performance issues, was any improvement observed subsequent to her being notified of being placed on 30-Day PIP? If so, describe in detail how she had or had not improved.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

92. What reason(s), explanation(s), or justification(s) if any, were given to Complainant for placing her on a 30-Day PIP?
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

93. Did Complainant dispute the reason(s)/explanations or justifications given? Please explain.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

94. Did Complainant appeal being placed on a 30-Day PIP? If so, identify by full name and position the management official to whom she appealed the PIP to and describe the outcome of the appeal.
**Answer:** Unknown; I have no knowledge. Please see answer to Question 77.

95. Cite the policies and/or contract provisions that apply or were relied upon in your decisions and/or actions when Complainant being placed on a 30-Day PIP? Explain in detail how each policy and/or contract provision applies.
**Answer:** Unknown; I did not decide or initiate the decision to place SA Walton on a 30-Day PIP in April 2019. Please see answer to Question 77.

96. Was Complainant's **race** a factor when Complainant was placed on a 30-Day PIP in April 2019? If so, explain in detail how and why it was a factor and why.
**Answer:** Unknown; I have no knowledge and was not involved in the decision. Please see answer to Question 77.

97. Was Complainant's **sex** a factor when Complainant was placed on a 30-Day PIP in April 2019? If so, explain in detail how and why it was a factor.
**Answer:** Unknown; I have no knowledge and was not involved in the decision. Please see answer to Question 77.

98. Was Complainant's **prior EEO activity** a factor when Complainant was placed on a 30-Day PIP? If so, explain in detail how and why it was a factor.
**Answer:** Unknown; I have no knowledge and was not involved in the decision. Please see answer to Question 77.

99. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her.

_____

_____
**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:11:57 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **37** | **38** | **2022-0009-R06** |

**Answer:** Unknown; I have no knowledge and was not involved in the action. Please see answer to Question 77.

## HARASSMENT/HOSTILE WORK ENVIRONMENT:

100. Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her? If so, describe in detail when and what specifically the Complainant told you and what was your response/action?
    **Answer:** No. SA Walton never told me in verbal or written form that my actions constituted harassment and/or a hostile work environment.

101. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment? If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.
    **Answer:** On March 22, 2022, I was notified that I was to be interviewed as part of EPA Order 4711, "Procedure for Addressing Allegations of Workplace Harassment," regarding harassment in the workplace. Until that notification, I had never been apprised of any allegations regarding my actions being perceived as harassment or a hostile work environment. I have no background on the complaint provided by SA Walton and what official she provided the complaint to and when. On March 24, 2022, I was interviewed by the fact finder. The only harassment alleged, based on the line of questioning, was a conversation I had with SA Walton regarding evidentiary issues in the Dallas evidence room on August 24, 2021. Please note, that there were two evidence inventories conducted by SA Walton in 2021 – August 24, 2021 and September 23, 2021. I was NOT present during the evidence inventory on August 24, 2021; the alleged dated of the harassment. I was however, present for the inventory on September 23, 2021. Please see my notes of the interaction with SA Walton on September 23, 2021 (Exhibit 1).

102. Was an investigation conducted into Complainant's allegations of harassment/hostile work environment? If so, by whom and when?
    **Answer:** Please see response to Question 101. I do not have detailed knowledge or specifics as the scope, timeframe, or other information to the EPA Order 4711 investigation. The fact finder was Mark Miller, Investigative Attorney, Administrative Investigations Directorate, EPA OIG.

103. To your knowledge, what was the outcome of the investigation? Please provide a copy of the report.

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/14/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.14 23:13:29 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **38** | **38** | **2022-0009-R06** |

**Answer:** I do not have a copy of the report, nor was I provided details of the findings. However, I received a memorandum from Acting Assistant Inspector General for Investigation Marc Perez on May 3, 2022, that stated "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711. *See* EPA Order 4711, Sections IV(A), (K)." (Exhibit 29)

104. Was Complainant informed of the outcome?  If yes, how?
    **Answer:** I am unaware on whether SA Walton was informed of the outcome.

105. Was any corrective or preventative action necessary?  If so, what action was taken?
    **Answer:** I am unaware of any action taken.

106. If no investigation was conducted, please explain why.
    **Answer:** An investigation was conducted, but details of the investigation and related records are in the custody of the EPA OIG Administrative Investigations Directorate.

107. Have you received training, since your last affidavit, on anti-harassment/hostile work environment while employed by the agency?  If so, when and what?
    **Answer:** My last recorded anti-harassment training – Anti-Harassment Procedures Training for EPA Employees, August 11, 2020.  I have had other managerial training, which included harassment/hostile work environment training as part of the curriculum, such as the Office of Mission Support-Labor and Employee Relations All-Day Basic Supervisor Training, February 9, 2021.

*108.* Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation and harassment/hostile work environment?  *[If you mentioned any  documents in answering your affidavit questions please provide.*
    **Answer:** No.

    **I provided an extensive number of relevant and related source documents (Exhibits 1-32) as inclusive to this affidavit**. **This affidavit is incomplete without the exhibits and should not be included in any report of investigation or referral without the referenced exhibits.**

_____

**I, Garrett J. Westfall, declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.14 23:17:54 -05'00' | Date Signed 6/14/2022 |
|---|---|---|---|

# Certification

Case Number
## 2022-0009-R06

I have read the proceeding attached statement, consisting of 38 pages with 32 Exhibits, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

**Privacy Act Statement and Rehabilitation Act Notice**

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

**Standards of Conduct**

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of _____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | |

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
|---|---|
| X   GARRETT WESTFALL   Digitally signed by GARRETT WESTFALL Date: 2022.06.14 21:38:11 -05'00' | X   6/14/2022 |

Form 2571 October 2015

**EEO Investigative Affidavit** *(Witness)*

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **1** | **19** | **2022-0009-R06** |

| 1. Affiant's Name (Last, First, MI) **Westfall, Garrett, J.** | 2. Employing Federal Agency and Office **EPA OIG, OI, Dallas, TX** |
|---|---|

| 3. Position Title **Special Agent in Charge** | 4. Grade and Series GS-1811-15 | 5.Address and Zip +4 1201 Elm Street, Suite 500 Dallas, TX 75270 | 6. Organizational Unit **OIG Office of Investigations** |
|---|---|---|---|

### Privacy Act Notice and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Response to Complaint
Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required.  Form will auto-create if using Microsoft Word*)

**Please complete the top section of this form, boxes #2 through #6.**

### <u>AMENDED AFFIDAVIT</u>

**CLAIM 5:ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

109.  The Complainant alleged in her amended complaint that she received a Notice of Proposed Removal on or about March 1, 2022 for failing to successfully complete the PIP Complainant was placed on November 10, 2021 and  notified on April 22, 2022, that a decision was made to not substantiate the Removal. Is this true?  Please respond to Complainant's allegation.

**Answer:**  Yes, I provided, via email (Exhibit 33), a Notice of Proposed Removal to SA Walton on March 1, 2022, based on the results of the failed PIP, and her inability to improve her performance to a minimally successful level (Exhibit 8).  On April 22, 2022, Thomas Roelke, Deputy Assistant Inspector General for Investigations, Headquarters

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:00:04 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **2** | **19** | **2022-0009-R06** |

Operations, EPA OIG, Washington, DC, did not substantiate the removal recommendation (Exhibit 30).

**\*\*Please note: certain data within Exhibits/Attachments will be redacted due to active OIG investigations, including case titles/subject names, and or information containing grand jury or Bank Secrecy Act restrictions.\*\***

110.  Was it your decision to issue the Complainant a Notice of Proposal Removal from her position with the agency?  If so, please give in detail the reason for your decision.
 **Answer:** Yes, I made the decision to issue SA Walton a Notice of Proposed Removal, in consultation and concurrence with HRD and OC.  I recommended the action because SA Walton failed to improve her performance to a minimally successful level in the cited critical elements during the 45-day PIP evaluation (Exhibit 8). Please refer to the Notice of Proposed Removal and attached PIP evaluation, which details the reasons for the proposal.

As discussed previously, as an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or electronic case management system (ECMS) chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or lacking in credibility.  During the 45-day PIP evaluation, SA Walton failed to provide accurate, relevant, correctly sourced records, and clear and concise work products.  The tasks assigned during the PIP were relevant, stakeholder requests to be provided to the U.S. Attorney's Office, in the form of discovery. As a management official, I am responsible to ensure OIG work products are relevant, clear, concise, accurate, and supported with facts.  As a result, I do not have confidence that SA Walton can submit accurate, factual work products to internal and external stakeholders.

For example, during the PIP, SA Walton converted another Agency's work product and used the information inaccurately in her self-created attachment and claimed the investigative activity as her own (Exhibit 8 page 100). Specifically, she cut website screen shots taken by an EPA CID agent on December 10, 2020 and pasted the screen shots into a self-created attachment to reference an alleged investigative activity conducted by SA Walton on June 9, 2020; an investigative activity that had never been documented by SA Walton per policy in the ECMS.  While SA Walton stated that this was an error done

---
I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:00:47 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 3 | 19 | 2022-0009-R06 |

inadvertently during the PIP, this example illustrates the lack of improvement in her performance and the potential inaccuracies and integrity concerns in her work products. Had the discrepancies not been identified during management review prior to being provided to an external stakeholder, this error could have affected the case and the reputation of the OIG. Further, the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list. A Giglio list is a list compiled usually by a prosecutor's office or a law enforcement office containing the names and details of law enforcement officers who have had sustained incidents of untruthfulness, criminal convictions, candor issues, or some other type of issue placing their credibility into question.

111.  If you did not make the decision, what was your involvement, if any, in this action?
    **Answer:**  N/A. See answer to question 110.

112. If you had no involvement in Complainant being issued the Notice of Proposed Removal, please provide the management official who did. Identify by name, position title, facility address, telephone number and email address.
    **Answer:** N/A. See answer to question 110.

113. Who concurred with the action to issue the Complainant a Notice of Proposed Removal? Identify by name, position title work location and phone number.
    **Answer:**  The following officials were consulted and concurred with regarding the proposed action: Erik Mabry, HRD, EPA OIG, Boston, MA, (202) 566-2048; Elizabeth Moreira, OC, EPA OIG, Washington, DC, (202) 566-2695; and Lori Ruk, OC, EPA OIG, Washington, DC, (202) 566-1287.

114. Did you consult with anyone for guidance and or advice prior to issuing Complainant the Notice of Proposed Removal? If so, identify him/her/them by full name and position and describe his/her/their involvement.
    **Answer:** Yes.  I consulted and received guidance from Erik Mabry, HRD, EPA OIG; Elizabeth Moreira, OC, EPA OIG, and Lori Ruk, OC, EPA OIG.  Mabry, Moreira, and Ruk provided guidance on drafting and issuing the Notice of Proposed Removal.  At no point was there a concern by HRD or OC that there was insufficient evidence to warrant the proposed action.

115.  How was the Complainant notified (verbally or in writing) of being issued a Notice of Proposed Removal? If verbally, who notified her and when? **If in writing, provide a copy of the written notification**.
    **Answer:**  I notified SA Walton, via email, of the Proposed Removal on March 1, 2022, at approximately 2:31 pm CST (Exhibit 32 & Exhibit 8).  On March 1, 2022, at approximately

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:01:32 -05'00' | Date Signed  6/15/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet*)***

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 4 | 19 | 2022-0009-R06 |

2:30 pm CST, I conducted a Microsoft (MS) Teams meeting (video conference) with SA Walton to discuss the proposed action. Erik Mabry was present during the MS Teams meeting. During the meeting, I notified SA Walton of the proposed removal and advised her to direct any questions to Mabry. I also advised her to read the proposed removal in detail as it provided information and a timeframe on her response to the decision maker.

116. Please explain, if not already done so, why Complainant was issued a Notice of Proposed Removal?
**Answer:** See answer to question 110. Please refer to the Notice of Proposed Removal and attached PIP evaluation, which details the reasons for the proposal.

117. Was the Complainant given any type of warning prior to being issued the Notice of Proposed Removal? If yes, please explain what type of warning was given and what occurred.
**Answer:** I did not provide any warning to SA Walton prior to being issued the Notice of Proposed Removal. I was unaware of any a requirement for prior notification to the complainant, as it was never discussed or advised by HRD and OC. However, in the conclusion section of the PIP, the memorandum explains the possible actions for failure.

118. What reason(s) was provided to the Complainant for issuing her a Notice of Proposed Removal?
**Answer:** During the meeting on or about March 1, 2022, I informed SA Walton that she was being issued a Notice of Proposed Removal because of her failure to improve her performance in two critical performance elements during the PIP.

119. Did the Complainant dispute the reason(s) given? If so, how, and why,
**Answer:** I do not recall any dispute provided by SA Walton to me. SA Walton provided a verbal and/or written response to the Notice of Proposed Removal, as part of the PIP process, to the decision official, DAIGI Roelke. I am neither aware of the response nor been given a copy or information regarding the response by SA Walton. On April 22, 2022, DIAGI Roelke did not sustain the removal action of SA Walton (Exhibit 30).

120. What was/is Complainant's current work status as result of the Notice of Proposed Removal and why?
**Answer:** Prior to, during, and after the PIP/Proposed Removal, SA Walton has remained a GS-1811-13 Special Agent within the OIG, Office of Investigations, Western Region Field Office, Southwest Division, assigned to the Dallas office. SA Walton's current work status has remained unchanged.

121. What documentation, if any, exists to support allegedly issuing a Notice of Proposed Removal to Complainant? Please explain and provide a copy of the documentation.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/15/2022 |
|---------------------|---|-----------------------|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:02:16 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 5 | 19 | 2022-0009-R06 |

**Answer:** I notified SA Walton, via email, of the Proposed Removal on March 1, 2022, at approximately 2:31 pm CST (Exhibit 32 & Exhibit 8). The Notice provided evidence to support that SA Walton failed to improve her performance during the PIP to a minimally successful level. The Notice of Proposed Removal, which includes the PIP evaluation, supported my decision to issue the proposed action.

122. Was Complainant's **race** a factor in your decision when she was allegedly given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 202 and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
    **Answer:** No.

    If so, explain in detail how the Complainant's **race** was a factor and why.
    **Answer:** N/A

123. Was Complainant's **sex** a factor in your decision when she was allegedly given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 202 and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
    **Answer:** No

    If so, explain in detail how the Complainant's **sex** was a factor and why.
    **Answer:** N/A

124. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
    **Answer:** I disagree with above statement that the cited action is a form of harassment. I did not propose and initiate the cited action based on race, sex, religion, national origin, age, disability, or genetic information. I proposed the action for the reasons previously stated. The PIP was not punitive, as she was given the opportunity to illustrate improved performance in several critical elements. Furthermore, SA Walton never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.  As stated previously, in consultation with HRD and OC, I recommended the action because SA Walton failed to improve her performance to a minimally successful level in the cited critical elements during the 45-day PIP evaluation.

    As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:03:04 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **6** | **19** | **2022-0009-R06** |

legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or first lacking in credibility.

When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance in several performance standards to include product timeliness and accuracy; identification and documentation of relevant records; and poor communication. As her performance could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues and ways to improve her performance and engage SA Walton in communication (Exhibit 10).  I repeatedly told her I was open to mentor her to assist in her performance.  SA Walton chose not to engage me as a coach/mentor and failed to communicate with me on a regular basis.

125. Was Complainant's **prior EEO activity** a factor in your decision when she was allegedly given a Notice of Proposed Removal for  failing to successfully complete the PIP Complainant was placed on November 10, 2021 and  notified on April 22, 2022, that a decision was made to not substantiate the Removal?
   **Answer:** No., I have no knowledge or involvement in SA Walton's prior EEO activity.

If so, explain in detail how the Complainant's **prior EEO activity** was a factor and why.
**Answer:** N/A

126. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were** issued a Notice of Proposed Removal as the Complainant?
   **Answer:**  I have not supervised any other employees who were in the same or similar circumstances like SA Walton.  Other than SA Walton, I have not issued a Notice of Proposed Removal any other employee under my supervision.

If so, identify each comparator employee by full name, race, sex, position title, type of discipline/infraction issued, date of issuance, and by whom it was issued and concurred. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
**Answer:** N/A

Are you aware of each cited comparator having prior EEO activity? State yes, no, or unknown.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:03:55 -05'00' | Date Signed  6/15/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **7** | **19** | **2022-0009-R06** |

**Answer:** N/A

127. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not** issued a Notice of Proposed Removal as the Complainant?
   **Answer:** I have not supervised any other employees who were the same or similar circumstances like SA Walton. Other than SA Walton, I have not issued a Notice of Proposed Removal any other employee under my supervision.

   If so, identify each comparator employee by full name, race, sex, position title, and explain why the Notice of Proposed Removal was not issued. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
   **Answer:** N/A

   Are you aware of each comparator cited having prior EEO activity? State yes, no, or unknown.
   **Answer:** N/A

128. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when issuing the Complainant a Notice of Proposed Removal. Explain in detail how each policy and/or contract provision applies.
   **Answer:** EPA OIG's policy and procedures for a PIP and related actions are detailed in OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6) and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System (Exhibit 7). I initially consulted the OIG Supervisor's Guide, which stated that, "If the supervisor determines that the employee has failed to improve their performance, the supervisor must initiate a performance based action to either reassign, reduce in grade, or remove the employee. The supervisor must consult with OC and HRD prior to taking any action." After the termination of the PIP on or about December 24, 2021, I subsequently consulted and coordinated the proposed action with HRD and OC. OC reviewed the proposed action for legal sufficiency.

129.  **Other than this EEO complaint** are you aware if the Complainant filed any other kind of administrative action/appeal, grievance and/or met with higher level management when Complainant was issued a Notice of Proposed Removal? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
    **Answer:** I am unaware whether SA Walton filed an appeal or an administrative grievance for being issued a Notice of Proposed Removal.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL   Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:05:11 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)***

| Page No. | No. Pages | Case No. |
|---|---|---|
| **8** | **19** | **2022-0009-R06** |

## CLAIM 6: ON MAY 2, 2022, COMPLAINANT WAS INFORMED ME THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT

130. Complainant alleged she was informed  that an internal investigation was initiated based on allegations of misconduct by you (Garrett). Please respond to Complainant's allegation.

**Answer:** I can't attest to what SA Walton was informed, as I was not directly involved in any interview with SA Walton regarding the internal investigation.

I referred possible misconduct allegations involving SA Walton to HRD and OC as early as October 2021 (Exhibit 1).  Based on consultation with HRD and OC on several occasions, they opined that any possible conduct related issues could not be addressed until the full PIP and possible recommending action were resolved.  Accordingly, the conduct issues were tabled until the PIP action, complainant response, and decision were concluded.  However, during subsequent managerial discussions with Acting AIGI Marc Perez and DAIGI Sean Earle as early as November 2021, Acting AIGI Perez decided to initiate an internal investigation, directed by the Office of Investigations' Eastern Region Field Office, based on two matters that I brought to his attention.  I did not make the decision to initiate an internal investigation but relayed my concerns and related relevant documents/evidence to Acting AIGI Perez and DAIGI Earle regarding several alleged misconduct issues.  While I was not involved in the investigation, the case was investigated by SA Paul Brezinski, EPA OIG, Philadelphia, PA, and Joey Campbell, EPA OIG, Atlanta, GA.  I had no visibility or oversight of the case, including being restricted from viewing the case in the ECMS.  Accordingly, I had no detailed knowledge of the investigative plan, steps taken, or findings.

The internal investigation of SA Walton was derived based on four referrals from me – 1) the circumstances surrounding the loss of computer evidence in the Dallas office; 2) concerns with the possible inflation of SA Walton's Law Enforcement Availability Pay (LEAP) hours to achieve the required 2.0 FY21 LEAP average; 3) the modification and manipulation of the case chronology log in the ECMS, including my supervisory case review, to support a previously unsupported investigative activity; and 4) the modification of another (separate case and occurrence than No. 3) case chronology log in the ECMS to support a previously undocumented investigative activity, which was later reported falsely after the PIP. Please note, based on my knowledge, the last two misconduct allegations were added later during the investigation after being discovered, as described below.  I also referred a fifth (5) allegation concerning the modification of a subject matter expert (SME) report without the SME's knowledge, but it was not included, to my knowledge, in the internal investigation.

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:39:11 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **9** | **19** | **2022-0009-R06** |

On or about November 10, 2021, I briefed Acting AIGI Perez on the status of the WRFO, including the loss of civilian computer in evidence discovered in June 2021 in the Dallas office.  Acting AIGI Perez requested records related to the loss of the computer (Exhibit 34). During the briefing with Acting AIGI Perez, I recommended an internal investigation into the circumstances and reasons as to why the computer was lost.  An investigation would include possible misconduct or dereliction of duty by officials with the Electronic Crimes Division and SA Walton, as she was the evidence custodian at the time in the Dallas office.  SA Walton did not adequately conduct a thorough evidence inventory in 2019 and 2020 sufficient to discover the loss and incorrectly reported that the contents of the evidentiary items, including the computer, were verified during the above inventories.

On or about November 15, 2021, I had a discussion with Acting AIGI Perez and DAIGI Earle regarding concerns that I had with SA Walton's final LEAP average for FY21.  Acting AIGI requested that I forward him background and related records regarding SA Walton's FY21 LEAP average.  On November 15, 2021, I sent records related to her LEAP average to DAIGI Earle (Exhibit 35). Specifically, I believed that SA Walton may have inflated her LEAP hours worked prior to the fiscal year end to meet the annual LEAP requirement.  While SA Walton reported 11.5 case related LEAP hours between September 26, 2021 and September 30, 2021, there were no documented work products or chronology entries in the ECMS by SA Walton to account for the reported time.  During the mid-year evaluation on or about April 12, 2021, I notified SA Walton of her need to address and increase her LEAP hours based on the average at the time – 1.68 hours (Exhibit 1).

On or about January 6, 2022, I conducted a MS Teams meeting with Acting AIGI Perez and DAIGI Earle regarding concerns that SA Walton allegedly manipulated the case chronology log in the electronic case management system (ECMS), including my supervisory case review, to support a previously unsupported investigative activity.  On January 8, 2022, I sent records related to the alleged conduct to Acting AIGI Perez and DAIGI Earle (Exhibit 36).  These records showed that without knowledge or approval of management, SA Walton allegedly modified two previous chronology log entries in the ECMS to support a revised closing report submitted by SA Walton after management feedback on December 22, 2022.  These unapproved modifications were done five months after original entry and conflicted with a previously approved memorandum of the same activity in the ECMS. The alleged activity included the manipulation to a supervisory case review (i.e., a chronology entry entered by me to document the bi-weekly management review of the case) entered the ECMS on June 27, 2021. The case closing report submitted by SA Walton remains unapproved, as I believe the report to include false information, in direct contradiction to previous statements and work products submitted by SA Walton. In my meeting with Acting AIGI Perez and DAIGI Earle on or about January 6, 2022, I recommended the investigation of the alleged

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:06:32 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 10 | 19 | 2022-0009-R06 |

misconduct by SA Walton as the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list.

On or about May 3, 2022, I discussed my concerns with Acting AIGI Perez regarding the modification of another case chronology log by SA Walton under a different case, in which the investigative activity was previously undocumented by SA Walton. Acting AIGI Perez directed me to refer the matter to SA Brezinski to possibly include in the internal investigation. On or about May 3, 2022, I discussed the alleged conduct with SA Brezinski and sent him a summary on May 3, 2022, prepared by ASAC (Exhibit 37), and related support records on May 6, 2022 (Exhibit 38). These records showed that without knowledge or approval from management, SA Walton allegedly modified a previous chronology log entry to support a revision to a memorandum, in which a specific investigative activity was never documented by SA Walton. The unapproved modification was done several months after original entry and conflicted with previous statements and submissions of work products by SA Walton. The final work product submitted by SA Walton remains unapproved, as I believe the report to include false information, in direct contradiction to previous statements and work products submitted by SA Walton. In my meeting with Acting AIGI Perez on or about May 3, 2022, I recommended the investigation of the alleged misconduct by SA Walton as the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list.

On or about January 28, 2022, I discussed and forwarded concerns and related support records to Acting AIGI Perez and DAIGI Earle regarding SA Walton's alleged modification of a SME report without the SME's knowledge and approval (Exhibit 39). While I referred the matter to Acting AIGI Perez for possible inclusion into the internal investigation, I do not believe the issue was included, as Acting AIGI did not want to include so many issues that it downplayed the severity of the other issues. I referred the matter as the alleged conduct could have detrimental effects on the case and the credibility and reputation of the SME, as they may be called to testify to the accuracy and modifications to the report, for which they had prior knowledge of.

131. Was it your decision for an internal investigation for Complainant based on allegation of misconduct? If so, please give in detail the reason for your decision.
    **Answer:** No. I did not make the decision to initiate an internal investigation but relayed my concerns and related documents/evidence to Acting AIGI Perez and DAIGI Earle regarding several allegations of misconduct issues involving SA Walton. I was excluded and was not involved in the internal investigation, including being restricted from viewing

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:08:29 -05'00' | Date Signed 6/15/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 11 | 19 | 2022-0009-R06 |

the case in the ECMS.  Accordingly, I had no detailed knowledge of the investigative plan, steps taken, or findings of the internal investigation.

132.  If you did not make the decision, what was your involvement, if any, in this action?
 **Answer:**  See answer to question 130 & 131.

133. If you had no knowledge or involvement in Complainant being given an internal interview, please identify who did and the reason(s) for doing so.  Provide the management official's name, position title, facility address, telephone number and email address.
**Answer:** As I was excluded from involvement and oversight of the internal investigation, I had no direct involvement in the internal interview, other than coordination with the interviewing agents for EPA Region 6 entry.  The interviewing agents did not have the respective key cards/elevator badge to gain access to the interview location in the Dallas office.  In addition, the case agent, SA Paul Brezinski, EPA OIG, Philadelphia, PA, informed me that they intended to take SA Walton's EPA government-owned laptop computer and requested that I obtain a replacement laptop from IT.  I secured a replacement laptop computer for SA Walton in May 2022, from the OIG IT department.  Accordingly, on the day of the interview, May 25, 2022, I coordinated office entry and provided a replacement computer for SA Walton to SA Brezinski, and Joey Campbell, EPA OIG, Atlanta, GA.  Management officials with involvement in the interview – (possibly) ASAC Marcella Phelps, EPA OIG, Washington, DC, (202) 380-6395, phelps.marcella@epa.gov; Acting AIGI Marc Perez, EPA OIG, Seattle, WA, (202) 603-4861, perez.marc@epa.gov; and DAIGI Sean Earle, EPA OIG, Atlanta, GA, (404) 562-9865, earle.sean@epa.gov.

134.  Who concurred with the action for there to be an internal investigation for Complainant?  Identify by name, position title work location and phone number?
 **Answer:** Acting AIGI Marc Perez, EPA OIG, Seattle, WA, (202) 603-4861; and DAIGI Sean Earle, EPA OIG, Atlanta, GA, (404) 562-9865.

135.  Did you consult with anyone for guidance and or advice prior to Complainant  being involved in an internal investigation.? If so, identify him/her/them by full name and position and describe his/her/their involvement.
 **Answer:** I have brought the misconduct allegations to the attention of both Eric Mabry, HRD, and Lori Ruk, OC, for guidance. Based on consultation with HRD and OC, they opined that any conduct related issues could not be addressed until the full PIP and possible action were resolved.

136.  Identify by full name, position title and work location the management official(s) who  was responsible for the internal investigation.  Please describe each manager's role in the decision.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:10:27 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 12 | 19 | 2022-0009-R06 |

**Answer:**
- SAC Garrett J. Westfall, EPA OIG, Dallas, TX.  I coordinated and referred the misconduct allegations to HRD, OC, and OI Senior Leadership (Acting AIGI Perez/DAIGI Earle).
- ASAC Staci Gurin, EPA OIG, Kansas City, KS. ASAC Gurin observed four of the misconduct allegations and provided support records on two of the allegations (No. 4 & 5 as described in Question No. 130).
- Acting AIGI Marc Perez, EPA OIG, Seattle, WA. One of two senior OI leaders that decided the alleged conduct warranted an internal investigation.
- DAIGI Sean Earle, EPA OIG, Atlanta, GA. One of two senior OI leaders that decided the alleged conduct warranted an internal investigation.

137. Please explain in detail the facts that led up to the  internal investigation.
     **Answer:** Please see answer to Question 130.

138. How was Complainant notified (verbally or in writing) and who notified her regarding the internal investigation? ***If in writing, please provide a copy.  If verbally, explain what was said or done.***
     **Answer:** I am unaware how SA Walton was notified of the internal investigation.  I am aware the investigative agents, SA Campbell and SA Brezinski, attempted to schedule an interview with her and her attorney in early December 2021, but the interview was delayed until May 25, 2022.

139. When did the (dates- to and from ) internal investigation take place?
     **Answer:** Unknown.  I have no specific knowledge of the timeframe of the internal investigation.

140. Were you present during the internal investigation?  If so, please explain what happened and why.
     **Answer:** No. I have been excluded from the internal investigation and have not been present during the investigation or any interviews conducted. I have no oversight role as an OI manager of the investigation and have been restricted from access in the ECMS of the case.

141. Please state what information was to be obtained from the internal investigation.
     **Answer:** Unknown.  I have not been briefed or provided information on the planned investigative steps or subsequent findings of the internal investigation.

142. Please explain why there was an investigation into Complainant's misconduct.
     **Answer:** Please see response to Question 130.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:13:01 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 13 | 19 | 2022-0009-R06 |

143. Did the Complainant communicate with you and/or any management official(s) her concerns regarding the internal investigation? If so, please explain what was said and response Complainant received.
**Answer:** SA Walton has not communicated with me any aspect of the internal investigation, including her concerns. I am unaware of any communication by SA Walton another management official on her concerns regarding the internal investigation.

144. Do you have any documentation or evidence to support the internal investigation? If so, what and provide a copy with your affidavit.
**Answer:** Please see response to question 130 and related Exhibits 34-39 for documentation and evidence to support the alleged conduct referrals I made to Acting AIGI Perez and DAIGI Earle.

For clarification, I do not have documentation of the internal investigation.

145. Was Complainant given a reason/explanation/justification for the internal investigation of Complainant's misconduct?
**Answer:** Unknown, I have not communicated with SA Walton regarding the internal investigation.

If so, state the reason/explanation Complainant was given and identify by full name and position the management official(s) who gave her the reason/explanation.
**Answer:** Unknown

If Complainant was given a reason/explanation, did she disagree with it? If so, explain in detail why.
**Answer:** Unknown

146. Was Complainant's **race** a factor when an internal investigation was initiated based on allegations of misconduct?
**Answer:** No. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton. My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. SA Walton's race was not a factor when I made the referrals.

147. Was Complainant's **sex** was a factor when an internal investigation was initiated based on allegations of misconduct ?
**Answer:** No. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton. My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. SA Walton's sex was not a factor when I made the referrals.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:15:40 -05'00' | Date Signed  6/15/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **14** | **19** | **2022-0009-R06** |

148.  Was Complainant's **prior EEO activity** was a factor when an internal investigation was initiated based on allegations of misconduct?
   **Answer:** No., I have no knowledge or involvement in SA Walton's prior EEO activity. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton.  My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. Since I have no knowledge of SA Walton's prior EEO activity, the said activity was not a factor when I made the referrals.

149.  How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
   **Answer:** I disagree with above statement that the cited action is a form of harassment. I did not refer the alleged misconduct involving SA Walton based on race, sex, religion, national origin, age, disability, or genetic information.  Furthermore, SA Walton never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.

   As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or first lacking in credibility.

   When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance, to include possible misconduct concerns. As her performance and conduct could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies and misconduct observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues (Exhibit 10).

150. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were given an internal investigation** as the Complainant?
   **Answer:**  I have not supervised any other employees who were in the same or similar circumstances like SA Walton.  Other than SA Walton, I have not referred allegations of

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL    Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:18:16 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **15** | **19** | **2022-0009-R06** |

misconduct, which resulted in an internal investigation of any other employee under my supervision.

If so, identify each comparator employee by full name, position title race and sex and explain why they were given an internal investigation. .Provide the name of each employee's supervisor. **Provide copy for each cited comparator.**
**Answer:** N/A

Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
**Answer:** N/A

151.  Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not** given an **internal investigation** as the Complainant?
   **Answer:**  I have not supervised any other employees who were in the same or similar circumstances like SA Walton.  Other than SA Walton, I have not referred allegations of misconduct, which resulted in an internal investigation of any other employee under my supervision.

   If so, identify each comparator employee by full name, position title race, sex and explain why they were not given an internal investigation.  Provide the name of each employee's supervisor. **Provide copies for each cited comparator.**

   Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
   **Answer:**  N/A

152. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when an internal investigation was initiated based on allegations of misconduct by Complainant. Explain in detail how each policy and/or contract provision applies.
   **Answer:**  I did not decide to initiate the internal investigation.  I did not rely upon any policies in initiating an internal investigation, as I only referred allegations of misconduct to Acting AIGI Perez and DAIGI Earle.

   There are multiple OIG procedures, which I applied as criteria when evaluating SA Walton's alleged misconduct in drafting the referrals, including:

   - Procedure 206: Case Administration – This procedure outlines the specific guidelines, expectations, and timeframes related to case work (Exhibit 11). Section

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:20:34 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **16** | **19** | **2022-0009-R06** |

3.1 outlines general investigative standards such as any investigative product should be complete, concise, accurate and objective; and communicate the pertinent facts in clear, simple language.  Section 4.1 outlines requirements for the official case file in that all investigative activity, both exculpatory and incriminating, should be recorded in the official investigative file.

- Procedure 207: Interviews, Advisement of Right, Oaths, Statements and Record Reviews – This procedure outlines specific guidelines, expectations, and requirements for conducting interviews, advisement of rights, documenting interviews and record reviews, and obtaining statements (Exhibit 12). Section 5.3 outlines that the agent report an interview in a memorandum of activity within 10 days from the date of the interview. Section 7.2 outlines that record reviews will be similarly written within 10 days from the activity.

- Procedure 211: Physical and Documentary Evidence – This procedure outlines the specific guidelines, expectations, and requirements regarding the receipt, custody, and disposition of evidence as an agent, as well as an evidence custodian (Exhibit 13). As SA Walton was an evidence custodian during the rating period, this procedure was used to evaluate her possible misconduct in a collateral duty.

- Procedure 223: Investigative Reports – this procedure outlines the specific guidelines, expectations, and requirements in preparing investigative reports (Exhibit 15).  Section 2.1 provides the following report requirements, pertinent to SA Walton's performance:

  o All investigative reports will be complete, clear, concise, accurate and logically organized, and communicate the pertinent facts in clear, simple language. Unnecessary, obscure and confusing language should be avoided.

  o The report will contain facts discovered during the investigation, such as those learned during interviews, record reviews, searches, surveillances or other investigative activities. The report will not include any information that was not obtained during the course of the investigation.

  o Irrelevant material will not be included in investigative reports.

  o Investigative reports will address all aspects of the allegations and no issues will be left unaddressed.

  o All statements in the investigative report will be supported by exhibits. When an exhibit is referenced, the reader will be directed to the specific page and/or paragraph of the exhibit.

  o Investigative reports will contain the necessary supporting information so the reader does not have to make computations, question how amounts were determined, or review voluminous documents.

  o Tables, schedules or charts may be included in the report to clearly present information as long as they are supported by and referenced to the appropriate exhibits.

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:23:02 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| **17** | **19** | **2022-0009-R06** |

Procedure 218: Law Enforcement Availability Pay – this procedure outlines the specific guidelines, expectations, and requirements in working and reporting LEAP hours (Exhibit 40). Section 5.3 outlines the information and required documentation for searches based on consent.

153. **Other than this EEO complaint** are you aware if the Complainant filed any other administrative action/appeal, grievance and/or met with higher level management when Complainant was given an internal investigation? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
**Answer:** I am unaware of any appeal or grievance based on the internal investigation.

## HARASSMENT/HOSTILE WORK ENVIRONMENT:

154. Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her?  If so, describe in detail when and what specifically the Complainant told you and what was your response/action?
**Answer:** No.  SA Walton never told me in verbal or written form that my actions constituted harassment and/or a hostile work environment.

155. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment?  If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.
**Answer:** On March 22, 2022, I was notified that I was to be interviewed as part of EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, regarding harassment in the workplace.  Until that notification, I had never been apprised of any allegations regarding my actions being perceived as harassment or a hostile work environment.  I have no background on the complaint provided by SA Walton and what official she provided the complaint to and when.  On March 24, 2022, I was interviewed by the fact finder.  The only harassment alleged, based on the line of questioning, was a conversation I had with SA Walton regarding evidentiary issues in the Dallas evidence room on August 24, 2021, during an evidence inventory. Please note, that there were two evidence inventories conducted by SA Walton in FY 2021 – August 24, 2021 and September 23, 2021.  I was NOT present during the evidence inventory on August 24, 2021; the alleged dated of the harassment.  I was present for the inventory on September 23, 2021. Please see my notes of the interaction with SA Walton on September 23, 2021 (Exhibit 1).

156. Was an investigation conducted into Complainant's allegations of harassment/hostile work environment?  If so, by whom and when?

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:25:18 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 18 | 19 | 2022-0009-R06 |

**Answer:** Please see response to Question 155. I do not have detailed knowledge or specifics as the scope, timeframe, or other information to the EPA Order 4711 investigation. The fact finder was Mark Miller, Investigative Attorney, Administrative Investigations Directorate, EPA OIG.

157. To your knowledge, what was the outcome of the investigation? Please provide a copy of the report.
**Answer:** I do not have a copy of the EPA Order 4711 investigative report, nor was I provided details of the findings. However, I received a memorandum from Acting AIGI Perez on May 3, 2022, that stated "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711. *See* EPA Order 4711, Sections IV(A), (K)." (Exhibit 29).

158. Was Complainant informed of the outcome? If yes, how?
**Answer:** I am unaware on whether SA Walton was informed of the outcome.

159. Was any corrective or preventative action necessary? If so, what action was taken?
**Answer:** I am unaware of any action taken.

160. If no investigation was conducted, please explain why.
**Answer:** An investigation was conducted, but details of the investigation and related records are in the custody of the EPA OIG Administrative Investigations Directorate.

161. Have you received training, since your last affidavit, on anti-harassment/hostile work environment while employed by the agency? If so, when and what?
**Answer:** My initial affidavit for this EEO action was submitted on June 14, 2022. I have not received any training on anti-harassment/hostile work environment since the initial submittal on June 14, 2022.

My last recorded anti-harassment training – Anti-Harassment Procedures Training for EPA Employees, August 11, 2020. I have had other managerial training, which included harassment/hostile work environment training as part of the curriculum, such as the Office of Mission Support-Labor and Employee Relations All-Day Basic Supervisor Training, February 9, 2021.

162. Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation, and harassment/hostile work environment? *If you mentioned any documents in answering your affidavit questions please provide.*
**Answer:** No.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:27:07 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| **19** | **19** | **2022-0009-R06** |

**I provided an extensive number of relevant and related source documents (Exhibits 33-40) as inclusive to this amended affidavit, and cited related documents from the prior affidavit (Exhibits 1-32). This amended affidavit is incomplete without the exhibits and should not be included in any report of investigation or referral without the referenced exhibits and previously submitted affidavit.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL   Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:29:20 -05'00' | |

October 2015

| **Certification** | Case Number<br>**2022-0009-R06** |
|---|---|

I have read the proceeding attached statement, consisting of 19 pages with 8 Exhibits, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

**Privacy Act Statement and Rehabilitation Act Notice**

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

**Standards of Conduct**

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of _____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | |

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | | Date Signed |
|---|---|---|
| X   GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL<br>Date: 2022.06.15 18:55:10 -05'00' | **6/15/2022** |

Form 2571 October 2015

| EEO Investigative Affidavit *(Witness)* | Page No. **1** | No. Pages **11** | Case No. **2022-0009-R06** |
|---|---|---|---|

| 1. Affiant's Name (Last, First, MI) **Perez, Marc A.** | 2. Employing Federal Agency and Office **EPA OIG/Seattle** |
|---|---|

| 3. Position Title **Investigative Counsel** | 4. Grade and Series **GS-15-0905** | 5.Address and Zip +4 **1200 Sixth Ave., Ste. 155 Seattle, WA 98101** | 6. Organizational Unit **Office of Investigations** |
|---|---|---|---|

## Privacy Act Notice and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

## Response to Complaint

Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required.  Form will auto-create if using Microsoft Word*)

## Please complete the top section of this form, boxes #2 thru #6.

1. Please state your name, position title, grade level, work location, work address (include zip+4), work telephone number, and work e-mail address.

**Name: Marc A. Perez**
**Position title and grade level: Investigative Counsel; GS-15-0905**
**Department/division/work group: Office of Investigations**
**Work address: 1200 Sixth Ave., Ste. 155, Seattle, WA 98101**
**Work telephone number: (202) 603-4861**
**Work e-mail address: Perez.Marc@epa.gov**

2. State the period of time you have held your current position.

**I have served as Investigative Counsel since September 2020; from September 2021 until June 2022, I served as the acting Assistant Inspector General for Investigations.**

**[NOTHING FOLLOWS ON THIS PAGE]**

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed **09.13.2022** |
|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **2** | **11** | **2022-0009-R06** |

3. Identify your first and second line supervisors.

**My first line supervisor is Assistant Inspector General for Investigations Jason Abend; my second line supervisor is Deputy Inspector General Nicole Murley**

4. Describe your past or current working/reporting relationship with Complainant, Lisa Walton (i.e., co-worker, supervisor, etc.).  State the period of time of the working/reporting relationship with Complainant.

**I began working with Special Agent Alisa Walton after I joined the EPA's Office of Inspector General in September 2020. I provide the special agents legal assistance on their criminal and civil investigations. My first encounter with SA Walton would have been around December 2020 or January 2021.**

<u>**RACE AND SEX ALLEGATION:**</u>

5. Please identify your **race**.

**I am White and of Latino (Central American) ethnicity.**

6. Were you aware of Complainant's **race** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **race**?

**Yes, I am aware of SA Walton's race. I became aware of SA Walton's race when I met her on a video conference call in December 2020 or January 2021. Since then, I have joined her on several video conference calls.**

7. Please identify your **sex**.

**Male**

8.      Were you aware of Complainant's **sex** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **sex**?

**Yes, I am aware of SA Walton's sex. I became aware of SA Walton's sex when I met her on a video conference call in December 2020 or January 2021. Since then, I have joined her on several video conference calls.**

**[NOTHING FOLLOWS ON THIS PAGE]**

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **3** | **11** | **2022-0009-R06** |

## RETALIATION ALLEGATION:

9.      Were you aware of the Complainant being involved in EEO activity prior to this complaint?  (EEO activity includes filing a charge, testifying, assisting another, or participating in a discrimination proceeding; or otherwise opposing discrimination.) If so, when did you become aware of the Complainant's EEO activity?

**I was unaware of SA Walton's "prior EEO activity" when I initiated an internal investigation into her alleged misconduct. I became aware that SA Walton claimed she had been involved in "prior EEO activity" when, on or about March 2, 2022, I was provided a copy of her allegations under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, in which she claimed she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity. I was and remain unaware of any details related to "prior EEO activity" by SA Walton.**

10. If you were named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he/she filed or was involved in, please identify the case number(s) and identify the issue(s) involved in the complaint.

**I have not been named as the Responsible Management Official or witness in any prior EEO complaint.**

11.      If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?

**I have not been involved in any prior EEO activity.**

12.       If not involved, how did you become aware of the EEO activity?

**I became aware that SA Walton claimed she had been involved in "prior EEO activity" when, on or about March 2, 2022, I was provided a copy of her allegations under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, in which she claimed she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity. I was and remain unaware of any details related to "prior EEO activity" by SA Walton.**

13.      If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?

**I was not involved in any prior EEO activity.**

**[NOTHING FOLLOWS ON THIS PAGE]**

---

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **4** | **11** | **2022-0009-R06** |

**CLAIM 6:    ON MAY 2, 2022, COMPLAINANT WAS INFORMED THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT.**

14.    Complainant alleged she was informed that an internal investigation was initiated based on allegations of misconduct. Please respond to Complainant's allegation.

**SA Walton is the subject of an ongoing internal investigation into allegations that she inflated her Law Enforcement Availability Pay (LEAP) hours prior to her submission of her FY2021 annual certification to ensure she attained the average of 2.0 hours of unscheduled duty per regular work day as required by federal law and agency policy, and that, on several occasions, she manipulated data in the electronic case management system to support investigative activity that never occurred.**

15.    Was it your decision to have an internal investigation conducted based on allegations of Complainant's misconduct?  If so, please give in detail the reason for your decision.

**Yes, it was my decision to initiate an internal investigation into allegations of misconduct.**

16.    If you did not make the decision, what was your involvement, if any, in this action?

**Not applicable.**

17.    If you had no knowledge or involvement in Complainant being subjected to an internal investigation, please identify who did and the reason(s) for doing so.  Provide the management official's name, position title, facility address, telephone number and email address.

**Not applicable.**

18.    Who concurred with the action for there to be an internal investigation for Complainant's alleged misconduct? Identify by name, position title work location and phone number?

**Not applicable.**

19.    Did you consult with anyone for guidance and or advice prior to initiating an internal investigation for Complainant's alleged misconduct? If so, identify him/her/them by full name and position and describe his/her/their involvement.

**No.**

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **5** | **11** | **2022-0009-R06** |

20. Identify by full name, position title and work location the management official(s) who was/were responsible for the internal investigation. Please describe each manager's role in the decision.

**At the time that I initiated the internal investigation into allegations of misconduct, I was the acting Assistant Inspector General for Investigations.**

21. Please explain in detail the facts that led up to the internal investigation.

**SA Walton is the subject of an internal investigation into allegations that she inflated her Law Enforcement Availability Pay (LEAP) hours prior to her submission of her FY2021 annual certification to ensure she attained the average of 2.0 hours of unscheduled duty per regular work day as required by federal law and agency policy, and that, on several occasions, she manipulated data in the electronic case management system to support investigative activity that never occurred.**

**The investigation is ongoing.**

22. How was Complainant notified (verbally or in writing) and who notified her regarding the internal investigation? _**If in writing, please provide a copy. If verbally, explain what was said or done.**_

**SA Walton was notified verbally of the allegations on or about May 25, 2022, when she was interviewed. A transcript of the interview is in the case file.**

**The internal investigation is ongoing.**

23. When did the (dates to and from) internal investigation take place?

**The allegations of misconduct were first raised in October 2021 and the internal investigation was initiated in November 2021.**

**The internal investigation is ongoing.**

24. Were you present during the internal investigation? If so, please explain what happened and why.

**I was the acting Assistant Inspector General for Investigations when I initiated the internal investigation. I am now back to serving as the Investigative Counsel.**

**The internal investigation is ongoing.**

---

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **6** | **11** | **2022-0009-R06** |

25. Please state what information was to be obtained from the internal investigation.

**The internal investigation is ongoing.**

26. Please explain why there was an investigation into Complainant's misconduct.

**SA Walton is the subject of an ongoing internal investigation into allegations that she inflated her Law Enforcement Availability Pay (LEAP) hours prior to her submission of her FY2021 annual certification to ensure she attained the average of 2.0 hours of unscheduled duty per regular work day as required by federal law and agency policy, and that, on several occasions, she manipulated data in the electronic case management system to support investigative activity that never occurred.**

**Each criminal investigator who receives availability pay (LEAP) must certify annually that she has "read the requirements for availability pay authorized by 5 U.S.C. § 5545a and set forth in OIG Policy 218" and "met the requirements to perform an annual average of 2 hours of unscheduled duty per regular work day." A false certification could expose a criminal investigator to criminal and/or civil liability.**

**Similarly, entering false data into the electronic case management system could expose a criminal investigator to criminal liability and compromise the integrity of an ongoing criminal or civil investigation.**

27. Did the Complainant communicate with you and/or any management official(s) her concerns regarding the internal investigation? If so, please explain what was said and response Complainant received.

**SA Walton did not communicate with me about any concerns regarding the internal investigation. I am unaware if she communicated any concerns about the internal investigation to any other management official.**

28. Do you have any documentation or evidence to support the internal investigation? If so, what and provide a copy with your affidavit.

**I do not maintain any evidence or documentation related to this internal investigation. All evidence and documentation should be maintained in the case file in the electronic case management system.**

**The internal investigation is ongoing.**

**[NOTHING FOLLOWS ON THIS PAGE]**

---

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **7** | **11** | **2022-0009-R06** |

29. Was Complainant given a reason/explanation/justification for the internal investigation of Complainant's misconduct?

**SA Walton was advised of the allegations of misconduct at her interview, which occurred on or about May 25, 2022.**

**The internal investigation is ongoing.**

a. If so, state the reason/explanation Complainant was given and identify by full name and position the management official(s) who gave her the reason/explanation.

**At her interview, SA Walton was advised that she was being investigated for allegations of misconduct, including that she inflated her Law Enforcement Availability Pay (LEAP) hours prior to her submission of her FY2021 annual certification to ensure she attained the average of 2.0 hours of unscheduled duty per regular work day as required by federal law and agency policy, and that, on several occasions, she manipulated data in the electronic case management system to support investigative activity that never occurred.**

**No management official was present for the interview of SA Walton.**

**The internal investigation is ongoing.**

b. If Complainant was given a reason/explanation, did she disagree with it? If so, explain in detail why.

**I am unaware whether SA Walton disagreed with the allegations of misconduct during or after her interview. A transcript of the interview is in the case file.**

**The internal investigation is ongoing.**

30. Was Complainant's **race** a factor when an internal investigation was initiated based on allegations of misconduct?

**No.**

31. Was Complainant's **sex** a factor when an internal investigation was initiated based on allegations of misconduct?

**No.**

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **8** | **11** | **2022-0009-R06** |

32. Was Complainant's **prior EEO activity/protected activity** a factor when an internal investigation was initiated based on allegations of misconduct?

**No. I became aware of the allegations of misconduct in October 2021. I initiated the internal investigation in November 2021, and, in March 2022, I became aware that SA Walton claimed she had engaged in some form of prior EEO activity.**

33. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?

**If SA Walton believes that I initiated an internal investigation into the allegations of misconduct as a form of harassment, then she is mistaken. Both allegations of misconduct are serious.**

**Falsely certifying LEAP could expose a criminal investigator to criminal and/or civil liability. Similarly, entering false data into the electronic case management system could expose a criminal investigator to criminal liability and compromise the integrity of an ongoing investigation.**

34. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when an internal investigation was initiated based on allegations of misconduct by Complainant. Explain in detail how each policy and/or contract provision applies.

**Each criminal investigator who receives availability pay (LEAP) must certify annually that she has "read the requirements for availability pay authorized by 5 U.S.C. § 5545a and set forth in OIG Policy 218" and "met the requirements to perform an annual average of 2 hours of unscheduled duty per regular work day."**

**A criminal investigator must enter correct and accurate information into the electronic case management system because incorrect and inaccurate information can compromise the integrity of an investigation. Moreover, the nature of a criminal investigator's activities creates a special need for high standards of professionalism and integrity. Thus, all special agents must adhere to high standards in their professional and personal conduct.**

**[NOTHING FOLLOWS ON THIS PAGE]**

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| EEO Investigative Affidavit (Continuation Sheet) | 9 | 11 | 2022-0009-R06 |

35.    **Other than this EEO complaint** are you aware if the Complainant filed any other administrative action/appeal, grievance and/or met with higher level management when Complainant was given an internal investigation? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**

**The internal investigation is ongoing.**

**On or about March 2, 2022, I became aware that SA Walton filed a complaint under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, and alleged she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity. I was and remain unaware of any details related to any "prior EEO activity."**

**The Office of Counsel for EPA's Office of Inspector General maintains an unredacted version of SA Walton's complaint under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment.**

<u>**HARASSMENT/HOSTILE WORK ENVIRONMENT:**</u>

36.    Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her?  If so, describe in detail when and what specifically the Complainant told you and what was your response/action?

**No, SA Walton never told me that my actions constituted harassment or a hostile work environment for her.**

37.    Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment?  If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.

**On or about March 2, 2022, I became aware that SA Walton filed a complaint under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, and alleged she had been subjected to a hostile work environment on account of her race, sex, and prior EEO activity. I was and remain unaware of any details related to any "prior EEO activity."**

**[NOTHING FOLLOWS ON THIS PAGE]**

---

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Date Signed |
|---|---|
| | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **10** | **11** | **2022-0009-R06** |

38.    Was an investigation conducted into Complainant's allegations of harassment/hostile work environment?  If so, by whom and when?

**Yes. As the acting Assistant Inspector General for Investigations, I approved the Administrative Investigations Directorate (AID) to investigate SA Walton's complaint under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment.**

39.    To your knowledge, what was the outcome of the investigation?  Please provide a copy of the report.

**I reviewed the fact-finding results; consulted with agency's legal counsel and human resources officials; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under EPA Order 4711.**

**The agency's Office of Counsel maintains a copy of the fact-finding report.**

40.    Was Complainant informed of the outcome?  If yes, how?

**Yes, SA Walton was provided a written determination on her allegation of harassment.**

41.    Was any corrective or preventative action necessary?  If so, what action was taken?

**No. I determined that the conduct described in the information gathered as part of the fact-finding inquiry failed to constitute harassment under EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment.**

42.    If no investigation was conducted, please explain why.

**Not applicable.**

43.    Have you received training on anti-harassment/hostile work environment while employed by agency?  If so, when and what?

**As part of my annual training requirements at EPA's Office of Inspector General, in Fiscal Year 2022, I completed No FEAR Act (Notification & Federal Employee Anti-Discrimination & Retaliation Act) training.**

---

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Affiant's Signature | Date Signed |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **11** | **11** | **2022-0009-R06** |

44. Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation and harassment/hostile work environment? *[If you mentioned any documents in answering your affidavit questions please provide.]*

**I do not have any additional relevant information or documentation. To the extent I mentioned any documents in my answers, those documents are maintained by the agency's Office of Counsel or in the case file of the internal investigation, which is ongoing.**

**[NOTHING FOLLOWS ON THIS PAGE]**

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Marc A. Perez  Digitally signed by Marc A. Perez  Date: 2022.09.13 23:57:37 -07'00' | | 09.13.2022 |

October 2015

# Certification

| Case Number |
| --- |
| **2022-0009-R06** |

I have read the proceeding attached statement, consisting of 11 pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

## Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

## Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of_____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
| --- | --- |
|  |  |

## Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
| --- | --- |
| X | X    09.13.2022 |

Form 2571 October 2015

| From: | Westfall, Garrett |
| To: | Perez, Marc |
| Cc: | "Sean Earle" |
| Subject: | Conduct issue |
| Date: | Friday, January 28, 2022 4:59:00 PM |
| Attachments: | DS Woods MOA Summary 1.28.2022 GJW.docx |
| | W10192020 Review of ▇▇▇▇▇▇ web site MOA ▇▇▇▇▇▇ (002).docx |
| | 10192020 Review of ▇▇▇▇▇▇ web site by Bruce Woods (2).docx |
| | FW ▇▇▇▇▇▇ report.msg |

Good afternoon Marc,

Please find the conduct issue raised to my attention today by ASAC Gurin regarding SA Alisa Walton. Specifically, SA Walton modified a MOA from a SME – Dr. Bruce Woods.  While SA Walton did not change or modify any content, she added highlights (green, blue, pink, and red) to the MOA that then created confusion. More importantly, Dr. Woods did not make the highlights (only yellow highlights).  While even though the addition is highlighted content, I believe it is problematic for an agent to modify, in any way, a deliverable/report from a SME.  Please see the summary from ASAC Gurin.  The first MOA (W10192020...) is the original MOA prepared and provided to SA Walton in October 2020.  The second MOA (10192020...) is the MOA uploaded by SA Walton on 1/27/22.  On a side note, the MOA was not finalized and uploaded until 2022 (see email chain).  I am forwarding this issue to you for your awareness.

Please let me know if you have any questions or need any additional information. Thank you

Garrett J. Westfall
Special Agent in Charge
Western Region Field Office
U.S. Environmental Protection Agency
Office of Inspector General
Office of Investigations
1201 Elm Street, Suite 500
Dallas, TX 75270
(214) 665-6545 (fax)
(214) 665-2249 (office)
(214) 846-9402 (cell)

Summary of MOA Review of ████████████ Website
Assistant Special Agent in Charge Staci Gurin
January 28, 2022

The following memorializes the events that lead to the uploading and review of the above referenced MOA. For the purpose of this memorialization ████████████ is also referenced as D&S.

On December 1, 2021, SA Walton submitted into I2M an MOA with the description "12.1.2021 MOA-D&S Claims." The attachments related to this MOA were uploaded into I2M on December 2, 2021. On December 3, 2021, SAC Garrett Westfall provided feedback on the MOA and attachments for revision, and ASAC Gurin "Resubmitted" the MOA and attachments back to SA Walton in I2M. On December 6, 2021, via a Teams meeting, and December 7, 2021, via email, SAC Westfall provided additional feedback to SA Walton on the MOA for the D&S website review.

On January 3, 2022, ASAC Gurin met with SA Walton for bi-weekly case reviews. The guidance provided for the ████████████ case review by ASAC Gurin stated in part, "Case agent will revise and submit MOA on D&S website review." ASAC Gurin reads guidance entries out loud to each agent prior to submitting guidance entries to make sure the agent agrees with the guidance. SA Walton agreed with the guidance.

On January 19, 2022, ASAC Gurin sent an email to SA Walton to follow-up on outstanding items from case reviews held on January 3, 2022. SA Walton was asked to provide ASAC Gurin with an update of where she was on certain items discussed on January 3, 2022, by the end of the week of January 19, 2022. On January 21, 2022, SA Walton replied to this email stating, "I wrapping up the revision of the MOA and spreadsheet for the 2015-2019 invoices from the thumb drive. I should have that to you here shortly. Once I complete this MOA, I will provide you the ████████████ MOA and the other relevant records on the thumb drive. I revised the other MOA's but got caught up on the MOA for the invoices for 2015-2019 and have not had a chance to go back to them and review to send. I will send them to you shortly as well." ASAC Gurin did not receive the D&S MOA on January 21, 2022, as SA Walton informed ASAC Gurin on January 22, 2022, that another MOA was taking longer than expected.

On January 25, 2022, ASAC Gurin met with SA Walton, via Teams, to review a MOA on another investigation. As part of this meeting, ASAC Gurin inquired as to the status of the D&S website review MOA. SA Walton told ASAC Gurin she was waiting on an MOA from EPA-CID so that she could finish her MOA. *Note: ASAC Gurin discussed with SA Walton on October 27, 2021, to see if CID had an MOA regarding screenshots taken of the S&D Website.* Additionally, SA Walton said that she believed EPA-OIG Chemist Dr. Bruce Woods may have prepared a memo regarding some of the claims made on the D&S website, which may help in answering some of the questions posed by SAC Westfall in his feedback from December 3, 6 and 7, 2021.

On January 25, 2022, ASAC Gurin followed up from the Teams meeting with an email, which stated in part, "Also per our Teams meeting today, you are waiting on additional information from EPA-CID, including a copy of an MOA, in order to complete your MOA with attachments on the ████████████ ████ MOA on the website analysis. Per our conversation, you will provide me with a status update of both the information pending from CID, possible information from Bruce Woods, and the MOA itself by COB Thursday, January 27, 2022." SA Walton replied to this email stating that she agreed with the meeting follow-up summary.

On January 27, 2022, SA Walton sent an email to ASAC Gurin stating in part that "Bruce Woods stated the MOA was not uploaded into I2M. I have uploaded it into I2M."

On January 28, 2022, ASAC Gurin accessed the MOA by Dr. Woods in I2M to review for approval. ASAC Gurin noticed that the MOA was prepared in October 2020. ASAC Gurin also took note of several highlighted items in the report in different colors (i.e., green, blue, pink, red, and yellow) with no key as to what the highlights meant. ASAC Gurin reached out to SAC Westfall, who suggested a Teams meeting be set up with Dr. Woods to get an understanding of the highlighted items.

On January 28, 2022, SAC Westfall and ASAC Gurin met with Dr. Woods via Teams. Dr. Woods explained that when an agent requests assistance involving an MOA, he will draft the MOA and then send the draft to the agent to review for content and understanding. Dr. Woods said that in the past, if he did not hear back from the agent, he would assume the draft was fine, and he would upload the MOA into I2M. Dr. Woods further explained that with the implementation of I2M version two, unless he is staffed to a case, he does not have the ability to upload a report into the system. Dr. Woods said that if he remembered correctly, he sent the MOA to SA Walton for her review, but he never heard back. He could not upload the MOA into the case file, because he had not been staffed to the case. Dr. Woods said he did not do anything with the MOA until SA Walton reached out to him earlier in the week (week of January 24, 2022) requesting a copy of the MOA.

ASAC Gurin shared her screen of the MOA prepared by Dr. Woods of the D&S Website review. ASAC Gurin scrolled through the MOA showing Dr. Woods the MOA with the different colored highlighted areas and asked Dr. Woods to explain what the different colored highlights meant. Dr. Woods told SAC Westfall and ASAC Gurin that he only highlighted a few sections in yellow to emphasize those areas, but he did not add the other colored highlights to the report. Dr. Woods was requested to send the same MOA draft and email to SAC Westfall and ASAC Gurin that he sent to SA Walton in October 2020. Dr. Woods was also requested to send any additional email correspondence he had with SA Walton regarding the MOA.

On January 28, 2022, Dr. Woods provided six email chains with SA Walton regarding the MOA. It appears that SA Walton initiated her request for Dr. Woods' assistance on October 16, 2020. On October 20, 2020, Dr. Woods provided SA Walton with a draft MOA regarding the D&S website review. On the same date, SA Walton replied via email, in part, "Thanks a lot Bruce for your assistance. I will review your MOA and the article you included."

It does not appear that SA Walton corresponded with Dr. Woods again until January 26, 2022, when she sent him an email asking Dr. Woods if he had a finalized copy of the report he sent her in October 2020. Dr. Woods provided the same draft copy from October 2020 back to SA Walton on January 26, 2022. Dr. Woods did note that the address was different on the second report, as he had been instructed since October 2020 to use the Headquarters address on reports, but otherwise, the report was the same.

ASAC Gurin did a visual comparison of the MOA that was uploaded into I2M to the MOA sent to ASAC Gurin directly from Dr. Woods. There were some slight spacing differences in the two reports, and the report from Dr. Woods contained only yellow highlighting; no additional colors were used.

## Certification

I have read the proceeding attached statement, consisting of __17__ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

### Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the __25__ day of __MAY__ , 20 __22__.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

Signature of EEO Complaints Investigator

Signature of Affiant

### Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

Signature of Affiant

Date Signed

x 25 May 22

Form 2571 October 2015

| EEO Investigative Affidavit *(Witness)* | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **1** | **9** | **2022-0009-R06** |

| 1. Affiant's Name (Last, First, MI) **Earle, Sean** | 2. Employing Federal Agency and Office **EPA Office of Inspector General** |
|---|---|

| 3. Position Title **DAIGI** | 4. Grade and Series  GS-15 | 5.Address and Zip +4 61 Forsyth Street Atlanta GA 30303 | 6. Organizational Unit **Office of Investigations** |
|---|---|---|---|

**Privacy Act Notice and Rehabilitation Act Notice**

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

**Response to Complaint**

Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word*)

### *Amended Affidavit*

**CLAIM 5:ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

109.   The Complainant alleged in her amended complaint that she received a Notice of Proposed Removal on or about March 1, 2022 for failing to successfully complete the PIP Complainant was placed on November 10, 2021 and  notified on April 22, 2022, that a decision was made to not substantiate the Removal. Is this true?  Please respond to Complainant's allegation.
   **Answer:** I was not SA Walton's supervisor and have no knowledge if the statement above is true.

110.   Was it your decision to issue the Complainant a Notice of Proposal Removal from her position with the agency?  If so, please give in detail the reason for your decision.
    **Answer:** I had no involvement in the PIP mentioned above, I was not SA Walton's supervisor.

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature **Earle, Sean** | Digitally signed by Earle, Sean Date: 2022.07.25 11:59:39 -04'00' | Date Signed |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **2** | **9** | **2022-0009-R06** |

111. If you did not make the decision, what was your involvement, if any, in this action? Please be specific.
    **Answer:** I had no involvement in this action.

112. If you had no involvement in Complainant being issued the Notice of Proposed Removal, please provide the management official(s) who did. Identify by name, position title, facility address, telephone number and email address.
    **Answer:** SA Walton's supervisor was SAC Garrett Westfall, EPA OIG Dallas, and ASAC Staci Gurin EPA OIG Kansas City.

113. Who concurred with the action to issue the Complainant a Notice of Proposed Removal? Identify by name, position title work location and phone number.
    **Answer:** I am not aware of this information, I was not her supervisor.

114. Did you consult with anyone for guidance and or advice prior to issuing Complainant the Notice of Proposed Removal? If so, identify him/her/them by full name and position and describe his/her/their involvement.
    **Answer:** I was not involved in the issuance of the PIP and did not consult with anyone regarding the issuance of the PIP.

115. How was the Complainant notified (verbally or in writing) of being issued a Notice of Proposed Removal? If verbally, who notified her and when? **If in writing, provide a copy of the written notification**.
    **Answer:** I am unaware of how she was notified, I was not her supervisor.

116. Please explain, if not already done so, why Complainant was issued a Notice of Proposed Removal?
    **Answer:**

117. Was the Complainant given any type of warning prior to being issued the Notice of Proposed Removal? If yes, please explain what type of warning was given and what occurred.
    **Answer:** I do not know if she was given any warning prior to the Notice of Removal. I was not her supervisor.

118. What reason(s) was provided to the Complainant for issuing her a Notice of Proposed Removal?
    **Answer:** I do not know what reasons were provided.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Earle, Sean | Digitally signed by Earle, Sean Date: 2022.07.25 12:00:53 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **3** | **9** | **2022-0009-R06** |

119.  Did the Complainant dispute the reason(s) given? If so, how, and why,
**Answer:** I am unaware of her disputing the reasons given, I was not involved in the PIP process.


120.  What was/is Complainant's current work status as result of the Notice of Proposed Removal and why?
**Answer:** In recent case reviews I had with all field agents, SA Walton is working cases as expected.  I was not informed that her status was different than any other agent, and it was not disclosed to me during our recent case review if her status was anything other than full duty.

121.  What documentation, if any, exists to support allegedly issuing a Notice of Proposed Removal to Complainant?  Please explain and provide a copy of the documentation.
**Answer:** I do not know what documentation exists.  I was not her supervisor nor was I involved in the PIP.

122.  Was Complainant's **race** a factor in your decision when she was allegedly given a Notice of Proposed Removal?
**Answer:** I was not involved in the issuance of a Notice of Proposed Removal to SA Walton, and race is never a factor in my decision making.

If so, explain in detail how the Complainant's **race** was a factor and why.
**Answer:**

123.  Was Complainant's **sex** a factor in your decision when she was allegedly given a Notice of Proposed Removal
?
**Answer:** I was not involved in the issuance of a Notice of Proposed Removal to SA Walton and sex is not a factor in my decision making.

If so, explain in detail how the Complainant's **sex** was a factor and why.
**Answer:**

124.  Was Complainant's **prior EEO activity** a factor in your decision when she was allegedly given a Notice of Proposed Removal?
**Answer:** I was not involved in the decision to issue a Notice of Proposed Removal, I am unaware of any prior EEO activity, nor would that be a factor in any decision I would make.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Digitally signed by Earle, Sean | Date Signed |
|---|---|---|
| Earle, Sean | Date: 2022.07.25 12:02:34 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **4** | **9** | **2022-0009-R06** |

125. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
**Answer:** I would disagree.

If so, explain in detail how the Complainant's **prior EEO activity** was a factor and why.
**Answer:**

126. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were** issued a Notice of Proposed Removal as the Complainant?
**Answer:** No employees I supervise have been issued a Notice of Proposed Removal.

If so, identify each comparator employee by full name, race, sex, position title, type of discipline/infraction issued, date of issuance, and by whom it was issued and concurred. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
**Answer:**

Are you aware of each cited comparator having prior EEO activity? State yes, no, or unknown.
**Answer:**

127. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not** issued a Notice of Proposed Removal as the Complainant?
**Answer:** No employees I supervise were not issued a Notice of Proposed Removal under the same or similar circumstances.

If so, identify each comparator employee by full name, race, sex, position title, and explain why the Notice of Proposed Removal was not issued. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
**Answer:**

Are you aware of each comparator cited having prior EEO activity? State yes, no, or unknown.
**Answer:**

128. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when issuing the Complainant a Notice of Proposed Removal. Explain in detail how each policy and/or contract provision applies.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Earle, Sean | Digitally signed by Earle, Sean Date: 2022.07.25 12:03:16 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **5** | **9** | **2022-0009-R06** |

**Answer:** I was not involved in the decision to issue a Notice of Proposed Removal to SA Walton. I was not her supervisor.

129. **Other than this EEO complaint** are you aware if the Complainant filed any other kind of administrative action/appeal, grievance and/or met with higher level management when Complainant was issued a Notice of Proposed Removal? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
 **Answer:** I am unaware of any other complaint being filed by SA Walton.

**CLAIM 6:  ON MAY 2, 2022, COMPLAINANT WAS INFORMED THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT**

130. Complainant alleged she was informed  that an internal investigation was initiated based on allegations of misconduct. Please respond to Complainant's allegation.
 **Answer:** I was not her supervisor and am unaware of the facts of this internal investigation.

131. Was it your decision to have an internal investigation conducted on Complainant based on allegation of misconduct?  If so, please give in detail the reason for your decision.
 **Answer:** I am not her supervisor and have no input into this investigation.

132. If you did not make the decision, what was your involvement, if any, in this action?
 **Answer:** I have had no involvement in this investigation and have made no decisions in this investigation.

133. If you had no knowledge or involvement in an internal investigation being conducted on Complainant, please identify who did and the reason(s) for doing so.  Provide the management official's name, position title, facility address, telephone number and email address.
 **Answer:** I have no knowledge of the facts of the internal investigation.  Acting AIGI Marc Perez would have requested the opening of the investigation.  His number is 202-603-4861.

134. Who concurred with the action for there to be an internal investigation on Complainant? Identify by name, position title work location and phone number?
 **Answer:**  I was not involved and have no knowledge of who concurred with the action.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Earle, Sean | Digitally signed by Earle, Sean  Date: 2022.07.25 12:03:57 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **6** | **9** | **2022-0009-R06** |

135. Did you consult with anyone for guidance and or advice prior to Complainant being involved in an internal investigation.? If so, identify him/her/them by full name and position and describe his/her/their involvement.
    **Answer:** I was not her supervisor and was not involved in this investigation.

136. Please explain in detail the facts that led up to the internal investigation.
    **Answer:** I am unaware of the facts that led up to this investigation.

137. How was Complainant notified (verbally or in writing) and who notified her regarding the internal investigation? ***If in writing, please provide a copy. If verbally, explain what was said or done.***
    **Answer:** I was not her supervisor and am unaware of how she was notified.

138. When did the (dates- to and from ) internal investigation take place?
    **Answer:** I was not her supervisor and do not have knowledge of the dates.

139. Were you present during the internal investigation? If so, please explain what happened and why.
    **Answer:** I was not present during the internal investigation. I was not her supervisor.

140. Please state what information was to be obtained from the internal investigation.
    **Answer:** I do not know what was obtained from the internal investigation.

141. Please explain why there was an investigation into Complainant's misconduct.
    **Answer:** I was not her supervisor. I do not have information as to why an internal investigation was conducted.

142. Did the Complainant communicate with you and/or any management official(s) her concerns regarding the internal investigation? If so, please explain what was said and response Complainant received.
    **Answer:** The complainant did not communicate with me. I was not her supervisor.

143. Do you have any documentation or evidence to support the internal investigation? If so, what and provide a copy with your affidavit.
    **Answer:** I do not have any documentation or evidence in this matter.

144. Was Complainant given a reason/explanation/justification for the internal investigation of Complainant's misconduct?
    **Answer:** I do not have information concerning this investigation.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Digitally signed by Earle, Sean | Date Signed |
|---|---|---|
| Earle, Sean | Date: 2022.07.25 12:04:30 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **7** | **9** | **2022-0009-R06** |

If so, state the reason/explanation Complainant was given and identify by full name and position the management official(s) who gave her the reason/explanation.
  **Answer:**

If Complainant was given a reason/explanation, did she disagree with it?  If so, explain in detail why.
**Answer:**

145.   What was the outcome of the internal investigation?
**Answer:** I do not know what the outcome was in this investigation.  I was not her supervisor.

146.   Was Complainant's **race** a factor when an internal investigation was initiated based on allegations of misconduct?
**Answer:**  The complainant's race would never be a factor in the initiation of an investigation.

147.   Was Complainant's **sex** was a factor when an internal investigation was initiated based on allegations of misconduct ?
  **Answer:**  The complainant's sex would never be a factor in the initiation of an investigation.

148.  Was Complainant's **prior EEO activity**  was a factor when an internal investigation was initiated based on allegations of misconduct?
  **Answer:** Any prior EEO activity would have no place in determining whether or not to open an investigation.

149.  How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
  **Answer:**  I do not have information concerning the facts of the investigation cited.

150. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were given an internal investigation** as the Complainant?
  **Answer:** I have had no employees under my supervision that were involved in allegations of misconduct as stated in this document.

If so, identify each comparator employee by full name, position title race and sex and explain why they were given an internal investigation. .Provide the name of each employee's supervisor. **Provide copy for each cited comparator.**
**Answer:**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Earle, Sean | Digitally signed by Earle, Sean  Date: 2022.07.25 12:05:05 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **8** | **9** | **2022-0009-R06** |

Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
**Answer:**

151.  Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not** **given an internal investigation** as the Complainant?
 **Answer:** I have not had any employees under my supervision who meet the criteria cited above.

If so, identify each comparator employee by full name, position title race, sex and explain why they were not given an internal investigation.  Provide the name of each employee's supervisor. **Provide copies for each cited comparator.**

Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
**Answer:**

152. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when an internal investigation was initiated based on allegations of misconduct by Complainant. Explain in detail how each policy and/or contract provision applies.  I did not have a role in the initiation of this investigation.  I was not the supervisor of the complainant.

153. **Other than this EEO complaint** are you aware if the Complainant filed any other administrative action/appeal, grievance and/or met with higher level management when Complainant was given an internal investigation? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
 **Answer:**  I am unaware of any other EEO filings by the complainant.

**HARASSMENT/HOSTILE WORK ENVIRONMENT:**

154. Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her?  If so, describe in detail when and what specifically the Complainant told you and what was your response/action?
  **Answer:**  The complainant did not have any conversations with me regarding harassment or allegations of a hostile work environment.  I was not her supervisor.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Digitally signed by Earle, Sean | Date Signed |
|---|---|---|
| Earle, Sean | Date: 2022.07.25 12:05:44 -04'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | 9 | 9 | 2022-0009-R06 |

155. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment?  If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.
   **Answer:**  I am unaware of the complainant bringing this allegation to anyone.

156. Was an investigation conducted into Complainant's allegations of harassment/hostile work environment?  If so, by whom and when?
   **Answer:**  I am unaware of the allegation and whether or not an investigation was conducted.

157. To your knowledge, what was the outcome of the investigation?  Please provide a copy of the report.
   **Answer:**  I have no knowledge of the investigation.

158. Was Complainant informed of the outcome?  If yes, how?
   **Answer:** I do not know if the complainant was informed.  I have no knowledge of the investigation.

159. Was any corrective or preventative action necessary?  If so, what action was taken?
   **Answer:** I do not have any information on whether or not any action was necessary.

160. If no investigation was conducted, please explain why.
   **Answer:** I have no knowledge on whether or not an investigation was conducted.

161. Have you received training, since your last affidavit, on anti-harassment/hostile work environment while employed by the agency?  If so, when and what?
   **Answer:**  I have not received additional training.

*162.* Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation and harassment/hostile work environment?  *[If you mentioned any  documents in answering your affidavit questions please provide.*
   **Answer:**  I have no documents to provide.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed |
|---|---|---|
| Earle, Sean | Digitally signed by Earle, Sean  Date: 2022.07.25 12:06:27 -04'00' | |

October 2015

# Certification

Case Number
## 2022-0009-R06

I have read the proceeding attached statement, consisting of 9_____pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

### Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of_____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | |

### Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | | Date Signed |
|---|---|---|
| X Earle, Sean | Digitally signed by Earle, Sean Date: 2022.07.25 12:10:11 -04'00' | X |

Form 2571 October 2015

| EEO Investigative Affidavit *(Witness)* | Page No. **1** | No. Pages **19** | Case No. **2022-0009-R06** |
|---|---|---|---|

| 1. Affiant's Name (Last, First, MI) **Westfall, Garrett, J.** | | 2. Employing Federal Agency and Office **EPA OIG, OI, Dallas, TX** | |
|---|---|---|---|
| 3. Position Title **Special Agent in Charge** | 4. Grade and Series GS-1811-15 | 5.Address and Zip +4 1201 Elm Street, Suite 500 Dallas, TX 75270 | 6. Organizational Unit **OIG Office of Investigations** |

### Privacy Act Notice and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Response to Complaint

Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required.  Form will auto-create if using Microsoft Word*)

**Please complete the top section of this form, boxes #2 through #6.**

### <u>AMENDED AFFIDAVIT</u>

**CLAIM 5:** **ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

109.  The Complainant alleged in her amended complaint that she received a Notice of Proposed Removal on or about March 1, 2022 for failing to successfully complete the PIP Complainant was placed on November 10, 2021 and  notified on April 22, 2022, that a decision was made to not substantiate the Removal. Is this true?  Please respond to Complainant's allegation.

**Answer:**  Yes, I provided, via email (Exhibit 33), a Notice of Proposed Removal to SA Walton on March 1, 2022, based on the results of the failed PIP, and her inability to improve her performance to a minimally successful level (Exhibit 8).  On April 22, 2022, Thomas Roelke, Deputy Assistant Inspector General for Investigations, Headquarters

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:00:04 -05'00' | Date Signed  6/15/2022 |
|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **2** | **19** | **2022-0009-R06** |

Operations, EPA OIG, Washington, DC, did not substantiate the removal recommendation (Exhibit 30).

**\*\*Please note: certain data within Exhibits/Attachments will be redacted due to active OIG investigations, including case titles/subject names, and or information containing grand jury or Bank Secrecy Act restrictions.\*\***

110.  Was it your decision to issue the Complainant a Notice of Proposal Removal from her position with the agency?  If so, please give in detail the reason for your decision.
    **Answer:** Yes, I made the decision to issue SA Walton a Notice of Proposed Removal, in consultation and concurrence with HRD and OC.  I recommended the action because SA Walton failed to improve her performance to a minimally successful level in the cited critical elements during the 45-day PIP evaluation (Exhibit 8). Please refer to the Notice of Proposed Removal and attached PIP evaluation, which details the reasons for the proposal.

As discussed previously, as an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or electronic case management system (ECMS) chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or lacking in credibility.  During the 45-day PIP evaluation, SA Walton failed to provide accurate, relevant, correctly sourced records, and clear and concise work products.  The tasks assigned during the PIP were relevant, stakeholder requests to be provided to the U.S. Attorney's Office, in the form of discovery. As a management official, I am responsible to ensure OIG work products are relevant, clear, concise, accurate, and supported with facts.  As a result, I do not have confidence that SA Walton can submit accurate, factual work products to internal and external stakeholders.

For example, during the PIP, SA Walton converted another Agency's work product and used the information inaccurately in her self-created attachment and claimed the investigative activity as her own (Exhibit 8 page 100). Specifically, she cut website screen shots taken by an EPA CID agent on December 10, 2020 and pasted the screen shots into a self-created attachment to reference an alleged investigative activity conducted by SA Walton on June 9, 2020; an investigative activity that had never been documented by SA Walton per policy in the ECMS.  While SA Walton stated that this was an error done

_____

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:00:47 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 3 | 19 | 2022-0009-R06 |

inadvertently during the PIP, this example illustrates the lack of improvement in her performance and the potential inaccuracies and integrity concerns in her work products. Had the discrepancies not been identified during management review prior to being provided to an external stakeholder, this error could have affected the case and the reputation of the OIG. Further, the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list.  A Giglio list is a list compiled usually by a prosecutor's office or a law enforcement office containing the names and details of law enforcement officers who have had sustained incidents of untruthfulness, criminal convictions, candor issues, or some other type of issue placing their credibility into question.

111.   If you did not make the decision, what was your involvement, if any, in this action?
 **Answer:**  N/A. See answer to question 110.

112. If you had no involvement in Complainant being issued the Notice of Proposed Removal, please provide the management official who did. Identify by name, position title, facility address, telephone number and email address.
**Answer:** N/A. See answer to question 110.

113. Who concurred with the action to issue the Complainant a Notice of Proposed Removal? Identify by name, position title work location and phone number.
 **Answer:**  The following officials were consulted and concurred with regarding the proposed action: Erik Mabry, HRD, EPA OIG, Boston, MA, (202) 566-2048; Elizabeth Moreira, OC, EPA OIG, Washington, DC, (202) 566-2695; and Lori Ruk, OC, EPA OIG, Washington, DC, (202) 566-1287.

114. Did you consult with anyone for guidance and or advice prior to issuing Complainant the Notice of Proposed Removal? If so, identify him/her/them by full name and position and describe his/her/their involvement.
 **Answer:** Yes.  I consulted and received guidance from Erik Mabry, HRD, EPA OIG; Elizabeth Moreira, OC, EPA OIG, and Lori Ruk, OC, EPA OIG.  Mabry, Moreira, and Ruk provided guidance on drafting and issuing the Notice of Proposed Removal.  At no point was there a concern by HRD or OC that there was insufficient evidence to warrant the proposed action.

115.   How was the Complainant notified (verbally or in writing) of being issued a Notice of Proposed Removal? If verbally, who notified her and when? **If in writing, provide a copy of the written notification**.
 **Answer:**  I notified SA Walton, via email, of the Proposed Removal on March 1, 2022, at approximately 2:31 pm CST (Exhibit 32 & Exhibit 8).  On March 1, 2022, at approximately

_____

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL<br>Date: 2022.06.15 18:01:32 -05'00' | Date Signed  6/15/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 4 | 19 | 2022-0009-R06 |

2:30 pm CST, I conducted a Microsoft (MS) Teams meeting (video conference) with SA Walton to discuss the proposed action. Erik Mabry was present during the MS Teams meeting. During the meeting, I notified SA Walton of the proposed removal and advised her to direct any questions to Mabry. I also advised her to read the proposed removal in detail as it provided information and a timeframe on her response to the decision maker.

116. Please explain, if not already done so, why Complainant was issued a Notice of Proposed Removal?
   **Answer:** See answer to question 110. Please refer to the Notice of Proposed Removal and attached PIP evaluation, which details the reasons for the proposal.

117. Was the Complainant given any type of warning prior to being issued the Notice of Proposed Removal? If yes, please explain what type of warning was given and what occurred.
   **Answer:** I did not provide any warning to SA Walton prior to being issued the Notice of Proposed Removal. I was unaware of any a requirement for prior notification to the complainant, as it was never discussed or advised by HRD and OC. However, in the conclusion section of the PIP, the memorandum explains the possible actions for failure.

118. What reason(s) was provided to the Complainant for issuing her a Notice of Proposed Removal?
   **Answer:** During the meeting on or about March 1, 2022, I informed SA Walton that she was being issued a Notice of Proposed Removal because of her failure to improve her performance in two critical performance elements during the PIP.

119. Did the Complainant dispute the reason(s) given? If so, how, and why,
   **Answer:** I do not recall any dispute provided by SA Walton to me. SA Walton provided a verbal and/or written response to the Notice of Proposed Removal, as part of the PIP process, to the decision official, DAIGI Roelke. I am neither aware of the response nor been given a copy or information regarding the response by SA Walton. On April 22, 2022, DIAGI Roelke did not sustain the removal action of SA Walton (Exhibit 30).

120. What was/is Complainant's current work status as result of the Notice of Proposed Removal and why?
   **Answer:** Prior to, during, and after the PIP/Proposed Removal, SA Walton has remained a GS-1811-13 Special Agent within the OIG, Office of Investigations, Western Region Field Office, Southwest Division, assigned to the Dallas office. SA Walton's current work status has remained unchanged.

121. What documentation, if any, exists to support allegedly issuing a Notice of Proposed Removal to Complainant? Please explain and provide a copy of the documentation.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:02:16 -05'00' | Date Signed 6/15/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 5 | 19 | 2022-0009-R06 |

**Answer:** I notified SA Walton, via email, of the Proposed Removal on March 1, 2022, at approximately 2:31 pm CST (Exhibit 32 & Exhibit 8). The Notice provided evidence to support that SA Walton failed to improve her performance during the PIP to a minimally successful level. The Notice of Proposed Removal, which includes the PIP evaluation, supported my decision to issue the proposed action.

122. Was Complainant's **race** a factor in your decision when she was allegedly given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 202 and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
    **Answer:** No.

    If so, explain in detail how the Complainant's **race** was a factor and why.
    **Answer:** N/A

123. Was Complainant's **sex** a factor in your decision when she was allegedly given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 202 and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
    **Answer:** No

    If so, explain in detail how the Complainant's **sex** was a factor and why.
    **Answer:** N/A

124. How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
    **Answer:** I disagree with above statement that the cited action is a form of harassment. I did not propose and initiate the cited action based on race, sex, religion, national origin, age, disability, or genetic information. I proposed the action for the reasons previously stated. The PIP was not punitive, as she was given the opportunity to illustrate improved performance in several critical elements. Furthermore, SA Walton never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment. As stated previously, in consultation with HRD and OC, I recommended the action because SA Walton failed to improve her performance to a minimally successful level in the cited critical elements during the 45-day PIP evaluation.

    As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:03:04 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | 6 | 19 | 2022-0009-R06 |

legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or first lacking in credibility.

When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance in several performance standards to include product timeliness and accuracy; identification and documentation of relevant records; and poor communication. As her performance could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies observed. Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues and ways to improve her performance and engage SA Walton in communication (Exhibit 10). I repeatedly told her I was open to mentor her to assist in her performance. SA Walton chose not to engage me as a coach/mentor and failed to communicate with me on a regular basis.

125. Was Complainant's **prior EEO activity** a factor in your decision when she was allegedly given a Notice of Proposed Removal for failing to successfully complete the PIP Complainant was placed on November 10, 2021 and notified on April 22, 2022, that a decision was made to not substantiate the Removal?
   **Answer:** No., I have no knowledge or involvement in SA Walton's prior EEO activity.

If so, explain in detail how the Complainant's **prior EEO activity** was a factor and why.
**Answer:** N/A

126. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were** issued a Notice of Proposed Removal as the Complainant?
   **Answer:** I have not supervised any other employees who were in the same or similar circumstances like SA Walton. Other than SA Walton, I have not issued a Notice of Proposed Removal any other employee under my supervision.

If so, identify each comparator employee by full name, race, sex, position title, type of discipline/infraction issued, date of issuance, and by whom it was issued and concurred. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
**Answer:** N/A

Are you aware of each cited comparator having prior EEO activity? State yes, no, or unknown.

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:03:55 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**Answer:** N/A

127. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not** issued a Notice of Proposed Removal as the Complainant?
   **Answer:** I have not supervised any other employees who were the same or similar circumstances like SA Walton. Other than SA Walton, I have not issued a Notice of Proposed Removal any other employee under my supervision.

   If so, identify each comparator employee by full name, race, sex, position title, and explain why the Notice of Proposed Removal was not issued. Provide the name of each employee's supervisor. **Provide copies of the discipline issued to each cited comparator.**
   **Answer:** N/A

   Are you aware of each comparator cited having prior EEO activity? State yes, no, or unknown.
   **Answer:** N/A

128. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when issuing the Complainant a Notice of Proposed Removal. Explain in detail how each policy and/or contract provision applies.
   **Answer:** EPA OIG's policy and procedures for a PIP and related actions are detailed in OIG Supervisor's Guide to Dealing with Poor Performance (Exhibit 6) and OIG Policy & Procedure 313 – Employee Performance Appraisal and Recognition System (Exhibit 7). I initially consulted the OIG Supervisor's Guide, which stated that, "If the supervisor determines that the employee has failed to improve their performance, the supervisor must initiate a performance based action to either reassign, reduce in grade, or remove the employee. The supervisor must consult with OC and HRD prior to taking any action." After the termination of the PIP on or about December 24, 2021, I subsequently consulted and coordinated the proposed action with HRD and OC. OC reviewed the proposed action for legal sufficiency.

129. **Other than this EEO complaint** are you aware if the Complainant filed any other kind of administrative action/appeal, grievance and/or met with higher level management when Complainant was issued a Notice of Proposed Removal? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
   **Answer:** I am unaware whether SA Walton filed an appeal or an administrative grievance for being issued a Notice of Proposed Removal.

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:05:11 -05'00' | Date Signed 6/15/2022 |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 8 | 19 | 2022-0009-R06 |

**CLAIM 6:  ON MAY 2, 2022, COMPLAINANT WAS INFORMED ME THAT AN INTERNAL INVESTIGATION WAS INITIATED BASED ON ALLEGATIONS OF MISCONDUCT BY COMPLAINANT**

130. Complainant alleged she was informed  that an internal investigation was initiated based on allegations of misconduct by you (Garrett). Please respond to Complainant's allegation.

**Answer:** I can't attest to what SA Walton was informed, as I was not directly involved in any interview with SA Walton regarding the internal investigation.

I referred possible misconduct allegations involving SA Walton to HRD and OC as early as October 2021 (Exhibit 1).  Based on consultation with HRD and OC on several occasions, they opined that any possible conduct related issues could not be addressed until the full PIP and possible recommending action were resolved.  Accordingly, the conduct issues were tabled until the PIP action, complainant response, and decision were concluded.  However, during subsequent managerial discussions with Acting AIGI Marc Perez and DAIGI Sean Earle as early as November 2021, Acting AIGI Perez decided to initiate an internal investigation, directed by the Office of Investigations' Eastern Region Field Office, based on two matters that I brought to his attention.  I did not make the decision to initiate an internal investigation but relayed my concerns and related relevant documents/evidence to Acting AIGI Perez and DAIGI Earle regarding several alleged misconduct issues.  While I was not involved in the investigation, the case was investigated by SA Paul Brezinski, EPA OIG, Philadelphia, PA, and Joey Campbell, EPA OIG, Atlanta, GA.  I had no visibility or oversight of the case, including being restricted from viewing the case in the ECMS.  Accordingly, I had no detailed knowledge of the investigative plan, steps taken, or findings.

The internal investigation of SA Walton was derived based on four referrals from me – 1) the circumstances surrounding the loss of computer evidence in the Dallas office; 2) concerns with the possible inflation of SA Walton's Law Enforcement Availability Pay (LEAP) hours to achieve the required 2.0 FY21 LEAP average; 3) the modification and manipulation of the case chronology log in the ECMS, including my supervisory case review, to support a previously unsupported investigative activity; and 4) the modification of another (separate case and occurrence than No. 3) case chronology log in the ECMS to support a previously undocumented investigative activity, which was later reported falsely after the PIP. Please note, based on my knowledge, the last two misconduct allegations were added later during the investigation after being discovered, as described below.  I also referred a fifth (5) allegation concerning the modification of a subject matter expert (SME) report without the SME's knowledge, but it was not included, to my knowledge, in the internal investigation.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature    GARRETT WESTFALL   Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:39:11 -05'00' | Date Signed  6/15/2022 |
|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **9** | **19** | **2022-0009-R06** |

On or about November 10, 2021, I briefed Acting AIGI Perez on the status of the WRFO, including the loss of civilian computer in evidence discovered in June 2021 in the Dallas office.  Acting AIGI Perez requested records related to the loss of the computer (Exhibit 34). During the briefing with Acting AIGI Perez, I recommended an internal investigation into the circumstances and reasons as to why the computer was lost.  An investigation would include possible misconduct or dereliction of duty by officials with the Electronic Crimes Division and SA Walton, as she was the evidence custodian at the time in the Dallas office.  SA Walton did not adequately conduct a thorough evidence inventory in 2019 and 2020 sufficient to discover the loss and incorrectly reported that the contents of the evidentiary items, including the computer, were verified during the above inventories.

On or about November 15, 2021, I had a discussion with Acting AIGI Perez and DAIGI Earle regarding concerns that I had with SA Walton's final LEAP average for FY21.  Acting AIGI requested that I forward him background and related records regarding SA Walton's FY21 LEAP average.  On November 15, 2021, I sent records related to her LEAP average to DAIGI Earle (Exhibit 35). Specifically, I believed that SA Walton may have inflated her LEAP hours worked prior to the fiscal year end to meet the annual LEAP requirement.  While SA Walton reported 11.5 case related LEAP hours between September 26, 2021 and September 30, 2021, there were no documented work products or chronology entries in the ECMS by SA Walton to account for the reported time. During the mid-year evaluation on or about April 12, 2021, I notified SA Walton of her need to address and increase her LEAP hours based on the average at the time – 1.68 hours (Exhibit 1).

On or about January 6, 2022, I conducted a MS Teams meeting with Acting AIGI Perez and DAIGI Earle regarding concerns that SA Walton allegedly manipulated the case chronology log in the electronic case management system (ECMS), including my supervisory case review, to support a previously unsupported investigative activity.  On January 8, 2022, I sent records related to the alleged conduct to Acting AIGI Perez and DAIGI Earle (Exhibit 36).  These records showed that without knowledge or approval of management, SA Walton allegedly modified two previous chronology log entries in the ECMS to support a revised closing report submitted by SA Walton after management feedback on December 22, 2022.  These unapproved modifications were done five months after original entry and conflicted with a previously approved memorandum of the same activity in the ECMS. The alleged activity included the manipulation to a supervisory case review (i.e., a chronology entry entered by me to document the bi-weekly management review of the case) entered the ECMS on June 27, 2021. The case closing report submitted by SA Walton remains unapproved, as I believe the report to include false information, in direct contradiction to previous statements and work products submitted by SA Walton. In my meeting with Acting AIGI Perez and DAIGI Earle on or about January 6, 2022, I recommended the investigation of the alleged

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:06:32 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| **10** | **19** | **2022-0009-R06** |

misconduct by SA Walton as the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list.

On or about May 3, 2022, I discussed my concerns with Acting AIGI Perez regarding the modification of another case chronology log by SA Walton under a different case, in which the investigative activity was previously undocumented by SA Walton. Acting AIGI Perez directed me to refer the matter to SA Brezinski to possibly include in the internal investigation. On or about May 3, 2022, I discussed the alleged conduct with SA Brezinski and sent him a summary on May 3, 2022, prepared by ASAC (Exhibit 37), and related support records on May 6, 2022 (Exhibit 38). These records showed that without knowledge or approval from management, SA Walton allegedly modified a previous chronology log entry to support a revision to a memorandum, in which a specific investigative activity was never documented by SA Walton. The unapproved modification was done several months after original entry and conflicted with previous statements and submissions of work products by SA Walton. The final work product submitted by SA Walton remains unapproved, as I believe the report to include false information, in direct contradiction to previous statements and work products submitted by SA Walton. In my meeting with Acting AIGI Perez on or about May 3, 2022, I recommended the investigation of the alleged misconduct by SA Walton as the conduct represented serious integrity concerns that could have ramifications of SA Walton's ability to testify under oath, per Giglio vs. United States, as the conduct could result in her being placed on a Giglio list.

On or about January 28, 2022, I discussed and forwarded concerns and related support records to Acting AIGI Perez and DAIGI Earle regarding SA Walton's alleged modification of a SME report without the SME's knowledge and approval (Exhibit 39). While I referred the matter to Acting AIGI Perez for possible inclusion into the internal investigation, I do not believe the issue was included, as Acting AIGI did not want to include so many issues that it downplayed the severity of the other issues. I referred the matter as the alleged conduct could have detrimental effects on the case and the credibility and reputation of the SME, as they may be called to testify to the accuracy and modifications to the report, for which they had prior knowledge of.

131. Was it your decision for an internal investigation for Complainant based on allegation of misconduct? If so, please give in detail the reason for your decision.
    **Answer:** No. I did not make the decision to initiate an internal investigation but relayed my concerns and related documents/evidence to Acting AIGI Perez and DAIGI Earle regarding several allegations of misconduct issues involving SA Walton. I was excluded and was not involved in the internal investigation, including being restricted from viewing

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---------------------|--|------------------------|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:08:29 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **11** | **19** | **2022-0009-R06** |

the case in the ECMS.  Accordingly, I had no detailed knowledge of the investigative plan, steps taken, or findings of the internal investigation.

132.  If you did not make the decision, what was your involvement, if any, in this action?
  **Answer:**  See answer to question 130 & 131.

133. If you had no knowledge or involvement in Complainant being given an internal interview, please identify who did and the reason(s) for doing so.  Provide the management official's name, position title, facility address, telephone number and email address.
  **Answer:** As I was excluded from involvement and oversight of the internal investigation, I had no direct involvement in the internal interview, other than coordination with the interviewing agents for EPA Region 6 entry.  The interviewing agents did not have the respective key cards/elevator badge to gain access to the interview location in the Dallas office.  In addition, the case agent, SA Paul Brezinski, EPA OIG, Philadelphia, PA, informed me that they intended to take SA Walton's EPA government-owned laptop computer and requested that I obtain a replacement laptop from IT.  I secured a replacement laptop computer for SA Walton in May 2022, from the OIG IT department.  Accordingly, on the day of the interview, May 25, 2022, I coordinated office entry and provided a replacement computer for SA Walton to SA Brezinski, and Joey Campbell, EPA OIG, Atlanta, GA.  Management officials with involvement in the interview – (possibly) ASAC Marcella Phelps, EPA OIG, Washington, DC, (202) 380-6395, phelps.marcella@epa.gov; Acting AIGI Marc Perez, EPA OIG, Seattle, WA, (202) 603-4861, perez.marc@epa.gov; and DAIGI Sean Earle, EPA OIG, Atlanta, GA, (404) 562-9865, earle.sean@epa.gov.

134.  Who concurred with the action for there to be an internal investigation for Complainant?  Identify by name, position title work location and phone number?
  **Answer:** Acting AIGI Marc Perez, EPA OIG, Seattle, WA, (202) 603-4861; and DAIGI Sean Earle, EPA OIG, Atlanta, GA, (404) 562-9865.

135.  Did you consult with anyone for guidance and or advice prior to Complainant  being involved in an internal investigation.? If so, identify him/her/them by full name and position and describe his/her/their involvement.
  **Answer:** I have brought the misconduct allegations to the attention of both Eric Mabry, HRD, and Lori Ruk, OC, for guidance. Based on consultation with HRD and OC, they opined that any conduct related issues could not be addressed until the full PIP and possible action were resolved.

136.  Identify by full name, position title and work location the management official(s) who  was responsible for the internal investigation.  Please describe each manager's role in the decision.

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:10:27 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **12** | **19** | **2022-0009-R06** |

**Answer:**
- SAC Garrett J. Westfall, EPA OIG, Dallas, TX.  I coordinated and referred the misconduct allegations to HRD, OC, and OI Senior Leadership (Acting AIGI Perez/DAIGI Earle).
- ASAC Staci Gurin, EPA OIG, Kansas City, KS. ASAC Gurin observed four of the misconduct allegations and provided support records on two of the allegations (No. 4 & 5 as described in Question No. 130).
- Acting AIGI Marc Perez, EPA OIG, Seattle, WA. One of two senior OI leaders that decided the alleged conduct warranted an internal investigation.
- DAIGI Sean Earle, EPA OIG, Atlanta, GA. One of two senior OI leaders that decided the alleged conduct warranted an internal investigation.

137. Please explain in detail the facts that led up to the  internal investigation.
   **Answer:** Please see answer to Question 130.

138. How was Complainant notified (verbally or in writing) and who notified her regarding the internal investigation? ***If in writing, please provide a copy.  If verbally, explain what was said or done.***
   **Answer:** I am unaware how SA Walton was notified of the internal investigation.  I am aware the investigative agents, SA Campbell and SA Brezinski, attempted to schedule an interview with her and her attorney in early December 2021, but the interview was delayed until May 25, 2022.

139. When did the (dates- to and from ) internal investigation take place?
    **Answer:** Unknown.  I have no specific knowledge of the timeframe of the internal investigation.

140. Were you present during the internal investigation?  If so, please explain what happened and why.
   **Answer:** No. I have been excluded from the internal investigation and have not been present during the investigation or any interviews conducted. I have no oversight role as an OI manager of the investigation and have been restricted from access in the ECMS of the case.

141. Please state what information was to be obtained from the internal investigation.
   **Answer:** Unknown.  I have not been briefed or provided information on the planned investigative steps or subsequent findings of the internal investigation.

142. Please explain why there was an investigation into Complainant's misconduct.
   **Answer:** Please see response to Question 130.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:13:01 -05'00' | Date Signed  6/15/2022 |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 13 | 19 | 2022-0009-R06 |

143. Did the Complainant communicate with you and/or any management official(s) her concerns regarding the internal investigation? If so, please explain what was said and response Complainant received.
   **Answer:** SA Walton has not communicated with me any aspect of the internal investigation, including her concerns. I am unaware of any communication by SA Walton another management official on her concerns regarding the internal investigation.

144. Do you have any documentation or evidence to support the internal investigation? If so, what and provide a copy with your affidavit.
   **Answer:** Please see response to question 130 and related Exhibits 34-39 for documentation and evidence to support the alleged conduct referrals I made to Acting AIGI Perez and DAIGI Earle.

   For clarification, I do not have documentation of the internal investigation.

145. Was Complainant given a reason/explanation/justification for the internal investigation of Complainant's misconduct?
   **Answer:** Unknown, I have not communicated with SA Walton regarding the internal investigation.

   If so, state the reason/explanation Complainant was given and identify by full name and position the management official(s) who gave her the reason/explanation.
   **Answer:** Unknown

   If Complainant was given a reason/explanation, did she disagree with it? If so, explain in detail why.
   **Answer:** Unknown

146. Was Complainant's **race** a factor when an internal investigation was initiated based on allegations of misconduct?
   **Answer:** No. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton. My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. SA Walton's race was not a factor when I made the referrals.

147. Was Complainant's **sex** was a factor when an internal investigation was initiated based on allegations of misconduct?
   **Answer:** No. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton. My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. SA Walton's sex was not a factor when I made the referrals.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed 6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:15:40 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **14** | **19** | **2022-0009-R06** |

148.  Was Complainant's **prior EEO activity** was a factor when an internal investigation was initiated based on allegations of misconduct?
   **Answer:** No., I have no knowledge or involvement in SA Walton's prior EEO activity. For clarification, I did not authorize or direct that an internal investigation be initiated involving SA Walton.  My involvement included the referral of possible misconduct to Acting AIGI Perez and DIAGI Earle for possible action. Since I have no knowledge of SA Walton's prior EEO activity, the said activity was not a factor when I made the referrals.

149.  How do you respond to Complainant's allegation that the cited action in this claim is a form of harassment against her?
   **Answer:** I disagree with above statement that the cited action is a form of harassment. I did not refer the alleged misconduct involving SA Walton based on race, sex, religion, national origin, age, disability, or genetic information.  Furthermore, SA Walton never made any harassment claims or reported to me that she felt she was being harassed or there was a hostile work environment.

As an EPA OIG agent, an agent's work product is relied upon by both internal and external stakeholders to the government to include the Agency, prosecutors, judges, victims, and the subjects of our investigations. It is imperative that all work products be accurate, including information provided to prosecutors to support criminal or civil prosecutions. In short, case work products, whether a memorandum or ECMS chronology log entry are legal documents open to discovery, and subsequent review, examination, and suppression. Reliance on work products has real world effects to include taking away someone's civil liberties and livelihood. Products that contain factual errors or discrepancies could result in, for example, a criminal or civil case being dismissed if the underlying statements in the work products are later determined to be inaccurate or first lacking in credibility.

When I began as a first-line supervisor in approximately July 19, 2020, I immediately began to see that SA Walton exhibited poor performance, to include possible misconduct concerns. As her performance and conduct could have material effects on her cases and the integrity and credibility of the OIG, I had a duty to address the performance deficiencies and misconduct observed.  Accordingly, I began coordination with HR and OC in as early as October 13, 2020, on performance and conduct related issues (Exhibit 10).

150. Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were given an internal investigation** as the Complainant?
   **Answer:**  I have not supervised any other employees who were in the same or similar circumstances like SA Walton.  Other than SA Walton, I have not referred allegations of

_____

_____
**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:18:16 -05'00' | Date Signed  6/15/2022 |
|---|---|---|---|

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **15** | **19** | **2022-0009-R06** |

misconduct, which resulted in an internal investigation of any other employee under my supervision.

If so, identify each comparator employee by full name, position title race and sex and explain why they were given an internal investigation. .Provide the name of each employee's supervisor. **Provide copy for each cited comparator.**
**Answer:** N/A

Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
**Answer:** N/A

151.  Within the past two years were there other employees under your supervision and with the same or similar circumstance as the Complainant who **were not given an internal investigation** as the Complainant?
**Answer:**  I have not supervised any other employees who were in the same or similar circumstances like SA Walton.  Other than SA Walton, I have not referred allegations of misconduct, which resulted in an internal investigation of any other employee under my supervision.

If so, identify each comparator employee by full name, position title race, sex and explain why they were not given an internal investigation.  Provide the name of each employee's supervisor. **Provide copies for each cited comparator.**

Are you aware of each cited comparator having prior EEO activity? If so, when, and how did you become aware?
**Answer:**  N/A

152. Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when an internal investigation was initiated based on allegations of misconduct by Complainant. Explain in detail how each policy and/or contract provision applies.
**Answer:**  I did not decide to initiate the internal investigation.  I did not rely upon any policies in initiating an internal investigation, as I only referred allegations of misconduct to Acting AIGI Perez and DAIGI Earle.

There are multiple OIG procedures, which I applied as criteria when evaluating SA Walton's alleged misconduct in drafting the referrals, including:

- Procedure 206: Case Administration – This procedure outlines the specific guidelines, expectations, and timeframes related to case work (Exhibit 11). Section

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:20:34 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **16** | **19** | **2022-0009-R06** |

3.1 outlines general investigative standards such as any investigative product should be complete, concise, accurate and objective; and communicate the pertinent facts in clear, simple language. Section 4.1 outlines requirements for the official case file in that all investigative activity, both exculpatory and incriminating, should be recorded in the official investigative file.

- Procedure 207: Interviews, Advisement of Right, Oaths, Statements and Record Reviews – This procedure outlines specific guidelines, expectations, and requirements for conducting interviews, advisement of rights, documenting interviews and record reviews, and obtaining statements (Exhibit 12). Section 5.3 outlines that the agent report an interview in a memorandum of activity within 10 days from the date of the interview. Section 7.2 outlines that record reviews will be similarly written within 10 days from the activity.

- Procedure 211: Physical and Documentary Evidence – This procedure outlines the specific guidelines, expectations, and requirements regarding the receipt, custody, and disposition of evidence as an agent, as well as an evidence custodian (Exhibit 13). As SA Walton was an evidence custodian during the rating period, this procedure was used to evaluate her possible misconduct in a collateral duty.

- Procedure 223: Investigative Reports – this procedure outlines the specific guidelines, expectations, and requirements in preparing investigative reports (Exhibit 15). Section 2.1 provides the following report requirements, pertinent to SA Walton's performance:

  - All investigative reports will be complete, clear, concise, accurate and logically organized, and communicate the pertinent facts in clear, simple language. Unnecessary, obscure and confusing language should be avoided.
  - The report will contain facts discovered during the investigation, such as those learned during interviews, record reviews, searches, surveillances or other investigative activities. The report will not include any information that was not obtained during the course of the investigation.
  - Irrelevant material will not be included in investigative reports.
  - Investigative reports will address all aspects of the allegations and no issues will be left unaddressed.
  - All statements in the investigative report will be supported by exhibits. When an exhibit is referenced, the reader will be directed to the specific page and/or paragraph of the exhibit.
  - Investigative reports will contain the necessary supporting information so the reader does not have to make computations, question how amounts were determined, or review voluminous documents.
  - Tables, schedules or charts may be included in the report to clearly present information as long as they are supported by and referenced to the appropriate exhibits.

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL   Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:23:02 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet)** | **17** | **19** | **2022-0009-R06** |

Procedure 218: Law Enforcement Availability Pay – this procedure outlines the specific guidelines, expectations, and requirements in working and reporting LEAP hours (Exhibit 40). Section 5.3 outlines the information and required documentation for searches based on consent.

153. **Other than this EEO complaint** are you aware if the Complainant filed any other administrative action/appeal, grievance and/or met with higher level management when Complainant was given an internal investigation? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
   **Answer:** I am unaware of any appeal or grievance based on the internal investigation.

## HARASSMENT/HOSTILE WORK ENVIRONMENT:

154. Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her?  If so, describe in detail when and what specifically the Complainant told you and what was your response/action?
   **Answer:** No.  SA Walton never told me in verbal or written form that my actions constituted harassment and/or a hostile work environment.

155. Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment?  If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.
   **Answer:** On March 22, 2022, I was notified that I was to be interviewed as part of EPA Order 4711, Procedure for Addressing Allegations of Workplace Harassment, regarding harassment in the workplace.  Until that notification, I had never been apprised of any allegations regarding my actions being perceived as harassment or a hostile work environment.  I have no background on the complaint provided by SA Walton and what official she provided the complaint to and when.  On March 24, 2022, I was interviewed by the fact finder.  The only harassment alleged, based on the line of questioning, was a conversation I had with SA Walton regarding evidentiary issues in the Dallas evidence room on August 24, 2021, during an evidence inventory. Please note, that there were two evidence inventories conducted by SA Walton in FY 2021 – August 24, 2021 and September 23, 2021.  I was NOT present during the evidence inventory on August 24, 2021; the alleged dated of the harassment.  I was present for the inventory on September 23, 2021. Please see my notes of the interaction with SA Walton on September 23, 2021 (Exhibit 1).

156. Was an investigation conducted into Complainant's allegations of harassment/hostile work environment?  If so, by whom and when?

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:25:18 -05'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 18 | 19 | 2022-0009-R06 |

**Answer:**  Please see response to Question 155. I do not have detailed knowledge or specifics as the scope, timeframe, or other information to the EPA Order 4711 investigation.  The fact finder was Mark Miller, Investigative Attorney, Administrative Investigations Directorate, EPA OIG.

157. To your knowledge, what was the outcome of the investigation?  Please provide a copy of the report.
   **Answer:** I do not have a copy of the EPA Order 4711 investigative report, nor was I provided details of the findings.  However, I received a memorandum from Acting AIGI Perez on May 3, 2022, that stated "I reviewed the fact-finding results; consulted with the agency's legal counsel and HR official; and concluded that the conduct described in the information gathered as part of the fact-finding inquiry fails to constitute harassment under EPA Order 4711. *See* EPA Order 4711, Sections IV(A), (K)." (Exhibit 29).

158. Was Complainant informed of the outcome?  If yes, how?
   **Answer:** I am unaware on whether SA Walton was informed of the outcome.

159. Was any corrective or preventative action necessary?  If so, what action was taken?
   **Answer:** I am unaware of any action taken.

160. If no investigation was conducted, please explain why.
   **Answer:** An investigation was conducted, but details of the investigation and related records are in the custody of the EPA OIG Administrative Investigations Directorate.

161. Have you received training, since your last affidavit, on anti-harassment/hostile work environment while employed by the agency?  If so, when and what?
   **Answer:** My initial affidavit for this EEO action was submitted on June 14, 2022.  I have not received any training on anti-harassment/hostile work environment since the initial submittal on June 14, 2022.

   My last recorded anti-harassment training – Anti-Harassment Procedures Training for EPA Employees, August 11, 2020.  I have had other managerial training, which included harassment/hostile work environment training as part of the curriculum, such as the Office of Mission Support-Labor and Employee Relations All-Day Basic Supervisor Training, February 9, 2021.

162. *Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation, and harassment/hostile work environment?  **[If you mentioned any  documents in answering your affidavit questions please provide.***
   **Answer:** No.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:27:07 -05'00' | |

October 2015

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit (Continuation Sheet***)* | **19** | **19** | **2022-0009-R06** |

**I provided an extensive number of relevant and related source documents (Exhibits 33-40) as inclusive to this amended affidavit, and cited related documents from the prior affidavit (Exhibits 1-32). This amended affidavit is incomplete without the exhibits and should not be included in any report of investigation or referral without the referenced exhibits and previously submitted affidavit.**

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Date Signed  6/15/2022 |
|---|---|---|
| | GARRETT WESTFALL  Digitally signed by GARRETT WESTFALL  Date: 2022.06.15 18:29:20 -05'00' | |

October 2015

# Certification

I have read the proceeding attached statement, consisting of 19 pages with 8 Exhibits, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

## Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the A g e n c y or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

## Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the _____ day of_____, 20_____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
|  |  |

## Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | | Date Signed |
|---|---|---|
| X  GARRETT WESTFALL | Digitally signed by GARRETT WESTFALL Date: 2022.06.15 18:55:10 -05'00' | 6/15/2022 |

Form 2571 October 2015

| From: | Westfall, Garrett |
|---|---|
| To: | "Sean Earle" |
| Subject: | FW: LEAP certification for FY21 |
| Date: | Monday, November 15, 2021 12:24:00 PM |
| Attachments: | PMA PP1 Screenshot 10.5.21.pdf |
| | PMA LEAP-Walton-FY21 10.7.21.pdf |
| | PMA LEAP-Walton-FY21 10.12.21.pdf |
| | AWALTON fy21 LEAP Cert and PMA Report 10.19.2021.pdf |
| | PMA Screeen shot PP1 Walton.11.15.21.pdf |

Sean,

Here are the Allegations regarding LEAP for FY21:

It is alleged that Special Agent Alisa Walton, EPA OIG, Region 6, Dallas Office, inflated her Law Enforcement Availability Pay (LEAP) hours prior to submission of her FY21 annual certification to ensure she attained the average of 2.0 hours per day, as required under Office of Investigations Procedure No. 218.   While SA Walton had not yet completed and certified her time and LEAP hours for Pay Period 1 for FY22 (which includes the last week in FY21), she had not logged in any LEAP hours as of October 5, 2021, and October 12, 2021 (as of the morning).  On October 12, 2021, at 11:14 AM CST, ASAC Staci Gurin sent an email to Southwest Division agents requesting their submittal of the annual LEAP certification.  It is alleged that the certification requested prompted SA Walton to add the LEAP hours (10.25 from 9/26-9/28) to boost her average to over 2.0 (2.03) to report on the certification.  She later added some additional LEAP hours to the week in question (13.50 from 9/26-9/30), that ended her LEAP average at 2.05, as cited on her annual certification and PMA (submitted and approved on 10/14/21).  Accordingly, it is believed that SA Walton may have inflated her hours worked in an effort to meet the annual LEAP requirement.   While work products do not always correspond to the hours associated with a case, 6 LEAP hours were attributed to the ▮▮▮▮▮▮▮▮ case, and 5.5 LEAP hours were attributed to ▮▮▮▮▮▮▮ case by SA Walton between 9/26-9/30/2021.  A review of I2M disclosed no MOAs or chron entries by SA Walton surrounding the questioned days on either case.

Please let me know if you need any further information. I included the original email & attachments as background.


Garrett J. Westfall
Special Agent in Charge
Western Region Field Office
U.S. Environmental Protection Agency
Office of Inspector General
Office of Investigations
1201 Elm Street, Suite 500
Dallas, TX 75270
(214) 665-6545 (fax)
(214) 846-9402 (cell)

**From:** Westfall, Garrett
**Sent:** Tuesday, October 12, 2021 7:32 PM
**To:** Mabry, Rufus <Mabry.Rufus@epa.gov>
**Cc:** Lee, Ellen <Lee.Ellen@epa.gov>; Gurin, Staci <gurin.staci@epa.gov>
**Subject:** LEAP certification for FY21

Erik

I am seeking guidance on how to address this issue with Alisa, or whether we are going to include it in the proposed PIP or if it is something I should not be addressed as this point because she technically has not reported her time/LEAP certification?

Every year Special Agents have to certify to their annual average of LEAP for the FY end.  SA Walton throughout the FY has been below the 2.0 average and has been reminded of her responsibility to get her average up on multiple occasions by myself and also ASAC Chris Huntington.  At mid-year, her LEAP average was at 1.68, which I specifically addressed with her.  This year, the average would include time charges associated with PP 1, ending last week (10/9) so Agents technically have through this week to get the hours in and submitted to their supervisor.  Supervisors have the ability to view Agents' timesheets in draft form prior to formal submittal.  As of last week and this morning (10/12), SA Walton had not reported (although it is technically in draft form until submittal to her supervisor) any LEAP associated with 9/26-9/30 (please see the snapshots of the reports attached), thus resulting in an average balance below requirements of 2.0 (**1.97**).  As shown in the above screenshot on 10/5 (and it was the same this morning as verified by SAC Westfall and ASAC Gurin), SA Walton had not completed any LEAP hours for 9/26-9/30 even though she had completed her regular hours for the week for 9/26 previously.  On October 4, 2021, ASAC Gurin sent an email requesting that all agent certification for the year to be completed, including the LEAP certification.  On October 12, 2021, at 11:14 AM CST, ASAC Gurin has sent an email to SW Division agents requesting their submittal of the annual LEAP certification.  We believe this prompted SA Walton to add the LEAP hours (**10.25 from 9/26-9/28**) to boost her average to over 2.0 (**2.03**) to report on the certification.  At this time, I am questioning the accuracy of these newly added LEAP hours (although technically not reported yet).

Accordingly:
- Is this even an issue that we need to address at this point (I assume it is)?
- Do we wait until she completed the certification/submitted the timesheet to address the issues?
- What can I or Staci request of her regarding the legitimacy of these hours?
- Can we ask for support records to show she in fact worked these LEAP hours, especially the Sunday hours?
- At what point does this need to be looked at by someone other than her supervisors (i.e., I would generally pull IP or VPN timeframes to see if she was on during the after-hours, but that would be an investigation, so I am not sure where the line is, if that makes sense.)

Any guidance would be appreciated.  Thank you

Garrett J. Westfall
Special Agent in Charge
Western Region Field Office
U.S. Environmental Protection Agency
Office of Inspector General
Office of Investigations
1201 Elm Street, Suite 500
Dallas, TX 75270
(214) 665-6545 (fax)
(214) 665-2249 (office)
(214) 846-9402 (cell)

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## OFFICE OF INSPECTOR GENERAL
1301 CONSTITUTION AVE, NW
WASHINGTON, DC 20004

LAW ENFORCEMENT AVAILABILITY PAY
ANNUAL CERTIFICATION

---

EMPLOYEE CERTIFICATION

---

I, Alisa Walton                                  , have read the requirements for
(Print Name of Special Agent)

availability pay as authorized by 5 U.S.C. § 5545a and set forth in OIG Policy 218.

For LEAP Year 20 21, which started October 1, 20 20 and ended September 30, 20 21, I certify
that I have met the requirement to perform an annual average of 2 hours of unscheduled duty per
regular work day. For LEAP Year 20 21 my annual average was 2.05.

For LEAP Year 20 22, which started October 1, 20 21 and ends September 30, 20 22, I certify
that I expect to perform unscheduled duty sufficient to meet the requirement of an annual average
of 2 hours of unscheduled duty per regular work day.

_Alisa Walton_                                   October 14, 2021
(Signature of Special Agent)                     (Date)

---

SUPERVISOR CERTIFICATION

---

I, Staci Gurin                                   , have read the requirements for availability
(Print Name of Supervisor)

pay as authorized by 5 U.S.C. § 5545a and set forth in OIG Policy 218.

I certify that the above-named Special Agent met the requirement to perform an annual average of
2 hours of unscheduled duty per regular work day for LEAP Year 20 21. His/her annual average
was 2.05.

For LEAP Year 20 22, I certify that the above Special Agent is expected to perform unscheduled
duty sufficient to meet the requirement of an annual average of 2 hours of unscheduled duty per
regular work day.

                                                 10/19/2021
(Signature of Supervisor)                        (Date)

# Project Management Actuals

October 14, 2021

LEAP Statistics FY2021

**PP27:  27-Sep-20 - 10-Oct-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 6.00 | 4 00 | 0.67 |

**PP1:  11-Oct-20 - 24-Oct-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 19.00 | 2.71 |

**PP2:  25-Oct-20 - 07-Nov-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 4.00 | 10.75 | 2.69 |

**PP3:  08-Nov-20 - 21-Nov-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 14.50 | 2.07 |

**PP4:  22-Nov-20 - 05-Dec-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 15.75 | 1.97 |

**PP5:  06-Dec-20 - 19-Dec-20**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 18.75 | 2.08 |

**PP6:  20-Dec-20 - 02-Jan-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 0 | 0 | 0 |

**PP7:  03-Jan-21 - 16-Jan-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 15.50 | 1.94 |

**PP8:  17-Jan-21 - 30-Jan-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 16.25 | 2.03 |

**PP9:  31-Jan-21 - 13-Feb-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 11.00 | 1.57 |

**PP10: 14-Feb-21 - 27-Feb-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 3.00 | 1.75 | 0.58 |

**PP11: 28-Feb-21 - 13-Mar-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 13.00 | 1.30 |

**PP12: 14-Mar-21 - 27-Mar-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 6.75 | 0.84 |

**PP13: 28-Mar-21 - 10-Apr-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 24.25 | 2.69 |

**PP14: 11-Apr-21 - 24-Apr-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 24.75 | 2.75 |

**PP15: 25-Apr-21 - 08-May-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 19.00 | 1.90 |

**PP16: 09-May-21 - 22-May-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 6.00 | 14.50 | 2.42 |

**PP17: 23-May-21 - 05-Jun-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 17.00 | 2.13 |

**PP18: 06-Jun-21 - 19-Jun-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 19.00 | 2.11 |

**PP19: 20-Jun-21 - 03-Jul-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 4.00 | 8.00 | 2.00 |

**PP20: 04-Jul-21 - 17-Jul-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 13.50 | 1.50 |

PP21: 18-Jul-21 - 31-Jul-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 16.75 | 1.68 |

**PP22:  01-Aug-21 - 14-Aug-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 26.00 | 2.89 |

**PP23:  15-Aug-21 - 28-Aug-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 21.25 | 2.13 |

**PP24:  29-Aug-21 - 11-Sep-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 22.75 | 2.53 |

**PP25:  12-Sep-21 - 25-Sep-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 24.00 | 2.40 |

**PP1:  26-Sep-21 - 09-Oct-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 4.00 | 13.50 | 3.38 |

| Total Includable Days | Total LEAP Hours | Annual Avg |
|---|---|---|
| 201 | 411.25 | 2.05 |

Case 3:25-cv-00535-S    Document 23-10 Filed 11/05/29/24  Page 228 of 248    PageID 609

# Project Management Actuals

October 7, 2021

## LEAP Statistics FY2021

**Fiscal Year** 2021  Apply

### PP27:  27-Sep-20 - 10-Oct-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 6.00 | 4.00 | 0.67 |

### PP1:  11-Oct-20 - 24-Oct-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 19.00 | 2.71 |

### PP2:  25-Oct-20 - 07-Nov-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 4.00 | 10.75 | 2.69 |

### PP3:  08-Nov-20 - 21-Nov-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 14.50 | 2.07 |

### PP4:  22-Nov-20 - 05-Dec-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 15.75 | 1.97 |

### PP5:  06-Dec-20 - 19-Dec-20

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 18.75 | 2.08 |

### PP6:  20-Dec-20 - 02-Jan-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 0 | 0 | 0 |

### PP7:  03-Jan-21 - 16-Jan-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 15.50 | 1.94 |

### PP8:  17-Jan-21 - 30-Jan-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 16.25 | 2.03 |

### PP9:  31-Jan-21 - 13-Feb-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 7.00 | 11.00 | 1.57 |

### PP10:  14-Feb-21 - 27-Feb-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 3.00 | 1.75 | 0.58 |

### PP11:  28-Feb-21 - 13-Mar-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 13.00 | 1.30 |

### PP12:  14-Mar-21 - 27-Mar-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 8.00 | 6.75 | 0.84 |

### PP13:  28-Mar-21 - 10-Apr-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 24.25 | 2.69 |

### PP14:  11-Apr-21 - 24-Apr-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 9.00 | 24.75 | 2.75 |

### PP15:  25-Apr-21 - 08-May-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 10.00 | 19.00 | 1.90 |

### PP16:  09-May-21 - 22-May-21

| Includable Days | LEAP Hours | Avg |
|---|---|---|

| 6.00 | 14.50 | 2.42 |

### PP17: 23-May-21 - 05-Jun-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 8.00 | 17.00 | 2.13 |

### PP18: 06-Jun-21 - 19-Jun-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 9.00 | 19.00 | 2.11 |

### PP19: 20-Jun-21 - 03-Jul-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 4.00 | 8.00 | 2.00 |

### PP20: 04-Jul-21 - 17-Jul-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 9.00 | 13.50 | 1.50 |

### PP21: 18-Jul-21 - 31-Jul-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 10.00 | 16.75 | 1.68 |

### PP22: 01-Aug-21 - 14-Aug-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 10.00 | 26.00 | 2.60 |

### PP23: 15-Aug-21 - 28-Aug-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 10.00 | 21.25 | 2.13 |

### PP24: 29-Aug-21 - 11-Sep-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |
| 9.00 | 22.75 | 2.53 |

### PP25: 12-Sep-21 - 25-Sep-21

| Includable Days | LEAP Hours | Avg |
| --- | --- | --- |

01254

**PP1: 26-Sep-21 - 09-Oct-21**

| Includable Days | LEAP Hours | Avg |
|---|---|---|
| 4.00 | 0 | 0 |

| Total Includable Days | Total LEAP Hours | Annual Avg |
|---|---|---|
| 202 | 397.75 | 1.97 |

October 13, 2021

**ALISA WALTON - Period 1 (09/26/2021 - 10/09/2021) - Not Submitted**

| | | Sun 09/26 | Mon 09/27 | Tue 09/28 | Wed 09/29 | Thu 09/30 | Fri 10/01 | Sat 10/02 | Sun 10/03 | Mon 10/04 | Tue 10/05 | Wed 10/06 | Thu 10/07 | Fri 10/08 | Sat 10/09 | Charge Total | Thru PP End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mission Support - Cases** | | | | | | | | | | | | | | | | | |
| COMP-2015-51 – COMP-2015-51 [redacted] POSSIBLE POSSESSION OF IMPROPER MATERIAL ON EPA ISSUED COMPUTER | TW-Unsched | | | 2.50 | | | 1.00 | | | | | | | | | 3.50 | 3.50 |
| OI-DA-2014-CAC-0018 – OI-DA-2014-CAC-0018 | TW-Unsched | | | | 1.00 | | 1.75 | | | | | | | | | 2.75 | 2.75 |
| OI-DA-2018-AFD-0091 – OI-DA-2018-AFD-0091 | TW-Unsched | | | | | 2.00 | 1.50 | 1.00 | | | | | | | | 4.50 | 4.50 |
| OI-DA-2019-ADM-0004 – OI-DA-2019-ADM-0004 [EPA REGION 6] | TW-Unsched | | | | 0.50 | | | | | | | | | | | 0.50 | 0.50 |
| OI-DA-2019-AFD-0087 – OI-DA-2019-AFD-0087 | TW-Unsched | | | | | | 1.75 | | | 2.00 | 1.50 | 4.50 | 2.75 | | 2.50 | 15.00 | 15.00 |
| OI-DA-2020-PFD-0100 – OI-DA-2020-PFD-0100 | TW-Unsched | | | 3.00 | 2.75 | | | | | | | | | | | 5.75 | 5.75 |
| OI-DA-2021-ADM-0025 – OI-DA-2021-ADM-0025 [EPA REGION 6] | TW-Unsched | | | 1.00 | 1.75 | | 0.50 | | | | | | | 3.75 | | 7.00 | 7.00 |
| **Mission Support - Cases Sub-total** | | | | 6.50 | 6.75 | 5.00 | 3.00 | 5.75 | | | 4.50 | 2.75 | | 9.25 | | 39.00 | |
| **Mission Support - General Assignments** | | | | | | | | | | | | | | | | | |
| OI-FY21-G-0003 – FY 2021 Collateral Duties | Reg | | | | | 2.00 | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0003 – FY 2021 Collateral Duties | TW-Unsched | | | | | | | | | | | | | | | 0.00 | 0.00 |
| OI-FY21-G-0007 – FY 2021 Health Improvement Program | TW-Unsched | | | 1.00 | | 1.00 | 1.00 | | | | | | | | | 3.00 | 3.00 |
| OI-FY21-G-0012 – FY 2021 Training | TW-Unsched | | | | | 2.00 | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0016 – FY 2021 General Employee Administration | Reg | | | | 1.00 | | | | | | | | | | | 1.00 | 1.00 |
| OI-FY21-G-0019 – FY 2021 General Employee Administration | TW-Unsched | | 0.50 | 1.25 | 1.00 | 1.50 | | | | | | | | | | 4.25 | 4.25 |
| OI-FY22-G-0003 – FY 2022 Collateral Duties | TW-Unsched | | | | | | 0.75 | | | | | | | | | 0.75 | 0.75 |
| OI-FY22-G-0007 – FY 2022 Health Improvement Program | TW-Unsched | | | | | | | | | 1.00 | 1.00 | | 1.00 | | | 3.00 | 3.00 |
| OI-FY22-G-0016 – FY 2022 General Employee Administration | TW-Unsched | | | | | | 0.75 | | | | 2.00 | 0.25 | | | | 3.00 | 3.00 |
| **Mission Support - General Assignments Sub-total** | | | 1.50 | 1.25 | 5.00 | 4.50 | 9.75 | | | 1.75 | 1.00 | 3.00 | 0.25 | | | 19.00 | |
| **Indirect Charges** | | | | | | | | | | | | | | | | | |
| Administrative Leave | | | | | | | | | | | | | 1.50 | | | 1.50 | 1.50 |
| Sick Leave | | | | | | | 1.50 | | | | 2.00 | 8.00 | | 1.50 | | 11.50 | 11.50 |
| **Indirect Charges Sub-total** | | | | | | | 1.50 | | | | 2.00 | 8.00 | | 1.50 | | 13.00 | |
| **Grand Total** | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 6.25 | 5.75 | 8.00 | 3.00 | 8.00 | | 71.00 | |

| | | Sun 09/26 | Mon 09/27 | Tue 09/28 | Wed 09/29 | Thu 09/30 | Fri 10/01 | Sat 10/02 | Sun 10/03 | Mon 10/04 | Tue 10/05 | Wed 10/06 | Thu 10/07 | Fri 10/08 | Sat 10/09 | Charge Total | Thru PP End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Overtime Charges** | | | | | | | | | | | | | | | | | |
| OI-DA-2019-AFD-0087 – OI-DA-2019-AFD-0087 [redacted] TAL | LEAP | | | | 3.25 | 1.50 | | | | | | | | | | 4.75 | 4.75 |
| OI-DA-2021-ADM-0025 – OI-DA-2021-ADM-0025 [EPA REGION 6] | LEAP | 3.75 | | | 1.75 | | | | | | | | | | | 5.50 | 5.50 |
| **Overtime Charges Sub-total** | | 3.75 | | 3.25 | 3.25 | | | | | | | | | | | 10.25 | |
| **Excludable Charges** | | | | | | | | | | | | | | | | | |

ALISA WALTON · Period 1  (09/26/2021 - 10/09/2021) · Not Submitted

| | | Sun 09/26 | Mon 09/27 | Tue 09/28 | Wed 09/29 | Thu 09/30 | Fri 10/01 | Sat 10/02 | Sun 10/03 | Mon 10/04 | Tue 10/05 | Wed 10/06 | Thu 10/07 | Fri 10/08 | Sat 10/09 | Charge Total | Thru PP End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mission Support - Cases** | | | | | | | | | | | | | | | | | |
| COMP-2015-51 – COMP-2015-51 POSSIBLE POSSESSION OF IMPROPER MATERIAL ON EPA ISSUED COMPUTER | TW-Unsched | | 2.50 | | | | 1.00 | | | | | | | | | 3.50 | 3.50 |
| OI-DA-2014-CAC-0016 – OI-DA-2014-CAC-0016 | TW-Unsched | | | | 1.00 | | 1.75 | | | | | | | | | 2.75 | 2.75 |
| OI-DA-2018-AFD-0091 – OI-DA-2018-AFD-0091 | TW-Unsched | | | | 2.00 | 1.50 | 1.00 | | | | | | | | | 4.50 | 4.50 |
| OI-DA-2019-ADM-0094 – OI-DA-2019-ADM-0094 - EPA REGION 6 | TW-Unsched | | | | | | | | | | | | | | | 0.00 | 0.00 |
| OI-DA-2019-AFD-0087 – OI-DA-2019-AFD-0087 ET AL | TW-Unsched | | | 1.75 | | 2.00 | 1.50 | | | 4.50 | | | | | | 9.75 | 9.75 |
| OI-DA-2020-PFD-0100 – OI-DA-2020-PFD-0100 ET AL | TW-Unsched | | 3.00 | 2.75 | | | | | | | | | | | | 5.75 | 5.75 |
| OI-DA-2021-ADM-0025 – OI-DA-2021-ADM-0025 EPA REGION 3 | TW-Unsched | | | | | | 0.50 | | | | | | | | | 0.50 | 0.50 |
| | **Mission Support - Cases Sub-total** | | 5.50 | 4.50 | 3.00 | 3.50 | 5.75 | | | 4.50 | | | | | | 26.75 | |
| **Mission Support - General Assignments** | | | | | | | | | | | | | | | | | |
| OI-FY21-G-0003 – FY 2021 Collateral Duties | Reg | | | | 2.00 | | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0003 – FY 2021 Collateral Duties | TW-Unsched | | | | | | 0.75 | | | | | | | | | 0.75 | 0.75 |
| OI-FY21-G-0007 – FY 2021 Health Improvement Program | TW-Unsched | | 1.00 | | 1.00 | 1.00 | | | | 1.00 | | | | | | 4.00 | 4.00 |
| OI-FY21-G-0012 – FY 2021 Training | TW-Unsched | | | | | 2.00 | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0016 – FY 2021 General Employee Administration | TW-Unsched | | | 0.75 | 1.00 | 1.50 | | | | 0.75 | | | | | | 4.00 | 4.00 |
| OI-FY21-G-0016 – FY 2021 General Employee Administration | Reg | | | | | 1.00 | | | | | | | | | | 1.00 | 1.00 |
| | **Mission Support - General Assignments Sub-total** | | 1.00 | 0.75 | 5.00 | 4.50 | 0.75 | | | 1.75 | | | | | | 13.75 | |
| **Indirect Charges** | | | | | | | | | | | | | | | | | |
| Sick Leave | | | | | | | 1.50 | | | | | | | | | 1.50 | 1.50 |
| | **Indirect Charges Sub-total** | | | | | | 1.50 | | | | | | | | | 1.50 | |
| | **Grand Total** | | 6.50 | 5.25 | 8.00 | 8.00 | 8.00 | | | 6.25 | | | | | | 42.00 | |

| | | Sun 09/26 | Mon 09/27 | Tue 09/28 | Wed 09/29 | Thu 09/30 | Fri 10/01 | Sat 10/02 | Sun 10/03 | Mon 10/04 | Tue 10/05 | Wed 10/06 | Thu 10/07 | Fri 10/08 | Sat 10/09 | Charge Total | Thru PP End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Overtime Charges** | | | | | | | | | | | | | | | | | |
| | **Overtime Charges Sub-total** | | | | | | | | | | | | | | | | | |
| **Excludable Charges** | | | | | | | | | | | | | | | | | |
| EOTH – Other | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| ETNG – Training | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| ETVL – Travel | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| | **Excludable Charges Sub-total** | | | | | | | | | | | | | | | | | |

Case 3:25-cv-00535-S   Document 23-10   Filed 11/05/24   Page 235 of 248   PageID 755

ALISA WALTON · Period 1 (09/26/2021 - 10/09/2021) · Approved on 10/14/2021

| Mission Support - Cases | | 09/26 | 09/27 | 09/28 | 09/29 | 09/30 | 10/01 | 10/02 | 10/03 | 10/04 | 10/05 | 10/06 | 10/07 | 10/08 | 10/09 | Charge Total | Thru PP End |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMP-2015-51 — COMP-2015-51 ████ POSSIBLE POSSESSION OF IMPROPER MATERIAL ON EPA ISSUED COMPUTER | TW-Unsched | | | 2.50 | | | 1.00 | | | | | | | | | 3.50 | 3.50 |
| OI-DA-2014-CAC-0016 — OI-DA-2014-CAC-0016 ████ | TW-Unsched | | | | | 0.50 | 1.75 | | | | 2.25 | | 1.50 | | | 6.00 | 6.00 |
| OI-DA-2018-AFD-0091 — OI-DA-2018-AFD-0091 ████ | TW-Unsched | | | | | 2.00 | 1.50 | 1.00 | | | | | | | | 4.50 | 4.50 |
| OI-DA-2019-ADM-0094 — OI-DA-2019-ADM-0094 ████ EPA REGION 6 | TW-Unsched | | | | 0.50 | | | | | | | | | | | 0.50 | 0.50 |
| OI-DA-2019-AFD-0087 — OI-DA-2019-AFD-0087 ████ ET AL | TW-Unsched | | | 1.75 | | 2.00 | 1.50 | | | 4.50 | 2.75 | | 1.00 | 2.50 | | 16.00 | 16.00 |
| OI-DA-2020-PFD-0100 — OI-DA-2020-PFD-0100 ████ | TW-Unsched | | | 3.00 | 2.75 | | | | | | | 0.50 | | | | 6.25 | 6.25 |
| OI-DA-2021-ADM-0025 — OI-DA-2021-ADM-0025 ████ EPA REGION 6 | TW-Unsched | | | 1.00 | 1.75 | | 0.50 | | | 1.75 | | | 2.00 | 3.75 | | 10.75 | 10.75 |
| | Mission Support - Cases Sub-total | | | 6.50 | 6.75 | 2.50 | 3.50 | 5.75 | | | 6.25 | 5.00 | | 5.00 | 6.25 | | 47.50 |

| Mission Support - General Assignments | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OI-FY21-G-0003 — FY 2021 Collateral Duties | Reg | | | | | 2.00 | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0007 — FY 2021 Health Improvement Program | TW-Unsched | | | 1.00 | | 1.00 | 1.00 | | | | | | | | | 3.00 | 3.00 |
| OI-FY21-G-0012 — FY 2021 Training | TW-Unsched | | | | | 2.00 | | | | | | | | | | 2.00 | 2.00 |
| OI-FY21-G-0016 — FY 2021 General Employee Administration | Reg | | | | | 1.50 | | | | | | | | | | 1.50 | 1.50 |
| OI-FY21-G-0016 — FY 2021 General Employee Administration | TW-Unsched | | | 0.50 | 1.25 | 1.00 | 1.50 | | | | | | | | | 4.25 | 4.25 |
| OI-FY22-G-0003 — FY 2022 Collateral Duties | TW-Unsched | | | | | | 0.75 | | | | | | | | | 0.75 | 0.75 |
| OI-FY22-G-0007 — FY 2022 Health Improvement Program | TW-Unsched | | | | | | | | | 1.00 | 1.00 | | 1.00 | | | 3.00 | 3.00 |
| OI-FY22-G-0016 — FY 2022 General Employee Administration | TW-Unsched | | | | | | 0.75 | | | | | | 2.00 | 0.25 | | 3.00 | 3.00 |
| | Mission Support - General Assignments Sub-total | | | 1.50 | 1.25 | 5.50 | 4.50 | 0.75 | | | 1.75 | 1.00 | | 3.00 | 0.25 | | 19.50 |

| Indirect Charges | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Leave | | | | | | | | | | | | | | 1.50 | | | 1.50 | 1.50 |
| Sick Leave | | | | | | | | 1.50 | | | 2.00 | 8.00 | | | | | 11.50 | 11.50 |
| | Indirect Charges Sub-total | | | | | | | 1.50 | | | 2.00 | 8.00 | | 1.50 | | | 13.00 |
| | Grand Total | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | | 80.00 | |

| | | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overtime Charges | | 09/26 | 09/27 | 09/28 | 09/29 | 09/30 | 10/01 | 10/02 | 10/03 | 10/04 | 10/05 | 10/06 | 10/07 | 10/08 | 10/09 | Charge Total | Thru PP End |
| OI-DA-2014-CAC-0016 — OI-DA-2014-CAC-0016 ████ | LEAP | | | | | 0.50 | | | | | 0.75 | | | | | 1.25 | 1.25 |
| OI-DA-2019-AFD-0087 — OI-DA-2019-AFD-0087 ████ ET AL | LEAP | | | 3.25 | 1.50 | 1.25 | | | | 1.75 | | | | | | 7.75 | 7.75 |
| OI-DA-2021-ADM-0025 — OI-DA-2021-ADM-0025 ████ EPA REGION 6 | LEAP | | 3.75 | | 1.75 | | 1.50 | | | | | | | | | 7.00 | 7.00 |
| 7530 — OI-FY22-G-0016 FY 2022 General Employee Administration | LEAP | | | | | | | | | | | 1.00 | | | | 1.00 | 1.00 |
| | Overtime Charges Sub-total | | 3.75 | 3.25 | 3.25 | 1.75 | 1.50 | | | 1.75 | 0.75 | | 1.00 | | | 17.00 | |

| Excludable Charges | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EOTH – Other | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| ETNG – Training | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| ETVL – Travel | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| | Excludable Charges Sub-total | | | | | | | | | | | | | | | 0.00 | |

Overtime Charge Summary

| Regular Work Days This Period | Total LEAP Hours This Period | Average LEAP Hours Per Day |
|---|---|---|
| 9.00 | 17.00 | 1.90 |

View Annual LEAP Statistics

Exhibit 34

| From: | Westfall, Garrett |
|---|---|
| To: | Perez, Marc |
| Cc: | "Sean Earle" |
| Subject: | Memo from EC on Missing Evidence - computer |
| Date: | Wednesday, November 10, 2021 10:16:00 AM |
| Attachments: | Memo to SAC File Dallas - Evidence █ -OI-DA-2014-CAC-0016 - 10.29.2021 GJWaw.pdf |

Good morning Marc,

FYSA. As discussed, attached is the memo I had Evidence Custodian, Alisa Walton, prepare in regards to the missing laptop computer first discovered during evidence disposition on the case in June of this year. After conclusion of the Annual Inventories in September 2021, the computer was not found. The resolution on restitution to the owner (former lab fraud owner/subject) is still outstanding, as I am waiting a response from OSD (Justin) on the path forward. As far as corrective actions, I removed Alisa as a evidence custodian at the fiscal year end. Paul is now primary and Brett is secondary evidence custodians. In addition, this issue, as well as 7 other evidentiary issues, will also be addressed as conduct issues with Alisa (in coordination with HRD and OC), after the conclusion of the PIP (hopefully instituted this week). On my to-do list as well is the development of an annual training for evidence custodians, with verification of participation and review of the Policy 211.

Let me know if you have any questions or need any additional information on this matter.

Garrett J. Westfall
Special Agent in Charge
Western Region Field Office
U.S. Environmental Protection Agency
Office of Inspector General
Office of Investigations
1201 Elm Street, Suite 500
Dallas, TX 75270
(214) 665-6545 (fax)
(214) 665-2249 (office)
(214) 846-9402 (cell)

# Exhibit 36

| | |
|---|---|
| **From:** | Westfall, Garrett |
| **To:** | "Earle, Sean" |
| **Cc:** | Perez, Marc |
| **Subject:** | Referral for Possible Investigation - Conduct Issue |
| **Date:** | Saturday, January 8, 2022 2:30:00 PM |
| **Attachments:** | 1.8.22 Conduct Referral-Walton_.docx |
| | 1.8.22 Conduct Referral Attachment 1_Redacted.pdf |
| | 1.8.22 Conduct Referral Attachment 2_Redacted.pdf |
| | 1.8.22 Conduct Referral Attachment 3_Redacted.pdf |
| | 1.8.22 Conduct Referral Attachment 4.pdf |
| | 1.8.22 Conduct Referral Attachment 5.pdf |

Sean,

Please find the allegation regarding I2M data manipulation by SA Walton and related attachments
for your review and consideration for further inquiry.  The Attachments have been redacted to
exclude the personnel matter.  Please let me know if you have any additional questions.

Thanks.

Garrett J. Westfall

Special Agent in Charge

Western Region Field Office

U.S. Environmental Protection Agency

Office of Inspector General

Office of Investigations

1201 Elm Street, Suite 500

Dallas, TX 75270

(214) 665-6545 (fax)

(214) 665-2249 (office)

(214) 846-9402 (cell)

Exhibit 39

| From: | Westfall, Garrett |
|---|---|
| To: | Perez, Marc |
| Cc: | "Sean Earle" |
| Subject: | Conduct issue |
| Date: | Friday, January 28, 2022 4:59:00 PM |
| Attachments: | DS Woods MOA Summary 1.28.2022 GJW.docx |
| | W10192020 Review of ▮▮▮▮▮▮ web site MOA ▮▮▮▮▮▮▮▮ (002).docx |
| | 10192020 Review of ▮▮▮▮▮▮ web site by Bruce Woods (2).docx |
| | FW ▮▮▮▮▮▮ report.msg |

Good afternoon Marc,

Please find the conduct issue raised to my attention today by ASAC Gurin regarding SA Alisa Walton. Specifically, SA Walton modified a MOA from a SME – Dr. Bruce Woods. While SA Walton did not change or modify any content, she added highlights (green, blue, pink, and red) to the MOA that then created confusion. More importantly, Dr. Woods did not make the highlights (only yellow highlights). While even though the addition is highlighted content, I believe it is problematic for an agent to modify, in any way, a deliverable/report from a SME. Please see the summary from ASAC Gurin. The first MOA (W10192020...) is the original MOA prepared and provided to SA Walton in October 2020. The second MOA (10192020...) is the MOA uploaded by SA Walton on 1/27/22. On a side note, the MOA was not finalized and uploaded until 2022 (see email chain). I am forwarding this issue to you for your awareness.

Please let me know if you have any questions or need any additional information. Thank you

Garrett J. Westfall
Special Agent in Charge
Western Region Field Office
U.S. Environmental Protection Agency
Office of Inspector General
Office of Investigations
1201 Elm Street, Suite 500
Dallas, TX 75270
(214) 665-6545 (fax)
(214) 665-2249 (office)
(214) 846-9402 (cell)

**EEO Investigative Affidavit *(Witness)***

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | **1** | **7** | **2022-0009-R06** |

| 1. Affiant's Name (Last, First, MI) **Roelke, Thomas** | | 2. Employing Federal Agency and Office **EPA OIG** | |
|---|---|---|---|
| 3. Position Title **Deputy Assistant Inspector General for Investigations** | 4. Grade and Series GS-1811/15 | 5.Address and Zip +4 1200 Pennsylvania Ave., NW Washington, DC 20460 | 6. Organizational Unit **HQ Operations Directorate, Office of Investigations** |

### Privacy Act Notice and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

### Response to Complaint

Regulations require all employees to cooperate in any EEO investigation

7. Statement (*Continue on Form 2569 if additional space is required. Form will auto-create if using Microsoft Word*)

**Please complete the top section of this form, boxes #2 thru #6.**

1. Please state your name, position title, grade level, work location, work address (include zip+4), work telephone number, and work e-mail address.

   Name: Thomas Roelke
   Position title and grade level: Deputy Assistant Inspector General for Investigations
   Department/division/work group: Office of Inspector General, Office of Investigations, Headquarters Operations Directorate
   Work address: 1200 Pennsylvania Ave. NW, Washington, DC 20460
   Work telephone number: (202) 566-0549
   Work e-mail address: roelke.thomas@epa.gov

2. State the period of time you have held your current position.
   **Answer: I believe I started as the Acting Deputy Assistant Inspector General for Investigations in early 2021 and was subsequently selected to become one of the Deputy Assistant Inspector Generals due to the retirement of one of the OI DAIGIs. I cannot recall any exact dates.**

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE Date: 2022.07.28 13:43:41 -04'00' | Date Signed |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 2 | 7 | 2022-0009-R06 |

3. Identify your first and second line supervisors.
   **Answer: Jason Abend, Assistant Inspector General for Investigations**
   **Nicole Murley, Acting Deputy Inspector General**

4. Describe your past or current working/reporting relationship with Complainant, Alisa Walton (i.e., co-worker, supervisor, etc.).  State the period of time of the working/reporting relationship with Complainant.
   **Answer: Alisa Walton is assigned to the Dallas OI office and I do not recall any times that I may have worked directly with her.**

<u>**RACE AND SEX ALLEGATION:**</u>

5. Please identify your **race.**
   **Answer: White**

6. Were you aware of Complainant's **race** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **race**?
   **Answer: Not that I recall. I am sure that she may have been involved in previous video conferences during those time frames where I was also an attendee. I can recall Alisa's rebuttal with her attorney and our Human Resources Directorate when I was assigned as the deciding official for Alisa's proposed removal.**

7. Please identify your **sex.**
   **Answer: Male**

8. Were you aware of Complainant's **sex** during the time period (2019, 2020 and 2021) of this complaint?  How and when were you made aware of her **sex**?
   **Answer: Yes, based on my assumption due to her name, Alisa Walton and more than likely between 2019 – 2021, Alisa may have been referred to as a female. I cannot provide any specific information or time.**

**RETALIATION ALLEGATION:**

9. Were you aware of the Complainant being involved in EEO activity prior to this complaint? (EEO activity includes filing a charge, testifying, assisting another, or participating in a discrimination proceeding; or otherwise opposing discrimination.) If so, when did you become aware of the Complainant's EEO activity?
   **Answer: No**

10. If you were named by the Complainant as a Responsible Management Official or witness, in a prior EEO Complaint that he/she filed or was involved in, please identify the case number(s) and identify the issue(s) involved in the complaint.

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE Date: 2022.07.28 13:45:13 -04'00' | Date Signed |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 3 | 7 | 2022-0009-R06 |

**Answer: N/A**

11. If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?
**Answer: N/A**

12. If not involved, how did you become aware of the EEO activity?
**Answer: Alisa's rebuttal/reply to her proposed removal provided by her attorney, Mollie Buie.**

13. If you were involved in the prior EEO activity, what was your personal involvement in that case(s)?
**Answer: N/A**

**CLAIM 5: ON MARCH 1, 2022, COMPLAINANT WAS ISSUED A NOTICE OF PROPOSED REMOVAL FOR SUPPOSEDLY FAILING TO SUCCESSFULLY COMPLETE THE PIP COMPLAINANT WAS PLACED ON NOVEMBER 10, 2021. COMPLAINANT WAS NOTIFIED ON APRIL 22, 2022, THAT A DECISION WAS MADE TO NOT SUBSTANTIATE THE REMOVAL.**

14. The Complainant alleged in her complaint that she received a Notice of Proposed Removal on or about March 1, 2022, for failing to successfully complete the PIP Complainant was placed on November 10, 2021, and notified on April 22, 2022, that a decision was made to not substantiate the Removal. Is this true? Please respond to Complainant's allegation.
**Answer: Yes**

15. The Complainant alleged you made the decision to not substantiate the Removal. If you did not make the decision, what was your involvement, if any, in this action?
**Answer: Correct**

16. If you had no involvement in Complainant being issued the Notice of Proposed Removal, please provide the management official who did. Identify by name, position title, facility address, telephone number and email address.
**Answer: Garrett Westfall, Special Agent in Charge, Western Region Field Office, Office of Inspector General, Office of Investigations, 1201 Elm Street, Suite 500, Dallas, TX 75270.**

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE Date: 2022.07.28 13:46:35 -04'00' | Date Signed |
|---|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 4 | 7 | 2022-0009-R06 |

17. Who concurred with the action to issue the Complainant a Notice of Proposed Removal? Identify by name, position title work location and phone number.
   **Answer: I do not know, I was not involved in that process.**

18. Did Complainant provide you with an oral and/or written response to the Notice of Proposal Removal? If so, what was her oral presentation and if there was a written presentation, please provide a copy.
   **Answer: Yes, both.**

19. How was the Complainant notified (verbally or in writing) of being issued a Decision for the Notice of Proposed Removal? If verbally, who notified her and when? **If in writing, provide a copy of the written notification**.
   **Answer: Email.**

20. As the deciding official to Complainant's Notice of Proposed Removal, what was your decision? Please be specific.
   **Answer: I was informed by Human Resources that I could support the proposed removal, I could recommend reassignment or take no action. I wanted to reassign Alisa to a new supervisor; however, she was under new immediate supervision, so the recommendation was to take no action by not sustaining the proposal to remove her.**

21. Complainant alleges you made the decision to not sustain the proposal to remove her from her position. Is this accurate?
   **Answer: Yes.**

22. Please explain, if not already done so, why Complainant was issued a Decision to not sustain the Notice of Proposed Removal?
   **Answer: Please see below.**

**Upon review of the Performance Improvement Plan assessed results regarding SA Alisa Walton by SAC Garrett Westfall, I do not support SAC Westfall's proposed removal for unacceptable performance. I recommend no action as SA Walton has a new immediate supervisor.**

**I disagree with the created tasks and deadlines established for the PIP as I do not believe the tasks provided an opportunity for the employee to be successful.**
- **Tasks had to be reevaluated and subsequently the number of tasks had to be reduced.**
- **Established completion dates for the records review task was unrealistic and created without evaluating the quantity or quality of information associated with the task.**
- **Deadlines were consistently adjusted or extended for assignment during the evaluation period.**
- **Unintentionally, tasks may have been created and deadlines established based on what the supervisor believed that it would take someone with the same level of experience and training that the supervisor had to accomplish the task and not a GS-1811-13 employee.**

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE | Date Signed |
|---|---|---|---|
| | *[signature]* | Date: 2022.07.28 13:47:40 -04'00' | |

October 2015

**EEO Investigative Affidavit (Continuation Sheet)**

| Page No. | No. Pages | Case No. |
|---|---|---|
| 5 | 7 | 2022-0009-R06 |

I disagree that the employee was provided the environment to demonstrate acceptable performance through closer than normal supervision.

- The supervisor conducting the evaluation had been promoted and was no longer the employee's immediate supervisor.
- The employee's daily interaction while working with the tasks identified on the PIP were conducted with a new immediate supervisor that was less experienced. While the evaluating supervisor met with the employee as identified, any questions, discussions, or concerns would have occurred daily between the employee and their new immediate and less experienced supervisor.
- I believe that this environment would be disadvantageous to the employee and could promote unclear expectations or conflicting guidance as stated during the employee's rebuttal.
- Other mitigating circumstances include a reported death in the evaluated employee's family and this occurring during the holiday season.

I disagree with evaluation of the of the work products submitted by the employee undergoing the PIP as I feel the evaluations were overly critical.

- As with the identification of the tasks to be evaluated during the PIP, the supervisor may have unintentionally set their expectations at their level (GS-1811-15) and not at the employee's level who was being evaluated. The supervisor's level of training and experience provides the supervisor with a better level of understanding when evaluating information and determining the information's relevancy which the employee may not possess. This creates a level of assumption by the supervisor the evaluated employee would know what the supervisor would identify as relevant and why that information would be relevant.
- Supervisors are required to review and confirm work products submitted by agents that contain dates, monetary amounts, cited sources, and other statements which may take a significant amount of time. As stated by the supervisor, the "Reliance on your work products has real world effects to include taking away someone's civil liberties and livelihood." However, the supervisor also states that extensive reviews should not have to be conducted by management on work products by a GS-1811-13. The supervisor is still responsible for the accuracy of the information and its review but implies the level of information verification as conducted during this evaluation may not be applied equally amongst other GS-1811-13s.
- The employee's work product was expected to be at a higher grade than their current GS-1811-13 grade as indicated by the evaluating supervisor. The supervisor indicated they should be able to provide the employee's work product to internal and external stakeholders; however, as a GS-1811-13 they are not expected to produce reports which do not require management oversight, review, or corrections.

23. What reason(s) was provided to the Complainant for issuing her a Decision to not sustain the Notice of Proposed Removal?
    **Answer: That after carefully reviewing the totality of materials and information that I have been provided, I am not sustaining the proposal to remove you from your position.**

24. Was Complainant's **race** a factor in your decision?
    **Answer: No**

If so, explain in detail how the Complainant's **race** was a factor and why.
**Answer: N/A**

25. Was Complainant's **sex** a factor in your decision?
    **Answer: No**

---

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Digitally signed by THOMAS ROELKE Date: 2022.07.28 13:49:01 -04'00' | Date Signed |
|---|---|---|

October 2015

**EEO Investigative Affidavit (Continuation Sheet***)*

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 6 | 7 | 2022-0009-R06 |

If so, explain in detail how the Complainant's **sex** was a factor and why.
**Answer: N/A**

26.  Was Complainant's _ prior EEO activity _ a factor in your decision?
  **Answer: No**

If so, explain in detail how the Complainant's **prior EEO activity** was a factor and why.
**Answer: N/A**

27.  Cite the Agency policies and/or contract provisions that were relied upon in your decisions and/or actions when issuing the Complainant, a Notice of Proposed Removal.  Explain in detail how each policy and/or contract provision applies.
  **Answer: I relied on counsel with HRD that I had three options based on the information provided by the supervisor for the PIP. I could sustain their recommendation of removal, recommend reassignment or not sustain the supervisor's recommendation.**

28.  **Other than this EEO complaint** are you aware if the Complainant filed any other kind of administrative action/appeal, grievance and/or met with higher level management when Complainant was issued a Notice of Proposed Removal? If so, to whom (name and title) did she complain, when (what date), what was the resolution/response? And what is the status of the appeal? **Provide a copy of the written contentions, if applicable.**
  **Answer: In the final reply provided by Alisa Walton's attorney, Molly Buie, there are references regarding Alisa Walton seeking EEO counseling in Nov 2021 and filing a formal complaint in Feb 2022.**

## HARASSMENT/HOSTILE WORK ENVIRONMENT:

29.  Did Complainant tell you that your actions constituted harassment and/or a hostile work environment for her?  If so, describe in detail when and what specifically the Complainant told you and what was your response/action?
  **Answer: No.**

30.  Are you aware of Complainant (or anyone acting on behalf of Complainant) bringing to the attention of any other management official concerns about her allegation of harassment/hostile work environment?  If so, to whom did he/she inform of her concerns and when, to the best of your knowledge.
  **Answer: No.**

31.  Was an investigation conducted into Complainant's allegations of harassment/hostile work environment?  If so, by whom and when?

___

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE | Date Signed |
|---|---|---|---|
| | | Date: 2022.07.28 13:50:53 -04'00' | |
| October 2015 | | | |

**EEO Investigative Affidavit (Continuation Sheet*)***

| Page No. | No. Pages | Case No. |
|---|---|---|
| 7 | 7 | 2022-0009-R06 |

Answer: I do not know.

32.  To your knowledge, what was the outcome of the investigation?  Please provide a copy of the report.
 **Answer: I do not know.**

33.  Was Complainant informed of the outcome?  If yes, how?
    **Answer: I cannot answer.**

34.  Was any corrective or preventative action necessary?  If so, what action was taken?
    **Answer: I cannot answer.**

35.  If no investigation was conducted, please explain why.
    **Answer: I cannot answer.**

36.  Have you received training, since your last affidavit, on anti-harassment/hostile work environment while employed by the agency?  If so, when and what?
    **Answer: N/A**

*37.*  Do you have any additional information or documentation that is relevant to the issue including in this EEO complaint and/or Complainant's claim of discrimination, retaliation, and harassment/hostile work environment?  ***[If you mentioned any documents in answering your affidavit questions please provide.**
    **Answer: I have provided the documents.**

---

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | | Digitally signed by THOMAS ROELKE<br>Date: 2022.07.28 13:52:13 -04'00' | Date Signed |
|---|---|---|---|

October 2015

# Certification

| | Case Number |
| --- | --- |
| | **2022-0009-R06** |

I have read the proceeding attached statement, consisting of __7__ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

"Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

## Privacy Act Statement and Rehabilitation Act Notice

**Privacy Act Statement:** Your information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. Collection is authorized by 39 U.S.C. 401, 409, 410, 1001, 1005, and 1206. Providing the information is voluntary, but if not provided, we may not be able to process your request. We may disclose your information as follows: in relevant legal proceedings; to law enforcement when the Agency or requesting agency becomes aware of a violation of law; to a congressional office at your request; to entities or individuals under contract with the Agency; to entities authorized to perform audits; to labor organizations as required by law; to federal, state, local or foreign government agencies regarding personnel matters; to the Equal Employment Opportunity Commission; and to the Merit Systems Protection Board or Office of Special Counsel.

**Rehabilitation Act Notice:** Under the Rehabilitation Act, medical information is confidential and may only be requested or disclosed in very limited circumstances. Medical documentation about the complainant's and possible comparison employees' medical conditions and work restrictions may be requested in connection with the investigation of an EEO complaint. Information about medical restrictions (but not medical conditions) obtained in the course of an EEO investigation may be disclosed to supervisors and managers who need to know about restrictions on the work or duties of the employee and about necessary accommodations. Supervisors and managers are not permitted to share such information with peers or subordinates or to discuss the information with those who have no need to know and whose requests for the information are not job-related and consistent with business necessity.

## Standards of Conduct

Regulations require all employees to cooperate in any EEO investigation.

Subscribed and (sworn) (affirmed) before me on the __28__ day of July_____, 2022____.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
| --- | --- |
| | *Thomas Roelke* Digitally signed by THOMAS ROELKE Date: 2022.07.28 14:04:44 -04'00' |

## Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant must sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
| --- | --- |
| X *Thomas Roelke* Digitally signed by THOMAS ROELKE Date: 2022.07.28 14:05:11 -04'00' | **July 28, 2022** |

Form 2571 October 2015

